IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| RICKY JACKSON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, Estates of | ) | No. 1:15-CV-989 |
| former Cleveland Police Detectives | ) | |
| EUGENE TERPAY, JAMES T. | ) | |
| FARMER, and JOHN STAIMPEL, | ) | |
| Estate of former Cleveland Police | ) | |
| Sergeant PETER COMODECA, | ) | |
| former Cleveland Police Detective | ) | |
| FRANK STOIKER, former Cleveland | ) | |
| Police Sergeant JAMES WHITE, | ) | |
| former Cleveland Police Detective | ) | |
| ENGELHART, Badge No. 242, former | ) | |
| Cleveland Police Detective MICHAEL | ) | |
| CUMMINGS, and as-yet unidentified | ) | |
| current or former employees of the | ) | |
| City of Cleveland, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## COMPLAINT

Now comes Plaintiff, RICKY JACKSON, by his attorneys, LOEVY & LOEVY,

and complaints of Defendants CITY OF CLEVELAND, Estates of former Cleveland

Police Detectives EUGENE TERPAY, JAMES T. FARMER, and JOHN STAIMPEL,

Estate of former Cleveland Police Sergeant PETER COMODECA, former Cleveland

Police Detective FRANK STOIKER, former Cleveland Police Sergeant JAMES

WHITE, former Cleveland Police Detective ENGELHART, Badge No. 242, and

former Cleveland Police Detective MICHAEL CUMMINGS, and as-yet unidentified

current or former employees of the City of Cleveland Police Department, as follows:

## Introduction

1.      Plaintiff, Ricky Jackson, spent 39 years wrongfully incarcerated in prison for a murder that he did not commit. Arrested at the age of 18, he was wrongfully convicted and sentenced to death for the murder of Harold Franks.

2.      In 1978, Mr. Jackson's death sentence was commuted to life in prison.

3.      Mr. Jackson served over 39 years of his sentence before he was exonerated in November 2014. Upon information and belief, Mr. Jackson was the longest-serving wrongfully convicted person to be exonerated in U.S. history.

4.      Mr. Jackson was exonerated after the one and only supposed eyewitness who testified against him at his criminal trial, Edward ("Eddie") Vernon, finally came forward to tell the truth: that as a 12 year-old boy, Eddie was threatened and coerced by Cleveland police detectives into falsely testifying against Mr. Jackson, and that his statement implicating Mr. Jackson was a complete fabrication created by the detectives.

5.      It was the misconduct by Cleveland police detectives and those working in concert with them that led to Mr. Jackson's wrongful conviction. This misconduct included but was not limited to witness manipulation; fabrication, destruction, and suppression of evidence; and perjury. Mr. Jackson therefore brings this action pursuant to 42 U.S.C. § 1983 and Ohio law seeking redress for the wrongs done to him, as well as to deter future misconduct.

## Jurisdiction and Venue

6.    This Court has jurisdiction over Mr. Jackson's federal claims pursuant to 28 U.S.C. § 1331, and over his state-law claims pursuant to 28 U.S.C. § 1367.

7.    Venue is proper because, upon information and belief, nearly all of the individual defendants reside within this district, and all of the events giving rise to the claims asserted herein occurred within this district.

## Parties

8.    Plaintiff Ricky Jackson is a 58 year-old resident of Cleveland, Ohio. At the time of his arrest in May 1975, he was just 18 years-old and living with his family in Cleveland.

9.    Defendant City of Cleveland (the "City") is an Ohio municipal corporation that operates the Cleveland Police Department (the "Department"). The City is liable for all torts committed by the Defendant Officers while employed by the City pursuant to the doctrine of *respondeat superior*. The City is additionally responsible for the policies and practices of the City and Department.

10.    Defendant Estate of Eugene Terpay (hereafter, "Defendant Terpay") is joined as successor in interest to Eugene Terpay, who at all times relevant to this Complaint was a Cleveland Police Detective.

11.    Defendant Estate of James T. Farmer (hereafter, "Defendant Farmer") is joined as successor in interest to James T. Farmer, who at all times relevant to this Complaint was Cleveland Police Detective.

12.     Defendant Estate of John Staimpel (hereafter, "Defendant Staimpel") is joined as successor in interest to John Staimpel, who at all times relevant to this Complaint was a Cleveland Police Detective.

13.     Defendant Estate of Peter Comodeca (hereafter, "Defendant Comodeca") is joined as successor in interest to Peter Comodeca, who at all times relevant to this Complaint was a Cleveland Police Detective Sergeant.

14.     Defendant Frank Stoiker was at all times relevant to this Complaint a Cleveland Police Detective.

15.     Defendant James White was at all times relevant to this Complaint a Cleveland Police Sergeant.

16.     Defendant Engelhart, Badge No. 242, was at all times relevant to this Complaint a Cleveland Police Detective.

17.     Defendant Michael Cummings was at all times relevant to this Complaint a Cleveland Police Detective.

18.     As-yet unidentified current or former employees of the Cleveland Police Department were at all times relevant to this Complaint law enforcement officers within the Department.

19.     Defendants Terpay, Farmer, Staimpel, Comodeca, Stoiker, White, Engelhart, Cummings, and as-yet unidentified current or former employees of the Cleveland Police Department are referred to as the "Defendant Officers." At least one of the Defendant Officers was, at all times relevant, a final policymaker, or had been delegated such authority, for the Defendant City.

4

20.     At all times relevant, the Defendant Officers acted under color of law and within the scope of their employment for the Defendant City and the Department. They are sued in their individual capacities.

## Background

21.     Ricky Jackson was born in Mississippi and grew up in Ohio. In 1972, Mr. Jackson and his family moved to a house on Arthur Avenue in Cleveland, Ohio.

22.     Mr. Jackson became friends with Ronnie ("Bitsey") and Wiley ("Buddy") Bridgeman, two brothers who lived a few houses down from Mr. Jackson. Mr. Jackson and the Bridgeman brothers were close together in age: in 1975, Ronnie Bridgeman was 17 years old and Wiley Bridgeman was 20 years old.

23.     In May 1975, Mr. Jackson had been recently honorably discharged from the Marines for medical reasons. The week that he was wrongfully arrested, he had been preparing to obtain employment.

## The Murder of Harold Franks

24.     On the afternoon of May 19, 1975, Harold Franks was shot and killed outside of Fairmount Cut-Rate, a drugstore on Fairhill Avenue near where Mr. Jackson and his family lived.

25.     Mr. Franks was a money order salesman. He was killed as he left the Fairmount Cut-Rate after conducting business there. The two assailants had thrown acid in Mr. Franks' face, beat him over the head, stole his briefcase containing cash and blank money orders, and shot him twice in the chest. The

5

shooter also fired a third shot into the store, wounding the storeowner's wife, Anna Robinson.

## The Evidence

26.     Neither Mr. Jackson nor the Bridgeman brothers had anything to do with Mr. Franks' robbery and murder. They are completely innocent.

27.     Within a week of the crime, Mr. Jackson, along with Wiley and Ronnie Bridgeman,[1] were arrested for the robbery and murder of Harold Franks.

28.     There was never any physical evidence tying Mr. Jackson or the Bridgeman brothers to the crime. Although police recovered some physical evidence from the scene, not a single piece of it was linked to Mr. Jackson or the Bridgeman brothers.

29.     None of Mr. Jackson's or the Bridgeman brothers' fingerprints or DNA were ever found at the crime scene, nor was any incriminating evidence of any kind ever discovered in their possession.

30.     In fact, much of the evidence pointed to other persons. Almost immediately after the shooting, an informant told police that he had seen the assailants escape in a two-toned green car. The informant gave a license plate number of CC4902. The Defendant Officers learned that this plate matched a dark green car belonging to Ishmael Hixon, whose arrest record included a robbery and shooting the year before. The year after Mr. Jackson's conviction, Hixon pleaded guilty to over a dozen counts of aggravated robbery in an unrelated case.

---

[1] Ronnie Bridgeman has since changed his name to Kwame Ajamu.

6

31.    The Defendant Officers also received information that another man, Paul Gardenshire, might have been involved in the murder. Shortly after the shooting, Gardenshire's mother contacted the store owner and police to report that her son had a gun and that she believed he was involved in the shooting in some way.

32.    Defendant Officers also received information from a second informant, Ed Garrett, that implicated Gardenshire in the shooting. Garrett told the Defendants that Gardenshire had stolen his grandfather's .38 caliber handgun, which was the same caliber gun used in the crime. He also reported that Gardenshire was driving around in a green convertible, which matched the initial description of the two-toned green car the assailants used to flee the scene. Neither of these details was public knowledge at the time Garrett provided this information to Defendants. Defendant Terpay found Gardenshire's green convertible where Garrett said it would be.

33.    Despite these leads, the Defendant Officers did not conduct any serious investigation into Hixon, Gardenshire, or any other suspects. The Defendant Officers' investigation into these suspects ended around the time that Mr. Jackson and the Bridgeman brothers were supposedly identified by a single 12 year-old supposed eyewitness named Eddie Vernon.

## Fabrication of Eddie Vernon's Testimony

34.     The only evidence ever linking Mr. Jackson to the crime was the testimony of Eddie Vernon, who claimed that he saw Mr. Jackson and the Bridgeman brothers commit the crime.

35.     In actuality, Eddie did not see who committed the crime and had no information or knowledge suggesting that Mr. Jackson or the Bridgeman brothers were involved. At the time of the shooting, Eddie was a seventh grader on a school bus coming home from junior high school with other children. He heard shots while he was on the bus but did not see anything. He was familiar with Ricky and the Bridgeman brothers from the neighborhood, but he did not see them commit any crime.

36.     Thereafter, Eddie was one of a number of children who walked to the scene of the shooting from the bus stop after the shooting had already occurred. After the police began pushing back the crowd of people observing the scene, Eddie and a friend, Tommie Hall, left the scene.

37.     As Eddie and Tommie walked home, Tommie allegedly told Eddie that he knew who committed the crime, and that it was "Ricky," "Buddy," and "Bitsey." Tommie, who was only a year or two older than Eddie at the time, had not seen who committed the crime, either; he and Eddie were on the school bus at the same time when the shooting occurred.

38.     After stopping by his home, Eddie went back to the scene of the crime. There, he purportedly told the police that he knew who may have committed the

crime. Although he had not witnessed the crime, Eddie thought at the time that he was being helpful. However, things quickly spiraled out of control.

39.     Sometime over the course of the next several days, one or more of the Defendant Officers, including Defendants Terpay, Farmer, and Comodeca, questioned Eddie without his mother or other guardian present. Eddie told the Defendants that he did not see any of the assailant's faces. Defendants Terpay and Farmer also showed Eddie photographs of potential suspects, but he did not identify anyone out of those photographs.

40.     One or more of the Defendant Officers, including Defendants Terpay, Farmer, and Comodeca, engaged in unduly leading and coercive questioning and fed Eddie details about the crime, including where Mr. Franks was shot, that acid was thrown in his face and that he was hit over the head. None of this was information that Eddie knew because he did not witness the crime. The Defendant Officers interrogated Eddie without a guardian present.

41.     Defendants Terpay and Farmer took Eddie for a ride around the neighborhood and told him to point out the houses of "Buddy" and "Ricky."

42.     On May 25, 1975, Mr. Jackson and Wiley Bridgeman were arrested. Ronnie Bridgeman was only arrested initially for allegedly interfering with police procedure during the course of Wiley's arrest.

43.     One or more of the Defendant Officers, including Defendants Terpay and Farmer, interrogated Mr. Jackson and the Bridgeman brothers separately regarding the murder of Mr. Franks. During the interrogation, Defendants Terpay

and Farmer repeatedly put a phone book on Mr. Jackson's face and other areas of his body and hit him through it so that it would not leave any marks. Defendant Terpay also called Mr. Jackson the "n-----" word and tried to coerce him into falsely confessing to the crime.

44.     Despite this abuse, Mr. Jackson did not falsely confess to the crime.

45.     At Defendants Terpay and Farmer's direction, Defendants Stoiker and Staimpel picked up Eddie from his home and brought him alone to the police station to view a lineup with Wiley Bridgeman and Mr. Jackson in it. Defendants White and Cummings were also involved in conducting the lineup.

46.     Eddie tried to come clean about not knowing who committed the crime. During the lineup, Eddie did not identify anyone he recognized as being involved in the crime because he did not witness the crime. He told Defendants Stoiker, Staimpel, White, and Cummings that he did not recognize anyone.

47.     After Eddie failed to identify Mr. Jackson and Wiley Bridgeman in the lineup, the Defendant Officers were furious at Eddie.

48.     One or more of the Defendant Officers, including Defendants Stoiker, Staimpel, White, and Cummings took Eddie alone into a separate room. Defendants Stoiker, Staimpel, White, and/or Cummings began yelling at Eddie, calling him names, throwing things around the room, and slamming and beating on the table. The Defendants told Eddie that he was lying and threatened to put his mother and father in jail if he backed out. Eddie was scared, did not understand what was

happening, and began to cry. Eddie's mother was sick at that time, and the prospect of her going to jail was very scary to him as a 12 year-old boy.

49.    With Eddie terrified and in tears, one or more of the Defendant Officers, including Defendants Staimpel and Stoiker, told him not to worry and that they would "fix it." Defendants Staimpel and Stoiker told Eddie to say that he was scared during the lineup and that that was the reason why he did not pick anyone out. Eddie was not, in fact, scared to pick anyone out of the lineup; the reason he did not pick anyone out of the lineup was because he had no actual knowledge that Mr. Jackson or the Bridgeman brothers had committed the crime.

50.    Eddie told the Defendant Officers that he did not see what happened, but they threatened him and told him that if he did not testify against Mr. Jackson, his mother and father would be arrested. Eddie did not believe that he had any choice but to go along with the statement fabricated for him by the Defendant Officers.

51.    After the lineup, one or more of the Defendant Officers, including Defendants Staimpel, Stoiker, and Cummings, engaged in suggestive identification procedures by showing Eddie single photos of Mr. Jackson, Wiley Bridgeman, and Ronnie Bridgeman.

52.    Defendants Staimpel, Stoiker, and Engelhart prepared a written statement for Eddie falsely implicating Mr. Jackson and the Bridgeman brothers in the crime.

11

53.     All of the Defendant Officers knew that what they put in Eddie's statement was not true and that it contained information they fed to him.

54.     After the lineup, Defendants Terpay and Farmer got Eddie out of school. Defendant Terpay knew what had happened during the lineup and Eddie's fabricated statement and told Eddie that he was mad at him for not picking anyone out of the lineup at first.

55.     In addition, the Defendant Officers ignored other evidence that exculpated Mr. Jackson and the Bridgeman brothers. For instance, a girl named Karen Smith viewed the same lineup because she walked past the assailants on her way into the store as Harold Franks was heading out of the store. Smith told the Defendant Officers that she was positive Mr. Jackson and Wiley Bridgeman were not the ones she had seen outside the store, because she knew who they were.

56.     Moreover, both the Jackson house and Bridgeman house were thoroughly searched by the police and nothing connecting Mr. Jackson or the Bridgeman brothers to the crime was found. Defendants Terpay, Farmer, Staimpel, and Stoiker searched the Jackson and Bridgeman's homes even though they had applied for and been denied search warrants by the prosecutor's office.

57.     Eddie testified against Mr. Jackson and Wiley Bridgeman in 1975 and Ronnie Bridgeman in 1977. During this time, one or more of the Defendant Officers, including Defendant Terpay, continued to meet with Eddie to rehearse the false testimony they had made up for him. The more they discussed the crime, the more information the Defendant Officers fed Eddie.

58.     One or more of the Defendant Officers, including Defendant Terpay, also created notes or memoranda of their interviews with Eddie containing exculpatory information, which they destroyed.

59.     One or more of the Defendant Officers, including Defendants Staimpel, Stoiker, Terpay, and Farmer, fabricated police reports indicating that Eddie possessed independent knowledge of facts from the crime that only someone who witnessed the crime would know.

60.     The Defendant Officers never disclosed to the prosecutors, Mr. Jackson, or his counsel, the fact that they fabricated Eddie's inculpatory statement; that Eddie could not identify anyone in the lineup because he had not witnessed the crime; or that they had created false police reports. The Defendant Officers never disclosed to the prosecutors, Mr. Jackson, or his counsel any of their misconduct described herein.

61.     At the time of his trial, Mr. Jackson did not know that the police had threatened Eddie into testifying falsely against him. The first time Mr. Jackson heard about the police threatening Eddie into providing false testimony was in 2014.

62.     If the prosecutors had known that the Defendant Officers fabricated evidence and committed the other misconduct described herein, they would not have pursued the prosecution of Mr. Jackson, and his unlawful detention would not have been continued.

13

63.     Given that the entirety of the State's case against Mr. Jackson rested on Eddie's testimony, the exculpatory evidence described in the preceding paragraphs would have been material, if not critical, to Mr. Jackson's defense of his criminal charges.

## Ricky Jackson's Wrongful Conviction

64.     Mr. Jackson was tried for Harold Franks' robbery and murder, and the attempted murder of Anna Robinson, in July and August 1975. On the basis of Eddie's testimony, Mr. Jackson was convicted of aggravated murder, aggravated robbery, and attempted aggravated murder. Subsequently, Mr. Jackson was sentenced to death by electric chair. Throughout the conviction and sentencing, Mr. Jackson maintained his innocence.

65.     During the time that the capital murder charges were pending against Mr. Jackson and before he was convicted, one of his defense counsel informed him that the State would be willing to forgo seeking the death penalty if he would plead guilty and testify against the Bridgeman brothers. Even though Mr. Jackson was facing the possibility of a death sentence, he refused to plead guilty because he was innocent and had committed no crime.

66.     Had the Defendant Officers disclosed their fabrication of Eddie Vernon's testimony at the time of the original trial to prosecutors, Mr. Jackson, or his counsel, the prosecution would not have been pursued and Mr. Jackson would not have been convicted.

67.    At all times relevant hereto, it was the policy of the attorneys in the Cuyahoga County Prosecutor's Office to disclose all exculpatory evidence of which they were aware.

68.    The exculpatory evidence described in the preceding paragraphs was not provided by any member of the Cleveland Police Department to any member of the Prosecutor's Office.

69.    The Defendant Officers' misconduct continued even after Mr. Jackson's conviction and during the time that he was pursuing appellate and post-conviction relief. A few years after Mr. Jackson's conviction, a defense attorney contacted Eddie to ask him questions about what he saw. Defendant Terpay told Eddie that he was not allowed to talk about the incident, and that if anyone came asking questions, he should tell him and Defendant Terpay would "take care of it." Because Eddie was scared of Defendant Terpay, he did not talk to the defense attorney.

70.    Similarly, when Eddie was around 19 or 21 years old, another defense attorney came to talk to him. Because the Defendant Officers had told him not to talk to anyone, he refused to talk and contacted Defendant Terpay instead.

71.    During this time, Eddie continued to be fearful of Defendant Terpay and other officers if he came forward to tell the truth.

### Mr. Jackson's Exoneration

72.    In 2013, Eddie told his pastor that he had given false testimony in the trials of Mr. Jackson and the Bridgeman brothers decades before. Now in his early

50's, Eddie could no longer bear the weight of having contributed to the wrongful incarceration of three innocent men.

73.     After Mr. Jackson and his attorneys became aware of Eddie's new testimony, they presented that testimony to the criminal court via a motion for new trial and petition for post-conviction relief.

74.     An evidentiary hearing was held in November 2014. Eddie testified at the hearing that Mr. Jackson and the Bridgeman brothers were innocent, he never witnessed the Franks murder, and he was coerced and threatened by Cleveland police into making false statements against Mr. Jackson and the Bridgeman brothers.

75.     At the conclusion of the evidentiary hearing, the State of Ohio withdrew its opposition to Mr. Jackson's motion for a new trial and moved to dismiss the criminal charges against Mr. Jackson.

76.     On November 21, 2014, the court granted the State's motion to dismiss, and all charges against Mr. Jackson were dismissed. Mr. Jackson was ordered released from prison after serving more than 39 years of a life sentence.

77.     Two courts subsequently entered orders in December 2014 and February 2015 declaring that Ricky Jackson did not commit the offenses of which he was charged, including all lesser-included offenses, and that he was a wrongfully imprisoned individual. These judgments were entered without objection by the State.

**Ricky Jackson's Injuries**

78.     On information and belief, Mr. Jackson's 39 years of wrongful incarceration is the longest ever served prior to exoneration in the history of the United States.

79.     In serving almost four decades behind bars, Mr. Jackson was wrongfully deprived of his entire adult life to date. Imprisoned at age 18 and released at age 58, Mr. Jackson must now attempt to make a life for himself outside of prison without the benefit of the decades of life experiences which ordinarily equip adults for that task.

80.     Additionally, the emotional pain and suffering caused by losing 39 years in the prime of life has been enormous. During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to fall in love and marry and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being. He lost his mother, father, stepfather, and other loved ones during his wrongful incarceration.

81.     Not only did Plaintiff spend nearly four decades in prison as an innocent man, but he was tried for capital murder, sentenced to death, and spent years on death row.

82.     Plaintiff was physically assaulted during his wrongful incarceration by guards and other inmates, and he was also sexually assaulted more than once.

83.     As a result of the foregoing, Plaintiff has suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

## Count I: 42 U.S.C. § 1983 – Fourteenth Amendment
### *Brady* Violations

84.     Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

85.     In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, destroyed, failed to disclose, and otherwise withheld and/or suppressed exculpatory information and material from the prosecution, Plaintiff, and Plaintiff's defense counsel.

86.     The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

87.     The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial guaranteed by the U.S. Constitution. By their actions, the Defendant Officers thereby misled and misdirected the criminal prosecution of Plaintiff. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and there is a reasonable probability that he would not have been convicted.

88.     Furthermore, in the manner described more fully above, one or more of the Defendant Officers, including Defendant Terpay, continued to withhold and/or suppress exculpatory evidence from Plaintiff even after his criminal trial and during the time that Plaintiff's appellate and post-conviction efforts were pending.

89.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that Cleveland police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and/or suppressing exculpatory evidence. For instance, it was a widespread practice and custom of the officers in the Department not to turn over investigative notes, including statements of witnesses, taken during the course of an investigation. As a matter of practice, such memos and notes were destroyed after the creation of typewritten official reports that were placed into an investigation file.

90.     This widespread practice was so well-settled as to constitute de facto policy in the Cleveland Police Department, and it was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

91.     Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the Department declined to implement sufficient policies or training on officers' obligation to disclose exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and related case law, even though the need for such

19

policies and training was obvious. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers who violated their *Brady* obligations, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

92.     In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the violation of Plaintiff's rights described in this Count was caused by the actions of policymakers for these Defendants.

93.     The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

94.     As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count II: 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
## Fabrication of False Evidence

95.     Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

96.     In the manner described more fully above, the Defendant Officers, acting individually, jointly and in conspiracy with each other, fabricated evidence,

including without limitation, false police reports, fabricated statements attributed to witnesses, and fabricated testimony offered at Plaintiff's trial. Defendants knowingly fabricated evidence and a reasonable likelihood exists that the false evidence affected the decision of the jury.

97.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

98.    The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial guaranteed by the U.S. Constitution. Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued. This misconduct caused Plaintiff to be wrongfully convicted of crimes of which he is innocent.

99.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City and the Department in that Cleveland police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by fabricating evidence, feeding information to witnesses, and engaging in leading, coercive, and unduly suggestive questioning of witnesses.

100.    This widespread practice was so well-settled as to constitute de facto policy in the Cleveland Police Department, and it was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

101.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the Department declined to implement sufficient policies or training on the fabrication of evidence or police reports, or on the obligation not to provide details about crimes to witnesses, even though the need for such policies and training was obvious. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers who fabricated evidence or fed information to witnesses, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

102.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the violation of Plaintiff's rights described in this Count was caused by the actions of policymakers for these Defendants.

103.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

104.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count III: 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
## Malicious Prosecution

105.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

106.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, instigated, influenced, or participated in the decision to prosecute Plaintiff, and there was no probable cause for the criminal prosecution. As a consequence of the criminal prosecution, Plaintiff suffered a deprivation of liberty apart from his initial seizure. Plaintiff's criminal prosecution was terminated in his favor in a manner indicative of innocence.

107.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

108.    Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. In so doing, the Defendants fabricated evidence and withheld exculpatory information.

109.    In the manner described more fully above, the Defendant Officers' misconduct denied Plaintiff his constitutional right to procedural due process under the Fourteenth Amendment and right under the Fourth Amendment to be free from continued detention without probable cause. Absent this misconduct, there would

have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued. This misconduct caused Plaintiff to be wrongfully convicted of crimes of which he is innocent.

110.    Furthermore, in the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

111.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

112.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that Cleveland police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and suppressing exculpatory evidence, coercing and threatening witnesses into providing false inculpatory testimony, providing their own false testimony, and fabricating false evidence.

113.    This widespread practice was so well-settled as to constitute de facto policy in the Cleveland Police Department, and it was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

114.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the

Department declined to implement sufficient policies or training on the disclosure of exculpatory evidence, fabrication of evidence, feeding information to witnesses, engaging in coercive, leading, or unduly suggestive questioning of witnesses, or use of coercion or threats against witnesses, even though the need for such policies and training was obvious. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers who committed such misconduct, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

115.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the violation of Plaintiff's rights described in this Count was caused by the actions of policymakers for these Defendants.

116.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

117.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count IV: 42 U.S.C. § 1983 – Failure to Intervene

118.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

119.    In the manner described more fully above, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

120.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

121.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that Cleveland police officers regularly failed to intervene to prevent the violation of suspects' constitutional rights.

122.    This widespread practice of failing to intervene was so well-settled as to constitute de facto policy in the Cleveland Police Department, and it was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

123.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the Department declined to implement sufficient policies or training even though the need for policies and training was obvious. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment,

26

thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

124.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

125.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count V: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

126.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

127.    Prior to Plaintiff's conviction, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in this Complaint.

128.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of these rights.

129.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

130.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

131.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VI: 42 U.S.C. § 1983 – Supervisory Liability

132.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

133.    The constitutional injuries complained-of herein were proximately caused by the intentional misconduct of the supervisory defendants, including Defendants Comodeca and White, or when they were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

134.    Specifically, these supervisory defendants, including Defendants Comodeca and White, were aware of and facilitated, condoned, and oversaw the unconstitutional measures used by other Defendants to obtain Edward Vernon's false testimony, or were deliberately, willfully, or recklessly indifferent to their subordinates' unconstitutional tactics.

28

135.    Moreover, these supervisory defendants, including Defendants Comodeca and White, were aware of and facilitated, conducted, and oversaw the withholding of exculpatory evidence, including but not limited to Edward Vernon's statement that he could not identify the perpetrators, but failed to disclose that information, or were deliberately, willfully or recklessly indifferent to their subordinates' unconstitutional actions in withholding exculpatory evidence.

136.    The supervisory defendants, including Defendants Comodeca and White, were acting under color of law and within the scope of their employment when they took these actions.

137.    As a direct and proximate result of the actions of the supervisory defendants, including Defendants Comodeca and White, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VII: Ohio State Law – Malicious Prosecution

138.    Each paragraph of this Complaint is incorporated as if restated fully herein.

139.    In the manner described more fully above, the Defendant Officers, acting maliciously, individually, jointly, and in conspiracy with each other, instituted or continued the prosecution of Plaintiff without probable cause. As a consequence of the criminal prosecution, Plaintiff was unlawfully seized, deprived of liberty, and wrongfully convicted of a crime for which he is innocent. Plaintiff's

29

criminal prosecution was terminated in his favor in a manner indicative of innocence.

140.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

141.    Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. In so doing, the Defendants fabricated evidence and withheld exculpatory information.

142.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

143.    Through the doctrine of *respondeat superior*, Defendant City is liable as principal for all torts committed by its employees or agents, including the misconduct by Defendant Officers described in this Count.

144.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VIII: Ohio State Law – Intentional Infliction of Emotional Distress

145.    Each paragraph of this Complaint is incorporated as if restated fully herein.

146.    In the manner described more fully above, Defendant Officers, acting individually, jointly, and in conspiracy with each other, intentionally or recklessly engaged in extreme and outrageous conduct that caused Plaintiff serious, severe emotional distress as well as bodily harm. The Defendant Officers' misconduct was the actual and proximate cause of Plaintiff's emotional distress and bodily harm.

147.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

148.    Through the doctrine of *respondeat superior*, Defendant City is liable as principal for all torts committed by its employees or agents, including the misconduct by Defendant Officers described in this Count.

149.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count IX: Ohio State Law – Civil Conspiracy

150.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

31

151.    In the manner described more fully above, the Defendant Officers, acting in concert with other known and unknown co-conspirators in a malicious combination, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

152.    In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

153.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

154.    Through the doctrine of *respondeat superior*, Defendant City is liable as principal for all torts committed by its employees or agents, including the misconduct by Defendant Officers described in this Count.

155.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count X: Ohio State Law – *Respondeat Superior*

156.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

157. While committing the acts alleged in the preceding paragraphs, the Defendant Officers were employees and agents of the Defendant City, acting at all relevant times within the scope of their employment.

158. While committing the acts alleged in the preceding paragraphs, the behavior of the Defendant Officers was calculated to facilitate and/or promote the business for which they were employed by their employer, Defendant City.

159. Defendant City is liable as principal for all torts committed its agents.

## Count XI: Ohio State Law – Indemnification

160. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

161. Ohio law provides that the Defendant City is directed to pay any tort judgment for compensatory damages for which its employees are liable within the scope of their employment activities.

162. The Defendant Officers were employees of the Defendant City and acted within the scope of their employment at all times relevant in committing the actions and omissions described herein.

WHEREFORE, Plaintiff Ricky Jackson respectfully requests that this Court enter judgment in his favor and against Defendants City of Cleveland, Estate of Eugene Terpay, Estate of James T. Farmer, Estate of John Staimpel, Estate of Peter Comodeca, James White, Frank Stoiker, Detective Engelhart, Michael Cummings, and other as-yet unidentified current or former employees of the City of Cleveland, awarding compensatory damages, costs, and attorneys' fees against each

Defendant, along with punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, Ricky Jackson, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

RICKY JACKSON

By: /s/ Jon Loevy
Attorney for Plaintiff

Arthur Loevy                        Elizabeth Wang
Jon Loevy                           LOEVY & LOEVY
LOEVY & LOEVY                        2060 Broadway, Ste. 460
312 N. May St., Ste. 100            Boulder, CO 80302
Chicago, IL 60607                   (720) 328-5642
(312) 243-5900

*Counsel for Plaintiff*

Michele L. Berry
The Law Office of Michele Berry, LLC
114 E. 8th St.
Cincinnati, OH 45202
(513) 919-5315

*Local counsel for Plaintiff*