## AFFIDAVIT OF WILLIAM TELL



STATE OF OHIO )
) SS:
COUNTY OF CUYAHOGA )

I, WILLIAM TELL, first having been duly sworn according to law, do hereby declare and state the following:

1. I am over 18 years of age, and I have personal knowledge of the facts relative to this matter.

2. I was employed as a police officer for the City of Cleveland from 1969 until 2001.

3. When I was hired as a police officer in 1969, I was assigned to the Fourth District.

4. I was assigned to the auto theft bureau as a detective for the City of Cleveland Police Department on or about 1972.

5. On or about 1980, I was promoted to Sergeant in the Fourth District.

6. On or about 1983, I was promoted to Lieutenant in the Fourth District.

7. On or about 1995, I was promoted to Commander in Fifth District.

8. In 2001, I retired from the Police Department on good terms as Commander of the Sixth District.

9. In 1975, I was a detective in the auto theft bureau.

10. The statements that follow concern practices, polices, and procedures in the Cleveland Police Department in 1975 regarding training of police officers:

    a. There was no formal training on police policies, practices, procedures after completing police academy training. All training after employment as a police officer was on-the-job training from other officers. Training was not standard

        nor uniform for every new officer because senior officers who trained new officers did not all use the same practices.

    b. There was no formal training whatsoever for detectives in the 1970s.

    c. Information about changes in the law was not provided to detectives through formal training.

    d. New General Police Orders reflecting changes in the law were issued and passed out to detectives to review on their own time.

11. The statements that follow concern policies, practices, procedures, and training in the Cleveland Police Department in 1975 regarding providing information to prosecutors:

    a. There were no formal, written department rules dictating what information detectives should or must provide to prosecutors.

    b. There was no policy or practice requiring detectives to turn over everything in their possession to prosecutors.

    c. It was the practice of Cleveland Police detectives to provide to prosecutors only arrest reports, witness forms, and written statements taken by the Statement Unit.

    d. Unless a prosecutor asked the detective working the case if there was anything else related to the case that he should know about, then the prosecutor would not receive any additional information beyond written statements.

    e. If there was evidence that an alternative suspect committed a crime, detectives investigated and decided for themselves whether this information would be turned over to the prosecutor.

      f. If someone provided a detective with a tip that an alternative suspect committed a crime the detective was investigating, the detective would follow up on the tip. If the detective felt that the tip did not materialize, the detective would not tell the prosecutor about the tip.

      g. Each detective maintained his own file for the cases he investigated. His handwritten notes were kept in this personal file and were not turned over to prosecutors.

      h. After criminal prosecutions concluded, detectives placed their personal notes in the detective's personal case folder. There was no formal or written rule about how long these personal notes were maintained in 1975, and no such rules were enforced until the 1980s at the earliest.

12. The statements that follow concern practices, polices, and procedures in the Cleveland Police Department in 1975 regarding interrogation training and practices:

      a. Beyond academy training, there was no training for Cleveland Police detectives on how to interrogate witnesses.

      b. Detectives developed and used their own methods and practices in interrogations.

      c. There was no formal written order or directive that prohibited giving information to a suspect or witness in the course of an interview or interrogation concerning the facts of the crime.

      d. During the 1970s, I recall Cleveland Police officers conducting interrogations of suspects where officers punched suspects in the face and head, knocking them down, in efforts to get those suspects to confess or implicate others.

3

> When physically beating these people, the officers would say things along the lines of, "Now you're going to tell us the truth." I witnessed this conduct on occasions where officers interrogated or interviewed black people, both as suspects and as witnesses.
>
> e. In the 1970s, I was also aware of other officers wrongfully conducting interrogations of juveniles without their parents present.

13. I was the first African American to be assigned as Sergeant to the First District of the Cleveland Police Department. I was also the first African American to head a major detective bureau in the City of Cleveland. I was also the first African American to head vice squad in City of Cleveland. I was also the first African American to command the Sixth District in the City of Cleveland.

14. The statements that follow concern race and racism in the Cleveland Police Department in the 1970s:

> a. Many older white police officers were racially biased at the time.
>
> b. Mayor Carl Stokes advocated for the hiring of more black police officers to combat racially biased practices in the Department.
>
> c. When black officers were present at the scene, white officers engaged in less frequent and/or less severe violent behavior toward black suspects.
>
> d. White suspects were often treated with more respect and dignity than black suspects. For example, police would often allow white suspects who were under arrest to leave their homes on their own and walk to meet police officers in a location where they would not be embarrassed in front of their families and neighbors. This kind of treatment was not afforded to black suspects.

On or about 1980, I witnessed a white police officer shoot a young black woman by accident. The white officer later claimed that he shot the young woman because she brandished a knife. I reported this bad shooting case to my supervisor at the time and the Judge Lloyd Brown. No adverse action or discipline was taken against the shooting officer. I was told not to pursue the claims of misconduct any further. Officers engaged in similar misconduct at the time were not usually disciplined for these acts.

15. The statement that follows concerns discipline in the Cleveland Police Department in the 1970s:

   a. It was well known among police officers and detectives at the time that they could get away with serious misconduct without being disciplined.

16. I hereby declare under penalty of perjury that the foregoing is true and correct. FURTHER AFFIANT SAYETH NAUGHT.

_01-11-2016_
DATE

_[signature]_
WILLIAM TELL

SWORN TO BEFORE ME, and subscribed in my presence, this 11th day of January, 2016.

_Michelle M. Macala_
NOTARY PUBLIC

5

MICHELLE M. MACALA
Notary Public - State of Ohio
My Commission Expires _10-3-17_