IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| RICKY JACKSON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 1:15-CV-989 |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, et al., | ) | Judge Christopher A. Boyko |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CITY OF
CLEVELAND'S MOTION FOR SUMMARY JUDGMENT [Dkt. 101]**

Jon Loevy
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: 312.243.5900
jon@loevy.com

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF MATERIAL FACTS .................................................................................2

I.      The City Failed to Adopt Policies where Policies Were Obviously Needed, including with respect to *Brady* Obligations and Interviewing Juvenile Witnesses...........................3

II.    The City Had an Express Policy Instructing Officers Not to Disclose Reports or Witness Statements .............................................................................................................5

III.   The City Failed to Train its Officers regarding *Brady* Obligations and other Critical Police Functions............................................................................................................6

IV.   The City Failed to Supervise and Discipline its Officers, Creating an Environment where They Knew They Could Commit Misconduct without Consequence ................................8

V.    The City's Final Policymakers Had Notice of the Need to Adopt Policies and Training as Early as 1972 and Chose Not to Adopt Any .................................................................11

ARGUMENT .........................................................................................................................13

I.      The City Had an Express Policy that Was Unconstitutional and Required Police Not to Disclose Evidence such as Witness Statements ................................................................16

II.    The City's Conscious Choice Not to Have Policies on *Brady* Obligations and Other Crucial Issues Amounted to Deliberate Indifference........................................................17

III.   The City's Failure to Train and Supervise Amounted to Deliberate Indifference............25

IV.   The City's Policy, Training, and Supervision Failures Caused the Violation of Plaintiff's Constitutional Rights .......................................................................................28

CONCLUSION.......................................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AM Int'l, Inc. v. Int'l Forging Equip.*, 743 F. Supp. 525 (N.D. Ohio 1990)....................................2

*Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998)....................................17

*Avery v. Burke Cnty.*, 660 F.2d 111 (4th Cir. 1981) ....................................18

*Barber v. City of Salem*, 953 F.2d 232 (6th Cir. 1992)....................................14

*Bd. of the Cnty. Comm'rs* of *Bryan Cnty. v. Brown*, 520 U.S. 396 (1997)....................25, 26, 30

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320 (S.D.N.Y. 2001).....................................................................................................9

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) ....................................10, 19, 29

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................................. passim

*Cage v. City of Chicago*, 979 F. Supp. 2d 787 (N.D. Ill. 2013)....................................5

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006)....................................25

*City of Canton v. Harris*, 489 U.S. 378 (1989)....................................14, 17, 25, 26

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)....................................19

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)....................................14

*Connick v. Thompson*, 131 S. Ct. 1350 (2011) ....................................25, 26

*Doe v. Sullivan Cnty.*, 956 F.2d 545 (6th Cir. 1992) ....................................15

*Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002)....................................15

*Fowler v. Jago*, 683 F.2d 983 (6th Cir. 1982) ....................................9

*France v. Lucas*, 836 F.3d 612 (6th Cir. 2016)....................................15

*Garner v. Memphis Police Department*, 8 F.3d 358 (6th Cir. 1993)....................................15

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)....................................2, 18

*Haley v. City of Boston*, 2013 WL 4936840 (D. Mass. Sept. 12, 2013)....................................18

*Henry v. Cnty. of Shasta*, 132 F.3d 512 (9th Cir. 1997) ....................................10

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986) ....................................................17

*Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857 (6th Cir. 2017).........................3

*Kluppelberg v. Burge*, 2016 WL 6821138 (N.D. Ill. Sept. 16, 2016)................................5

*Matulin v. Village of Lodi*, 862 F.2d 609 (6th Cir. 1988) .........................................17, 30

*Miller v. Calhoun Cnty.*, 408 F.3d 803 (6th Cir. 2005) .................................................18

*Milligan v. United States*, 644 F. Supp. 2d 1020 (M.D. Tenn. 2009)............................28

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ..........................2, 27, 28, 30

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ..............................................14, 16

*Obrycka v. City of Chicago*, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012) ....................17

*Owen v. City of Independence*, 445 U.S. 622 (1980).....................................................14

*Paige v. Coyner*, 614 F.3d 273 (6th Cir. 2010).............................................................14

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)........................................13, 14, 18

*Richko v. Wayne Cnty.*, 819 F.3d 907 (6th Cir. 2016) ..................................................15

*Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992) .........................................28

*Shadrick v. Hopkins Cnty.*, 805 F.3d 724 (6th Cir. 2015)...............................25, 28, 30

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012)..........................................18

*United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, 2009 WL 5227661
(S.D. Ohio Nov. 20, 2009).............................................................................................3

*Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001)....................................15

**Rules**

Fed. R. Civ. P. 10(c) .........................................................................................................2

Fed. R. Civ. P. 30(b)(6)....................................................................................................3

## INTRODUCTION

Eddie Vernon told Cleveland police he never saw who shot Harold Franks. Police never disclosed that statement to prosecutors, so they never knew the truth. Prosecutors also didn't know that police threatened then-12-year-old Vernon—whom they called a "nigger"—into changing his story and fed him information about the crime to fabricate an inculpatory statement. Three innocent men spent decades in prison as a result.

In a very real sense, the City of Cleveland is the party that is ultimately responsible for the tragedy of Jackson's wrongful conviction. Even if no individual defendants had been a part of this case, Jackson can still prevail against the City on his *Monell* claim because he has sufficient evidence to prove an underlying constitutional violation that was caused by the City's policies and practices. The City entirely failed to adopt obviously needed policies, training, and supervision to inform detectives of their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and other critical areas of police responsibility such as juvenile-witness interviews. Operating under an outdated Manual of Rules from 1950, the City had no policies whatsoever regarding *Brady* and the obligations it imposed regarding the extent of information that must be provided to prosecutors. Indeed, a General Police Order ("GPO") in effect at the time instructed police that they should not disclose witness statements (such as Vernon's statement that he never saw the crime). And the City failed to train and supervise regarding *Brady* obligations, making the potential for the constitutional violations that occurred here an obvious outcome. Worse, Cleveland detectives testified that the CPD operated under a "code of silence" where misconduct was not to be reported. Officers knew they could commit misconduct without any consequences, and there are documented instances of the detectives in this case attempting to coerce individuals

in other cases—frequently black suspects and witnesses who were beaten with guns, burned, and kicked until they would give a statement the police wanted.

The net result was a policy and practice of indifference to the problem of rampant suppression. The evidence shows that the CPD remained stuck in a pre-*Brady* mindset for a long time after Jackson's conviction. Despite the City's own acknowledgement of the need for policies and training as early as 1972, no revisions to policies, procedures, or training were made until well after 1975. Whatever changes were made then, however, came too late for Jackson, who was convicted as a direct result of the prior policies and practices.

The Sixth Circuit has addressed similar cases involving *Monell* claims against cities for failure to adopt policies or training on officers' *Brady* obligations, and the court has concluded that such cases are inappropriate for summary judgment—a jury must decide whether the failures create liability. *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006); *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009). Those cases are factually indistinguishable from the evidence presented here and constitute binding precedent. Thus, whether the City has any responsibility for the travesty here in light of its policies and practices is for a jury to decide.

## STATEMENT OF MATERIAL FACTS

Plaintiff incorporates by reference the Statement of Material Facts in his response to Defendant Lamendola's Motion for Summary Judgment, pp. 2-15. *See* Fed. R. Civ. P. 10(c); *AM Int'l, Inc. v. Int'l Forging Equip.*, 743 F. Supp. 525, 528 n.1 (N.D. Ohio 1990). As discussed below, the City's policies and practices—including its failure to adopt policies, training, and supervision where clearly needed—were the moving force behind the constitutional violations committed by Detectives Terpay, Farmer, Staimpel, Stoiker, and Englehart.

## I.   The City Failed to Adopt Policies where Policies Were Obviously Needed, including with respect to *Brady* Obligations and Interviewing Juvenile Witnesses.

In the 1970s, the CPD had two sources of written policy: The Manual of Rules and General Police Orders ("GPOs"). *See* Dkt. 102 (Tomba Dep.) at 22, 90;[1] Dkts. 102-2, 102-5, 102-6 & 102-7 (Manual of Rules and GPOs). But there were problems with these policies. In 1975, when Harold Franks was murdered, the Manual was 25 years old; it hadn't been updated since 1950. Dkt. 102 at 24, 37. And some officers didn't even receive a copy of the Rules or the GPOs. *See id.* at 120–21; Dkt. 103 (Tell Dep.) at 28–29; Dkt. 104 (Turner Dep.) at 16–17.

Most importantly, in 1975, the City had no policies explaining officers' obligation to preserve or disclose exculpatory evidence under *Brady*. Dkt. 102 at 84, 87, 109–10; *see* Dkts. 102-2, 102-4, 102-5, 102-6, 102-7;[2] Dkt. 103 at 67; Dkt. 103-3 (Tell Aff.) ¶ 11a. The City could not say whether its officers were even informed at any time from 1963 to 1975 about *Brady* or what officers' *Brady* obligations were. Dkt. 102 at 86–87. Indeed, Detectives Cummings and White were not familiar with *Brady* at all, and—contrary to basic law—Cummings did not think that impeachment evidence would be considered exculpatory evidence. Ex. 20 (Cummings Dep.) at 16, 83; Ex. 35 (White Dep.) at 16. This is not surprising given that the City believes that detectives in 1975 did not have an obligation to disclose exculpatory and impeachment evidence to prosecutors. *See* Ex. 8 at No. 1; Ex. 36 at No. 1. Accordingly, the City did not adopt any policies or training to inform its detectives of what it believed was a non-existent obligation.

---

[1] Tomba was designated by the City to testify about the City's policies, practices, and training in the 1970s, including who was the final policymaker. *See* Dkt. 102-1 (Rule 30(b)(6) Dep. Notice); Dkt. 102 at 11–18. It is improper for the City to attempt to contradict his testimony in its motion. *See* Fed. R. Civ. P. 30(b)(6); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 867 (6th Cir. 2017) (testimony of a Rule 30(b)(6) witness is binding on the organization); *United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, 2009 WL 5227661, at *2 (S.D. Ohio Nov. 20, 2009).

[2] Any policy about disclosure of exculpatory evidence would be in a GPO. Dkt. 102 at 25–26, 95, 131.

Not only were there no policies relating to *Brady*, but there was no practice requiring detectives to turn over all information to prosecutors. Dkt. 103-3 ¶ 11a (Detective Tell averred: "There were no formal, written department rules dictating what information detectives should or must provide to prosecutors."), ¶ 11b ("There was no policy or practice requiring detectives to turn over everything in their possession to prosecutors."). Although Detectives Tell and Turner stated that they were told in the academy to turn over exculpatory evidence to the prosecutor, they also said that what detectives did in practice was different than what they were told, and "once you got out [of academy], you did what you wanted to do with it." Dkt. 103 at 67; Dkt. 104 at 101–02, 122. And the City's own witness, as well as Detectives Allen, Cummings, and White, testified that there was nothing taught in academy about disclosure of exculpatory evidence at all. Ex. 20 at 14–15; Ex. 13 (Allen Dep.) at 22; Ex. 35 at 15–16; Dkt. 102 at 143.

Tell, who was a CPD detective in 1975, explained that it was the practice of CPD detectives *not* to provide all information to the prosecutor. Instead, the practice was, "Don't ask, don't tell. And you don't give it to them." Dkt. 103 at 78. The practice was "to provide to prosecutors only arrest reports, witness forms, and written statements taken by the Statement Unit." Dkt. 103-3 ¶ 11c. This "happened all the time, [in] every case." Dkt. 103 at 76. "Unless a prosecutor asked the detective working the case if there was anything else related to the case that he should know about, then the prosecutor would *not receive any additional information* beyond written statements." Dkt. 103-3 ¶ 11d (emphasis added); Dkt. 103 at 78. For example, not all interviews were turned over. Dkt. 103 at 77. It was up to each detective to determine what additional information he would give to the prosecutor. *Id.* at 193. Detectives' personal files would contain information and notes that was not in the official file that was turned over to the prosecutor, and there were no policies governing the keeping of a personal file or notes. *Id.* at

4

68–69, 191, 195–96, 202–05; Dkt. 103-3 ¶¶ 11g, h. The prosecutor received the "cleaned up version" of the file, not the personal file, which detectives withheld from the prosecutor. Dkt. 103 at 204. Tell testified, "All detectives did that." *Id.* at 205. And the evidence that detectives kept from prosecutors could be critical to the case. For example, detectives—including homicide detectives—routinely did not turn over information relating to alternate suspects or other witnesses. *Id.* at 79–82; Dkt. 103-3 ¶¶ 11e, f.

The lack of City policy and acceptable practices was endemic to numerous crucial areas of policing. No policies guided police on areas including preservation or documentation of exculpatory evidence; conducting interrogations and interviews (especially of juveniles); eyewitness identification; or training or supervision of detectives. *See* Dkt. 102 at 34, 44–45, 61, 80–83, 90–93, 107–29, 157–58; Ex. 38a (Anders Report) at 11–12; Dkt. 103 at 86, 155–56, 164–66; Dkt. 103-3 ¶ 12c. As police-practices expert Anders explained, the CPD lacked reasonable and appropriate policies in these areas. Ex. 38a at 11–12, 29–30, 36–38, 42–44, 52–55, 60–61.[3]

## II.    The City Had an Express Policy Instructing Officers Not to Disclose Reports or Witness Statements.

Not only did the City lack any policy whatsoever regarding its basic *Brady* obligations in 1975, the City actually had an express policy instructing officers *not* to disclose reports or

---

[3] The City urges the Court to disregard Anders' opinions because he did not become a police officer until 1978 and did not opine on what "generally accepted police practices" in 1975 were. Dkt. 101 at 12. But the City has not proffered any evidence on what "generally accepted police practices" were in 1975 or any argument on why that would be the correct metric by which to judge the City's policies and practices. As Anders explained, his opinions are based on what would have been reasonable and appropriate for CPD policymakers to have adopted in 1975, given its notice of its own problems. *See* Dkt. 105 (Anders Dep.) at 18, 46-49, 118, 141–44, 166. Moreover, Anders has decades of experience as a police officer, including in investigative, training, and supervisory positions, such as supervising the homicide unit at San Jose Police Department, making him more than qualified to render his opinions in this case. Ex. 38a at 2; Ex. 38b (Anders CV) at 1–6; Dkt. 105 at 6–17, 26–29. Furthermore, Anders' opinions are supported by recognized national standards in place at the time. *See* Ex. 39. And finally, courts have repeatedly refused to bar experts based on criticism of this kind, finding instead that these types of experience gaps are fodder for cross-examination, not exclusion. *See Kluppelberg v. Burge*, 2016 WL 6821138, at *2 (N.D. Ill. Sept. 16, 2016); *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 820-24 (N.D. Ill. 2013).

witness statements—directly contrary to *Brady*. The City has admitted that this policy is not in effect today because it is not consistent with constitutional requirements. Dkt. 102 at 101–02.

GPO No. 19-73 explicitly advised officers that witness statements were not discoverable by the defense. It provided: "NO POLICE DEPARTMENT IS REQUIRED OR SHALL GIVE TO DEFENSE COUNSEL AND/OR ANY COURT ANY RECORD, PAPER, STATEMENT, REPORT OR TANGIBLE OBJECT OF A CRIMINAL CASE." Dkt. 101-7. The GPO continued, "by application to the Prosecuting Attorney and/or the court, the defense counsel may be entitled to the following: … 6. Evidence favorable to the defendant." *Id*. The GPO thus explained the prosecutor's obligation to the defendant, but it did not explain officers' obligation to the prosecutor, and it did not inform officers that they were obligated to turn over everything to the prosecutor. It also did not explain what constitutes "evidence favorable to the defendant." *Id*.; Dkt. 102 at 99. Nor were there any other written documents dating from the 1970s that explained the meaning of that phrase. *See* Dkt. 102 at 87; Dkts. 102-2, 102-5, 102-6, 102-7.

More importantly, the "EXCEPTION TO THE FOREGOING" *excluded* witness statements and police reports from disclosure:

> The foregoing does not authorize the discovery or the inspection of *reports*, memoranda, or other internal documents made by the Prosecuting Attorney or his agents (police departments are his agents) in connection with the investigation or prosecution of the case, or of *statements made by witnesses* or prospective witnesses to state agents.

Dkt. 101-7 (emphasis added); Dkt. 102 at 99–100. Thus, GPO No. 19-73 informed officers that they were under no obligation to disclose witness statements or police reports.

## III. The City Failed to Train its Officers regarding *Brady* Obligations and other Critical Police Functions.

In addition to lacking rudimentary policies, the City failed to provide adequate training to its officers. The only training that detectives and officers received as of 1975 was at the police

academy and through "on-the-job" training. Dkt. 102 at 103, 105–06, 140–41; *see also* Dkt. 102-15 at 9;[4] Dkt. 103 at 59; Ex. 13 at 15; Ex. 26 (Englehart Dep.) at 41; Ex. 35 at 15–18. On-the-job training simply meant that an older detective would tell a younger one, "this is what we're going to do and this is how you're going to do it." Ex. 35 at 17–18.

Nothing was taught in academy about the obligation to disclose exculpatory evidence or other critical topics related to investigations. Ex. 20 at 14–15; Ex. 13 at 22; Ex. 35 at 15–16; Dkt. 102 at 143. The subjects covered in academy included just the basics on traffic laws, the criminal code, first aid, firearms, and community relations. *See* Dkt. 103 at 25.

Detectives (including homicide detectives) did not receive any kind of specialized training. Dkt. 102 at 106; Dkt. 103 at 158; Dkt. 104 at 99; Ex. 20 at 17–19; Ex. 26 at 11–12. This is because the detective function within the police department is an assignment, not a rank. Dkt. 102 at 106; Ex. 35 at 14–15; *see also* Dkt. 103 at 25. There was no exam to become a detective. Dkt. 104 at 132–33; Ex. 13 at 31. To become a detective in the 1970s, "[i]t [wa]s not what you know, it [wa]s who you know." Dkt. 103 at 158; *see also id.* at 159–61. Homicide detectives were simply picked from patrol or other detective units. Ex. 13 at 31–32.

Whatever training the detectives had would have been reflected in their training certificates in their personnel files. Dkt. 102 at 141, 146–51, 154–55. The personnel files of Terpay, Farmer, Staimpel, Stoiker, and Englehart reflect no training whatsoever on preservation or handling of exculpatory evidence, interviews of juvenile witness, note-taking, report-writing, or interrogations of suspects. *See* Dkt. 102-13; *see also* Ex. 26 at 33, 35.

---

[4] Citations to Tomba's deposition exhibits are to the page number of the Dkt. No. at the top of the page.

IV.    **The City Failed to Supervise and Discipline its Officers, Creating an Environment where They Knew They Could Commit Misconduct without Consequence.**

Not only did the City lack policies and training regarding fundamental police work and *Brady* obligations, the City also failed to supervise and discipline officers. This created an environment where officers knew they could commit grave misconduct—including withholding evidence, fabricating evidence, threatening witnesses, and physically abusing suspects—without consequences. Dkt. 103 at 187; Dkt. 104 at 36–46, 86–89, 103–05, 113–16. Detectives Tell and Turner described numerous instances of misconduct. *See id.*; *see also* Dkt. 103 at 35–46, 70–74, 87–93, 112–13, 124–32, 184–87; Dkt. 104 at 36, 46–47, 57–58, 69–75. Detectives were rarely, if ever, disciplined for such misconduct, and supervisors knew about these practices but allowed them to occur. Dkt. 103 at 93–94, 184–87; Dkt. 104 at 115–18. Indeed, it was worse than simply a culture of misconduct: CPD detectives testified that there was a "code of silence" under which officers would be ostracized if they attempted to report any misconduct of fellow officers. Dkt. 103 at 91, 116–17, 161–62, 187–89; Dkt. 104 at 30–31, 47–52, 57–58, 118, 125–26.

The lack of supervision made the dire conditions regarding *Brady* obligations (no policies, no training) even worse. The City contends that supervisors were responsible for ensuring that everything relating to a case was turned over to the prosecutor's office, but that is meaningless where the investigating detective decided not to write something down in his reports. Dkt. 102 at 164, 166–67. The supervisor would know only what the detective decided to tell him. *Id.* at 166–67; *see also* Ex. 13 at 86. Thus, a supervisor would not know if a detective decided not to write down that the sole alleged "eyewitness" to a crime said he never saw the crime take place (as Vernon said), and the supervisor would not know if that detective decided not to reveal how it was that the witness was persuaded or coerced to change that statement, or what information he was fed about the crime. This is why, as Anders made clear, adequate

8

supervision is not "[w]rite a report, give it to the sergeant to sign off." Dkt. 105 at 89. "That is not a policy." *Id.*; *see also* Ex. 38a at 50–52.

Detective Turner's and Tell's testimony in this regard is corroborated by documented instances describing misconduct and abuse by fellow detectives within their ranks, including Terpay and Farmer, whose conduct is at the heart of this case. These documented instances suggest a troubling practice of officers coercing statements from suspects and witnesses through violent threats and intimidation, especially among black witnesses and suspects, who were repeatedly referred to by Cleveland police as "niggers." This fits exactly what Vernon and Plaintiff testified police did to them, calling them "nigger" and threatening them to say what the police wanted to hear (and with 12-year-old Vernon, it worked).

The record here reveals at least four such instances beyond the misconduct to which Turner and Tell testified. *First*, there is sworn testimony from three people arrested in May 1974 that Cleveland detectives, including Farmer, coerced statements from them after they struck them in the face and stomach with guns, called them "niggers," threw them to the ground, kicked them while handcuffed, and put out a cigarette on one of their legs. Ex. 43 at J13975–90, 13995–14031, J14177, 14201–64, 14413, 14440–68, 14476–77, 14481–95. One man, Craig Fowler, testified that Farmer said to him, "[n]igger, you have no rights" and "[y]ou are going to make a damn statement or we are going to beat you half to death." *Id.* at 14476–77, 14484.[5] Fowler ended up making a statement. *Id.* at 14481–95. *Second*, Albert Rembert testified that during his arrest by Cleveland police detectives in 1977, he was beaten, stomped, and called a "nigger." Ex. 44 (Rembert Dep.) at 8–18, 99–100. The detectives also coerced a witness to testify falsely

---

[5] This testimony was given in the context of a habeas proceeding. *See Fowler v. Jago*, 683 F.2d 983 (6th Cir. 1982). The City argues that this testimony is irrelevant because the habeas court did not grant relief. Dkt. 101 at 11. But that is irrelevant—the credibility determinations of that court are not binding in this case, and the City has cited no cases otherwise. *See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 323–24 (S.D.N.Y. 2001). Plaintiff can call Fowler, Jordan, and Johnson to testify at trial in this case.

against him. *Id*. at 23–27, 98–99. Rembert's memory as to who the detectives were was unclear; he identified the photos of Staimpel, Farmer, and Stoiker, but also believed that the detectives' names were Fuerst and Feist. *Id*. at 12–14, 17, 33; Dkt. 99-8. Regardless, they were Cleveland detectives. Ex. 44 at 96–97.[6] *Third*, in 1975, a lawyer named Stanley Tolliver wrote a letter to Chief Garey complaining that Terpay used force to coerce his client into making a statement without Tolliver present, even though Tolliver expressly told the police not to question his client. Ex. 42 at CLE3913. *Fourth*, Marion Williams alleged that Terpay committed perjury at Williams' criminal trial. *See* Ex. 41 at J13041–42, CLE3868–3885.[7]

The City knew about supervision problems as far back as 1966, when the Public Administration Service wrote to the Cleveland Little Hoover Commission and stated that there was no supervision at all: "Effective field supervision is virtually *non-existent*." Ex. 40 at CLE1123 (emphasis added). Yet, other than telling officers to generically "follow the law," the City could not identify any efforts it made to identify, investigate, or prevent any misconduct regarding *Brady* or coercing of witness statements. Dkt. 102 at 155–56, 157–61, 163–64.

---

[6] The City argues that Rembert's testimony is inadmissible because occurred in 1977. Although Rembert's testimony might not be used to demonstrate notice, it is relevant and admissible evidence on what the practices were at the time and the City's deliberate indifference. *See, e.g.*, *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry."); *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."). It also corroborates Turner's and Tell's testimony. A reasonable jury could infer that Cleveland detectives who felt comfortable beating people and calling them racial slurs in 1977 also felt comfortable committing similar misconduct in 1975.

[7] The City argues that this complaint is hearsay, but it would not be used for the truth of the matters asserted. Instead, the complaint was investigated by the CPD; documentation of it was in Terpay's personnel file. Ex. 41 at CLE3868-3885. The City also admitted that its own investigation of this incident was inadequate because it did not interview the complainant. Dkt. 102 at 177–82. The City cannot argue that its failure to discipline in the above-referenced incidents was appropriate when it admits that its own internal investigations were inadequate. As Anders testified, citizens' complaints should not be ignored. Dkt. 105 at 161–62.

**V.  The City's Final Policymakers Had Notice of the Need to Adopt Policies and Training as Early as 1972 and Chose Not to Adopt Any.**

As early as 1972, the City was aware that it needed to address widespread misconduct and outdated policies in the CPD. In October 1972, Mayor Ralph Perk wrote a memo to Director of Public Safety James Carney and Chief of Police Gerald Rademaker titled, "Protection for the Citizens of Cleveland." Dkt. 102-16 at 88. In this memo, the Mayor acknowledged corruption and misconduct within the CPD, widespread failure to respond to citizen complaints, and indictments of police officers. *Id*. The Mayor wrote, "I am instructing you both to take immediate steps to reverse this trend and rectify an intolerable situation," and "the time has come to stop making excuses and act." *Id*. at 89. The Mayor further instructed, "[i]mmediate steps should also be undertaken for a complete revision of the 'Rules of Conduct and Discipline' written in 1950, for members of the Cleveland Police Department so that it is *consistent with the requirements and conditions that exist today in 1972*." *Id*. at 93 (emphasis added).

But no changes were made. In March 1974, Mayor Perk announced the formation of a Mayor's Commission to examine the very same problems and provide recommendations. Dkt. 102-16 at 15 (3/21/74 press release). In June 1974, the Mayor's Crime Commission issued a report with recommendations for reforms for the CPD. *Id*. The Commission emphasized that "*Departmental procedures and rules have not been revised in nearly one-quarter of a century despite the overwhelming changes in society and the police functions which had taken place in that period of time*." *Id*. at 7 (emphasis added). "These policies," the report continued, "should be integrated into the Department's training program." *Id.* The point was to "insure that corruption and misconduct will not take place." *Id*. at 11. Despite knowledge of these problems and recommendations for reform, the Mayor, Director of Public Safety, and Chief of Police had still made no revisions to policies or training by the time of the Franks homicide investigation.

Indeed, in September 1975, the Cleveland Foundation issued a report detailing the massive deficiencies in the CPD after extensive study and interviews with the Chief and many officers. Dkt. 102-15 at 8–9, 16.[8] The Foundation observed that the 1950 manual was "out of date," as it focused on topics such as conduct and manners instead of providing guidance on "police policy." *Id*. at 35–36 (emphasis added) (citing ABA Standards and 1973 NAC Report). The Foundation also recognized the importance of policy in limiting officers' discretion and the lack of supervision over the massive power delegated to subordinate officers. *Id*. at 13 ("No other agency … does so little supervising of vital policy determinations which directly involve justice or injustice to individuals."). The Foundation also observed that "[p]resently there is little formal training going on in the Department …." Dkt. 102-15 at 37. CPD officers themselves believed that lack of training was a problem. *Id.* at 37 (citing NAC Standard 16.5); Ex. 39 at 382.

By 1980, the CPD's policies still had not been updated. The CPD observed in its own report that officers still lacked appropriate policy and guidance: "Patrol officers *need clear guidance* from their department in the form of written rules which lay out the department's expectations for their behavior." Ex. 46 (CPD report) at CLE1060 (emphasis added). "Sometimes those rules are called *policy*; sometimes they are called general orders," the report continued. *Id.* (emphasis added).  "In Cleveland, the orders have been added on top of one another over a thirty year period, and no one in the department has an up-to-date rule book." *Id.*; *see also id.* at CLE1063; Ex. 38a at 20.

The City admitted that it was not aware of any changes made between 1950 and 1980 to any policies, procedures, or training relating to preservation or disclosure of exculpatory evidence and documentation of witness interviews and retention of notes. Dkt. 102 at 173–76.

---

[8] The Private Sector Assistance report was also produced by the City as CLE977-1026 (*see* Ex. 45).

This evidence shows that the City's final policymaker (the Chief of Police) had notice of misconduct and the need for adequate policies and training, and chose not to implement necessary policies, training, or supervision. *See* Dkt. 105 at 165–66; Ex. 38a at 1. In 1975, the Chief of Police was the final policymaker for the CPD on all issues that a police officer might confront. Dkt. 102 at 22–23; *see also* Dkt. 103 at 173. This was set by the Charter of the City of Cleveland. Dkt. 102 at 24. The Director of Public Safety did not have any responsibility for creating or promulgating rules or general orders for the CPD. *Id*. at 24, 41; *see also* Dkt. 102-2 at CLE3229 (the Chief of Police was responsible for directing all activities of the division, promulgating orders and enforcing all laws and ordinances). The 1972 memo from the Mayor to the Chief and Director also show that the Mayor delegated authority to them on CPD policies and training. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). In any event, the evidence described above shows that the Mayor, Director of Public Safety, and Chief of Police all had notice of misconduct and need for adequate policies and training and chose not to implement necessary policies, training, or supervision. *See* Dkt. 105 at 165–66; Ex. 38a at 1.

In sum, the CPD in 1975 lacked formal policies and adequate training—particularly with regard to *Brady* obligations—and operated under a "code of silence" that enabled serious misconduct to persist without consequence. The City knew about this. Yet it did nothing. This resulted in the withholding of Vernon's statement that he never saw this crime and the fabrication of his testimony. Prosecutors never knew the truth, and three innocent men needlessly spent decades in prison because of it.

## ARGUMENT

Summary judgment should be denied. Whether the City is liable here is to be decided by a jury. We begin with the basic principles regarding municipal liability that govern here

13

(including that a city can be liable even if individual officers have been dismissed from the case), and then discuss the three independent claims against the City that require a trial.[9]

A municipality can be directly liable under § 1983 for constitutional violations caused by (1) enforcement of a municipal policy, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); (2) a widespread, though unwritten, custom or practice, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); or (3) action of a municipal final policymaker, *Pembaur*, 475 U.S. at 483.

Municipalities can also be liable for failure to train, where the need for more or better training is sufficiently obvious, and where the lack of training causes injury. *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Failure to train is a subset of a municipal policy claim. *Id.* at 390. Furthermore, "policy or custom does not have to be written law; it can be created 'by those whose edits or acts may fairly be said to represent official policy.'" *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010) (quoting *Monell*, 436 U.S. at 694).

The defense of qualified immunity is unavailable to municipalities. *Owen v. City of Independence*, 445 U.S. 622, 657 (1980). Even if officers had qualified immunity because the law was not clearly established at the time of their actions (disputed in this case in any event), "a municipality may nevertheless be liable if the actions complained of rise to the level of constitutional violations in light of present law." *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992) (citing *Owen*, 445 U.S. at 657–58). Given that the City's liability is evaluated in light of present law, the City's suggestion that its policies were acceptable in light of "generally accepted practices" in 1975 (which, in any event, is unsupported any evidence), must be rejected.

---

[9] Plaintiff incorporates by reference the discussion of legal standards in his Response to Defendant Lamendola's Motion for Summary Judgment.

Furthermore, contrary to the City's argument otherwise, Dkt. 101 at 14, the City may be liable even if no individual defendant is liable. Indeed, in *Garner v. Memphis Police Department*, the Sixth Circuit rejected the city's argument that because the only defendant officer in the case had been dismissed by the district court, the city should also be dismissed. 8 F.3d 358, 365 (6th Cir. 1993). While the plaintiff may need to prove an underlying constitutional violation committed by a city employee, the plaintiff does not have to prove actual liability on the part of a named defendant officer. *Id.* For instance, a court could find that defendant officers in a case are entitled to dismissal, and yet, if a constitutional violation has been committed, the plaintiff could still prevail on a *Monell* claim. *Id.*; *Richko v. Wayne Cnty.*, 819 F.3d 907, 920 (6th Cir. 2016); *Doe v. Sullivan Cnty.*, 956 F.2d 545, 553–54 (6th Cir. 1992). Thus, even if the Court were to find that Englehart and Stoiker were entitled to qualified immunity, Plaintiff can still prevail against the City if there is enough for a reasonable jury to find a constitutional violation was committed.

Likewise—and more important—the fact that Terpay, Farmer, and Staimpel are deceased and the Court denied the motion to substitute the administrator is irrelevant to whether Plaintiff can prevail on his *Monell* claim, as long as Plaintiff has sufficient evidence that one of the detectives committed a constitutional violation against him. Thus, Plaintiff can pursue a *Monell* claim by proving an underlying constitutional violation by any of the detectives—Terpay, Farmer, Staimpel, Stoiker, or Englehart—whether or not any of them are named defendants or found individually liable. *See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002).[10]

There are three independent claims establishing Plaintiff's right to a jury trial against the City here: (1) the City's unconstitutional policy that instructed officers not to disclose certain

---

[10] *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001), cited by the City, supports the point. *Watkins* stands only for the uncontroversial proposition that plaintiff must prove a constitutional violation. In *Watkins*, there were no other officers whose conduct was at issue besides the named individual defendants. *France v. Lucas*, 836 F.3d 612, 631 (6th Cir. 2016), also cited by the City, actually supports Plaintiff's argument: "Richland County cannot be liable under *Monell* without an underlying constitutional violation."

evidence (GPO No. 19-73); (2) the City's lack of any policy regarding *Brady* obligations and juvenile interviews; and (3) the City's failure to train and supervise its officers in light of the obvious need. Taking the evidence in the light most favorable to Plaintiff, summary judgment is improper here, and each of these claims should proceed to trial.

## I.     The City Had an Express Policy that Was Unconstitutional and Required Police Not to Disclose Evidence such as Witness Statements.

GPO No. 19-73 expressly instructed officers that witness statements were not discoverable. It stated that it "does not authorize the discovery or the inspection of reports, memoranda, or other internal documents made by the Prosecuting Attorney or his agents (police departments are his agents) in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents." Dkt. 101-7; Dkt. 102 at 99–100. As discussed above, this policy was enacted by the Chief of Police, who had final policymaking authority or had been delegated such by the Mayor and Director of Public Safety. Thus, there is sufficient evidence that this express policy of the City was unconstitutional as a plain violation of *Brady*. *See Monell*, 436 U.S. at 690.

The City argues that GPO No. 19-73 merely instructed officers to turn over evidence to the prosecutor and to allow the prosecutor to disclose exculpatory evidence, but that is not what the GPO says. Indeed, the City admitted, through its designated witness, that this rule was in effect in 1975, but it is not in effect today because "our rules have changed. And the rules of discovery and what the prosecutor requires us to provide them is any and all documentation in a case." Dkt. 102 at 101–02. This is not how the City instructed its officers in 1975.

This is not merely an unconstitutional policy; it is an unconstitutional policy that is at the heart of the constitutional violations Plaintiff brings here. The causal chain for the jury to consider is straightforward. Assuming the facts and inferences in Plaintiff's favor, Vernon told

16

Cleveland detectives that he did *not* witness the Franks murder and they coerced him into making a statement saying that he did see it, which led to Jackson, Ajamu, and Bridgeman needlessly spending decades in prison. *See* Dkt. 99-1 at 91–94, 175–76. Vernon's statement that he never saw the crime was not disclosed to the prosecutor. Nor was the fact that he was fed all the details about the crime, or the coercion or fabrication of his statement. The express terms of GPO No. 19-73 did not authorize discovery of statements of witnesses. Dkt. 101-7. Simply put, a jury could conclude that officers did not disclose Vernon's statement that he never saw the crime and did so consistent with this official policy of the City. Moreover, that is not for this Court to decide, because causation is a jury question. *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988) ("The matter of causation is an issue of fact which must be decided by the jury."); *Obrycka v. City of Chicago*, 2012 WL 601810, at *9 (N.D. Ill. Feb. 23, 2012) (holding that plaintiff's evidence, including expert testimony, created a genuine dispute of material fact on causation prong of *Monell*).

## II. The City's Conscious Choice Not to Have Policies on *Brady* Obligations and Other Crucial Issues Amounted to Deliberate Indifference.

In addition to being held liable for having an expressly unconstitutional policy (such as GPO No. 19-73), a municipality may also be held liable under § 1983 for its *deliberate choice not to have a policy* when one is called for. In *Canton*, the Supreme Court "distinguished between a city's deliberate or conscious choice not to have a policy, which can fairly be characterized as a municipal policy, and the city's occasional negligent administration of an otherwise sound program." 489 U.S. at 391 (internal citations and quotation marks omitted). Liability occurs in "a situation that demands a policy," where the failure to implement a policy "ignored a plainly obvious danger." *Armstrong v. Squadrito*, 152 F.3d 564, 577–78 (7th Cir. 1998); *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) ("In situations that call for

17

procedures, rules or regulations, the failure to make policy itself may be actionable."); *Avery v. Burke Cnty.*, 660 F.2d 111, 114 (4th Cir. 1981) ("Official policy may be established by the omissions of supervisory officials as well as from their affirmative acts."); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143–44 (9th Cir. 2012).

Thus, it is of little moment that the City argues that it had no express policies instructing officers to withhold exculpatory evidence, fabricate evidence, or threaten witnesses. Dkt. 101 at 3, 5. The City can be liable for its deliberate choice not to have policy in these areas.

Moreover, Plaintiff need not prove a pattern of unconstitutional conduct to prevail on this type of claim regarding the failure to adopt a policy where the need for policy is obvious. "If the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur*, 475 U.S. at 481. "More importantly, where action is directed by those who establish government policy, *the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly*." *Id.* (emphasis added); *see also Gregory*, 444 F.3d at 755 (plaintiff can show the municipality's inaction had the "obvious consequence" of leading to a constitutional violation of the sort experienced by the plaintiff); *Miller v. Calhoun Cnty.*, 408 F.3d 803, 816–17 (6th Cir. 2005) (if the violation is a "known and obvious" or "highly predictable consequence" of an ongoing course of action or inaction, knowledge of past violations is unnecessary and deliberate indifference will be assumed).

For example, in a case involving similar claims as here, the court denied summary judgment to a city where the plaintiff's *Monell* claim alleged that the city failed to adopt any *Brady* policies or training in 1971. *Haley v. City of Boston*, 2013 WL 4936840, at *5 n.12 (D. Mass. Sept. 12, 2013). Like the CPD's manual here, the police manual in *Haley* dated from 1950.

18

The court explained that "the lack of pattern evidence is not necessarily fatal to a municipal liability claim" where it was foreseeable that a constitutional violation would result without a policy. *Id.* (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 832 (1985) (Brennan, J., concurring)).[11] This Court should deny summary judgment here, as the City of Cleveland similarly made the deliberate choice not to have policies regarding obligations with respect to *Brady*, interviewing juvenile witnesses, and other critical police functions.

The City admits that written policy explaining officers' *Brady* obligations is important to protecting the constitutional rights of citizens with whom officers may interact: The City now has adopted such written policy in the manuals for each investigative unit of the CPD. Dkt. 102 at 26–28, 32–33. There were no such policy manuals in the 1970s. *Id.* at 31. Ensuring that officers understood their *Brady* obligations was no less important in 1975 than it is in 2017. And, by 1975, *Brady* was not new: it had been the law of the land for a dozen years. As expert Anders explained, "documented policy is the single-most important control measure by which improper police performance, corruption, misconduct and tragic outcomes can be dissuaded." Ex. 38a at 2.

Consider the state of affairs with City policy in 1975. New "recommended national standards" for police policy had been developed by the early 1970s. Dkt. 102-15 at 34–35. Yet the City was still operating under its Rules from 1950. These policies obviously pre-dated *Brady*, and they were "out of date in light of these new standards." Dkt. 102-15 at 35. Neither the Rules nor the GPOs addressed in any way the disclosure of exculpatory and impeachment evidence. *See Bordanaro*, 871 F.2d at 1159–60 ("The City of Everett was operating under a set of rules and regulations promulgated in 1951 and last distributed to the officers in the mid-sixties. The Rules

---

[11] Contrary to the City's argument, Dkt. 101 at 20, *Tuttle* does not hold that a plaintiff must present proof of more than a single incident. *Tuttle* held that proof of a single incident is not sufficient *unless* there is also proof that the incident was caused by an existing, unconstitutional municipal policy that can be attributed to a municipal policymaker. Here, the failure to implement any training on *Brady* was a deliberate and conscious choice on the part of the final policymaker, and this constituted an official policy.

and Regulations of the Everett Police Department … failed to address contemporary law enforcement issues and lacked sufficient detail to serve as the operating directives of a modern police force."). Simply put, the City had no policies that explained what evidence must be preserved or disclosed, what constitutes impeachment or exculpatory evidence, or that all evidence had to be turned over to the prosecutor's office. Because officers are not trained in the law, they need explicit policies that explain the meaning of impeachment and exculpatory evidence, and training on those policies. *See* Ex. 38a at 21–22. The City deliberately and consciously chose to have neither, despite knowledge that its policies and training were outdated. *See* Dkts. 102-15, 102-16; Ex. 46.

These failures ignored the plainly obvious danger that citizens' constitutional rights would be violated in the absence of such policies. The City's final policymaker, the Chief of Police, knew of these problems as early as 1972, when Mayor Perk wrote to the Chief and the Director that CPD policies and training needed revision.

The City nonetheless contends that it did have express policies in place regarding *Brady* obligations. The City points to four rules, but none of them deal with *Brady* obligations. *First,* Rule 66—created in 1950 and pre-dating *Brady*—merely states, "Officers … shall thoroughly familiarize themselves with all of the facts and details concerning such a case, so that all of the evidence may be properly presented to the court." Dkt. 102-2 at 55. It says nothing about disclosing all information, including exculpatory and impeachment evidence, to the prosecutor. *See* Dkt. 102 at 50. *Second*, Rule 77 states, "Officers and members shall report on all matters referred to or investigated by them. Such reports may be either verbal or written, as the officer in charge may direct." Dkt. 102-2 at 59. As Anders explained, this rule is too vague and general to inform officers of their obligation to disclose exculpatory and impeachment evidence under

*Brady*, as it does not explain what "report on all matters" means, or how specific an officer must be in his reports. Dkt. 105 at 74–79. *Third*, Rule 78 provides that reports, testimony, and conversations affecting the Division of Police "shall be truthful and unbiased." Dkt. 102-2 at 60. But this rule does not say anything about disclosure of exculpatory or impeachment evidence, and the City does not claim that it does. *See* Dkt. 101 at 5; Dkt 105 at 132. As Anders testified, Rule 78 is wholly inadequate. Dkt. 105 at 78–79, 88–89, 132. *Finally*, Rule 99 merely tells officers not to violate the law. Dkt. 102 at 84–85; Dkt. 102-2 at 68. But, as the City admitted, most police officers are not lawyers, Dkt. 102 at 88, and officers would need training or instruction to know what the law is. Officers and detectives did not get any such training or instruction. *See supra*, Statement of Material Facts, III. As Anders explained, "written policy that merely instructs officers (to include detectives) … to follow the law (violate no laws), or abide by the laws and the U.S. Constitution, is not reasonable, appropriate or adequate policy." Ex. 38a at 21. Adequate policy must guide officers' conduct and "direct the performance of police officers to a reasonable degree of specificity and relevance." *Id.*; Dkt. 105 at 76–78.

Most telling is that officers at the time did not understand Rules 66, 77, 78, or 99 as requiring them to disclose exculpatory evidence to the prosecutor. All the detectives deposed in this case testified that there were no written policies in the 1970s stating that officers should disclose exculpatory evidence (or all evidence) to the prosecutor. *See* Dkt. 103-3 ¶ 11a; Ex. 20 at 80–82; Ex. 26 at 36; Ex. 35 at 20, 73–74; Ex. 13 at 148–49; *see also* Dkt. 102 at 87. No one pointed to Rule 66, 77, 78, 99, or any other rule or GPO as evidence that the City had a policy requiring officers to disclose exculpatory and impeachment evidence.[12]

---

[12] The City argues that Anders stated that it is possible for officers to conduct themselves in a manner consistent with accepted practices without written policies. *See* Dkt. 101 at 13. Anders acknowledged the possibility but unequivocally stated that officers in this case did not conduct themselves in a reasonable or acceptable manner (if a jury credits Vernon's testimony). Dkt. 105 at 58-59, 62-63, 70-71, 105. Moreover, this does not contradict

In light of this evidence of no written policy, the City points instead to Allen's and Cummings' testimony that it was the *practice* of homicide detectives to turn over everything to a prosecutor and let the prosecutor make the decision what should be disclosed. But unwritten practice is not an adequate substitute for a written policy on an issue as important as officers' *Brady* obligations. *See* Ex. 38a at 8–11. This is evidenced by the fact that the City has written policy on *Brady today*. Moreover, Allen's and Cummings' testimony is disputed by Detectives Tell and Turner, as discussed above. According to them, officers acted contrary to law *in practice*, due to the lack of formal policies. Unlawful acts and misconduct were "a part of police activity," and "it was the norm." Dkt. 104 at 35–36. The practice within the CPD was to "handle your case like you need to … get it solved," Dkt. 103 at 166, and the custom was to win a case, "make the pinch, to make the arrest." Dkt. 104 at 120. Turner knew of detectives manipulating evidence, and evidence was "never turned for the defense, ever. It was always for the prosecution, because winning the case was what it was all about. It wasn't about what was fair, honest, it was about winning." *Id*. at 119–20. The City quibbles with the fact that Detectives Turner and Tell could not recall specific cases, quantify with precise numeric frequency, or list names of specific offending officers. These are classic subjects for cross-examination, and the City cites no authority suggesting that Detectives Turner and Tell can be disregarded wholesale on that basis. There is a factual dispute that only a jury can resolve.

The City also asks the Court to disregard Tell's and Turner's testimony by drawing a false distinction between the practices of Cleveland homicide detectives and other detectives. Dkt. 101 at 6–7. But Tell and Turner testified that they were familiar with the general practices of all the detectives. Dkt. 103 at 83; *see* Dkt. 104 at 119–20. And, given that there was no

---

Anders' opinion that it is entirely foreseeable that *Brady* violations by officers will be committed when they are provided no guidance or training whatsoever on their *Brady* obligations. Anders explained that officers need guidance on key areas of police responsibility. *See id.* at 55-56, 84-85; *see also* Ex. 38a at 12, 14.

training provided to become a detective, *see supra*, Statement of Material Facts, III., much less specialized training to become a homicide detective, Tell's and Turner's testimony bears on the practices of all detectives. Finally, Tell and Turner both described a widespread practice of detectives not turning over exculpatory evidence even though they were in different detective units of the CPD in the 1970s. *See* Dkt. 103 at 22; Dkt. 104 at 53, 99.

Indeed, Defendants Englehart and Lamendola claim that police detectives did *not* have an obligation to disclose exculpatory and impeachment evidence to prosecutors. Ex. 47 at Nos. 1–2; Ex. 48 at No. 2; Ex. 49 at No. 2. Given that the detectives did not *believe* they were obligated to disclose exculpatory and impeachment evidence,[13] a reasonable jury could readily conclude that it was not detectives' *practice* to disclose such evidence, especially when the goal of detectives was to win cases. The story the City wants to tell is that, regardless of whatever unconstitutional practices may have existed in the rest of the detective division, the practices of homicide detectives were wholly compliant with all constitutional requirements—despite the lack of written policy and training and Defendants' own admission that they had no obligation to turn over *Brady* evidence. Given the evidence, a jury could reasonably reject this story.

Turner's and Tell's description of the failure to disclose exculpatory evidence as a common practice amongst all detectives is also corroborated by the fact that both homicide and non-homicide detectives described many other practices common to both homicide and other divisions. For instance, Cummings (who was in both auto theft and homicide), Allen (who was in homicide), and White (who was a general-duty detective), all testified that it was CPD practice that officers could interview juvenile witnesses without parents present. Ex. 20 at 17–19, 24–25; Ex. 13 at 45–46; Ex. 35 at 44–49; Dkt. 103 at 94–96, 154–55; Dkt. 103-3 ¶ 12e. Similarly, Allen

---

[13] As Plaintiff argues in his Responses to these Defendants' motions, detectives were obligated under clearly established law in 1975 to disclose exculpatory and impeachment evidence and avoid falsifying evidence.

testified that he did not recall any GPOs pertaining to homicide that did not also pertain to other kinds of investigations, and he did not think that witness interviews, note taking, or disclosure of exculpatory evidence in a homicide case would be any different than in any other kind of case. Ex. 13 at 79, 80–81. As Anders explained, the fundamentals with respect to how a detective would investigate a homicide versus other kinds of serious felonies is the same. Dkt. 105 at 171.

In sum, there is ample evidence in the record to permit a jury to conclude that it was the CPD's policy and practice not to require the disclosure of exculpatory evidence.

In addition to the failure to implement policies on *Brady* obligations, the City also chose not to implement any written policies on how to conduct interviews with juvenile witnesses or how to avoid an unduly suggestive interview by providing unknown or leading information to witnesses. *See* Dkt. 102 at 81. Not only were there no written policies, but it was CPD practice that officers could interview juvenile witnesses without parents present. Ex. 20 at 24–25; Ex. 13 at 45–46; Ex. 35 at 44–48; Dkt. 103 at 94–96, 154–55; Dkt. 103-3 ¶ 12e. Written policies on these topics are important because of unique factors associated with juveniles, including "susceptibility to intimidation and coercion, accuracy, undue influence and believability, and impartiality, more so than many adults." Ex. 38a at 29; *see also* Dkt. 103 at 176–78 (juveniles could be easily led or coerced, especially in the absence of their parents). Yet, the City had no policies informing officers that juveniles are more susceptible to suggestive questioning than adults and require the presence of adults. *See* Ex. 26 at 31–32; Dkt. 102 at 81.

The City acknowledges the importance of such policies because, as with *Brady*, the City presently has rules and orders relating to juvenile witnesses that instruct officers that adults should be present during a juvenile witness interview. Dkt. 102 at 168–70. The City

acknowledges that it is important for juveniles to be interviewed in the present of an adult. These policies did not exist in the 1970s. *Id*. at 170–71.

A jury could readily conclude that the City's deliberate choice not to have policies regarding officers' *Brady* obligations and juvenile interviews played a direct role in Plaintiff's wrongful incarceration. Policies regarding *Brady* would have required that information such as Vernon's statement that he did not see the crime to be disclosed. Policies also would have required the detectives to disclose their feeding of information to Vernon, their coercion of Vernon, their notes taken during their interviews of Vernon, and their fabrication of Vernon's signed statement. Moreover, as Vernon testified, if his mother had been allowed to accompany him to the police station on the day of the lineup, none of this would have happened. Ex. 5 at J6510. Indeed, if his parents were there, police would not have been able to wrongfully threaten Vernon that his parents would go to jail if he didn't change his statement to their liking.

**III.    The City's Failure to Train and Supervise Amounted to Deliberate Indifference.**

To prevail on his claim for failure to train or supervise, Plaintiff must show that (1) the City's training or supervision was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the City's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006). There is sufficient evidence for a reasonable jury to find in favor of Plaintiff on this claim.

As with Plaintiff's claim regarding the City's failure to adopt necessary policy, single-incident liability is available where the need for more or different training is so obvious that a plaintiff's injury is a "highly predictable consequence" of deficient training. *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011); *Canton*, 489 U.S. at 390; *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 396, 409 (1997); *Shadrick v. Hopkins Cnty*., 805 F.3d 724, 739

(6th Cir. 2015). "Liability under this theory depends on the 'likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Brown*, 520 U.S. at 409–10.

The Supreme Court in *Connick* contemplated the situation presented here: The failure to train officers regarding *Brady* obligations presents a highly predictable danger of constitutional violations. In *Connick*, the Court concluded that there was no single-incident liability for failure to train *prosecutors* about *Brady* because prosecutors are legally trained and familiar with *Brady*. 131 S. Ct. at 1361–65. The Court expressly distinguished attorneys from police officers: "legal '[t]raining is what differentiates attorneys from average public employees.'" *Id*. at 1361; *see also id.* 1363 ("A licensed attorney making legal judgments, in his capacity as a prosecutor, about *Brady* material simply does not present the same 'highly predictable' constitutional danger as *Canton*'s untrained officer."). In fact, the Court expressly stated that police officers are not equipped with the tools to find, interpret, and apply *Brady*: "The reason why the *Canton* hypothetical is inapplicable is that attorneys, ***unlike police officers***, are equipped with the tools to find, interpret, and apply legal principles." *Id.* at 1364 (emphasis added).

The Sixth Circuit's decision in *Gregory* is directly on point and controlling here. In *Gregory*, a plaintiff who had been wrongfully convicted due to a *Brady* violation alleged that the City of Louisville failed to train its officers in the requirement to disclose exculpatory material. The district court granted summary judgment to the city. The Sixth Circuit reversed. The court examined the evidence presented by plaintiff, which was (1) expert testimony that the police department's training on handling of exculpatory materials was nonexistent, and (2) "deposition and inferential evidence" that officers generally did not receive any instruction in the handling of exculpatory materials. 444 F.3d at 753–54. The city countered with testimony from a former

26

chief of police that "officers are trained to document and turn over to the prosecutor all evidence in their possession." *Id*. at 754. The Court explained that, at "a minimum, Plaintiff has presented sufficient evidence to survive summary judgment on his failure to train allegations regarding exculpatory materials." *Id.* "The obligation to turn over exculpatory materials," the court continued, "is a significant constitutional component of police duties with obvious consequences for criminal defendants." *Id.* In sum, the Court held that "the district court erred when it failed to consider that evidence of failure to train on the proper handling of exculpatory materials has the 'highly predictable consequence' of constitutional violations." *Id. See also Moldowan*, 578 F.3d at 393 (affirming denial of summary judgment on failure-to-train claim regarding *Brady*).

Plaintiff's evidence here is indistinguishable from that in *Gregory*. The City deliberately chose to provide no training on *Brady* or juvenile-witness interviews, even though the need for such training was obvious to prevent the violation of a criminal defendant's constitutional rights. There are no written policies, training bulletins, or any other documentation whatsoever indicating that officers or detectives were taught anything on these topics. *Brady* obligations were not taught in academy or to detectives when they became detectives. Nor do any of the training certificates for the detectives show any training on disclosure of exculpatory evidence.

The City relies heavily on Allen's testimony about "on-the-job training" in which he learned from the "old timers," but at best this merely creates a factual dispute: Turner and Tell testified that the practice was *not* to disclose all information.[14] Moreover, on-the-job training is insufficient when older detectives, who were themselves not trained on *Brady*, train younger

---

[14] The "old-timers" who trained Allen who had been on the job at least 15–20 years before Allen joined the CPD in 1967. Ex. 13 at 9, 26-27. *See also* Ex. 20 at 34–35. And because those "old timers" had joined the department years before *Brady* was decided, they could not have trained Allen on his *Brady* obligations. The City admitted that between 1950 and 1980, it did not train detectives to disclose exculpatory evidence. Dkt. 102 at 143. This time frame covers both the "old timers" and the detectives in this case, who all joined the CPD between 1949 and 1964. Exs. 50–53; Ex. 26 at 8–9.

detectives. As expert Anders explained, the lack of knowledge is simply passed down from one generation of detectives to another. *See* Ex. 38a at 53; Dkt. 103 at 157, 190; Dkt. 103-3 ¶ 10a. The sufficiency of on-the-job training here is a factual question for the jury. *See Shadrick*, 805 F.3d at 740 (on-the-job training of LPNs was inadequate and reasonable jury could find deliberate indifference); *Milligan v. United States*, 644 F. Supp. 2d 1020, 1044–45 (M.D. Tenn. 2009) (adequacy of on-the-job training was a jury question in context of *Monell* claim). And Anders' expert opinions on the City's deficiencies regarding their failures to train are the sort that the Sixth Circuit has recognized as particularly valuable. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) (reliance on expert testimony regarding a city's failure to train under *Monell* is "particularly appropriate where, as here, the conclusions rest directly upon the expert's review of the materials provided by the City itself").

Just as in *Gregory* and *Moldowan*, a jury must assess whether the City's failure to train contributed to the constitutional violations here. Not only was there 1) an express GPO stating that officers should *not* disclose witness statements, and 2) no polices regarding *Brady* obligations and conducting juvenile interviews, but there was no training or supervision regarding these obligations. Thus, when Eddie Vernon told Terpay and Farmer that he never saw this crime and "they didn't do it," Dkt. 99-1 at 93, they never disclosed that information to prosecutors. The detectives similarly never disclosed that they fed him all the information about the crime. And, as noted, none of this would have occurred if Vernon's parents were there when detectives interviewed and threatened him.

## IV. The City's Policy, Training, and Supervision Failures Caused the Violation of Plaintiff's Constitutional Rights.

There is an extensive amount of exculpatory evidence which a jury could find was withheld in this case. Vernon described telling Terpay and Farmer that Jackson and the

28

Bridgeman brothers "didn't do it"; being fed information by the detectives about how the crime occurred; threatened by Staimpel and Stoiker into falsely implicating Jackson and his co-defendants; and seeing Terpay and Farmer taking notes throughout their interviews with him, none of which were preserved or disclosed. Karen Smith corroborates this through her testimony that she was given information about the crime by one of the detectives. Jackson also testified that Terpay and Farmer attempted to physically beat him into giving a false confession. None of these facts were written in a report or disclosed. *See* Ex. 38a at 22–25. If there had been policies or training on the importance of *Brady* (or the other investigation topics discussed above), then the detectives likely would not have committed the constitutional violations that a reasonable jury could find they committed in this case. Significantly, the City has admitted that the individual Defendants acted consistently with the policies of the City. Dkt. 102 at 133–34.

If there had been policies on disclosure of exculpatory evidence or any of the other topics discussed above, then it is likely that the detectives would have understood the parameters of the law and expectations for their conduct. As Anders explained, "[a]dequate policies and training are essential for reasonable and lawful police conduct." Ex. 38a at 60. Policy is "crucial" not only because it sets "[o]rganizational standards," but also because it sets "[g]uidelines, mandates, and expectations," "[s]tructure, parameters and consistency," and "[r]esponsibilities." *Id*. at 8–9. Policies must tell officers "what their actions should be to conform to the law." *Id*. at 21. This is especially important for "criminal detectives who investigate crimes and thus frequently deal with exculpatory and/or impeachment evidence." *Id*. at 22. *See also Bordanaro*, 871 F.2d at 1160 ("Since few rules or guideposts for conduct were in force, the organization of the police department placed too much discretion at all operating levels.").

All of this, at the very least, presents a jury question. "'The high degree of predictability may … support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.'" *Shadrick*, 805 F.3d at 739 (quoting *Bryan Cnty.*, 520 U.S. at 409–10). The City argues that the failure to train and supervise could not have caused Plaintiff's injury because no amount of training or supervision would have prevented detectives from fabricating evidence, lying, or concealing exculpatory evidence. *See* Dkt. 101 at 27. But the City's own expert, Dan Montgomery, has stated that when there is a subculture of officers who "do things the way they want to do them," and the city has failed to address this subculture, the city is "thereby endorsing it." *Ortega v. City and Cnty. of Denver*, No. 11-2394, Dkt. 62-6 (D. Colo. July 16, 2012). Moreover, causation is a jury question. *Matulin*, 862 F.2d at 613. Just as in *Gregory*, Plaintiff is entitled to a jury trial on his *Monell* claim: "A custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the City and the causal connection to the constitutional violations experienced by Plaintiff." 444 F.3d at 754; *see also Moldowan*, 578 F.3d at 393. The Sixth Circuit in *Gregory* and *Moldowan* considered the same causation issue and held that it is a jury question.

## CONCLUSION

Three innocent men needlessly spent decades in prison. Eddie Vernon has testified that he told police he never saw the crime. The City's policies and practices enabled that statement, and the truth, to remain unknown to prosecutors. Under Supreme Court and Sixth Circuit precedent, a trial is required against the City of Cleveland on Jackson's *Monell* claims. The City's motion for summary judgment should be denied.

Respectfully submitted,

s/ Elizabeth Wang
One of Plaintiff's Attorneys

Jon Loevy                          Elizabeth Wang
LOEVY & LOEVY                       LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.       2060 Broadway, Ste. 460
Chicago, IL 60607                  Boulder, CO 80302
O: 312.243.5900                    O: 720.328.5642
jon@loevy.com                      elizabethw@loevy.com

## CERTIFICATE OF SERVICE

I, Elizabeth Wang, an attorney, hereby certify that on March 1, 2017, I served the foregoing Plaintiff's Response in Opposition to Defendant City of Cleveland's Motion for Summary Judgment [Dkt. 101] on all counsel of record via CM/ECF.

s/ Elizabeth Wang

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(f), I hereby certify that the foregoing complies with the 30-page limitation for memoranda relating to dispositive motions in complex cases. This case has been assigned to the complex track. Dkt. 42.

s/ Elizabeth Wang

32