IN THE UNITED STATES DISTRICT COURT

    NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

RICKY JACKSON,

            Plaintiff,
                                    JUDGE BOYKO
    -vs-                            CASE NO. 1:15-CV-00989

CITY OF CLEVELAND, et al.,

            Defendants.
_____/
KWAME AJAMU, et al.,

            Plaintiffs,

    -vs-                           JUDGE BOYKO
                                   CASE NO 1:15-CV-01320

CITY OF CLEVELAND, et al.,

            Defendants.
_____/

    Deposition of LEO ALLEN, taken as if upon examination before Brian A. Kuebler, a Notary Public within and for the State of Ohio, at the offices of Roetzel & Andress, 1375 East 9th Street, 10th Floor, Cleveland, Ohio, at 9:15 a.m. on Thursday, June 16, 2016, pursuant to notice and/or stipulations of counsel, on behalf of the Plaintiffs in this cause.

                        - - - -



EXHIBIT 13

APPEARANCES:

Elizabeth Wang, Esq.
Loevy & Loevy
2060 Broadway, Suite 460
Boulder, Ohio  80302
(720) 328-5642,

    On behalf of the Plaintiff;
    Ricky Jackson;

Terry H. Gilbert, Esq.
Friedman & Gilbert
55 Public Square, Suite 1022
Cleveland, Ohio  44113
(216) 241-1430,

    and

David E. Mills, Esq.
The Mills Law Office, LLC
1300 West Ninth Street, Suite 636
Cleveland, Ohio  44113
(216) 929-4747,

    On behalf of the Plaintiffs,
    Kwame Ajamu and Wiley Bridgeman;

Stephen W. Funk, Esq.
Roetzel & Andress
222 South Main Street
Suite 400
Akron, Ohio  44308
(330) 376-2700,

    On behalf of the Individual
    And Estate Defendants;

Shawn Mallamad, Esq.
City of Cleveland Law Department
601 Lakeside Avenue
Room 106 City Hall
Cleveland, Ohio  44114
(216) 664-2569,

    On behalf of the Defendant,
    City of Cleveland.



LEO ALLEN                                              June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                                     3

                          I N D E X

EXAMINATION
LEO ALLEN
BY MS. WANG                                 4
EXAMINATION
LEO ALLEN
BY MR. GILBERT                              113


Plaintiff's Exhibit 1                       139



800.211.DEPO (3376)
EsquireSolutions.com

LEO ALLEN, of lawful age, called by the Plaintiffs for the purpose of examination, as provided by the Rules of Civil Procedure, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF LEO ALLEN

BY MS. WANG:

Q. Could you please state and spell your name for the record.

A. Certainly.  Leo Allen.  A-l-l-e-n.

Q. What's your date of birth?

A. September the 5th, 1944.

Q. Are you currently employed?

A. I have a part-time job with the City of Parma. Umpiring chief.

Q. In Ohio?

A. Yes.

Q. And what do you do?

A. I'm the chief umpire.  I train umpires, make their schedules.  I work with them.  It's a part-time job in the summer.

Q. For their baseball team?

A. Yes.  I'm the chief umpire.

Q. Okay.  How long have you done that?

A. About 15 years.



Q.   Where do you live currently?

A.   In Parma, Ohio.

Q.   Okay.  Do you live there year round?

A.   No.

Q.   What is your other address?

A.   It's in Naples, Florida.  A condo.

Q.   What's the address?

A.   I have a condo down there.

Q.   What's your address?

A.   Where?

Q.   In Florida.

A.   Do you really need that, Miss?  It's just a condo in Naples, Florida.

Q.   Well --

A.   I have received papers there, so it's 1650 Windy Pines Drive, Naples 34112.

Q.   And what is your address in Parma?

A.   7524 Marlborough, that's just like the cigarette but with a u-g-h on the end, Avenue.

Q.   What's the ZIP?

A.   44129.

Q.   Are you married?

A.   Yes, ma'am.

Q.   Do you have any kids?

A.   Yes, ma'am.



Q.   How many children?

A.   Two.  A son and a daughter.

Q.   How old are they?

A.   Son is 43, daughter is 40.

Q.   Were you a detective at the Cleveland Police Department?

A.   Yes, ma'am.

Q.   For how long?

A.   I was a detective for 21 years.

Q.   From what years?

A.   A detective from 1973 until I retired in 1994.

Q.   When did you first join the Cleveland Police Department?

A.   September of 1967.

Q.   And what employment have you had since you retired in '94?

A.   I worked for the National Basketball Association as a security representative for the Cavaliers here.  And I also went all over the country and did drug testing for the NBA.  And then I had a -- also worked for a private security company out of Westlake, Ohio, and I did investigation for them and surveillance and things like that.

Q.   What was the security company in Westlake?

A.   Oh, man, I knew you were going to ask me that and



I just -- Research Associates.  How could I forget?

Q. What years did you work for them?

A. Well, I did some work for them -- boy, that's a good question.  Let's see, I would say in the middle 1980s until maybe about 2005, approximately, give or take a year or two.

Q. So that was secondary employment that you had, that overlapped a bit with your employment at CPD?

A. Yes, it did.  Yes.

Q. Okay.  What other jobs have you had since you retired in '94 from the Cleveland Police Department?

A. Oh, I had a part-time night security job at a high-rise condo in Naples, Florida.  I worked maybe two, three days a week to help them out.

Q. Are you doing that currently?

A. No.  That was for the Continental Club.  That's the name of the place.

Q. And what years did you do that?

A. Oh, let's see, approximately from 2002 until maybe 2010.  Seven or eight years in there.

Q. Why did you leave that job?

A. They went with like their own little private



security company.  They didn't need, you know, individual retired people.  They went and got their own little security company to do it.

Q.  Why did you leave the job with the security company in Westlake, Research Associates?

A.  Huh, I had a disagreement with one of the employees and I thought, well -- the owner had passed away, Mr. Peterson, he used to be an FBI agent, he had passed away, and after that whoever took it over, I don't know, I just had enough, enough doing that.

Q.  You said Mr. Peterson was the owner?

A.  Yes.

Q.  What was his first name?

A.  I think it was Bob Peterson.  He passed away.

Q.  He used to be an FBI agent?

A.  Yes.

Q.  What was the nature of the disagreement?

A.  Oh, you mean with the employee there?

Q.  Yes.

A.  It was over a rate of pay.

Q.  Whose rate of pay?

A.  Mine.

Q.  Oh, okay.  Was the employee a supervisor of yours?



A.   No.  He wasn't a supervisor, but he -- well, he was kind of a supervisor, but he wasn't -- I guess you could say that.  Yeah, he ran the surveillance part of it, and then he would give me a job from time to time.  And then he had a job in Florida, I went and did it, he said charge whatever you want.  So apparently he thought I charged a little bit too much and it was a big disagreement.  And I said, hey, no problem, pay me what you think.  And then it -- I just had enough at that point, I had worked enough.

Q.   Were you terminated?

A.   No.

Q.   You left voluntarily?

A.   Sure.

Q.   What other jobs have you had since you retired from the Cleveland Police Department in 1994?

A.   NBA security, City of Parma, which I'm still there, Continental Club -- best of my recollection, that's it, ma'am.

Q.   Do you know anything about the homicide investigation of Harold Franks?

A.   Harold Franks, not really.  I don't recall that name.

Q.   What do you mean "not really"?



A.  Well, I don't recall that name, ma'am, Harold Franks.

Q.  Do you know anything about the investigation or prosecution of Ricky Jackson?

A.  I did not work on that case, but I realize that's why we're here, so --

Q.  Okay.

A.  But I did not work on the case.

Q.  You did not work on the case?

A.  No, ma'am.

Q.  Did you ever have any interactions with Ricky Jackson?

A.  No, ma'am.

Q.  Did you ever have any interaction with Wiley Bridgeman?

A.  No, ma'am.

Q.  Did you ever have any interaction with a person who used to be known as Ronny Bridgeman?

A.  No, ma'am.

Q.  Did you ever have any interaction with a witness named Edward Vernon?

A.  No, ma'am.

Q.  Are you represented by counsel here today?

A.  Yes.

Q.  Who is your counsel?



A.   Mr. Funk.

Q.   Did you retain Mr. Funk as your counsel?

A.   No, ma'am.  I had a conversation with Mr. Funk
     and he told me that he would be representing me.

Q.   Have you had prior interactions with Mr. Funk?

A.   Yes, ma'am.

Q.   In what context?

A.   It was a lawsuit involving two death row inmates
     against me and several others, the city, and the
     coroner, and a lot of other people.  And Mr. Funk
     was my attorney for that.

Q.   Was that the Joe D'Ambrosio case?

A.   Yes, ma'am.

Q.   And so Mr. Funk was your attorney for that case?

A.   Yes, ma'am.

Q.   Did you ever have an attorney/client relationship
     with Mr. Funk in any other case?

A.   No, ma'am.

Q.   Did you ever have any interaction with Mr. Funk
     outside of the Joe D'Ambrosio case and your
     interaction with him for this deposition?

A.   I don't know what you mean by "interaction".

Q.   Did he ever represent you in anything else?

A.   Oh, no, no, no.

Q.   Have you ever spoken to him about anything else



other than this deposition or the Joe D'Ambrosio case?

A. No, ma'am, not that I remember.

MR. FUNK:  I just asked to clarify that there's also, there was a related case of Keenan versus that.  It's also been -- both of those cases were dismissed with prejudice, but they're both related to the same.

MS. WANG:  It was related to the Joe D'Ambrosio case?

MR. FUNK:  Uh-huh, right.

BY MS. WANG:

Q. When were you first contacted by Mr. Funk?

A. Regarding?

Q. This case.

A. Probably a couple weeks ago.

Q. How many conversations have you had with Mr. Funk?

A. Two or three.

Q. Were they by telephone?

A. One was.

Q. And the other two were in person?

A. Yes.

Q. Was the telephone conversation the first



conversation that you had with Mr. Funk?

A.   Yes.

Q.   And were you in Ohio or Florida when that conversation took place?

A.   I believe I was up here.  I had just gotten back.

Q.   How long did that conversation last?

A.   Not long, ma'am.

Q.   Was there anybody with you when you had that conversation with Mr. Funk?

A.   No, ma'am.

Q.   Do you know if there was anybody else with Mr. Funk when he was on the phone with you?

A.   I would have no knowledge.

Q.   Your second conversation with Mr. Funk was in person; is that correct?

A.   Yes, ma'am.

Q.   How long after that first conversation did it take place?

A.   About a week.

Q.   Where did you meet with Mr. Funk?

A.   Right here.

Q.   In the conference room?

A.   Actually, no.  Down in one of the offices down there, the smaller offices.

Q.   Okay.  In these offices here?



A.  Yes, ma'am.  In this building.

Q.  How long did that meeting last?

A.  Maybe about an hour and a half.  Maybe just a little bit longer, something along those lines.

Q.  How long ago was that meeting?

A.  Last week.

Q.  Was there anybody else present for the meeting besides you and Mr. Funk?

A.  No, ma'am.

Q.  The second meeting that you had with Mr. Funk -- or in-person meeting, where did that take place?

A.  At my friend's restaurant, downtown Cleveland.

Q.  In downtown Cleveland?

A.  Yes, ma'am.

Q.  And were you having a meal there?

A.  Actually we did.

Q.  So lunch or dinner?

A.  It was in between.  It was -- we had a corned beef sandwich.

Q.  Who was present for that meeting?

A.  Mr. Funk and myself.

Q.  Was there anybody else present for that meeting?

A.  No, ma'am.

Q.  How long did that meeting last?

A.  About the same time, about an hour and a half.



LEO ALLEN
JACKSON -vs- CITY OF CLEVELAND

June 16, 2016
15

Q.  And how long ago was that?

A.  That was yesterday.

Q.  Have you ever spoken with Shawn Mallamad?  He's
the gentleman at the end of the table there.

A.  Yes, we just met for the first time today.  I
know who he was, but, no, I've never spoken to
him.

Q.  Is he representing you in this deposition today?

A.  Not to my knowledge.  I don't know.

Q.  What did you speak with Mr. Mallamad about?

A.  I asked him if he was related to another Mallamad
that I know.  And then we talked about how he got
his name and Ellis Island and a few personal
things.  That's all.  Nothing about the case.

Q.  You didn't have any conversation about this case
here?

A.  No, ma'am.

Q.  Have you ever spoken with Mr Mallamad on any
other occasion?

A.  Not to my knowledge, recollection.

Q.  Have you ever been sued in any lawsuits other
than the Joe D'Ambrosio case and the related
case?

A.  No, ma'am.

Q.  Have you ever been a witness in a civil lawsuit?



A.   A witness to a civil lawsuit, I don't think so.

Q.   Have you ever sued somebody in a lawsuit?

A.   No, ma'am.

Q.   Have you ever been arrested?

A.   No, ma'am.

Q.   Prior to joining the Cleveland Police Department
     in 1967, were you employed?

A.   Yes, ma'am.

Q.   And what did you do?

A.   I was a -- let's see, well, I worked in an office
     and I worked for a Mr Mallamad, that's why I
     asked him if he was related.  And --

Q.   A different Mallamad?

A.   Yeah.  He didn't know the Mallamad.  I think it
     was spelled different.  I worked for him and his
     son.  They had a small office on the east side
     and then I joined the department.  And prior to
     that, I worked at National City Bank as an error
     checker in the check distributing department.

Q.   What year did you graduate from high school?

A.   1962.

Q.   Did you go to college?

A.   Yes.  For about a year and half.  I did not
     graduate.

Q.   Okay.  What college did you attend?



A.   Cuyahoga Community College, downtown campus.

Q.   What high school did you go to?

A.   Holy Name High School in Cleveland, Ohio.

Q.   Did you grow up in Cleveland?

A.   Yes, ma'am.

Q.   After you graduated from -- or after you attended college, what employment did you have right after attending college?

A.   Oh, I was employed while I went to college.  It was night classes.

Q.   Okay.  What was that employment?

A.   That was National City Bank.

Q.   Okay.  Did you continue that employment after you stopped going to college?

A.   Yes, for a little while.  Then I left the bank and I went to work for that -- gee, I can't remember what kind of a company it was with Mr. Mallamad and his son, but I worked in the office there for a while and then I joined the police force.

Q.   Why did you join the Cleveland Police Department?

A.   Why did I join?  Well, that's interesting, I never thought about being a police officer until one night I was out with some friends, I had just turned 21 and we were at a restaurant 3:00 in the



LEO ALLEN                                              June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                                   18

morning and I saw this sign, it said the
Cleveland Police Department needs you if you have
the guts.  It was a policeman pointing his
finger.  I never thought about being a policeman
prior to that.  And I always wanted to be a
professional baseball player, but that didn't
quite work out, so I kept thinking about that,
joining the police force, and I thought wow,
maybe I can do that, and I joined.

Q.   Did you have any family members who were police
     officers?

A.   No, ma'am.

Q.   When you joined the Cleveland Police Department,
     what was the first position that you held?

A.   Patrolman.

Q.   How long did you have that position?

A.   Until March of 1973.  September of '67 until
     March of '73.

Q.   When you joined the Cleveland Police Department,
     did you attend police academy?

A.   Yes, ma'am.

Q.   And how long was the police academy?

A.   I believe it was three months.

Q.   What classes did you take in the police academy?

A.   Well -- classes?  Well, firearms training of



course.  Procedures involving arrests.  Just -- I don't know how to answer that, I mean, further.  I can't recall anything more than that, but, you know, just preparing you to work the street and everything.

Q.  Are there any other classes that you took at the police academy that you can recall?

A.  No, ma'am.

Q.  Is there anything that would refresh your recollection as to the classes you took at the police academy?

A.  Well, ma'am, when you say classes, we -- like in in addition to firearms training of course that was very important.  I don't know if I would refer to them as classes, but just overall training to become a Cleveland Police Officer and what it means.

Q.  Well, let me ask you about the structure of the police academy then.  You said it lasted three months?

A.  To the best of my recollection, yes, ma'am.

Q.  And did you go to the academy every day or five days a week, or how many days a week?

A.  It was five days a week.

Q.  And how many hours a day?



A. Eight. Best of my recollection, eight.

Q. So you went to the police academy for three months five days a week, eight hours a day?

A. Best of my recollection, yes, ma'am. It was a long time ago.

Q. Do you remember any of the instructors that you had in the police academy?

A. Their names? Wow, I can't recall their names right now. It's so long ago.

Q. All right. So you said that you didn't receive classes, per se, just overall training?

MR. FUNK: Objection.

Q. What did you mean by that? Those were your words, sir. What did you mean by that?

A. Well, I don't recall an actual -- I remember sitting in a room and the lieutenant was up there, a couple different lieutenants. And I guess it could be referred to as a class, but I'm thinking of -- and, yes, they -- well, I guess you could construe it as a class. That's how we received our training.

Q. I mean, you can refer to it however makes the most sense to you, so I'm -- I just want a description of what it was you were --

A. I don't know, ma'am.



Q.   -- doing for five days a week, eight hours a day.

A.   I don't know.  I'm trying to recall.  Believe me, it was so long ago, I was such a young man.  It was almost 50 years ago.  It was just a regular police academy training, physical fitness was included, agility, firearms, arrest procedures.  That's all I can remember, ma'am.

Q.   What did you learn about arrest procedures?

A.   Well, arresting -- you're actually arrest somebody, you advise them of their rights and transport them downtown, I mean.

Q.   How did you learn what their rights were?

A.   That was part of the training.

Q.   And what did you learn about that?

A.   What their rights were.

Q.   What were they?

A.   Well --

                    MR. FUNK:  Objection.  Go ahead.

A.   Right to remain silent.  You have a right to have an attorney present at any time.  At any time.  And those are the basic rights that I recall.

Q.   Did you learn anything about the criminal code?

A.   I'm sure that we had some training in that area, but I don't recall, ma'am.

Q.   Did you learn anything about how to conduct



interrogations?

A.  During the police academy?  I don't recall, ma'am.

Q.  Did you learn anything about how to interview witnesses?

A.  Not that I -- I mean, I don't recall if that was part of the police academy training.  I don't recall.

Q.  And I am sticking with the police academy for now --

A.  Yes, ma'am.

Q.  -- in which you understand.

A.  Yes, ma'am.

Q.  Did you learn anything in the police academy about what evidence or information you had to disclose to prosecutors?

                    MR. FUNK:  Objection.  You can answer.

A.  Oh, I'm sorry.  I don't recall.  If it was, I don't recall, no.

Q.  By the way, have you ever been deposed before?

A.  Have I ever been what?

Q.  Deposed.

A.  I think one time before, maybe about 30, 35 years ago.



Q.   Okay.  So you're doing pretty well, but basically I ask you questions, you will provide answers to the best of your knowledge.  If there's something you don't understand, let me know and I'll be happy to try to make my question more understanding.  Is that fair?

A.   Absolutely, ma'am.  Yes, ma'am.

Q.   You can take a break at any time unless there's a question pending, in which case you have to answer the question before you go on your break.  Is that fair?

A.   Thank you.  Yes, ma'am.

Q.   Your attorney and other attorneys may make objections to any of my questions, but they're for the record and you still have to answer the question.  Is that fair?

A.   Okay.  Sure.  Yeah.

Q.   Did you learn anything in the police academy about how to conduct juvenile witness interviews?

A.   Not that I recall, ma'am.

Q.   Did you learn anything in the police academy about how to interrogate juvenile suspects?

A.   Not that I recall, ma'am.

Q.   Did you learn anything in the police academy about what information you could -- you should or



should not provide to suspects during interviews?

A.  I don't recall anything like that, ma'am.

Q.  Did you learn anything in the police academy about what information you should and should not provide to witnesses during interviews?

A.  I don't recall anything like that, ma'am.

Q.  Did you learn anything in the police academy about how to take notes during an investigation?

A.  I don't recall anything like that, ma'am.

Q.  Did you learn anything in the police academy about how to keep and preserve your notes?

A.  I don't recall anything like that, ma'am.

Q.  Did you learn anything in the police academy about the importance of taking notes during interviews with witnesses?

A.  I don't recall.

Q.  Did you learn anything in the police academy about how to preserve notes and other evidence in an investigative file?

A.  I don't recall, ma'am.

Q.  After you left the police academy, what area of the city did you patrol?

A.  The west side.

Q.  And was there a district associated with that?

A.  One.



Q.  How long were you in District 1?

A.  For six and a half years.  Until March of 1973.

Q.  Did you have a partner?

A.  Yes, ma'am.

Q.  Who was your partner?

A.  For the most part, his name was David Eckstein.

Q.  How do you spell the last name?

A.  Eckstein, E-c-k-s-t-e-i-n.  Badge No. 2039.

Q.  How do you remember his badge number?

A.  I don't know.  My partners, I remember them.

Q.  Is he still alive?

A.  That's a good question.  I don't know.

Q.  When is the last time you were in touch with him?

A.  Oh, years ago.  Years ago.

Q.  What were your daily responsibilities as a patrol officer?

A.  Respond to radio calls, patrol the zone that we were assigned to.  Basically that's it.

Q.  During the time that you were a patrol officer for the First District from 1967 to 1973, did you receive any additional training?

A.  Formal training, is that what you mean, ma'am?

Q.  Sure, formal training.

A.  Like a class or anything?

Q.  Right.



A. No.

Q. Did you receive any informal training?

A. No, I guess you would call it on-the-job training.

Q. What kind of on-the-job training did you receive?

A. Just general experiences. Patrolman Eckstein was on the job a little bit longer than I was, so I learned from him and other patrolmen that I worked with.

Q. Who were the other patrolmen that you worked with that you learned from?

A. I can remember a couple names of old timers. Eddie Collerman. Galbinsia, George Galbinsia. Jim Gatter -- I learned a lot from James Gatter. Badge No. 17.

Q. How do you spell his last name?

A. G-a-t-t-e-r. In fact, he was the very first man I ever worked with.

Q. Before Dave Eckstein?

A. Yeah, right. My first day on the job I worked with James Gatter.

Q. How long --

A. But he wasn't a regular partner, you know.

Q. Okay. How long had he been on the job?

A. Oh -- at that time?



Q.   Yes.

A.   At least 20 years.

Q.   And Eddie Collerman --

A.   Yes, ma'am.

Q.   -- how long had he been on the job when you started leaning from him?

A.   Fifteen to 20 years.  He was an old timer.

Q.   What about Galbinsia?

A.   Same thing, yeah, they were, uh-huh.

Q.   Do you know what training each of those individuals had?

A.   No, ma'am.

Q.   When you joined the police department in '67, did you receive any information about what the police department's policies and procedures were?

A.   I'm sure I did in the police academy.  I don't recall specifically.  Right now I don't recall specifically, but I'm sure that they went over that, procedures and policies.

Q.   Do you remember anything specifically, procedure and policy, that you learned when you joined the police force?

            MR. FUNK:  Objection.

A.   No.

Q.   Do you recall there being a manual of rules?



A.  I don't recall.

Q.  Did you ever have in your possession a copy of
    the manual of rules?

A.  No, ma'am.

Q.  Did you ever have in your possession a copy of
    the Cleveland Police Department's general police
    orders?

A.  No, ma'am.

Q.  Did you ever have in your possession a copy of
    the Cleveland Police Department's departmental
    notices?

A.  No, ma'am.

Q.  Do you know if there was a copy of the manual of
    rules at the district that you were at, District
    1?

A.  There may have been, yes.  I don't recall.

Q.  You don't recall ever seeing it there?

A.  No, but it could have been.

Q.  Did you ever see it there?

A.  I don't recall, ma'am.

Q.  Did you ever see a copy of the general police
    orders at District 1?

                    MR. FUNK:  During the period when
          he was working as a patrol officer?

A.  Yes.  When I was in the district, I don't really



recall.  It may have been there, but I don't recall.

Q.  Did you ever see a copy of any departmental notices at District 1 from '67 to '73?

A.  Again, ma'am, I don't recall specifically, but they very well could have been there.

Q.  Are there any other individuals that you learned from in terms of on-the-job training when you were in District 1 other than the individuals you mentioned?

A.  Oh, there were a couple of sergeants, absolutely.

Q.  Do you recall their names?

A.  Tom Sutter.  Tom Sutter, he's the one that comes to mind right now, Tom Sutter.  He was one of my sergeants.

Q.  And how long had he been on the police force?

A.  Well, again, I would say in excess of 15 years. I don't know exactly.

Q.  And what kind of things did you learn from the people you mentioned who gave you on-the-job training when you were at District 1?

A.  Just how to conduct yourself in a patrol car. What to do -- if I can tell you a funny story. My second or third day on the job, I was driving, and we got a call for a family fight.  And I



pulled up, I saw the house, and I was working with an old timer who just died recently -- I forget his name -- well, I'm looking for a parking space when I'm in a black and white police car and he said, what are you doing?  I said I'm looking for a parking space.  He said this is a black and white Cleveland police car, you're on a call you park anywhere you feel like parking, we have to get into the house.  So that was on-the-job training right there.

So I pulled up right in front of the house where there was a fire hydrant.  I mean, I just thought that was kind of funny the way he said it to me.  And I told that to his family at the funeral home, how I learned from him.

Q. Anything else you learned from the individuals you've mentioned while you were in District 1?

MR. FUNK:  Objection.

A. Specifically, no, ma'am.  Just how to answer calls, you know, talk to people nicely.  Things like that, you know.

Q. Anything else that you recall?

A. I can't recall anything, ma'am.

Q. After March of 1973 what district did you go to?

A. I was at the Justice Center, ma'am.



Q.  And what did you do there?

A.  I went right into homicide.

Q.  You became a detective?

A.  Yes, ma'am.

Q.  All right.  And was there some kind of -- was there a test or anything you had to take to become a detective?

A.  No, ma'am.

Q.  How was it that you became a detective?

A.  Well, in 1972 Cleveland had the most murders in its history and I believe it still stands at three hundred and -- I believe the number was 343 murders or 323 murders.  And the powers to be, chief and everybody, determined that they were going to need a lot more people in homicide.

So they decided to have one patrolman from each district, six districts, to come into homicide right off the street.  And six detectives from the general detective bureau, have them come in too.  So, 12 of us went into homicide in 1973, in March.  And I was picked from the First District.

Q.  Do you remember who the other 12 -- who the other 11 were?

A.  Oh, wow.  No.



Q. Did you tell any of your superiors that you wanted to be a detective?

A. No, ma'am.

Q. Who told you that you would be -- you had been picked to become a detective?

A. Oh, there's other names, Sergeant Wally Kreps. He was one of my sergeants in the First District.

Q. How do you spell the last name?

A. Kreps, K-r-e-p-s.

Q. Okay.

A. And his father was a lieutenant in another Bureau somewhere and he had been a detective lieutenant -- or Sergeant Kreps, he said -- well, he called me Reggie.  He said, hey, Reggie, you've been picked to go to homicide.  What do you think?  I said, what.  I said, wow.  I said I don't know if I should do it, I don't know if I can do that.  He says you may never get another chance if you don't take it now.  I said, okay. So I accepted it and went right down.

Q. Why did he call you Reggie?

A. I was a left-handed batter.  I was a pretty good baseball player and he named me after Reggie Jackson.

Q. After Sergeant Kreps told you you had been picked



LEO ALLEN                                          June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                             33

to be become a detective, what did you do?

A.  Well, I just followed orders as far as where to report, you know, where to go and that's what I did.

Q.  Was the detective bureau at that time at the Justice Center?

A.  No.  The Justice Center I don't believe was built yet.  It was 1973 and we were in another building.

            MR. FUNK:  Let's go off the record.

                  -  -  -  -

            (Thereupon, a recess was had.)

                  -  -  -  -

BY MS. WANG:

Q.  Okay.

A.  Mr. Funk reminded me, and I do recall now that I was in Florida, and it was some time in May.  I had just recovered from a major surgery, and, no, I wasn't in the hospital, but I was recuperating at homes in Naples when he did call me the first time, and wanted to know about my availability.  I told him, I said, boy, I don't know when I am going to be released from my surgery from down here, but I'll let you know and keep you



informed.

So luckily my doctor released me to come back home and continue therapy up here.  There was a call in early May, I believe from Mr. Funk.  We just talked very shortly.

Q.  Did Mr. Funk tell you at that time he was going to be your lawyer?

A.  I believe he did.  I don't specifically recall that.  But I do specifically remember that I was going to be -- he was going to talk to me about -- when I got back about this case, you know.

Q.  Who is paying for your representation at this deposition?

A.  I have no idea.

Q.  You are not paying for it?

A.  No.  I would assume the City of Cleveland.  I don't know.

Q.  Why do you need a lawyer at this deposition?

A.  I don't know how to answer that.

Q.  Do you feel that you need a lawyer at this deposition?

MR. FUNK:  Objection.

A.  No.

MR. GILBERT:  I want to put something on the record here, because I



think there is just something odd about you representing a witness in this case, when you are representing other defendants.

And I just want to put that on the record, because you named him as a witness, and you have had discussion with him as a witness, and then you are probably going to try to insulate those discussions, because of an attorney/client relationship.

I have not researched this, but I want to -- I think there is something odd about that. I could have Bill Tell and Ronny Turner be my client, but I don't think there was anything to hide. We met with them, we talked to them, we disclosed information about them, and what they were going to say, so I don't know what --

MR. FUNK: Employees of the City of Cleveland are entitled to legal representation. In this case, the City of Cleveland has retained me to represent him in connection with this deposition. It would be no different than having somebody in the law department represent him, they just chose to hire outside counsel.



MR. GILBERT:  I don't know if you represented --  well, those guys were defendants.

MR. FUNK:  Retired employees or employees of the City of Cleveland, the City law department would potentially represent them.  In this case, they just asked me to do it.

MR. GILBERT:  Okay.  Go ahead.

Q.  You are not a defendant in this case, right?

A.  No, ma'am.

Q.  You have nothing to do with the investigation of Ricky Jackson?

A.  No, ma'am.

Q.  What did you discuss with Mr. Funk?

MR. FUNK:  I am going to object, to the extent you are asking for him to disclose attorney/client privilege communications.

Q.  Are you going to take your attorney's advice and --

MR. FUNK:  Is there any --

MS. WANG:  No, this is his privilege.  He could decide whether to waive the privilege or not.  And I am



LEO ALLEN                                              June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                                    37

asking him whether he --

             MR. FUNK:  I am instructing him

      not to answer the question.

Q.  Are you going to be following your attorney's

    advice --

             MR. FUNK:  If you are asking him

      for attorney/client privilege

      communication, I will instruct him not to

      answer.  If you have another question --

             MS. WANG:  I need an answer as to

      whether he is going to answer.  It's his --

      let me ask the question, then you could

      answer.  You could assert your privilege.

      I want to know the answer.

Q.  Are you going to follow Mr. Funk's advice and not

    answer any questions about what you and Mr. Funk

    discussed?

A.  Yes.

Q.  Do you feel that you have anything to hide in

    terms of what you and Mr. Funk discussed?

             MR. FUNK:  Objection.

A.  No.

Q.  Okay.  What documents did you review in

    preparation for your deposition?

A.  I did review the -- I believe it was an affidavit



from William Tell, a friend of mine.  I did review the complaint, a lot of papers of the complaint, against the five or six detectives regarding the Ricky Jackson case.  I did review that.

Q.  Are you saying it was just the complaint, or there were other documents with the complaint that you reviewed?

A.  Just the complaint.

Q.  Okay.  Anything, other than -- are there any documents, other than the affidavit of William Tell and the complaint that you reviewed?

A.  I don't recall.

Q.  When did you review the affidavit of William Tell?

A.  Yesterday, last night.

Q.  When did you review the complaint?

A.  That was about three weeks ago.

Q.  Did you review any policies and procedures of the City of Cleveland?

A.  No, ma'am.

Q.  Did you review any rules and regulations of the City of Cleveland?

A.  Are you talking about recently?

Q.  No, from the time period we are talking about,



the '70s?

A.   Did I review any what, I'm sorry?

Q.   Manuals, rules, or any rules and regulations?

            MR. FUNK:   In preparation for his
      deposition?

            MS. WANG:   Yes.

A.   Oh, no.

Q.   Did you review any news articles yesterday?

A.   No, ma'am.

Q.   Did you review any news articles this morning?

A.   No.

Q.   Did you review any documents related to the Joe
     D'Ambrosio case either yesterday or today?

A.   No.

Q.   Did you review any documents related to the Joe
     D'Ambrosio case at any time prior to your
     deposition, in preparation for the deposition?

A.   No, ma'am.

Q.   What do you understand to be your role in this
     case?

A.   What I do understand --

Q.   To be your role in this case?

A.   My role?

Q.   Yes, your role as a witness.

A.   I was under the impression that I was being



called to provide you with the way things worked in homicide when I was there.  How I received my training, procedures of homicide detectives, how we conducted investigations.  That's what I thought the crux of this was.

Q.  When you became a detective, when you first became a detective, did you receive any additional training?

A.  On-the-job training only.  No classroom, nothing like that.

Q.  And what kind of on-the-job training did you receive when you became a detective?

A.  It would be when I first went in there, working with most of the experienced detectives that were in there, most of the detectives that had been there for ten years plus.  Working with them, reading their reports, going with them, seeing how they did things; on-the-job training, ongoing.

Q.  Who were the other detectives that you learned from when you became a detective?

A.  Oh, wow.  Well, I could name most of them if I --

Q.  Go ahead.

A.  All right.  Sergeant Pete Comodeca, Sergeant Jack Kaminski, Sergeant Harold Murphy, Detective Pete



Becker, Detective James Koelliker.

Q.  That's K-o --

A.  K-o-e-l-l-i-k-e-r.  Detective William Lepamyer, I am just going around the room now.  Detective Frank Stoiker, and his partner Detective John Staimpel, Detective Eugene Terpay, Detective James Farmer, Detective Danny McDonald.  Let's see.  Detective Ernest Rowell, Detective Bill Hubbard, Detective Fred Carter, Detective David Hicks, Detective John McKibben.  I'm sure there were several others, ma'am, but those are the ones that come to my mind now.

Q.  Are any of the sergeants or detectives that you just named African-American?

A.  Yes.

Q.  Which ones?

A.  Ernie Rowell, Bill Hubbard, Fred Carter.  Oh, I just remembered another gentleman, George Withers, great guy.  Yes, those are all four African-American.

Q.  Withers was, too?

A.  Yes.  How could I forget Harvey Beavers.  Oh, my goodness.

            MR. GILBERT:  Shame on you.

            THE WITNESS:  I know.  My good



   friend, Harvey Beavers.  I love that guy.
Also an African-American.  Thank you, shame on me.  What a gentleman.

Q. Anything else that you recall?

A. They may come to me in a while, for now, that's about it.

Q. What kind of on-the-job training did you learn -- strike that.  When you became a detective, what kind of on-the-job training did you learn about what information you had to disclose to prosecutors?

A. I learned that everything, everything that pertains to any homicide goes into our file, the main file.  All of it goes to the prosecutor.  We don't get to determine.  All of it, period.

Q. And when you say, everything, you mean -- what do you mean, the paperwork, the reports?  What do you mean?

A. Any physical evidence, any Form 10 investigative police reports, any witness statement, any line-up forms, anything involving that particular case, everything went to the prosecutor.

Q. How did it get to the prosecutor?

A. Boy, that is a good question.  The exact procedure, I don't recall.  But if the defendant



went to city court first, the county prosecutor would get that whole file.  Exactly how it got there, ma'am, I couldn't tell you.  We didn't take it ourselves, we were too busy to do that. I don't know how it got there.

Q. If there was information that you did not document as a detective, is there any way the prosecutor would know about it, if you didn't tell him?

MR. FUNK:  Objection.

MR. MALLAMAD:  Objection.

A. We documented everything.  That's the way I was taught.  That was our usual procedure.  You document everything that you learn about a murder case.  Everything goes into the police reports.

Q. And if a detective decided not to document something, is there any way the prosecutor would know about it if the detective did not tell him?

MR. FUNK:  Objection.

MR. MALLAMAD:  Objection.

A. I would have no knowledge of any detective not turning anything over to a prosecutor.  We didn't do business like that.

Q. That's not my question.

A. I'm sorry.



Q. My question is:  If a detective did not document something during the course of an investigation, and did not tell the prosecutor about it, is there any way the prosecutor would know?

              MR. FUNK:  Objection.

              MR. MALLAMAD:  Objection.

A. I can't answer that, only to say I have no knowledge of that.

Q. I am not asking you if you know of any instance, I'm asking you --

A. A hypothetical?

Q. Yes.

A. I don't know.

Q. Did you have regular conversations with the prosecutors on the cases in which you were a detective?

A. On the cases that we worked -- our case that went to the prosecutor?

Q. Yes.

A. If the prosecutor would call us, yes, ma'am.

Q. If the prosecutor would call you?

A. Yes, and he would.

Q. Okay.  Did you have regular meetings with the prosecutors on the cases in which you were a homicide detective?



A.   On occasion, yes.

Q.   And generally what were those meetings about?

A.   That generally, yes, we are going to trial, yes,
     we will call you as a witness, and basically
     that's about it.

Q.   When you became a detective, did you get any
     on-the-job training about how to interview
     juvenile witnesses?

A.   How to interview juvenile witnesses, well, yes,
     on-the-job training.  If it happened, I would be
     with an older detective normally, and we would
     talk to the witnesses, yes, no matter how old
     they were; young, old, whatever.

Q.   What did you learn about how to conduct a
     juvenile witness interview, other than if they
     were there you would talk to them?

A.   Repeat that, ma'am.

Q.   What did you learn, when you became a detective,
     about how juvenile interviews -- juvenile witness
     interviews should be conducted?

A.   Like any other witness, you know.

Q.   Were parents required to be present for juvenile
     witness interviews?

A.   Not necessarily, no.

Q.   And what do you mean by that?



A. Well, if it was a juvenile, we normally wouldn't just take them from the street, take them downtown without his parents knowing what was going on normally. But if it's a witness on the street, a juvenile witness, we would talk to him right there, and if need be, make an arrangement to come downtown and take a statement.

Q. Was it the practice of Cleveland police detectives to interview juvenile witnesses without their parents?

                    MR. FUNK: Objection.

                    MR. MALLAMAD: Objection.

A. On occasion, yes.

Q. Was it the practice of the Cleveland police detectives to treat juvenile witnesses as like any other witness?

A. Yes.

Q. Did you learn anything on-the-job about how to conduct interrogations of juvenile suspects?

A. Yes.

Q. What on-the-job training did you learn about that?

A. When interrogating a juvenile suspect, it would always be a good practice to have a parent come down and -- for any interview like that, any



interrogation.

Q.   Was that the practice of the Cleveland Police Department?

          MR. FUNK:  Objection.

          MR. MALLAMAD:  Objection.

          MS. WANG:  You designated him as somebody who could testify about --

          MR. FUNK:  You are saying the Cleveland Police Department.  If you ask questions related to the homicide, where he worked, if you are talking about the entire Police Department, that's a different story.  I don't know if he could speak to the entire Police Department.

          MR. GILBERT:  Well, we will find out.  Now you gave him the answer.

          MR. FUNK:  Well.  She asked me.

A.   Answer to your question, that was my on-the-job training in the homicide unit that is always a good practice to have a parent present when we interrogate a juvenile suspect, yes, ma'am.

Q.   Was that the policy of the Cleveland Police Department?

          MR. FUNK:  Objection.

          MR. MALLAMAD:  Objection.



A.   I could not tell you.  I don't know.

Q.   Did you ever see any policies of the Cleveland
     Police Department relating to how juvenile
     suspect interrogations should be conducted?

A.   I'm sure that I did, ma'am.  They were available
     at the Detective Bureau downtown in the Justice
     Center, but I don't specifically recall.

Q.   What did they say?

A.   I wouldn't recall that now.

Q.   Were there any policies of the Cleveland Police
     Department -- during the time that you were a
     detective, when you first became a detective,
     were there any policies of the Cleveland Police
     Department relating to how to conduct juvenile
     witness interviews?

                    MR. FUNK:  Are you talking about
          written policies?

                    MS. WANG:  Written policies.

A.   I don't know.  I don't recall ever reading
     anything about that.

Q.   Were there any policies of the Cleveland Police
     Department relating to note taking by detectives?

                    MR. FUNK:  Is this, again, written
          policies?  Are you talking about written?

                    MS. WANG:  My question stands.



LEO ALLEN
JACKSON -vs- CITY OF CLEVELAND

June 16, 2016
49

A.  I would not know.  I don't know.

Q.  Do you recall there being any policies of the Cleveland Police Department relating to note taking by detectives?

A.  No.

Q.  Were you ever provided any on-the-job training about what kinds of notes detectives should take?

A.  What kinds of notes, well, the best way to answer that is the on-the-job training was if we are talking to a witness in the street, yes, we would take notes about what he may say, if it's very involved we would take notes.

And then if it was important to transfer to a written statement, we would either try to get it that day or make arrangements to get another day, but we would have those notes and transcribe it on to a police report.

Q.  On what kind of -- was there a specific form or document on which you would take the notes?

A.  No.

Q.  Was it just any -- did you have a notebook, was it plain paper?

A.  Notebook.  I used to just get the folded up black pieces of paper or stuff like that and bring it here, yeah, take the notes.



Q.  You are just gesturing to having paper in your
pocket?

A.  Yes.

Q.  So there was not some sort of uniform form that
would be used by detectives to take notes?

A.  No, ma'am.

Q.  Was there ever a memorandum book in which
detectives would take notes?

A.  Not that I'm aware of.

Q.  How about a run sheet?  Have you ever heard of a
run sheet?

A.  Run sheet, yeah, I think we used to take notes on
that, that was license plate numbers -- I really
don't -- I heard that name before, but I can't
describe what it was.  I do remember a run sheet.

Q.  You said if the notes were important enough, you
would transcribe them into a form, like a
Form 10?

A.  All information we received about any homicide,
it was our practice to transcribe everything into
a Form 10, any information that we would get,
yes, ma'am.

Q.  And you would transcribe it yourself?  You would
look at your notes and type them into a Form 10?

A.  Yes.



Q. And what would you type from your notes into your Form 10?

A. All the information that the witness might have told us, and his name, address, phone number how to get ahold of him, age, what he may or may not have seen, you know, whatever he or she would say on the -- whatever information they had, we would take it down out on a note, and when we got downtown, transcribe it onto a form 10, all of it.

Q. What would you do with your notes after you transcribed it into a form 10?

A. Put it in the circular file.

Q. And that's the trash?

A. Trash can, yes.

Q. When would you decide -- sorry, strike that.  How would you decide what notes -- strike that.  How would you decide when you would take notes when talking to a witness?

A. When it became apparent that the witness may or may not have known anything.  We would normally just -- if he said -- if the witness would say, I wasn't there, I didn't see anything, we would just take his name and transcribe that, whatever.

When we talked to anybody on the street,



name, address, phone number, age, do you know anything, if they said anything, we would transcribe it.

Q. So any time a witness would say anything, you would write it down?

A. Yes, ma'am.  Anybody we would talk to on the street, yes, ma'am.

Q. No matter what it is they said?

A. Yes, ma'am.  To the best of my recollection, yes.

Q. And that was your practice?

A. Yes, ma'am.

Q. Did you ever see any policy of the Cleveland Police Department outlining that as a policy?

A. I don't recall that, no.

Q. Did you ever see any rules, regulations, or any other kind of written document from the City of Cleveland instructing detectives as to when they should take notes?

A. No, ma'am.  That was all on-the-job training that I received in homicide.

Q. Who gave you that particular training about note taking?

A. All the older detectives that I had mentioned.

Q. Every single one of them?

A. I worked with all of those fellows.



Q.    Did you ever single one of the people that you
mentioned give you that training about note
taking?

A.    I learned all kinds of different things from all
those detectives.  Specifically, exactly what
everyone may have related to me, I can't say.

Q.    Do you know whether it was the practice of other
detectives in the Cleveland Police Department to
transcribe their notes into a Form 10?

A.    In homicide, yes.

Q.    How do you know that?

A.    I worked with all of these fellows, I read
reports for years and years, yes.

Q.    You read the typewritten reports?

A.    Yes, ma'am.

Q.    The Form 10s or the Form 1s?

A.    Yes, ma'am.

Q.    Did you see their notes?

A.    No -- I mean, if it was other detectives working
on other cases; is that what you mean?

Q.    Yeah.

A.    No. No, I did not see their notes.  I just read
what they put in.

Q.    So how do you know what they put in their form
10s was exactly transcribed from their notes?



A.  Well, that was our practice.

Q.  How did you know it was other peoples' practice?

A.  Because, I learned from all of them, this was the way we did things.  It was our usual practice.  Anything you learned about a homicide, you take a note, you put it on a Form 10.  That's the way it had to be done.  The sergeants looked all over that.  It was just the way we had to do things.

Q.  Tell me a specific instance in which you saw an officer or a detective transcribe their notes verbatim into a Form 10?

A.  Other than my partner?

Q.  Yes.

A.  Oh, I couldn't say.

Q.  You can't name a single one?

                    MR. FUNK:  Objection.

A.  Well, no, I wasn't with them.

Q.  Right.  So you don't know whether or not other detectives in the homicide unit transcribed all of their notes verbatim into Form 10s?

A.  Personal knowledge, ma'am, no, I could only tell you what our normal practice was for everybody.

Q.  Well, your normal practice was?

A.  All of us.

Q.  On how many occasions did you work with Pete



Comodeca?

A.   He was my sergeant.

Q.   Okay.  Did you work with him as a partner where you would investigate cases together?

A.   No.  He was a sergeant.

Q.   Okay.

A.   But he would come with us occasionally.

Q.   On investigations?

A.   On -- usually when we went to make an arrest, he was very active on the street.

Q.   Okay.  So what was his role in relation to you as a sergeant?

A.   Checking on the investigations, reading our reports, and basically that was it.

Q.   How many cases did you work with him on?

A.   Sergeant Pete Comodeca?

Q.   Yes.

A.   You mean where he came with us on different cases?

Q.   Sure.

A.   Maybe a dozen.

Q.   Were you present with him when he interviewed witnesses in those instances?

A.   Sometimes.

Q.   On how many occasions?



A.  Maybe a couple.

Q.  Did you see this Sergeant Comodeca take notes of witnesses in those instances, those couple instances?

A.  No. We are with him, that was our job.

Q.  Did you ever see Sergeant Comodeca take notes while interviewing a witness?

A.  I don't recall, ma'am.  No.

Q.  Did you ever do an investigation with Jack Kaminski?

A.  No, it was the same type of procedure.  Sergeant Kaminski normally would stay in the office and just review our work.

Q.  So he was a sergeant?

A.  Yes.

Q.  Were you ever present when he took notes while interviewing a witness?

A.  No, ma'am.

Q.  Were you ever present when he interviewed a witness without taking notes?

A.  Sergeant Kaminski?

Q.  Yes.

A.  No, ma'am.

Q.  Were you ever present when Sergeant Kaminski transcribed any notes into a Form 10?



A.  Normally Sergeant Kaminski did not get involved in the interviewing of people, taking notes and transcribing Form 10s.  He was mostly a supervisory sergeant, signing reports, checking on all of us.

Q.  Did you ever work on any investigations with Harold Murphy?

A.  No, ma'am.  That was the same type deal with Sergeant Kaminski.  He was like an inside sergeant, signing reports.

Q.  Did you ever see him interview any witnesses, Sergeant Murphy?

A.  Harold Murphy, I don't recall, ma'am.

Q.  Did you ever see him transcribe any notes into a Form 10 or a Form 1?

A.  I don't recall, ma'am.

Q.  Did you ever work in investigation with Pete Becker?

A.  Yes.

Q.  How many times?

A.  Not many.  I went out with Pete Becker maybe two or three times, maybe four times.

Q.  On an investigation?

A.  Yes.

Q.  So when you say, went out, do you mean those were



two, three, or four separate investigations?

A.   Yes, where I would work with him, we would go out
and do an investigation, yes.

Q.   Did you ever see Pete Becker interview any
witnesses?

A.   Yes.

Q.   On how many occasions?

A.   Those two, three, or four, just those.

Q.   Were there several witnesses that he interviewed
during each of those, or was there one witness
per incident?

A.   I don't recall, ma'am.  I couldn't tell you.

Q.   Did you ever see Pete Becker take notes during
his interviews with those witnesses?

A.   Yes, ma'am.

Q.   Did you ever see Pete Becker transcribe his notes
verbatim into his Form 10s or Form 1s?

A.   Well, yes, the notes that he took, I saw him
transcribe, he came back to our office went right
to the typewriter and typed the Form 10.

Q.   Which occasion was that?  When was that?  When
did you see him do that?

A.   Way back in the 1970s when I first came in.

Q.   What was name of that case?

A.   Oh, boy, come on, I would not remember that.



Q.  What was the name of the witness?

A.  Oh, man, I would not remember that.

Q.  Was that one particular instance?

A.  It was a couple times, yes.

Q.  Two?

A.  Well, when I say a couple, ma'am, it could be three.

Q.  I usually think of a couple as two.

A.  I'm sorry about that.  I'm trying to be --

Q.  Just trying to be accurate.

A.  I'm trying to be helpful here.

Q.  Okay.  Did you read Pete Becker's notes before he transcribed them into the Form 10?

A.  No. No.

Q.  Okay.  So you don't if he actually transcribed his notes verbatim into the Form 10 on those couple occasions?

        MR. FUNK:  Objection.

        MR. MALLAMAD:  Objection.

A.  When you say verbatim, no, I would not know that. But he was such a good detective, he worked on the Sam Shepard murder case, that's how far back he goes.

    And Pete Becker was a legend.  And when he interviewed a witness, take the notes down, put



them on paper, that's it.  I mean, no, verbatim, no, I did not watch him every second while he took a note and transcribed it.  I could not testify to that.

Q.  So you actually have no personal knowledge of whether Pete Becker ever transcribed his notes from witness interviews verbatim into Form 10s?

MR. FUNK:  Objection.  Asked and answered.

A.  I thought I just answered that, ma'am.  I am trying to help you, as best I can.

Q.  Yes or no, you have no personal knowledge of that?

A.  No, I was not sitting over his shoulder watching what he was doing, no.  But I know that was our normal practice, our usual practice.

Q.  Because in your opinion he was a good detective, and that's what he did?

MR. FUNK:  Objection.  Let him answer the question.

A.  I was just going to say, that's the way he did things, that's the way all the other detectives did things.  That's the way I was taught to do things.  I've never seen anything different than that in my time in homicide.



Case: 1:15-cv-00989-CAB  Doc #: 114-13  Filed:  03/01/17  61 of 157.  PageID #: 4994

LEO ALLEN                                      June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                         61

Q. On how many occasions did you work with James Koelliker?

A. Oh, boy, Jimmy K, maybe half a dozen times, maybe ten.  Six to ten, maybe.

Q. How many interviews did you see him conduct?

A. The exact number, I couldn't give you, ma'am, several.

Q. By several, could you estimate?

A. Three to five, three to six, to the best of my recollection.

Q. Did you see James Koelliker take notes on those occasions?

A. If I recall -- I can't specifically see him taking notes, but I don't recall, ma'am.  Yeah, that's what we did.

Q. You don't recall an instance where you saw James Koelliker take notes?

A. It's too long ago, ma'am.

                    MR. FUNK:  Objection.

Q. Did you ever see James Koelliker type up a Form 10 using his notes?

A. Yes.

Q. On how many occasions?

A. Several.

Q. Did you read his notes beforehand?



800.211.DEPO (3376)
EsquireSolutions.com

A.  No, ma'am.

Q.  Do you remember the names of those cases?

A.  No, ma'am.

Q.  Do you remember the names of the witnesses who were interviewed?

A.  Of course not.

Q.  Do you have any personal knowledge of whether James Koelliker typed up his notes verbatim into his Form 10s on those occasions?

A.  Again, verbatim, I would have no knowledge.

Q.  On how many occasions did you work with Detective Lepamyer?

A.  Maybe a dozen.

Q.  On how many occasions did you see him interview witnesses?

A.  Maybe a half dozen times, maybe eight, around in that area, best of my recollection, ma'am.

Q.  In those half a dozen or eight interviews with witnesses, on how many of those occasions was Detective Lepamyer taking notes?

A.  Well, I would say maybe half of them, the other half I was taking notes.  It all depends who was driving that day and who wasn't.

Q.  On the occasions on which Detective Lepamyer was taking notes, did you see him transcribe those



notes into a Form 10?

A.  I was in the room, but I wasn't over his shoulder watching exactly what he was doing.  That was our usual practice, ma'am.  And that's what all of us did, Form 10s, you don't need the notes anymore.

Q.  Did you read his notes before he typed up his Form 10?

A.  No, ma'am.

Q.  Do you have any personal knowledge of whether Detective Lepamyer, on those handful of occasions, typed up his notes verbatim into a Form 10?

A.  I would have no knowledge of that, ma'am.

Q.  How many occasions did you work with Frank Stoiker?

A.  About the same, maybe a dozen times, 9 to 12, around in that area.  Could be a little less, could be a little more.

Q.  On how many occasions did you see him interview witnesses?

A.  It's a general answer that I am giving to most of these fellows.  Maybe a half dozen times.

Q.  Did you ever see him type up a Form 10 using notes?

A.  Yes, ma'am.



Q.  Did you read those notes before he typed up his Form 10?

A.  No, ma'am.

Q.  Do you have any personal knowledge of whether Frank Stoiker, on those occasions, typed up his notes verbatim into the Form 10?

MR. FUNK:  Objection.

A.  I would have no knowledge, verbatim.

Q.  On how many occasions did you work with John Staimpel?

A.  Again, maybe a half dozen times, roughly.

Q.  On how many occasions did you see him interview witnesses?

A.  Several.

Q.  On how many occasions did you see him taking notes during those interviews?

A.  He took notes like all of us did.

Q.  On how many occasions did you see him taking notes during those interviews?

A.  Several, ma'am.

Q.  And during those occasions, did you see him type up his Form 10s?

A.  Like I said, I wasn't looking over his shoulder, but if it was my turn to drive that day with John, he would do the writing, so he would be



doing the typing with his notes.

Q. Did you read his notes before he typed them up?

A. No, ma'am.

Q. Do you have any personal knowledge of whether he typed up his notes verbatim into a Form 10?

A. No, ma'am.

Q. On how many occasions did you work with Eugene Terpay.

A. Maybe -- this is just a rough guess, maybe four to six times.

Q. On how many of those occasions did you see him interview witnesses?

A. Maybe three to four times.

Q. On how many of those occasions was he taking notes?

A. He was taking notes, yes, when he was doing the interviewing, yes.

Q. During all of the interviews?

A. Yes, ma'am.

Q. Did you see him type up his Form 10s?

A. Well, again, we went back to the office, and our usual practice was, it was his turn to do the typing, he would type them up.

And like I said, I wasn't -- I was the rookie in there at that time.  Even for the first three



or four years, I was the rookie.  I wouldn't be peering over his shoulders, so I wouldn't know.

Q.  Did you read his notes before he typed them up?

A.  No, ma'am.

Q.  Do you have personal knowledge of whether he typed up his notes verbatim into his Form 10?

A.  I would not have personal knowledge, no, ma'am.

Q.  How many occasions did you work with James Farmer?

A.  Jimmy Farmer, I worked with him quite a bit. Maybe a couple of dozen times.  I worked quite a bit with Jim Farmer.

Q.  On how many occasions did you see him interview witnesses?

A.  I'm just being vague again, maybe a dozen, maybe more, a little bit more, maybe.

Q.  Did you see him taking notes?

A.  Yes, ma'am.

Q.  And on those occasions, did you see him type up his Form 10s?

A.  Again, I knew that he was doing it.  He was at the typewriter, and I knew he was typing up the investigation we were working on, so I have no -- I wasn't peering over his shoulder, but he was typing up the Form 10.



Q. Do you have personal knowledge of whether or not James Farmer was typing up his notes of witness interviews verbatim into his Form 10s?

A. No, ma'am.

Q. Did you and James Farmer participate in the investigation of the death of William Griffith?

A. That name does not ring a bell.

Q. Do you recall an arrest of a person named Albert Rembert?

A. Now that name rings a bell, but I have no recollection of why or anything else. I couldn't tell you. You say he was arrested, but I have no recollection of it.

Q. Did you ever hear James Farmer call somebody a nigger?

            MR. FUNK: Objection.

A. No, ma'am.

Q. Did you ever hear Eugene Terpay call somebody a nigger?

            MR. FUNK: Objection.

A. Never.

Q. Did you ever hear Pete Comodeca call somebody a nigger?

            MR. FUNK: Objection.

A. No, ma'am.



Q.  Did you ever see James Staimpel called somebody a nigger?

MR. FUNK:  Objection.

A.  No.

Q.  Did you ever hear Frank Stoiker call somebody a nigger?

MR. FUNK:  Objection.

A.  No, ma'am.

Q.  Did you ever see -- did you ever call anybody a nigger?

MR. FUNK:  Objection.

A.  No, ma'am.

Q.  Did you ever use any derogatory terms towards any African-American suspects in your career?

MR. FUNK:  Objection.

A.  Did I ever what?

Q.  Use any derogatory terms towards any African-American suspects during your career as a Cleveland police officer.

A.  No, I did not.

Q.  Did you ever see in the district something called a nigger target?

MR. FUNK:  Objection.

A.  I never heard that term, ma'am.

Q.  You never saw these targets of black people with



targets on them hung up in the districts in the Cleveland Police Department?

A. No.

Q. Did you ever see a detective or sergeant who had a swastika on his car?

MR. FUNK:  Objection.

A. Oh my goodness, no, ma'am.

Q. Did you ever use physical force on a suspect?

A. On occasion, yes.

Q. On what occasions?

A. When we had to defend ourselves -- when I had to defend myself.

Q. On how many occasions?

A. Oh, boy, during 21 years in homicide; is that what you mean?

Q. Yes.

A. Maybe a dozen times, maybe, roughly.

Q. Were you ever disciplined for any of those occasions?

A. Disciplined, no.

Q. Did you ever receive any kind of reprimand at all from the Cleveland Police Department for your use of force on those occasions?

MR. FUNK:  Objection.

A. I only recall one time, when we were taking a



woman downtown, and she would not give me her purse, she would not let me check her purse for a weapon, so I took it from her.  She made a complaint, and that was the end of it.

Q. Did anything happen as a result of her complaint?

A. No, ma'am.

Q. Were you ever interviewed by internal affairs or any other officer of the Cleveland Police Department about that complaint?

A. Just the lieutenant who was an African-American, great guy, Bozzy Mack, he was in charge of the general Detective Bureau, he came to talk to me about it.

Q. And what happened after your conversation?

A. He just -- what happened afterwards?

Q. Yes.

A. The lady had -- she had some marijuana in her purse, maybe that's why she didn't want to give it up.  And we had a conversation, Lieutenant Mack and I, he said the complaint will be dropped if you don't charge her with marijuana, I said, no problem.  I got time for that.  That was the end of it.

Q. How many investigations did you work on with Danny McDonald?



LEO ALLEN                                          June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                                71

A.  Just a couple, because he was our office manager
    for a long, long time.

Q.  Do you ever see him interview witnesses during
    those investigations?

A.  Just those one or two times.  I can't recall,
    ma'am.

Q.  Did you ever work with Ernie Rowell?

A.  I worked with Ernie Rowell.

Q.  On how many investigations?

A.  Maybe three or four, roughly.

Q.  Did see him take notes?

A.  Ernie Rowell took notes.

Q.  Of interviews with witnesses?

A.  Yes, ma'am.

Q.  And did you see him type up his Form 10 from
    those notes?

A.  Yes, he did type up a Form 10.  Like I say, I was
    not peering over his shoulder.  I may have been
    doing something else, but he did make a Form 10.

Q.  Do you have any personal knowledge of whether or
    not he typed up his notes verbatim into his Form
    10?

A.  No, ma'am.

Q.  On how many occasions did you work with Fred
    Carter?



A.  Maybe a half dozen times.

Q.  Did you see him interview witnesses during those occasions?

A.  Yes, ma'am.

Q.  During those occasions, did you see him take notes?

A.  Yes, ma'am.

Q.  Do you have personal knowledge of whether or not he transcribed his notes verbatim into form 10s?

A.  I have no personal knowledge.

Q.  Is Fred Carter dead?

A.  I think he did die, yeah.  May God rest his soul.

Q.  How many occasions did you work with David Hicks?

A.  Now we are getting into my regular partners, so I'm going into hundreds.

Q.  Did you see David Hicks take notes during witness interviews?

A.  Yes.

Q.  On how many occasions?

A.  Hundreds.

Q.  Did you see David Hicks type up his notes into Form 10s?

A.  Yes, ma'am.

Q.  Do you have personal knowledge of whether or not he transcribed his notes verbatim into Form 10s?



A.  I have no knowledge of that.

Q.  On how many occasions did you work with John
    McKibben?

A.  Johnny Mack, maybe -- I worked with Johnny quite
    a bit.  Maybe a couple dozen times.

Q.  Did you see him interview witnesses?

A.  Yes.

Q.  On how many occasions?

A.  Many times.  He -- many, many times.  Maybe 15 to
    20 times.

Q.  On how many occasions did he take notes?

A.  When it was his turn to write that day, that I
    worked with him.

Q.  Do you have personal knowledge of whether or not
    he typed up his notes verbatim into Form 10s?

A.  No, ma'am.

Q.  On how many occasions did you work with Detective
    Hubbard?

A.  Bill Hubbard, several times, maybe three to four
    times, roughly.

Q.  On how many occasions did you see him interview
    witnesses?

A.  Several times.

Q.  Did you see him take notes on those occasions?

A.  Yes, ma'am.



Q.  Did you have personal knowledge of whether or not he wrote up his notes verbatim?

A.  No, I don't.

Q.  On how many occasions did you work with George Withers?

A.  Several times.  Maybe -- again, maybe three to four times.

Q.  On how many occasions did you see him take notes?

A.  On the times he was interviewing people, every time that he did, a couple of times.

Q.  Do you have personal knowledge of whether he wrote up his notes verbatim into his Form 10s?

A.  No, ma'am.

Q.  Did you ever see any policies of the Cleveland Police Department relating to what information to give or not give to witnesses during an interview?

A.  Repeat that one more time, ma'am.

Q.  Did you ever see any policies of the Cleveland Police Department relating to what information you should and should not give to witnesses during interviews?

            MR. FUNK:  Objection.

A.  I don't recall one way or the other whether there was general police orders on that or not.  I



don't recall ever reading that.

Q.  Were there any practices of the Cleveland Police Department on that issue?

          MR. FUNK:  Objection.

          MR. MALLAMAD:  Objection.

A.  Only in homicide I could say that our usual practice was to not give witnesses any information on what we are asking them.

Q.  Who told you that was the practice?

A.  That was the way I was taught.

Q.  By whom?

A.  All those detectives when I went into the homicide unit.

Q.  And what were you taught exactly?

A.  You don't tell the witness anything.  You let them tell you.

Q.  Did you receive any training, other than on-the-job training about how to conduct an interview with a witness?

A.  No, ma'am.

Q.  What exactly did you learn from the older detectives about what information you should and should not give to witnesses?

          MR. MALLAMAD:  Objection.

          MR. FUNK:  Objection.  Asked and



answered.

A.    Yeah, I thought I just answered that, ma'am, for you.  We were taught not to give any information to a witness about a crime.  That was for them to tell us what they knew, if anything.

Q.    Other than on-the-job training relating to interviews of witnesses, did you receive any other training on how to interview witnesses?

A.    No, ma'am, not that I recall.

Q.    Did you receive -- sorry, strike that.  Did you ever see any policies of the Cleveland Police Department relating to the preservation of notes?

A.    Preservation of notes, no, I haven't.

Q.    Did you ever receive any training from the Cleveland Police Department about the preservation of notes?

A.    Just the on-the-job training that I had, like I previously testified to, that once your notes that you write down yourself -- and you had to transcribe them the same day, you didn't come back the next day or three days later to make your report, that had to be done today, so the sergeant could read it.  Once we got done transcribing onto a Form 10, the notes were discarded.



Q.   And that was the practice of the Cleveland Police
     Department?

               MR. FUNK:  Objection.

A.   That was a practice of the homicide squad, ma'am.

Q.   The -- did you ever see any policies of the
     Cleveland Police Department relating to the
     keeping of a personal file?

A.   I don't recall anything, ma'am, no.

Q.   Did you ever keep a personal file?

A.   Of a homicide case?

Q.   Right.

A.   No, ma'am.

Q.   During the course of an investigation, what did
     you do with the documents that you were using
     day-to-day in an investigation?

A.   They stayed with the original file.  There was
     always an original in the file, in the homicide
     file.

          Okay.  And if I recall, there was a work
     copy, same thing, and that's what the detective
     may take with you a week later.  You know, a work
     copy, you would take that with you.  But the main
     file on that homicide, everything was in there.
     Statements, everything remained in the homicide
     unit until it went over to the prosecutor.



Q.  What was the in the work copy?

A.  Just Form 10 police reports, mostly, the
    investigative reports.

Q.  Where did you keep your notes?  Any notes that
    you had, either witness interviews, or anything
    else you learned during the course of the
    investigation, where did you keep the notes?

        MR. FUNK:  Objection.

A.  I thought I answered that by the notes that we
    take, we threw them away after we transcribe it
    on to a Form 10.

Q.  Okay.  So are those notes that you would keep in
    the work copy until you transcribed them, or they
    would just be in your pocket?

        MR. FUNK:  Objection.

A.  No, the way we were always taught, usual practice
    of the homicide squad was, you had your notes
    from the street, and you would come into the
    office, sometimes you might only have a little
    bit, sometimes you've got a ton, you transcribe
    it right away while it is fresh in your mind,
    from your notes, on to the investigative Form 10,
    so the sergeant can review it.  After that, the
    notes would be thrown away.  No reason to keep
    them.  We did not keep a personal file.



Q. Is it fair to say that from time-to-time there would be new general police orders that would come out?

A. Yes, ma'am, it is fair to say.

Q. How did you learn about those?

A. They -- there was always a copy of the police orders in the general detective bureau, which is right around the corner from homicide.

And if there was anything that our sergeant thought was pertinent to homicide investigation, they would read it to us. Which didn't occur that often, really. But on occasion, they would read it to us, if it pertained to homicide.

Q. Were there general orders that you could think of that pertained to homicide that didn't pertain to any other kinds of investigations?

A. I would not be able to help you there. I don't recall anything like that.

Q. Do you think that the conducting of a homicide investigation in terms of interviewing witnesses, finding witnesses, interviewing suspects, that those things are different than how a investigation of say an assault or a rape case would go?

MR. FUNK: Objection.



LEO ALLEN                                                    June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                                        80

                    MR. MALLAMAD:  Objection.

A.   I have no knowledge on what they did in other
     units.  I could only testify to the way we did
     things, the way I was taught, our usual practice
     in homicide.  I can't really speak to other
     investigations, other units.

Q.   Do you think that the conducting of a witness
     interview in a homicide case should be conducted
     any differently than the interviewing of a
     witness in an attempted homicide case?

                    MR. FUNK:  Objection.

                    MR. MALLAMAD:  Objection.

A.   I don't think there should be any difference.

Q.   Do you think the conducting of a witness
     interview in a robbery case should be conducted
     any differently than the interview of a witness
     in a homicide case?

                    MR. MALLAMAD:  Objection.

                    MR. FUNK:  Objection.

A.   I don't think so.

Q.   Could you think of any reason why note taking
     practices in a homicide unit would be any
     different than note taking practice in the
     robbery unit?

                    MR. MALLAMAD:  Objection.



A.  I can't think of any, ma'am.

Q.  Could you think of any reason why practices relating to what information should be disclosed to the prosecutor would be any different for a homicide case than any other kind of felony crime?

MR. MALLAMAD:  Objection.

A.  I don't think it should be.

MR. FUNK:  Is it a good time for another break?

MS. WANG:  Okay.

- - - -

(Thereupon, a recess was had.)

- - - -

Q.  When you are in the homicide unit, how would -- strike that.  Did you have experiences where there would be more than one set of detectives working on an investigation?

A.  Yes.

Q.  All right.  And is it fair to say that there would be a team or a pair of detectives working on one shift, and then another shift of detectives might come on and continue working on that investigation?

A.  Yes, ma'am.

Q. Okay.  How would you communicate information between shifts?  Like if you had done something on your shift, and then another shift of detectives were coming on to work on that investigation, how would you tell them what you had done, so they would know how to continue?

A. By that Form 10 investigative report.

Q. So you would -- so tell me what you would do at the end of your shift to communicate information to the next shift?

MR. FUNK:  Objection.  Go ahead.

A. Well, like I have testified previously, the practice of me and my partner and everybody else that I knew of in the homicide unit, you got done with your shift, when you got done working you came back in the office, whoever was typing that day, get down at the typewriter and do the Form 10, which is what they did that day.

And the sergeant might say, how long will you be with that report, Leo, because Bill will pick it up on the second shift, so I said, well, about a half hour, something like that.

And I would get done, the sergeant takes it, reviews it, and separates it to a work copy, main file, then the second shift might pick it up.



Then sometimes even the third shift and around.

Q. So the incoming shift, the second shift, would know to look in the investigative files to see -- to look at the Form 10 from the previous shift?

A. Yes, ma'am.

Q. And you said something about the sergeant separating out the copies.  So were they carbon-copies?

A. I can't even remember.  I'm sorry.  I don't think.  I think the original came in, and then the sergeant went and made a copy of it, the work copy, I think.  And I can't remember exactly.  I don't think there was a --

Q. Did they have photocopiers in the '70s?

A. A copy machine?

Q. A copy machine.

A. Yes, ma'am.

Q. But it wasn't one of those forms -- the Form 10 is not one of those forms, or is one of those forms that had like a white copy, a yellow on the bottom, and a pink?

A. Boy, that's a darn good question.  I don't recall.  I'm sorry.

Q. So was it the practice of the homicide detectives in -- to -- if you were coming in on a shift, you



would know what to do on a particular investigation, to continue the work of the previous shift, you would go and look at the file and look at the Form 10s?

A. Yes, ma'am.

Q. So they would have an idea of what the previous set of detectives had done, so they knew where to continue; is that fair to say?

A. That's fair to say, yes, ma'am.

Q. Was it the practice to have conversations with the incoming shift, or would you leave before they would get there?

A. No, it wasn't a practice to talk to other detectives coming in, but on occasion it would happen, sure.

Normally when we get done with the report, turn it in to the sergeant, and then he would disseminate it and decide who is going to work on it on the next shift, if any.

Q. Now you mentioned that after you were done with your Form 10, your sergeant would review it?

A. Yes, ma'am.

Q. And was it the practice for him to review it at the end of every shift?

A. Well, mainly just the first shift, mainly.  If we



were on second shift, and we had an original investigation or follow-up investigation where we made a Form 10, the sergeant would get it when he comes down at six in the morning.

Q. What were the hours of the first shift?

A. Homicide detectives, 8 to 4.

Q. 8 a.m. to 4 p.m.?

A. Yes, ma'am.

Q. And what about the second shift?

A. Four to midnight.

Q. Was there a third shift?

A. Yes, ma'am.

Q. What was that?

A. Midnight to eight.

Q. And was there a sergeant present during each of those shifts?

A. No, ma'am.

Q. Okay.  What shift was there a sergeant?

A. Mainly the first shift.  On occasion, if I recall, a sergeant may work a second shift, if it was extremely busy, but not as normal practice. Mostly days.

Q. What would your sergeant be reviewing when he would review your Form 10s?

        MR. FUNK:  Objection.



A.  Be reviewing our work and the report, you know.

Q.  Would you have conversations with him about what you had done that day, in addition to giving him your Form 10s?

A.  Sometimes, yes.  Occasions, sure.

Q.  On what occasions would you actually have conversations with your sergeant about that?

A.  Every once in a while.  If it was kind of involved, we might say, sarge, we've got four eyewitnesses to this crime.  We are making arrangements to get their statements tomorrow, I made a Form 10, sir.  That's it.  Thank you.  I will give it to second shift, whatever he would do.  On occasion, we would talk to our sergeant about it, yes, ma'am.

Q.  How would your sergeant know what you -- is it fair to say that, for the most part, your sergeant had not been out there with you in the field that day doing whatever you were doing that led you to write up what was in your Form 10?

A.  Um-hmm.  Correct.

Q.  So how would he know what you had done and reported in your Form 10 was accurate?

A.  Accurate, well, he trusted us.  He used to be a homicide detective himself, and he knows what



should have been in there.

Q.   Was it expected that sergeants would read all of the reports, all the Form 10s in a case where they are overseeing the investigation?

A.   Was it expected of them?

Q.   Yes.

A.   Yes.

Q.   So were there sergeants that were -- strike that. So there were homicide detectives that were assigned to particular cases; is that fair to say?

A.   Yes, ma'am.

Q.   And, then, were the sergeants assigned to specific cases, or were they assigned to overview the work of particular detectives?

A.   Neither.

Q.   Okay.

A.   The sergeant -- sometimes we had three during the day, sometimes two, sometimes only one.  They would be in charge of all of the work.  In other words, if two sergeants were in there, they would be like overviewing all the reports that were made that day.  We get done with our reports at 2:00 or 3:00.  We are ready to hit the road at 3:30.  They would review all our reports right



then and there, and decide if they should pass it on to the second shift.

Q. And what do you mean, if they should pass it on to the second shift?

A. Well, if there is further work that needed to be done that day.  In other words, we talked to a witness at noon, he said, I have got to get back to work, but I would be glad to come in tonight after work and give you the statement, then we would make a request for the second shift to take the gentleman's statement or lady.

Q. Okay.  So would the sergeant decide what further steps needed to be taken in an investigation?

A. Not necessarily, no. On occasion he would make a suggestion, of course, but normally, the detectives that were working on the case would be seasoned enough, experienced enough, to know what needed to be done.

Q. So is it fair to say that the detectives in charge of an investigation would be responsible ultimately for what investigatory steps to take?

MR. FUNK:  Objection.

MR. MALLAMAD:  Objection.

A. Well, the best way I could answer that, ma'am, is that in my humble opinion, the fellows and later



LEO ALLEN
JACKSON -vs- CITY OF CLEVELAND

June 16, 2016
89

on the ladies that worked in homicide were the cream of the crop.  That's my humble opinion.

And to the answer your question, they know what needed to be done to solve a murder, and what steps needed to be taken.  And most of them really didn't need a sergeant to tell them, hey, you got to get this witness statement.  They knew to get it.

Q.  Right.  And I'm not questioning.  What I'm asking is -- because you said the sergeant would make suggestions, but --

A.  On occasion, sure --

Q.  But the --

A.  Ultimately --

MR. FUNK:  Let her get the question out.

THE WITNESS:  Oh, I'm sorry.  I'm sorry.  I'm trying to help the lady understand the way homicide worked.  I don't know.

Q.  Sure.  So the sergeant would make suggestions on occasion, but ultimately the decisions about what to investigate and where to go with the investigation in a case would be made by the detectives who were on that case?



A.   Yes, ma'am, it would be fair to say.

Q.   If a sergeant made a suggestion about a step to take in an investigation -- if a sergeant made a suggestion to a detective and the detective disagreed with it, who would decide whether that step should be taken?

A.   I don't ever remember that happening, ma'am.

Q.   Okay.  Well, when you were a detective, did you ever disagree with a suggestion made by a sergeant?

A.   No.

Q.   So if a -- I mean, did you feel if a sergeant made a suggestion, that was just a suggestion, you could take it or leave it, or you had to do what the sergeant wanted?

A.   Well, let's put it in this way:  I would always do what my sergeant wanted.  If on occasion, and I can't recall this ever happening, but if I didn't think it needed to be done, I would say, hey, sarge, you really think we need to do this, yeah, I think you should, then it's done.  But I don't remember ever disagreeing with my sergeant about anything.

Q.   Okay.  Did you feel it was your call at the end of the day, though?



MR. FUNK:  Objection.

MR. MALLAMAD:  Objection.

A.  My call as to what?

Q.  Whether to take that step.

MR. FUNK:  Objection.

MR. MALLAMAD:  Objection.

A.  Yes.

Q.  Okay.  Did you feel that you had the authority to control your own investigations?

A.  Control our own investigations, yes, I felt that way after I was in the homicide unit for several years, I felt that that was my responsibility, yes.  I would say, yes.

Q.  Were there any policies that limited you or constrained your discretion in deciding what to do in an investigation?

MR. FUNK:  Objection.

A.  I don't recall any, ma'am.  I could only testify that usual practice in homicide was that each homicide team worked a case, and they knew what to do to try to get it solved.  That's my best answer.

Q.  All right.  Do you know if anybody reviewed your Form 10s besides the sergeant?  Like would the sergeant pass it on to somebody above him?



A.   Well, we had a lieutenant, but he didn't spend all day reading our reports.  He -- if a certain homicide was news-worthy, policeman involved, yes, a lieutenant would read those, yes.

Q.   So if it was -- if it was a news-worthy case or if there was a special circumstance, a lieutenant might read the reports?

A.   Of course.  He wouldn't read them all, but on the ones where the chief may take an interest, the lieutenant wants to be kept up on it, he would read the reports, maybe come to us and say, hey, what is going on with this, got a call from the chief, blah, blah, blah, something like that.

Q.   Okay.  And who is above the lieutenant in terms of rank?

A.   Well, there was a commander.  Let's see.  We didn't have a commander, per se.  Our lieutenant was the big boss in homicide, and he answered to the chief.

Q.   In 1975, do you remember who was the lieutenant of the homicide unit?

A.   Leonard Lauerhass --

               MR. GILBERT:  How do you spell that?

               THE WITNESS:  L-a-u-e-r-h-a-s-s.



A.   -- for several years.

Q.   All right.  Do you know what years around 1975 he was the lieutenant?

A.   Oh, boy, wow.  Let's see.  Sorry.

Q.   And then who -- in 1975, who were the sergeants besides Pete Comodeca?

A.   Well, I recall Jack Kaminski and Harold Murphy those three.  That's it, as far as I remember.

Q.   Do you recall a Walter Dogin?

A.   Yes, there was a Walter Dogin.  Thank you. Exactly when he was there, I don't know exactly when he was there, but, yes, he was one of ours.

Q.   Did he ever supervise you on anything?

A.   You mean, like the other sergeants?

Q.   Yes.

A.   Yeah, he had equal authority to make a suggestion or look at our reports or ask us questions, of course.

Q.   You said the lieutenant of the homicide unit, in 1975, he reported directly to the chief of police?

A.   Well, not that he reported to the chief, but if the chief wanted to know about a certain investigation, he would naturally call the lieutenant, and the lieutenant would want to give



him the information.  Exactly reporting to him, I don't know if that's the right wording, but our lieutenant was in charge.

Q. Okay.  So what about the commander, was the commander above the lieutenant, then?

A. Well, yeah, but if I remember correctly, we had a captain back then.  Commanders didn't come into play for a while.

Q. Oh, they didn't have commanders?

A. If I recall.  Yeah, I think they started commander in maybe --around 1980.  I can't be for sure, but I don't recall us having a commander way back then.  We had a captain of the Detective Bureau.  They didn't really get involved in what we did.  It was our lieutenant that was in charge.

Q. Who was the captain of the Detective Bureau in 1975?

A. Well, I can't really say in '75.  I don't recall.

Q. Do you remember any captains from the 1970s at all?

A. Morallis, he was one of the captains.  When?  I think he was a little bit later, though.  In the 70s, I'm sorry, I don't remember.

Q. Okay.  So the captain didn't really get involved



in your day-to-day investigations?

A.   No.

Q.   So what was the captain's role, as a captain of the Detective Bureau?

A.   Good question.  They didn't do much.  I mean that.  To overview the general Detective Bureau. They had different units, you know, theft, arson, sex crimes, he was like in charge of them, even though they had their own bosses.

But they really didn't come to homicide too often, unless it was a major case that he wanted to know about, he might have walked down.  Very seldom we dealt with the captain.  It was always our lieutenant reporting to the chief.  Yeah, he was in charge of all the other units.

Q.   Okay.  So the captain was in charge of the whole Detective Bureau?

A.   That's what I recall at that time.

Q.   So you had a lieutenant specifically for homicide?

A.   Yes.

Q.   Were there any policies of the Cleveland Police Department in the 1970s relating to the conducting of line-ups?

A.   I don't recall one way or the other, if there



was.  There may have been.  I don't recall reading.

Q. Were there any policies of the Cleveland Police Department in the 1970s relating to how to use photo line-up or photo show-ups?

A. I can't testify one way or the other whether there was.  Like I say, it goes back to my on-the-job training.

Q. So were there any practices of the Cleveland Police Department in the 1970s relating to the conducting of in-person line-ups?

A. There may have been general police orders on that matter, which were available.  I don't recall reading any.

Q. Were there any practices of the Cleveland Police Department relating to the conducting of photo line-ups or show-ups?

                    MR. FUNK:  Objection.

A. I don't recall any specific order.

Q. Did you ever receive any training from the Cleveland Police Department about how to conduct in-person line-ups?

A. Just on-the-job training, like I had testified to, watching the older guys do it.

Q. Did you receive any training from the Cleveland



Police Department about how to conduct photo line-ups or show-ups?

A.  Just from the experienced detective from the homicide squad.

Q.  And what did you learn in terms of on-the-job training about how to conduct line-ups and show-ups?

A.  Okay.  If we had a suspect in jail, and we wanted to run a line-up for the witness to view, normally, there was a detective/sergeant that was kind of his thing and other things, if he was available, he would -- he would try to get the line-up together for us.

We would call him and say, hey, we got so and so, and he would look himself and try to get five or six men that were in jail or ladies that generally fit the description, the best they could, of the guy that we had in jail to run the line-up.

And then he may call us a half hour later and say, I got you a line-up ready.  And then we would go back there with our witness, and then --

Q.  Did you ever see any policies from the Cleveland Police Department about how to document line-ups?

MR. FUNK:  Objection.



MR. MALLAMAD:  Objection.

A.  I don't recall any, ma'am.

Q.  What were the practices -- or were there any
practices of the Cleveland Police Department
about how to document line-ups?

MR. MALLAMAD:  Objection.

A.  Well, I don't know what you mean by documenting.
I mean, we would, again, in our investigative
Form 10 report describe that so and so, suspect
was placed in a line-up with five other males,
witness was unable or able to make a pick.
That's what I learned to do on-the-job training,
that's -- if that's what you mean by documented,
it's the way I could answer it.

Q.  Were you trained as to whether or not to keep
photos of the line-up or to take photos of the
line-up, so that people would know what the
line-up looked like?

A.  No, as far as I recall, ma'am, that was not a
practice.

Q.  Is that a practice today?  Do you know?

A.  I wouldn't know.

Q.  Were you ever trained as to whether or not, when
documenting a line-up, you would write down
exactly who the other people who were in the



line-up, you know, the fillers?

A.   As far as I recall, I don't think we did that back then.

Q.   Why not?

A.   I don't know.

Q.   Do you know if it is done today?

                    MR. MALLAMAD:  Objection.

A.   No, ma'am.

Q.   Do you know if it was done at the time you retired?

A.   I don't recall.

Q.   Did you ever see any policies of the Cleveland Police Department relating to the use of threats or promises to witnesses during an investigation?

A.   I don't recall ever seeing anything like that, ma'am.

Q.   Were there any practices of the Cleveland Police Department relating to the giving of promises or threats to witnesses?

                    MR. FUNK:  Objection.

                    MR. MALLAMAD:  Objection.

A.   I don't recall anything like that one way or the other, ma'am.

Q.   Did you ever learn anything in your on-the-job training about the giving of promises or threats



to witnesses?

A.   No, ma'am.  I don't recall any practices or anything like that, no.  On-the-job training, no.

Q.   All right.  Have you ever worked with Jerold Englehart?

A.   Well, when you say, worked with him, he did not work in homicide, he was in the statement unit, and he would type statements for us.

Q.   Did you ever have him type statements for you?

A.   Yes.

Q.   On how many occasions?

A.   Many occasions.

Q.   Could you estimate?

A.   Oh, boy.  You are asking me some tough questions there.  40, 50, maybe during those years -- 30 to 50, when we had a statement unit.

Q.   How would you normally have Detective Englehart do your statements for you?

A.   Well, we would call to see if there was anybody available to type a statement, defendant or otherwise.  And if they say, yeah, what do you got, well, we got a couple witnesses, or we have a defendant, and how about if we bring them up; that's the way it was done.

They were on the next floor, if I recall.  We



would bring it up to them, and they would type the statement.  As a general practice, we were not good typists.

Q.  Do you know why they had detectives do the typing in the criminal statement unit?

A.  Not really.

Q.  Did you have -- I mean, you had secretaries in the Police Department, right?

A.  Yeah.  Yeah, there was some, sure.

Q.  Okay.  Do you know why they didn't do the typing?

A.  No, ma'am.  If I could just elaborate on that, the defendant, you would want a policeman to be able to read the rights and make sure the defendants would understand the rights before he could give the statement, so it would be advantageous to have a policeman do that for the court purposes when it comes to court.  That's why it would be advantageous to have a policeman.

Q.  Would you generally be present when a witness statement was taken and be typed up --

A.  Generally, yes.

Q.  -- if it was your investigation?

A.  Yes, ma'am.  Generally, yes.

Q.  Okay.  And were there occasions when you would not be present, and it would just be the witness



and the criminal statement detective?

A. No, no. It would be practice to have either one or both of us.  A lot of times we worked alone, too.  And it would be usual practice to have us be with the detective when he took a witness statement.

Q. Do you have any knowledge of the witness statement of -- that was taken of the witness, Edward Vernon, in this case?

A. No, ma'am.

Q. Is it your understanding that you will be testifying to the character of the defendant, detectives, in this case?

A. I was made aware that that might be a possibility, yes.

Q. What is your knowledge of Eugene Terpay besides what you already talked about?

A. Eugene Terpay was a gentleman.  He was a great detective, a great interviewer.  I never saw him do anything out of the ordinary.  I don't even remember him raising his voice on anybody.  I'm serious.  I mean, Eugene Terpay was -- he was a classic, good detective.

Q. You don't have any knowledge of what he did or didn't do in this case, do you?



A.   No, ma'am.

Q.   What is your knowledge of James Farmer?

A.   Jimmy Farmer was an ex-marine.  He was a -- we used to call him the hillbilly from West Virginia, because he was from Beckley.  And that's where he was -- when he died, that's where he was buried.

     James Farmer was a really good detective.  I went on several trips with him to retrieve prisoners from other states.  Again, I have a lot of respect for James Farmer.  Again, he like all the other fellows that I mentioned, black or white, he did things the right way.  I never saw him do anything stupid.  Never saw him scream at anybody, hit anybody.  James Farmer was a professional.

Q.   Do you have any knowledge of anything that James Farmer did in this case?

A.   No, ma'am.

Q.   Do you have any knowledge of anything that James Farmer did or didn't do in the Albert Rembert case?

A.   No, ma'am.

Q.   Do you have any knowledge of anything that James Farmer did or didn't do in a case involving a guy



named Craig Fowler?

A.  No, ma'am.

Q.  Do you know anything about the Craig Fowler case?

A.  No, ma'am.

Q.  Does the name Craig Fowler ring a bell --

A.  No.

Q.  -- he was a defendant?

A.  No.

Q.  Does the name Charles Jordan ring a bell?

A.  No.

Q.  How about Larry Johnson?

A.  No.

Q.  Did you have anything to do with the criminal prosecution of a guy named Craig Fowler and his two co-defendants?

A.  I don't recall, no.

Q.  Do you have any knowledge of anything that any Cleveland Police detective may or may not have done in a case involving a guy named Craig Fowler?

A.  No, ma'am.

Q.  Do you have any knowledge of anything that any Cleveland Police detective may or may not have done in a case involving a guy named Albert Rembert?



A.  No, ma'am.

Q.  What is your knowledge of James Staimpel?

A.  John Staimpel?

Q.  Or, sorry, John.

A.  John Staimpel, was again, a very good,
    experienced detective.  He worked in, I believe
    two different districts in the Detective Bureau
    when he came to homicide.  I learned a lot about
    him, about procedures, and the way you do things.
    I had a lot of respect for John.  He died
    tragically.

Q.  In a car accident?

A.  Yes, ma'am.

Q.  Was it because he was an alcoholic?

                MR. MALLAMAD:  Objection.

                MR. FUNK:  Objection.

A.  He may have had a drinking problem.

Q.  Do you know if his wife is still alive?

A.  No, ma'am.

Q.  You don't know one way or another, or she is not?

A.  I have no knowledge.

Q.  Do you know -- do you have any knowledge of
    anything that John Staimpel did in this case?

A.  No, ma'am.

Q.  What is your knowledge of Frank Stoiker?



A.  Frank Stoiker, again, perfect gentleman, on the classic range of Eugene Terpay.  Very good detective, very experienced, did things the right way.  I don't ever remember him raising his voice to anybody.  Unfortunately, he has had some problems lately.  He is a good friend of mine.  Him and his wife are good friends.  I have a lot of respect for Frank Stoiker.

Q.  Have you seen him recently?

A.  Yes.

Q.  How recently?

A.  About three weeks ago.

Q.  Did you have a conversation with him?

A.  Yes.

Q.  What did you talk about?

A.  All kinds of different things, but he's not aware of the proceedings against him.  His wife certainly knows, Viola.  But poor Frank is unable to grasp it.  He could have a general conversation with you, then he repeats himself over and over again.  I don't know.

Q.  Did you talk about this case at all?

A.  No, not with Frank Stoiker, no.

Q.  Right.  Does he remember you?

A.  Yes, he remembers me, but unfortunately he didn't



remember my wife and he knows her for years, so it's a shame. It's a horrible disease.

Q. How old is Viola? Do you know?

A. I don't know. Late '80s.

Q. Are you personal friends, then, with Frank Stoiker?

A. I would say, yes.

Q. Okay. And how long would you say you have been friends with him?

A. Well, I've known him since 1973. When we retired is when I bought my condo in Florida. It just so happened, he had a condo right across the street, and we would go out to dinner with them. So he's been pretty good friends with us through the years.

Q. Were you friends with Eugene Terpay?

A. Not outside the working environment downtown, no.

Q. Did you ever -- you know, back when you worked with him, did you ever go over to his house or have dinner with him?

A. No, ma'am.

Q. Did you ever socialize with him in any way?

A. No, ma'am.

Q. Do you know his son?

A. No, ma'am.



Q. Were you friends with James Farmer?

A. I would say, yes, I was friends with James Farmer. We did not socialize together, but I worked with him enough where I consider him a friend.

Q. And how long had you known him?

A. Since 1973 until his death.

Q. Have you ever seen him outside of work?

A. Socially, no. I did not socialize with Jimmy.

Q. On what other kinds of occasions did you see him outside of work?

A. If I misstated -- I didn't really see him outside of work socially or anything. I never went to his house. I knew where he lived, but I never went.

Q. Okay. Were you friends with Jerold Englehart?

A. Just on a business relationship at work.

Q. Did you ever socialize with him?

A. No, ma'am.

Q. What about -- did I ask you about John Staimpel? Were you friends with John Staimpel?

A. No, we never socialized outside of -- no, we didn't socialize. I just knew him from working cases with him and being in the homicide unit.

Q. How many times would you approximate you have



seen Frank Stoiker in the last year or so?

A.  Year, one time.

Q.  How about the last five years?

A.  Maybe three or four.

Q.  Were you friends with Peter Comodeca?

A.  He was my boss.  I would love to consider him a friend.  I had so much respect for him.  But outside of work, no, ma'am.  Just maybe on -- well, we would have -- occasionally, we would have a retirement party or an end of the month party, on occasion, and I would see him there, and that's about the extent of it, but he was my boss.

Q.  What was your knowledge of him?

A.  I would have went through a brick wall for Pete Comodeca.  He was such a good policeman.  He wasn't afraid of anything.  One of his last days of -- I don't want to be telling stories.  One of his last days of work before he retired, he insisted on going into a house looking for a murderer, the first one through.

    And we had uniform policemen there with shotguns, and he insisted on going in first.  That's the type of policeman he was.  And he was a very good detective.  I mean, he was always

there for us.  Great guy.  Everybody respected him, everybody.

Q.  Do you have personal knowledge of anything he did or didn't do in this case?

A.  No, ma'am.

Q.  Do you know -- do you have personal knowledge of anything that Peter Comodeca did or did not do in the Albert Rembert case?

A.  No.

Q.  Do you know anything that John Staimpel did not do in the Albert Rembert case?

A.  No, ma'am.

Q.  I skipped around a little, so I'm not sure if I asked you, but do you know -- have any knowledge of anything that John Staimpel did in this case?

A.  In this case, I have no knowledge.

Q.  Do you have any knowledge what Frank Stoiker did in this case?

A.  Well, I know they worked on it, but specifically what they did, I don't know.

Q.  Right.  Do you have any knowledge of anything that Jerold Englehart did in this case?

A.  Not particularly, no.  I believe he may have taken a statement, but I don't have any personal knowledge of it.



Q.  Did you ever see a statement that he took in this case?

A.  No, ma'am.

Q.  Okay.  Is that something you learned from the complaint?

A.  No.  It may have been in a conversation with Mr. Funk.

Q.  What is your knowledge of James White?

A.  James White, he was sergeant in the bureau.  I did not know him that well, way back then.  I have no recollection -- if he walked in front of me now, I wouldn't know what he looked like.  I have no personal knowledge of James White.  I know he was a sergeant.

Q.  Were you friends with him?

A.  No.

Q.  Do you know Michael Cummings?

A.  Sure.

Q.  How did you know him?

A.  He was another homicide detective.  He was in the unit.  And, yes, I knew him.

Q.  Were you friends with him?

A.  I was friendly with him.  And we went down to West Virginia to testify in a case, and we socialized a little bit down there.  Other than



that, we never really socialized outside of the job.  I knew him from -- he had a regular partner, Gene Bock, and we knew each other.

Q.  Do you know anything about his reputation?

A.  Nothing derogatory.  I mean, again, I can't say anything bad about Mike Cummings.  I don't have any personal knowledge.

Q.  Do you know anything about James White?

A.  No, ma'am.

MS. WANG:  I have no further questions -- actually wait.

Q.  Okay.  One more question.  Do you know anything about anything -- or strike that.  Do you have personal knowledge what Frank Stoiker did in the Albert Rembert's case?

A.  No, ma'am.

MS. WANG:  Okay.  No further questions.

MR. FUNK:  Do you need to stretch your legs or anything?

THE WITNESS:  No, I'm good.

MR. GILBERT:  Yeah, just let us know if you need a break.

- - - -

EXAMINATION OF LEO ALLEN



BY MR. GILBERT:

Q.  Okay.  Mr. Allen, you started in 1973 with the Detective Bureau.  Do you remember approximately what month that was?

A.  March.

Q.  And when you started, were you on some kind of like training mode where you didn't get all of the responsibilities the older guys got, and you were just following them around?  How did it work?

A.  You are basically right about that.  I didn't walk in there with any responsibilities.  I walked in there to try to learn.  They put me with all these veteran detectives, and it took me a good two, three years before I felt very confident to do a murder case, to take the responsibility.  But I watched and learned from all these guys, read their reports, worked with them.

Q.  So it would be accurate to say that during the first couple years, you didn't actually take charge of any investigations by yourself?  Would that be an accurate assessment?

A.  Yeah, by myself, no.  But if I was a rookie in homicide six months, let's say, just to give you



an example.  And if I'm working with Frank Stoiker or anyone of these gentlemen, and we get a murder case, I was equally responsible for that, but I leaned on him as to procedures, as to what to do.

Q.  Do you recall the first case that you actually took responsibility and investigated?

A.  No.

Q.  Can you give us a timeframe when that -- when the transition from being like a rookie to being a full detective with all the same duties as the veterans?

A.  That was my first day in.  I had all the responsibilities and duties, but I kept my mouth shut, and watched how all of them did it, worked with them, and -- but as far as responsibilities and duties, I had them as soon as I walked in.

Q.  Were you a case agent?  In other words, were you -- do you remember when you became like the lead detective in a case?

A.  Oh, no.  No, I can't really tell you when.

Q.  Would that have been before 1975 or after 1975?

A.  It is really hard to say, sir.  I don't recall being alone as a lead detective on any particular case.  In those first couple years, I may have



been with one of these other detectives where I was with them, and we had equal footing, responsibilities.  That's the best way I could answer it, sir.

Q. During those first couple years, and in the homicide unit, was it the practice of a particular detective to be known as a case agent that would work with the prosecutor?

A. No.  The best way to answer that, sir, if two detectives get an original homicide and do most of the work on it, when the prosecutor gets the case, he may call both of them in and see which one might be available to work with him on the case, to sit with him at the trial.  That's the best way I could describe it to you.

Q. Do you recall sitting at a trial between 1973 -- 1973 and 1975?

A. I would not recall that, sir.

Q. You don't remember the first case you actually sat in a courtroom?

A. No, sir, I don't.

Q. Was it more likely that it was after 1975?

MR. FUNK:  Objection.

A. I could not say, sir.  I don't know for sure.

Q. So, is it your testimony that you made the same



decisions regarding a case, when you were in the first couple years, as other detectives?

MR. FUNK:  Objection.

A.  I wouldn't say -- well, I wouldn't put it that way.  I would say that, I would be with them, following their lead, but ultimately I bore the responsibility, also.  I'm on the reports.  I'm with them.  I'm still learning, still following their lead.

Q.  And they would be making most of the major decisions, would they not?

MR. FUNK:  Objection.

A.  Well, I guess you could say that.

Q.  Now, I think we -- there was some questions about the structure of the homicide unit in the mid '70s.  I'm not sure if you remembered who the captain was, correct?

A.  Right.

Q.  You mentioned a Captain Morallis, but you don't know when he was there?

A.  I don't know when he was there, sir.

Q.  You remember Lieutenant Leonard Lauerhass?

A.  Yes, sir.

Q.  And did he physically have an office in the homicide unit?



A.   Yes, sir.

Q.   What exactly was his role?

A.   As a lieutenant?

Q.   Yes.

A.   He would be the overseer of what was going on in the unit, what detectives do and don't do.  What off days they get, or a sergeant might decide that with him.  His role is to oversee everything that goes on in homicide.

Q.   Would you say that he had more of an administrative role in the running of the homicide unit?

            MR. FUNK:  Objection.

            MR. MALLAMAD:  Objection.

A.   More or less, I would say, yes.

Q.   Would you say that he did not typically make decisions regarding the course or scope of an investigation?

            MR. FUNK:  Objection.

            MR. MALLAMAD:  Objection.

A.   That's a fair statement.

Q.   Would you say that it was the detectives who were on the hands-on aspects of the case, that made the decisions as to who was to be interviewed, what steps were to be made in the course of an



investigation, that type of thing?

MR. MALLAMAD:  Objection.

MR. FUNK:  Objection.

A.   That's a fair statement.

Q.   In the 21 years that you were a homicide detective, do you recall any incident in which a detective was disciplined?

A.   In homicide?

Q.   Yes.

A.   Disciplined, I can't recall anything.

Q.   Okay.  And over the years there would be typically a staffing of detectives, approximately how many at any given time, all shifts?

A.   Yes, sir.

Q.   How many were typically -- I know it increased over time, but you --how many detectives were there usually in the unit at any given time, approximately, if you know?

A.   In the '70s, there were 44 homicide detectives. Now, it may be not every year there was, maybe one or two retired, maybe they were replaced, maybe they weren't, but it was 44 detectives total, the most we've ever had in the '70s.

Q.   All right.  And in your 20 years of being in the homicide unit, would you -- would it be fair to



say there were more detectives in the '70s than
later on because of the crime demographics?

A.  That would be fair.

Q.  Did it go down after the '70s?

A.  Best of my recollection, yes, it did.

Q.  Okay.  And what did it -- what numbers changed
over time?  Do you have an idea?

A.  Not really.  I couldn't say.  Maybe in the 30s.

Q.  When you retired in '94, what was the personnel
strength of the homicide unit?

A.  I don't recall, sir.  I can't tell you.

Q.  So you would say at any given time, between the
30 to 40 number of homicide detectives?

A.  That's a fair statement.

Q.  I'm not trying to put words in your mouth.

A.  I can't give you an exact answer, because I
really don't remember.

Q.  And there would be turnover from time-to-time,
would there not be?

A.  Yes, sir.

Q.  In your tenure there, would you say there were
hundreds of homicide detectives?

A.  You mean --

Q.  Over the whole period of time.

A.  When I was there?



Q.  Yes.

A.  No, not hundreds.

Q.  Approximately how many?

A.  You mean from 1973 until I retired?

Q.  That came and went.

A.  Came and went?

Q.  Yeah.

A.  Certainly not hundreds.  I will give you a
    ballpark figure.  That's all I could do.

Q.  That's fine.

A.  50.

Q.  Okay.

A.  55.

Q.  So you are kind of indicating that given the
    turnover, people retiring, people being
    transferred, people coming in, that you knew
    approximately 55 or so detectives that you worked
    with during that period?

A.  That's my best estimate, yes.  I could be off a
    little bit, but that's my best estimate.

Q.  And let's assume that 55 number for the moment.
    Out of those 55, in 20 years, you never saw or
    are aware of anybody being disciplined --

            MR. FUNK:  Objection.

            MR. MALLAMAD:  Objection.



LEO ALLEN                                             June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                        121

Q.  -- is that right?

A.  I don't recall.

Q.  Okay.  Now, after Leonard Lauerhass, do you remember in chronological order, who were the lieutenants of the homicide unit?

A.  I could give you three names, but I can't tell you the order.  I don't remember.  Lieutenant Comodeca, John James came over from the SWAT team and -- oh, my gosh, I just had it on my -- oh, Eddy Kovacic, who then went to be chief.

Q.  Do you remember around the time that Eddy Kovacic was in charge?

A.  Some time in the '80s.

Q.  He was a lieutenant?

A.  Yes, sir.  Dennis Gunch, he was a lieutenant, I believe when I retired.  But chronological order for those other fellows, I can't recall.

Q.  And during the period that you were in the Detective Bureau, were there many changes that took place in terms of the way it operated?

A.  No, sir.  Things -- the way we did things remained the same when I was in there.

Q.  For 21 years, right?

A.  Yes, sir, the way we did things.

Q.  Was there any outside agencies that came in to



LEO ALLEN                                                    June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                                       122

review the practices in the homicide unit to see if there is anything that can be done to improve it, if you recall?

MR. MALLAMAD:  Objection.

A.  No, I don't recall.  I mean, I --

Q.  Did anybody --

MR. FUNK:  Let him finish.

MR. GILBERT:  I'm sorry.

A.  I am just going to say, not that I recall, I don't know of anything like that happening, is my answer.

Q.  And do you recall any safety director or chief of police or anybody under the direction of the chief of police that came into that unit and did any kind of review of procedures, policies, practices, if you recall?

MR. FUNK:  Objection.

A.  I don't know of anything like that.

Q.  As you sit here today, do you remember some of the big cases that you worked on?  I know you worked on hundreds of them.  Are there any cases that stand out in your mind?

A.  Well, certainly, because of the lawsuit, the D'Ambrosio case sticks out, certainly.  A murder of a young police officer in a bank, certainly



was one of the biggest cases.

Q.  Do you remember the name?

A.  I could see the bank, it's on Harvard; 131st and Harvard.  A young African-American police officer.

Q.  It was in a bank robbery?

A.  Leonard Jenkins was the man who killed him.  I don't remember the young officer's name.

Q.  You worked on that case?

A.  Yes, I did, testified in court.  That was a big one.

Q.  Any other ones?

A.  There were many, Mr. Gilbert.  I can't recall right now.

Q.  Okay.

A.  A lot of death penalty cases, those certainly.

Q.  And you worked with which prosecutor in that Leonard Jenkins case?  Do you remember?

A.  No, I don't recall.

Q.  So in your career, you could only remember two cases by name?

            MR. MALLAMAD:  Objection.

A.  You mean, cases that stand out in my mind?

Q.  Yeah.

A.  I just can't recall the names.  There were a lot



LEO ALLEN
JACKSON -vs- CITY OF CLEVELAND

June 16, 2016
124

of death penalty cases it happened so long ago. I don't recall the name.  There was a lot of them.

Q.  Well, you are not that old, are you?

A.  Yeah, I am.

Q.  You are not suffering from any kind --

A.  I'm not suffering, that I know of.

Q.  -- of any memory issues?

A.  I have been retired for 22 years, sir.

Q.  And you were proud to be a detective, right?  It was your career?

A.  I was, yes, sir.

Q.  And so the only two cases that you remember by name is D'Ambrosio, and a case involving a police officer, you don't remember his name, right?

A.  I don't.

Q.  Did you have any role in the investigation of the murder of Desmond Sherry?

A.  I don't recall.  I don't think so.

Q.  Or you are not sure?

A.  I don't think I had anything to do with that case.

Q.  Do you remember anything about that case, just from being in the --

A.  A little, yes.



LEO ALLEN                                    June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                        125

Q.  What do you remember?

A.  Oh, I remember he was an off-duty police officer that was killed by 66th and Euclid.  And there were three to four young black males involved.  That is basically what I remember.

Q.  Do you remember the -- was Lieutenant Kovacic in charge of the homicide unit at the time?

A.  I can't recall that.

Q.  That was a big case, was it not?

A.  Oh, sure.  The murder of a policeman, absolutely.

Q.  You don't remember having any role in that?

A.  No, but I remember the two guys that had the biggest roles.

Q.  Who was that?

A.  Bob Bulton and Jim Bastricky.  They are both deceased.

Q.  You remember the Feckner case?

A.  I remember the name, sir, and I remember Bastricky worked on that case also, but I don't recall if I had anything to do with that case.

Q.  Were you -- in the Desmond Sherry case, were you aware that a number of suspects were arrested and some brothers were charged in connection with that case, the killing of Desmond Sherry?

            MR. FUNK:  Objection.



He is asking if you remember it.
My objection is based on lack of personal knowledge, but --

MR. GILBERT:  Well, he remembered it. I'm trying to help him refresh his recollection, if he knows or if he doesn't know.

Q. Do you remember that some brothers were charged with killing Desmond Sherry?

A. I don't recall if they were brothers or not.  I do recall that the original men that were arrested were not the ones, if I recall right. And then later on, they were acquitted.

   I don't think they went to trial.  They were acquitted or released, and they got the right ones.  That's what I remember about it.  I couldn't tell you names.  I couldn't tell you anything else about it.

Q. Do you remember whether Kovacic said that the case was solved after the arrest of those two people who were later acquitted?

A. I don't recall that, sir.

Q. Do you remember allegations that some suspects were beaten and abused by detectives in the homicide unit in connection with that case?



A.  No, sir.

Q.  Were you aware that -- of a guy named Jerold
    Edwards?  Does that name ring a bell?

A.  No, sir.

Q.  Did you ever attend the trial?

A.  No, sir.

Q.  Do you know what the problem with that case was
    that led to an acquittal from the standpoint of
    the State's case?

A.  No, sir.

                    MR. FUNK:  Objection.

Q.  Did you know that there were two transvestites
    who claimed to have seen the murder in that case?

                    MR. FUNK:  Objection.

A.  No, sir.

Q.  How many cases are you aware where -- in your
    21-year period when, based on a homicide
    investigation that was conducted, that suspects
    were arrested and charged and later found not to
    have committed the crime?

A.  I can't recall any right now, but it may have
    happened.

Q.  All right.  And, from your knowledge, being in
    the unit, that happened in the Desmond Sherry
    case, correct?



A.   That's what I remember.  The first guys arrested were acquitted or let go, and then the correct ones were arrested later.  I have no personal knowledge of that.  That's what I remember off the top of my head.

Q.   Did you know whether one of the people arrested after the acquittal, that was involved in the murder, was the son of a cop?

          MR. FUNK:  Objection.

A.   I have no knowledge of that, sir.

Q.   All right.  Now in the Joe D'Ambrosio case, you were the lead detective, correct, in that case?

A.   Yes, sir.

Q.   All right.  Now, do you recall being --

          MR. FUNK:  I am going to object to this line of questioning.  I am going to allow you to go, I just want to put my objection on the record.  This case was a civil suit that was filed against Leo Allen, and it was dismissed with prejudice.

          It relates to a murder investigation from 1988, which is long after this.  And I think it's completely irrelevant, and subject of a total separate litigation that has now been conclusively



resolved in Mr. Allen's favor.  That's my objection.

MR. MALLAMAD:  I share in the objection.

MR. WANG:  It is relevant for impeachment.

MR. GILBERT:  Well, I am not going to ask him about Brady issues.

MR. FUNK:  I will allow you to ask the questions, I just wanted to get my objection out there.

MR. GILBERT:  All right.  Well, since he only remembers two cases --

MR. FUNK:  Without waiving my objection.

MR. GILBERT: -- this is one of the cases he remembers, actually.

Q.  Okay.  So, do you recall in the Joe D'Ambrosio case that he was -- there was an order for a new trial based on the withholding of some evidence?  Do you recall that?

MR. FUNK:  Objection.

A.  I'm recalling that's what the judge ruled.

Q.  And the case came back for a new trial; do you recall that?



A.  Yes.

Q.  You were already retired by then?

A.  Yes.

Q.  Do you recall testifying in a suppression hearing before Judge Synenberg?

A.  I recall that.

Q.  Do you recall that that was approximately in 2009?

A.  Sounds right.

Q.  Okay.  And I believe the prosecutors involved in that were Rick Bell, do you know him?

A.  Yes.

Q.  And Aaron Brockler?

A.  Yes.

Q.  And do you remember coming back -- I don't know if you were -- you had to come back from Florida or you were here, but I believe it was in August of 2009.  Do have any recollection of when that was?

A.  No, but that could be right.

Q.  And you would have been -- you come home for the summers, right, usually?

A.  Yeah, I'm a snowbird.

Q.  That would be a period of time that you would have been in the Cleveland area?



A.  Yes, sir.

Q.  And that case involved an issue of whether or not going to an apartment where Joe D'Ambrosio was arrested, and I believe a guy named Espinoza was also arrested, whether that was a legal entry into that apartment.  Do you remember that issue?

A.  Yes, sir.

                    MR. MALLAMAD:  Objection.

Q.  And do you remember being put on the stand by Rick Bell to answer questions about that?

A.  Yes.

Q.  And you were also crossed-examined in that case, I think Bob Tobik or Kelleher?

A.  I don't remember -- Kelleher rings a bell, yeah.

Q.  And even -- do you recall the judge asking you questions about what your recollection was about that entry into the house?

A.  I think she did, yeah.  Yeah, that was the questioning, sure.

Q.  Okay.  Do you recall that immediately after the death of Mr. Klann, K-l-a-n-n, who was the victim of the murder, his body was found at Doan Creek?  You remember that, right?

A.  Yes, I do.

Q.  And you were assigned to that case to be the



detective or one of the detectives?

A.   Yes, sir.

Q.   And in the day or two after the homicide, do you remember you were at the coroner's office, and you got a call, do you remember that, from a guy named Paul Lewis or Stoney Lewis?

A.   I did not receive a call, sir.

Q.   You were at the homicide unit when he showed up, right?

A.   No.

Q.   All right.  How did you -- how did the names, Espinoza, D'Ambrosio, and Keenan come to your knowledge?

                    MR. FUNK:  Objection.  Go ahead.

Q.   They are going to object to all of this, so don't worry about it.

A.   All right.  I was working with Detective Donald Ferris.  And there was a hanging in one of our jails.  And the sergeant directed me, he said, go out and get the details on the hanging, get all of the details on the hanging, get all the information you can.  I said, Okay.

     Donald was doing something else.  I went up to the morgue.  And it was early in the morning, 8:15, 8:30, first thing I did I went out to the



morgue.  While I was there getting the information on the hanging victim, I received a call from, I think it was Jimmy Swedrick, homicide detective.  He said, hey, there is a guy at the morgue, he identified that kid at Doan Creek from the other day.  He said talk to him, he is there.

So I went around the corner, I was in the autopsy room, and I went around the corner, and I asked the attendant, I said who is this gentleman here, and that's how I got to talk to Paul Lewis.  And I said, what are you doing here?  He said, I just identified my friend.  I said who is he?  Tony Klann.  They killed him.  They were looking for me, they killed him.  Who is they?  The three names.

Q.  Okay.  In the course of your investigation, did you find out that he actually had called, this Stoney Lewis, called, made a phone call?

A.  Yeah.  Right.

Q.  Were you aware that Stoney Lewis wanted to not only identify the body of Tony Klann, but was curious to know what kind of injuries he had?

MR. FUNK:  Objection.

A.  I don't recall specifically, but I recall



something along those lines.  I dont' recall specifically.

Q. In any event, you met Stoney Lewis for the first time at the coroner's office, correct?

A. Yes, and another witness, too.

Q. And who was the other witness?

A. Oh, boy.

Q. Do you remember?

A. He was the witness who was upstairs.

Q. Adam Flanik?

A. It could have been.

Q. And so they both were at the coroner's office?

A. Right.  I don't think they came together.  I'm not sure about that, but they were there.  I talked to both of them.

Q. Well, are you sure that they were both at the coroner's office?

A. Positive.

Q. Okay.  And what did they tell you about the murder --

A. Well --

Q. -- at that time?

                MR. FUNK:  Objection.  This is really getting far afield, but go ahead.

                MR. GILBERT:  It's his background



LEO ALLEN

June 16, 2016

JACKSON -vs- CITY OF CLEVELAND

135

leading up to something, so I want to make sure.

A.   Well, Paul Lewis told me that he found out they were looking for him.  I said, who is they?  He said Eddy, Joe, and Mike.  I said, who are these guys?  And then he give me their names.  He said I'll even show you where they live, where at.  I said, okay.  Hang on a minute.

I am getting the information in my notes writing it down, and that's when Adam Flanik came up, he says, yes, I was upstairs with my girlfriend, my wife, I don't remember, we looked out at 3:00 in the morning, and Joe was in the truck with a knife up to Tony's throat.  And Eddy and Mike were kicking down doors looking for Stoney.

So I said, we will need you as a witness statement.  He said, well, I've got to go to work now.  So we made arrangements.  I am taking notes from him, made arrangements to get his statement later on that night, because it was very crucial.

So I put Stoney Lewis in the car, I said, come on, you will show me where these guys stay and where they live.  That's when I called my partner, and our sergeant came with us, Sergeant



-- oh, John Francine. There is another guy. I forgot about that. John Francine was our sergeant at the time. He come out. He came out, and we went -- it was an apartment in Cleveland Heights. And we called for Cleveland Heights Police, and they sent out two or threes cruisers, and that's when we went to the apartment.

Q. Okay. Now, was this within 24 hours -- was that the same day that you had contact with Lewis and --

A. Oh, yeah, he was with us. We put him in the back seat. It was like, I went to the morgue at 8:15, 8:30 in the morning, got all that information from them and the hanging victim. And by the time my partner got into another car was around -- I'm estimating around 10:00. He came with the sergeant. And maybe it was -- we called Cleveland Heights Police right away. It was maybe around 10:30 a quarter to 11, the best of my recollection, that we all met at a gas station right across from the apartment building where D'Ambrosio stayed.

Q. Did you get evidence from either of these two guys, Lewis or Flanik, that Eddy, Joe, and Mike were involved in a murder of Tony -- the murder



of Tony Klann at that time?

MR. FUNK:  Objection.

A.  Neither of them were a witness to the actual murder.

Q.  Right.

A.  But Paul Lewis was talking to the witnesses, hey, they are looking for you, they kicked your door in.  They are saying they are going to find you and kill you.  And when I talked to Adam Flanik, he's relating to me that, yeah, I saw the three of them out there, they were looking for Stoney.

So the kid was killed around -- between 3 and 4 in the morning at Doan Creek, on a Saturday morning; Friday night, Saturday morning.  He was not identified until Monday morning at the morgue.

Q.  So would it be safe to say that you believed that they could be suspects in a murder?

A.  Absolutely.

Q.  Okay.  Did you feel --

A.  You are talking about the three?

Q.  The three.

A.  Eddy, Joe, and Mike?

Q.  Yes.

A.  After talking to Stoney and Adam, absolutely.



Q. And did you believe you had probable cause to arrest those three for the murder of Tony Klann?

A. Absolutely.

Q. Did you believe they were truthful about their knowledge that led you to that belief?

A. Yes, I was.

Q. But they didn't have --  they did not -- the only information you had was, one, there was some incident where Adam Flanik said he saw a knife near the throat of Joe D'Ambrosio?

A. Um-hmm.

Q. You've got to say, yes.

A. Yes.

Q. Okay.  And that there was some information about these guys looking for Lewis, correct?

A. They were telling Lewis, yes.  Not only Adam Flanik, but a couple ladies, men, and they were all talking together and --

Q. And that is all -- so I'm sure about this, that's all of the information that you had that linked Eddy, Joe, and Mike to the murder of a body found on Doan Creek?

                    MR. FUNK:  Objection.

A. At that time, yes.

                    MR. GILBERT:  Can you mark this,



LEO ALLEN                                                      June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                                          139

            please?

                         -   -   -   -

        (Thereupon, Plaintiff's Exhibit 1 was marked

            for purposes of identification.)

                         -   -   -   -

Q.  All right.  You have there in front of you --

                    MR. FUNK:  Give him a chance to

            look it over.

                    MR. GILBERT:  I'm just telling him

            you have in front of you a document, please

            read it.  Don't get --

Q.  Just so you know, before you review this, that

    this is an excerpt from that particular hearing

    out of the motion to suppress, dated August 3,

    2009.  I sent a copy of the full transcript to

    your lawyer yesterday, and I assume he didn't

    show it to you, correct?

                    MR. FUNK:  Late in the afternoon.

                    MR. GILBERT:  What is that?

                    MR. FUNK:  Late in the afternoon.

                    MR. GILBERT:  Well, Ms. Wang asked

            if he had reviewed any other documents.  He

            indicated --

                    MR. FUNK:  He has not reviewed it.

                    MR. GILBERT:  Okay.



Q.  So just so you know this is not the full hearing transcript of the motion to suppress, which was like 200 some pages.  This is just an excerpt.  I will ask you some questions.  You are free to review it.  Just read it to yourself.

A.  All right.  Okay.

Q.  Okay.  You've had a chance to look at it?

A.  Yes.

Q.  Okay.  Great.  Now, first question is, is this, to your best recollection, an accurate transcription of the questions and answers that occurred in these pages?

A.  Yes.

Q.  Do you have an independent recollection of Judge Synenberg asking you questions during that hearing?

A.  Yeah, I remember her asking her own questions.

Q.  And does this refresh your recollection of that question and answering?

A.  Yes.

Q.  All right.  And do you stand by your answers that you see on this transcript to those questions?

A.  Yeah, those are my answers.  And I always would testify truthfully.  That's what I remember saying that day.



LEO ALLEN                                                              June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                                              141

Q. And, as you look at this now, does anything come
to your mind that you would change or add from
what you said in this transcript?

A. Change or add, no, I wouldn't change anything.
This is what -- when I testified in 2009, sir,
that's exactly what I remember, that's exactly
the way I testified.

Q. So if you look at page 179, if you look at the
top of that page, and where it says -- this is
from the Court asking the question, did you state
under direct examination that Stoney Lewis
provided information to you that he had learned
from someone else that Eddy, Joe, and Mike were
involved in the Klann killing, and you say, yes.

A. Yes.

Q. I have a question about that, clarification.  I
think earlier you -- the two things that you knew
is that, one, there was an incident at Adam
Flanik's house, right, where Adam said he saw
something down in the truck with a knife?

A. Correct.

Q. And then the other thing was that some people
were looking -- that these people were looking
for Mr. Lewis, right?

A. Right.



Q. Did they actually -- now this information that Stoney Lewis provided, you indicated that he -- they were involved -- that Stoney Lewis told you that they were involved in the Klann killing?

A. Right.

Q. That is a little different; is it not?

A. No, I would not say so, sir.  What I recall, without reading this over, I could read it over again, but what I recall testifying to in 2009 and back during the trial way back when and now today is that when Paul Lewis talked to me and told me, I have talked to these -- some of these people, I don't think he said all of them, but I talked to some of the people that were there, and they saw Joe with a knife to Tony's throat, and Mike and Eddy were kicking down doors looking for me.  I am scared.  I will tell you what happened. I'll show you where these guys live.  That's what I remember.

Q. So when you say, involved in the Klann killing, if you look at that question again there, that he, Stoney Lewis, provided information to you that he had learned from someone else that Eddy, Joe, and Mike were involved in the Klann killing, right?



A.  Yes.

Q.  So he's telling you something that he heard from
    somebody else?

A.  Sure, because they were looking for him, they
    couldn't find him, right.

Q.  Okay.  Would you agree that that is secondhand
    information what you got from Stoney Lewis?

A.  Well, yes, of course he did not witness the
    killing.  He --  it's secondhand that he talked
    to the people that saw the things they did, and
    he believed them and he related that to me.

Q.  And you had no contact with Stoney Lewis in any
    other case, correct?

A.  Never met him before that day.

Q.  And you had no knowledge of him of being any kind
    of informant for the Police Department?

A.  No, sir.

                    MR. FUNK:  Objection.

Q.  You had no information whether or not he is a
    reliable witness?

A.  At that time when I talked to him?

Q.  Yes.

A.  No, I had no information.

Q.  Do you know that Stoney Lewis -- at that time,
    did you know that Stoney Lewis had any criminal



record?

A.   No, sir.

Q.   Did you later find out?

A.   Later, yes.

Q.   Would you consider -- would you have considered him a reliable informant at that time?

A.   When he was talking to me?

Q.   Yes.

A.   I perceived that he was telling me the truth, yes, sir.  I looked right into his eyes, and I had experience at that time.

Q.   And did they teach you in the on-the-job training that the determination of whether somebody is truthful could be developed through looking into somebody's eyes?

                    MR. FUNK:  Objection.

                    MR. MALLAMAD:  Objection.

A.   Not specifically, but it's a good tool.  It's one of the tools that you could use, of course.

Q.   If you look at page 181, where it says, the Court, I believe you indicated in your testimony that you found Stoney Lewis to be truthful, can you indicate for the Court, please, every reason that you found Stoney Lewis to be truth-telling?
     Your answer was that you had -- that the only



way I could tell is through my experience of interviewing literally thousands of people over the course of my career at the time.  Looking into his eyes, and getting the information from him the same way I felt about Eddy Espinoza.  I felt that morning that Paul Lewis was telling me the truth about what he knew.

Is that all -- the only -- the only basis for you concluding that Stoney Lewis was telling you the truth?

MR. FUNK:  Objection.

A.  At that time, yes.  At that time, I felt 100 percent he was telling me the exact truth.

Q.  And based on your belief that he was telling the truth, you --- did you feel that you had enough information to make an arrest?

MR. FUNK:  Objection.

MR. MALLAMAD:  Objection.

A.  In conjunction with Adam Flanik's testimony, yes, sir.

Q.  And if his eyes showed you that in your mind he wasn't telling the truth, would you have done the subsequent actions that you did in going to the house and making arrests?

MR. FUNK:  Objection.



MR. MALLAMAD:  Objection.

A.   It's a hypothetical, hard to say what I would have done next.  Talking to Adam Flanik, he certainly was telling the truth.

Q.   How do you know that?

A.   I could just tell.

Q.   All right.

A.   The way he was approaching me, the way he says, detective, I got to tell you what I saw last night -- or not last night but, Friday night.  I got to tell you what I saw.  I said, well, we need your statement.  I have to go to work now, he said, could I give it later?  So he was being truthful.

Q.   And what did you arrest -- what was the crime that you arrested Joe D'Ambrosio and Mr. Espinoza that day when you went to that apartment?  What was the crime that you arrested them for?

MR. FUNK:  Objection.

A.   The investigation in connection with the murder of Tony Klann.

Q.   Okay.  And you believe that there was probable cause to arrest him for the murder or Tony Klann?

A.   Yes, sir.

MR. GILBERT:  I'll take a moment



now.

- - - -

(Thereupon, a recess was had.)

- - - -

Q. I just have a few questions. Early on in your deposition you mentioned you reviewed the affidavit of Detective -- former Detective William Tell?

A. Yes, I did.

Q. And how do you know him, or how did you know him?

A. I knew Bill Tell way back when. We played some softball together, and I knew him when he was a patrolman, and that's how I knew him.

Q. All right. And do you have any reason to question his character, honesty, for telling the truth?

A. Well, I will tell you what, I don't agree with most of what is in his affidavit, but I have always known him to be a good guy. I have never really talked to him about a whole lot of cases or police work, but I've always liked the guy. I've always got along great with him, but I don't agree with what's in his affidavit, most of it.

Q. What, in particular, do you not agree with?

A. Well, I don't have it in front of me. One of the



few things, no formal training in the police policy after the academy, that is pretty much on the money.

MS. WANG:  Could we just put on the record that you are reviewing William --

THE WITNESS:  Yes.

MS. WANG:  -- Tell's affidavit?

MR. FUNK:  I think the question is -- do you want to go through each paragraph?

MR. GILBERT:  No, I didn't want to, but --

A.  I'm sorry, go ahead and ask me.

MR. FUNK:  You are having him read it?

MR. GILBERT:  I asked -- he wanted to see.

Q.  The question was what you disagree with.

MR. FUNK:  So read it, if you see something you disagree with, point that out.

THE WITNESS:  Okay.

A.  All right.  Page 2, 11 A there were no formal written department rules dictating what



information detectives should have provided to prosecutors.  Okay.  Formal written.  Okay.  Maybe there wasn't, but that's not the way I was trained, on-the-job training when I went into homicide, maybe there wasn't a formal.

Q.  Now that you have read it, okay --

A.  That statement there?

Q.  Yes.  Do you have any problems with that now?

A.  Formal written department rules, well, maybe there should have been way back then, that you have to turn over everything to the prosecutor.  That's what we always did.

Q.  I understand.

A.  But I don't remember reading anything about a police order or general order, you know.

Q.  So you agree there was no formal written department rules?

MR. MALLAMAD:  Objection.

A.  I don't remember any.

Q.  So you can't dispute that?

MR. MALLAMAD:  Objection.

A.  No.

MR. GILBERT:  Are you representing him now?

MR. MALLAMAD:  It's misleading.



MS. WANG:  It is misleading asking him if he agrees or disagrees with it?

MR. MALLAMAD:  I have my objection on the record.

Q.  Let's be clear about this, 11 A, do you have a disagreement as to what is said here, that there was no formal written department rules dictating what information detectives should or must provide to prosecutors?

A.  Okay.  I have no reason to refute that.  There may have been, but I'm not aware of any.

Q.  Okay.  What else do you have a problem with?

A.  Okay.  Let's see.  B, I definitely have a problem with, there was no policy or practice requiring detectives to turn everything in their possession to prosecutors.  That's totally wrong.

MR. FUNK:  That's 11 B.

A.  Oh, I'm sorry, 11 B, on page 2.  I mean, practice, our practice was that you got to give the prosecutors everything.

Q.  Okay.

A.  Everything.

Q.  Okay.  Got it.

A.  Next one, 11 C is not right, because not only arrest reports, witness forms, written



statements, Form 10s, any evidence at all, that had to go to the prosecutors, I'm talking about county prosecutors.

Q. Anything else?  We could go easier with this if you go through this and give us the paragraph that you have a problem with, instead of like going through an assessment of each one right now, and then I will ask you some questions.

MR. FUNK:  Take your time.  If you read it, if you disagree with it, give him the paragraph number and letter.

MR. GILBERT:  I'm trying to save time here.

MR. FUNK:  I understand.

A. 11 D.  Prosecutor gets everything --

Q. You don't need to read it, just tell me the paragraph.

A. Okay.  11 D, I won't read it.

Q. Keep going.

A. 11 E, don't agree.

Q. Okay.

A. 11 F, don't agree.  11 G is completely wrong for homicide detectives.  I can't speak for any other units, but homicide, no.

Q. Okay.  Continue.



A.  All right.  H, in homicide we did not have a personal case folder.  12 A I don't agree with.

Q.  What -- just to clarify that, you mean there was on-the-job training?

A.  Yeah, but you've got interrogate witnesses, we don't interrogate witnesses.

Q.  What do you do?

A.  We question them.

Q.  Okay.

A.  Interrogate suspects.

Q.  Okay.

A.  You know, it is something I have to address.

Q.  All right.  So the question is, when you disagree with no training, you disagree because there was on-the-job training, correct?

A.  There was on-the-job training for Cleveland Police homicide detectives on how to talk to witnesses and interrogate suspects, yes.

Q.  And continue on, please.

A.  Wow.  12 D, he may have, I have not.

Q.  Okay.  But you have no reason to challenge what he actually observed?

A.  Of course not.

Q.  Okay.  But you have not seen that?

A.  He never worked in homicide, so, I'm just -- no.



Q.  You've never seen any suspect punched in the face
or head, knocking them down in efforts to get
those suspects to confess or implicate others?

A.  No, I have not.  All right.  Continuation of D.

Q.  Just continue on.

A.  Okay.  Have no reason to refute what he may or
may not have said, but I could only say what
happened in homicide.

Q.  What are you referring to?

A.  Well, like what he says in 14.

Q.  Okay.  Once again, I'm asking you what you
disagree with.

A.  Well -- all right.  Well, I may disagree with it,
but that's his feeling.

Q.  Which one do you disagree with?

A.  Well, 14 A. I don't know of any.

Q.  So you don't agree with his statement, his
viewpoint that many older white police officers
were racially bias at that time?

A.  I don't agree with that.  I mean, that's his
feelings.  I don't agree with B.  I don't know
what --  you want me to continue?

Q.  Yeah.

A.  I don't know what racially bias practices were in
the department.  I don't know anything about



that.

Q.   Okay.

A.   14 C, I never observed anything like that.

Q.   Okay.

A.   14 D, I don't agree with that.  If you are a suspect you are a suspect, I don't care what color you are.  It doesn't matter.

Q.   Okay.  Well, obviously you would not know about his personal experience --

A.   No, no.

Q.   -- on a particular case?

A.   Of course not.

Q.   Let me ask you this --

            MR. FUNK:  He is not done with the affidavit.

Q.   15 A?

A.   15 A?

Q.   Yeah.  Would you disagree with 15 A?

A.   Oh, I definitely disagree with that.  Wow.  Come on, William Tell, what are you doing?

Q.   So in your 21 years of experience, you never saw any wrongdoing by any detectives in the homicide unit, correct?

A.   Correct.

Q.   In 21 years of being in homicide, you never saw



any wrongdoing by a police officer; is that right?  Have you ever seen any misconduct by a police officer?

A.  Misconduct, no, I haven't.

Q.  So as far as you're concerned, your whole career, every cop that you ever ran across, any detective that you ran across, handled themselves in -- without abusing a suspect, without coercing a suspect, without beating a suspect, anything like that?

MR. FUNK:  Objection.

Q.  You, personally.

A.  Me personally, not in my presence.

MR. GILBERT:  Okay.  Thank you.  I appreciate it.

THE WITNESS:  You're welcome.

MR. MALLAMAD:  I have no questions.



                    SIGNATURE OF DEPONENT


     I, the undersigned, WITNESS, do hereby

certify that I have read the foregoing

deposition and find it to be a true and

accurate transcription of my testimony, with

the following corrections, if any:

PAGE    LINE         CHANGE              REASON












                         _____
                         WITNESS



LEO ALLEN                                    June 16, 2016
JACKSON -vs- CITY OF CLEVELAND                        157

C E R T I F I C A T E

The State of Ohio, )   SS:
County of Cuyahoga.)

     I, Brian A. Kuebler, a Notary Public within and for the State of Ohio, authorized to administer oaths and to take and certify depositions, do hereby certify that the above-named witness was by me, before the giving of their deposition, first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition as above-set forth was reduced to writing by me by means of stenotypy, and was later transcribed by computer-aided technology under my direction; that this is a true record of the testimony given by the witness; that said deposition was taken at the aforementioned time, date and place, pursuant to notice or stipulations of counsel; that I am not a relative or employee or attorney of any of the parties, or a relative or employee of such attorney or financially interested in this action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

     IN WITNESS WHEREOF, I have hereunto set my hand and seal of office, at Cleveland, Ohio, this ____ day of _____, A.D. 20 ___.

_____
Brian A. Kuebler, Notary Public, State of Ohio
55 Public Square, Suite 1332
Cleveland, Ohio 44113
My commission expires June 12, 2017

