UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------------
                                    :
RICKY JACKSON,                      :
                                    :
          Plaintiff,                :
                                    :
       vs.                          :   NO. 1:15-CV-989
                                    :
CITY OF CLEVELAND, et al.,          :
                                    :
          Defendants.               :
                                    :
------------------------------------------------------------
                                    :
KWOME AJAMU, et al.,                :
                                    :
          Plaintiffs,               :
                                    :
       vs.                          :   NO. 1:15-CV-1320
                                    :
CITY OF CLEVELAND,                  :
                                    :
          Defendant.                :
                                    :
------------------------------------------------------------

        The telephonic and videotaped deposition of MICHAEL CUMMINGS, called as a witness at the instance of the plaintiffs for use in discovery in the above-entitled cause, taken pursuant to the Federal Rules of Civil Procedure, on the 9th day of December, 2015, Mr. Gilbert and Ms. Greene being in Cleveland, Ohio; Ms. Wang, Mr. Funk, Mr. Mallamad, the witness, videographer, and court reporter being at the offices of National Reporting Agency, 1255 Market Street, Chattanooga, Tennessee, before Kay R. Davis, RMR, LCR, and Notary Public for the State of Tennessee, pursuant to the stipulation of counsel.



EXHIBIT 20

                          I N D E X

MICHAEL CUMMINGS

    Examination By Ms. Wang  ....................5
    Examination By Mr. Gilbert  ................90
    Examination By Mr. Mallamad  ...............92
    Further Examination By Ms. Wang  ...........94

                    E X H I B I T S

No. 1     Rules of Conduct and Discipline  ....37
             1950

No. 2     General Police Order 27-75,  .......41
             July 19, 1975

No. 3     General Police Order 2-74,  ........48
             January 25, 1974

No. 4     Interrogatories .....................65

No. 5     General Police Order 19-73,  .......85
             July 18, 1973



APPEARANCES:

        FOR THE PLAINTIFF RICKY JACKSON:

        Elizabeth Wang, Esq.
        Loevy & Loevy
        2060 Broadway
        Suite 460
        Boulder, Colorado  80302

        FOR THE WITNESS MICHAEL CUMMINGS:

        Stephen W. Funk, Esq.
        Roetzel & Andress
        222 South Main Street
        Akron, Ohio  44308

        FOR THE DEFENDANT CITY OF CLEVELAND:

        Shawn M. Mallamad, Esq.
        City of Cleveland
        601 Lakeside Avenue, Room 106
        Cleveland, Ohio  44114

        FOR THE PLAINTIFFS KWOME AJAMU, ET AL
        (via telephone):

        Terry H. Gilbert, Esq.
        Jacqueline Greene, Esq.
        Friedman & Gilbert
        55 Public Square
        Suite 1055
        Cleveland, Ohio  44113-1901

Also present:  Lee Lusk, videographer
--------------------------------------------------------------
        S T I P U L A T I O N S

        It being agreed that Kay R. Davis, RMR,

LCR, and Notary Public, may swear the witness, report

the deposition in machine shorthand, afterwards

reducing the same to typewriting.

        All objections, except as to the form of

the questions, are reserved to on or before the



hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., are expressly waived.  Reading of the completed deposition and the signature of the witness, are expressly reserved.

MR. LUSK:  We're on the record.  The time is 9:39.  This is the videotaped deposition of Michael Cummings taken in the matter Ricky Jackson versus City of Cleveland, Tennessee.  Is it Tennessee?

MR. FUNK:  Ohio.

MR. LUSK:  Ohio.  Okay.  It was cut off on mine.

We're at National Reporting Agency, 1255 Market Street, Chattanooga, Tennessee.  My name is Lee Lusk.  Court reporter's name is Kay Davis.  We are representing Esquire Deposition Services.  I'll now have counsel to introduce themselves.

MS. WANG:  Elizabeth Wang, W-a-n-g, counsel for plaintiff, Ricky Jackson.

MR. GILBERT:  Terry Gilbert for plaintiffs Wiley Bridgeman and Kwome Ajamu.

MS. GREENE:  Jacqueline Greene for plaintiffs Kwome Ajamu and Wiley Bridgeman.

MR. MALLAMAD:  Shawn Mallamad, counsel for



the City of Cleveland.

MR. FUNK:  And Steve Funk, counsel for the other defendants in both cases, and I'll be representing Mr. Cummings here at the deposition today.

MR. GILBERT:  Can I just ask a question? Shawn, are you down there?

MR. MALLAMAD:  Yes, I am.

MR. GILBERT:  I'm impressed.

MR. MALLAMAD:  Thank you.

MR. LUSK:  The court reporter will now administer the oath.

MICHAEL CUMMINGS,

called as a witness, being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. WANG

Q    Could you please state your name and spell it for the record.

A    Michael Cummings.  M-i-c-h-a-e-l, C-u-m-m-i-n-g-s.

Q    Mr. Cummings, my name is Liz Wang.  I'm an attorney for the plaintiff, Ricky Jackson, in this matter of Jackson versus City of Cleveland and the related case Kwome Ajamu versus City of Cleveland.

Have you ever given a deposition before?



A    Not that I can remember.

Q    Okay.  Have you ever been in a situation like this where somebody was -- a court reporter was taking your sworn testimony without a judge or a jury?

A    No.

Q    Okay.

MR. GILBERT:  Can you speak up, please?

A    No.

MR. FUNK:  Terry, he's going to -- he's going to have to speak the way he can.  If you wanted to be here, you could have been here.

MR. GILBERT:  Oh, come on, Steve.  Don't start that.

MR. FUNK:  I mean, he's going to speak up. I don't want you interrupting him throughout the deposition while he's trying to answer the questions.

MS. WANG:  Can we just --

MR. GILBERT:  Well, I wasn't implying that he has a disability or anything.

MR. FUNK:  Okay.

MR. GILBERT:  I'm just saying that maybe you can turn the volume up.

MS. WANG:  Okay.  Can we just calm down? You and you, both of you.

Terry, you can hear me; right?



MR. GILBERT:  Yes.

MS. WANG:  Okay.  So I'll just move the phone closer to Mr. Cummings because I can speak really loudly.  Is that fine?

MR. GILBERT:  All right.  Thanks.

MS. WANG:  Can you hear me?  Okay.  Try not to the shout.  I will try not to shout.

THE WITNESS:  Okay.

Q     (By Ms. Wang)  Mr. Cummings -- all right. Let me give you a little bit of the background rules for a deposition.

A     Okay.

Q     I will be asking you some questions relating to the civil lawsuit that's at issue here.  If you need a break at any time, feel free to take one except when a question is pending.  Is that fair?

A     Sure.

Q     Okay.  If you need a break for any other reason, bathroom break or whatever other kind of break, at any time, just let us know and we'll be happy to take a quick break.  Is that all right?

A     Good.

Q     Okay.  Please -- because the court reporter is transcribing what we are saying, please allow me to finish asking my question before you begin your answer,



that way the transcript will be clear.  Is that fair?

A       Yes, ma'am.

Q       Okay.  And please also give answers verbally, such as yes or no, instead of saying uh-huh or huh-uh or shaking your head, that way the transcript will be clear.  Is that fair?

A       (Moved head up and down.)  Yes.

Q       Okay.  Thank you.

Mr. Cummings, how old are you?

A       Seventy-two.

Q       Okay.  So remind me, what's your year of birth?

A       I didn't hear you.  I'm sorry.

Q       What year were you born in?

A       1943.

Q       Okay.  And are you currently retired?

A       Yes, ma'am.

Q       How long have you been retired?

A       Since 2008.

Q       Okay.  By the way, do you have any trouble hearing?

A       No.

Q       Okay.  I just want to make sure.

Are you on any medications or anything today that would affect your ability to testify



truthfully?

A    No.

Q    Okay.  And in 2008 where did you retire from?

A    The Cleveland Police Department Homicide Unit.  I -- that's not --

MR. FUNK:  Yeah, go ahead and correct it.

A    I was in community relations at that time.

Q    Okay.

A    I was the officer in charge.

Q    And how long did you have that position there in community relations?

A    Approximately five years.

Q    Okay.  What were your duties and responsibilities in that position?

A    Anything that had to do with union problems, such as strikes; anything to do with something with the department wanted to get out to the public, like the 911 calls.  That was just a new thing back then.  And just anything else that the chief might assign to me.

Q    Okay.  Prior -- well, maybe let's -- maybe let's go in chronological order.

When did you first join the Cleveland Police Department?



A        September 1st, 1997.

MR. FUNK:  No.  She asked when you first joined.

THE WITNESS:  Yes.

MR. FUNK:  You said 1997.  When did you first join the Cleveland Police Department?

THE WITNESS:  I --

MR. FUNK:  You said '97 just to clarify. She asked when you first joined.

THE WITNESS:  The Cleveland Police Department?

MR. FUNK:  Right.

THE WITNESS:  9/1/67.

Q        (By Ms. Wang)  Oh, '67.

A        Sorry.

Q        That's okay.

A        I apologize.

Q        Okay.  9/1/67.

A        Yes, ma'am.

Q        All right.  And at that time had you been in any other law enforcement department prior to that?

A        Yes, ma'am.

Q        Where were you a law enforcement officer prior to that?

A        In Pittston, P-i-t-t-s-t-o-n, Pennsylvania.



Q How long were you an officer in that department?

A Approximately two and a half years.

Q What kind of position did you have there?

A A patrolman. They gave me a motorcycle to ride around on and issue tickets for parking.

Q Okay. Did you do any kind of investigative work as a detective there?

A No, ma'am.

Q All right. And when did you graduate from college?

A I didn't go to college.

Q Okay. When did -- what was your highest level of education?

A Twelfth grade.

Q Okay. When did you graduate from 12th grade?

A I'm not sure the exact day, but it was '67, and I think it was June of '67, but the date I don't remember.

Q Okay. So you joined -- is it fair to say -- well, did you join the Pittston Police Department shortly after completing the 12th grade?

A Approximately two years after I completed the 12th grade.



Q    Okay.  So after you completed 12th grade, what did you do in those two years in between 12th grade and the Pittston Police Department?

A    I worked for the number one coal company and the number one construction company.  It was heavy equipment, and I was a driver for Euclid trucks, which are the large construction truck with the wheels are almost as tall as I am.

Q    What -- and was that in Pennsylvania or in --

A    Yes, ma'am.

Q    Okay.  Did you grow up in Pennsylvania?

A    Yes, ma'am.

Q    Okay.  After your two and a half years as a patrolman in the Pittston Police Department, what was your next employment?

A    At J & L Steel in Cleveland as a plant protection officer, which is doing a fire watch and manning the gate to let traffic in and out, especially for delivery trucks, and that was about it.

Q    Okay.  How long did you have that position?

A    About 15 months.

Q    And after your position at J & L Steel, where did you -- where were you employed next?

A    Cleveland Police Department.



Q      Okay.  When you joined -- when you joined the Cleveland Police Department in 1967, did you go to police academy?

A      Yes, I did.

Q      Okay.  And how long did police academy last?  Do you recall?

A      I had to go twice.  Once for about six weeks and then went back for another four weeks.

Q      How long was it between the first time and the second time?

A      I think it was, like, 90 days.

Q      Okay.  Do you know why you had to go back twice?

A      Yes, ma'am.

Q      Why is that?

A      The class was very large and they didn't have facilities to treat them all at the same time.  Immediately after work -- or after swearing in, they sent half the class back and the other half they sent to the district to ride with other patrolmen before anything else.  And then when we come out of the class for the second time, they went back in so -- to do the same thing, to make sure you got everything you were supposed to.

Q      Okay.  And the police academy that you



attended, was that run by the Cleveland Police Department?

A    Yes, ma'am.

Q    Did you ever go to any training -- strike that.

At the beginning of your career at the Cleveland Police Department, did you ever go to any training that was run by the State of Ohio?

A    No, ma'am.

Q    Okay.  During -- at any time during your employment with the Cleveland Police Department, did you ever go to any training that was run by the State of Ohio?

A    Not that I can remember.

Q    Okay.  Do you recall anything that you were taught specifically about conducting lineups during the time that you were at the police academy?

A    No, I did not.

Q    Okay.  Do you recall if you learned anything about how to conduct lineups during your time at the police academy?

A    No, ma'am.

Q    Were you taught anything at police academy about police officers' obligation to disclose Brady evidence?



A      No.

Q      Okay.  Do you recall anything specifically that you learned in police academy?

MR. FUNK:  Objection.  Go ahead.

A      No.

Q      Okay.  Were you given any training materials at police academy, any manuals or policies?

A      Yes.

Q      Do you recall what they related to generally?

A      Generally it was report writing, self defense, firearms training, and that's -- there were other things too, but I don't remember them all.

Q      At any time during your career with the Cleveland Police Department did you ever attend any training concerning police officers' obligation to disclose exculpatory evidence?

MR. FUNK:  Objection.

MS. WANG:  What's your objection?  What's the basis?

MR. FUNK:  It's an unfair question.  It's asking for over the breadth of his entire career.  Go ahead and answer to the extent you know.

A      Could you repeat it, please?

Q      (By Ms. Wang)  During your career at the



Cleveland Police Department, did you ever attend any training concerning police officers' obligation to disclose exculpatory evidence to the defense?

MR. FUNK: Objection. Go ahead and answer.

A     No. Not that I remember anyway.

Q     Are you familiar with the case Brady versus Maryland?

A     Somewhat.

Q     Okay. What do you know about it?

MR. FUNK: Objection.

A     I can't come up with anything on it.

Q     Okay. After you were finished with police academy, did you become a patrolman?

A     Yes, ma'am.

Q     And what were your duties and responsibilities as a patrolman?

A     As a patrolman I was assigned to a zone car or a black-and-white unit and we were -- went out and I was sent to the fourth district, which is -- at that time was on 131st Street, 3600 East 131. And it was -- you attended roll call there. Showed up for work. They did a roll call. You were assigned a partner and you were responsible to radio to answer any of the calls that would come in through police service.

Q     And so as a patrolman your basic



responsibility was to answer radio calls?

A    Just -- yeah.

Q    Okay.  Did you -- do you remember if you had a partner in the beginning of your career as a patrolman?

A    A Jerry Biluski (phonetically).  And I don't remember how to spell it, but he was my first partner, and his partner was Ron Turner.

Q    Okay.  And how long were you a patrolman before you were assigned or obtained a different position in the police department?

A    Approximately 18 months.

Q    Okay.  And what position did you obtain at that time?

A    I was detailed to the auto theft unit which is located at the 21st and Payne in downtown.  I was -- I had a strong record in apprehending auto thieves and they detailed me to the auto theft unit to work in the fourth district.

Q    Were -- what was your title then?

A    Detective.

Q    Okay.  Did you have to go to detective school?

A    No.

Q    How did you become a detective other than



just being assigned to the auto theft unit?

A    I had more auto theft arrests than any other policeman that I know.

Q    Okay.  How long were you a detective with the Cleveland Police Department?

A    Twenty-six years, I believe.

Q    Did you receive any kind of training to become a detective?

A    There was different workshops that they put on in the police academy.  I tried to get as many as I could under my belt, but it wasn't for detectives, it was for policemen.

Q    What do you mean by that?

A    That you -- it wasn't restricted to just detectives.  It was any policeman.  If there was room, they could go.

Q    Okay.  So were there any -- were there any detective specific trainings that you were aware of that the Cleveland Police Department offered?

A    I was involved in a training course at the academy -- not involved in it, I attended -- and it was -- the topic was policemen being killed on duty and they were trying to -- I'm sorry.  It was just what happens when a policeman is shot.  That's it.

Q    Okay.  How long were you a detective with



the auto theft unit?

A     Approximately three years.

Q     And did you have a partner then?

A     No, I did not.

Q     And after those three years, what was your next position in the police department?

A     I was assigned to the homicide unit as a homicide investigator.

Q     So would this have been in approximately 1972 that you became a homicide investigator?

A     Roughly, yeah.

Q     Prior to becoming a homicide investigator with the Cleveland Police Department, did you receive any training in order to learn how to be a homicide investigator?

A     I received on-the-job training.  There were courses at the Cuyahoga County Corner's Office.

Q     Do you remember what the courses at the corner's office were about?

A     Yeah.  How many holes, the location of the hole, just how to look at a body and see what the body is telling me.

Q     The body?

A     Yeah.

Q     Okay.  And was it the medical examiner who



taught the courses at the corner's office?

A      Dr. Lester Adelson.

Q      You have a really good memory.

A      But it's short.

Q      Okay.  Were there any other kinds of courses that you took at the corner's office besides what you've described?

A      There were several.  Some detailing how you handle the crime scene.  If it was a person's home, you handled it differently than if it was a store or -- just so you didn't not obtain the evidence that was laying there in front of you.

Q      Okay.  And those were taught by the corner's office as well or...

A      I think it was a Sharon Rosenberg (phonetically) who was evidence technician who put on the course.

Q      Okay.  Were the evidence technicians employed by the CPD?

A      No.  Were there?  I can't answer that.  I didn't know -- I never called one and said come to a scene, if that's what you're asking me.

Q      Okay.

A      No.

Q      Were there any other trainings that you



attended in order to become a homicide investigator?

A     Not that I can recall.

Q     Prior to becoming a homicide investigator, did you ever take any courses or trainings relating to how to conduct interrogations?

A     Yes, ma'am.

Q     Okay.  And you took those courses before becoming a homicide investigator?

A     No.  While.

Q     Oh, during the time you were a homicide investigator?

A     Yes, ma'am.

Q     Okay.  Approximately how long after you became a homicide investigator did you take any courses about interrogations?

A     I would say within six months.

Q     Okay.  And was it the CPD that taught those courses?

A     Yes, ma'am.

Q     What do you recall about what you were taught during those courses?

MR. FUNK:  Objection.

A     That's a long time ago.  I don't remember.

Q     Did you ever -- either during the time that you were a homicide investigator or -- strike that.



Were you ever trained in how to conduct juvenile interrogations?

A     Yes.

MR. FUNK:  Object -- go ahead.

Q     When did you -- when did you obtain that training?

A     It was offered by the juvenile court, and I would say somewhere in that first six months they sent someone to the academy and I listened to what they had to say.

Q     That's within six months of becoming a homicide investigator?

A     Yes, ma'am.

Q     Okay.  Do you recall who taught that course from the juvenile court?

A     I really don't.

Q     Okay.  Do you recall how long that course lasted?

A     Two weeks, I believe.

Q     Okay.  How long did the interrogations course that you talked about before last?

A     I don't recall.

Q     Was the juvenile interrogations course different or separate from the regular interrogations course?



A     No.  There was different procedures you use on a juvenile than you would use at a -- with an adult.

Q     And what were those different procedures that you learned?

A     That you have some responsible member of the juvenile's family, mom, dad, or someone who Mom and Dad appointed to take care of Junior.

Q     To what?  Take care of?

A     Take care -- when I talked to them I needed somebody there.

Q     Okay.  So one of the things that you learned in the juvenile interrogations course was that when you talk to a -- or interrogate a juvenile you need to have some member of the family or somebody the parent has designated to be there present?

A     Right.

Q     Okay.  And why is that?  Why do you think that was?

A     I would imagine to have the parent or guardian or whoever it was there was to protect his constitutional rights.

Q     Did you ever interrogate juveniles during your time as a homicide detective?

A     I believe I did, but I -- I never had the occasion to go by the first part on it that says, you



know, you have the right to have an attorney.  The constitutional rights an adult gets but at a different time.

Q    Oh, I'm not sure I understood what you mean.  Could you explain that?

A    As you go in, you talk to the kid, you find out he's a kid first off, then you tell them you give me a number for your mom and dad.  And we would not place phone -- we would not place a call to the parents.  We would make sure he got a phone -- I'm assuming it's a boy, that he got an opportunity to call his parents.  That's all.

Q    Okay.  And would you follow those same procedures for a juvenile witness to a crime as with a juvenile suspect?

A    No.

Q    Why not?

A    The suspect is believed to be -- as far as I'm concerned, I believe that he was responsible for this crime you are investigating.  If he's just a witness, I wouldn't assume that.  General practices, that's what we did.

Q    So as a general practice in the Cleveland Police Department at the time, you did not involve parents in juvenile -- in questioning of juvenile



witnesses?

A    Juvenile witnesses.  No, I did not.

Q    Okay.  Were you ever aware of any policy in the Cleveland Police Department where parents were required to be present when a juvenile witness was being questioned?

MR. FUNK:  Objection.

A    Not that I remember.

Q    Okay.  And the practice, as you're aware of it, in the 1970s was that juvenile witnesses would not have parents present.

MR. FUNK:  Objection.

A    No, I don't think they would.  There's no jeopardy there.  There's -- I'm not looking to charge them with a crime.  If I found out that they were, I'd stop the interrogation right then and there and then do what I said before, get the parent.

Q    Okay.  When you -- when you first became a homicide investigator in roughly 1972, what kinds of crimes -- did you have specific kinds of crimes that you were assigned to investigate?  I mean, besides the fact that they were homicides, were you assigned a district or anything in particular?

A    You had the city and when radio called for a homicide car that's where we went.  You wouldn't --



no specific location like the District 2 or District 6. It would be you're responsible to the radio.

Q     Okay.  Did you have a partner at first?

A     I had a partner who was transferred into the homicide unit on the same day I was and his name was Detective Eugene Volk, V-o-l-k.

Q     B-o-l-k?

A     No, V as in Victor.

Q     Oh, V-o-l-k.

How long were you partners with Eugene Volk?

A     I don't know exactly.  It was 15 or 16 years.

Q     Oh, you were partners with him for that long?

A     Yes, ma'am.

Q     Okay.  Going back to your training when you became a homicide investigator, did you ever attend any trainings or courses regarding how to conduct a lineup?

A     Not that I can remember.

Q     When you became a homicide investigator, did you ever attend any trainings on the obligation to disclose exculpatory evidence?

A     Sort of.  If I can?

Q     Sure.



A     If I had evidence, no matter what it was, I would put it into a report from my notebook that would list whatever that we found is evidence, and then I would turn that over to an assistant county prosecutor and I would have no further discussion with the suspect, for lack of another word, lack of another word.

Will you excuse me just a second?

Q     Sure.

MR. FUNK:  Can we -- do you want to just take a quick break?  Are you okay?

THE WITNESS:  I'm fine.

MR. FUNK:  All right.

Q     (By Ms. Wang)  During the time that you were a homicide investigator, were you trained to take notes?

A     Trained to take notes?  I refer back to what I learned at the corner's office that, you know, we take a tape measure and figured out where the bullet hole was in a man's chest and how much -- and I'm just using man as a general.  Man's chest, figure it was this far from the left nipple or belly button, whatever significant point that was there.  But that was -- I learned that through the corner's office.

Q     Was it your practice to take notes when you



were questioning witnesses?

A    I could.  I wouldn't have any idea what the witness was going to say until I sat down.  If he became a suspect then the -- in the process, I -- as I said before, I'd stop the interrogation or statement-taking and then make sure he had somebody there if it was a juvenile.  If it wasn't a juvenile, I would advise him of his constitutional rights.

Q    Okay.  But let's say you're questioning a suspect -- or not a suspect.  I'm sorry.  Let's say you were questioning a witness, somebody who might have witnessed a crime --

A    Okay.

Q    -- to learn what that person might know, would you take notes?

MR. FUNK:  Objection.

A    More than likely.

Q    Okay.  Was it your practice generally to take notes?

A    Yes.

Q    Based on your knowledge and experience, was it a practice within the department for detectives to take notes during questioning of witnesses?

MR. FUNK:  Objection.

A    Can't --



MR. FUNK:  Go ahead.

A    I can't speak to what other guys do.  It was my practice and the homicide unit's practice to do that.

Q    Okay.  And when you say it was the homicide unit's practice, what do you mean by that?

A    During the course of business, you -- you try to put a story together that says this is what happens or we believe happened.  And from the evidence that we have seen or have confiscated or have sent to a lab, we'd always list that, to put it in what they call the Form 10, which is a standardized record that has a regular heading on it, victim's name, victim's address, the title of the crime, that sort of thing.  And then it went to the -- first the city prosecutor, then to the assistant county prosecutor that was assigned this particular case.  And I would not talk to any of the attorneys.  The only one I could go to is the assistant county prosecutor who had the case.  And more than likely he would -- he or she would be assigned to that case until its conclusion.

If you don't take notes and figure out where the bullet holes were or where -- what was happening in the house, was there blood here, was there a fight taking place, or there was evidence that I knew



I was going to take in connection with this crime, I would do that.

Q    Did you ever receive any training about how to take notes during the questioning of a witness?

A    I don't believe so.

Q    Okay.  When you did take notes, on the occasions when you did take notes, what would you do with your handwritten notes?

A    I would not keep them.  I -- I -- watching television they say it's not the way it happens.  You take the information, you put it into the Form 10. They're no longer valuable because you've transposed them into the Form 10 report.

Q    And were you ever given any instruction or -- were you ever given any instruction one way or another from the police department as to whether or not you should keep the handwritten notes?

MR. FUNK:  Objection.

A    I don't remember.

Q    Okay.  Do you know if your practice of -- so then after -- just so I understand, after -- if you did take notes, if you were questioning a witness, say, and then you transposed them into a Form 10, you would discard the notes, your handwritten notes?

A    I would, yes.



Q     Okay.  Do you know if that was the practice of other homicide detectives?

MR. FUNK:  Objection.

A     I have no idea.

Q     Okay.  Is the -- could you describe the Form 10 a little bit more?

A     It is about the size of your pad there, and they would have name of the crime, complaint number, date, victim's name, victim's address, victim's -- whatever other important information that was there. And then there was about a space about yea so big that was blank; so any information I was trying to -- that I had taken notes on, I would then try to fit it into that open space.

Q     Okay.  And then what would you do with the Form 10?

A     Turn it in to my supervisor.

Q     And then what would your supervisor do with it?  Do you know?

A     Most of the time read it, may have some questions on what I did or what I didn't do, but that would be it.  He would either assign it to another team just coming on and they'd continue or I did it the next day to tie up the loose ends.

Q     Okay.  Do you know what your -- where the



Form 10s would go after your supervisor would review them?

A    They would stay in the homicide unit office and eventually they would turn up at the Cuyahoga County Prosecutor's Office.

Q    Do you know how they would get there?

A    No, I don't.

Q    When you were investigating a case as a homicide detective, were you ever responsible for taking the Form 10s that you had completed or that were in the file over to the prosecutor's office?

A    I wasn't, but I don't know who took them. I would assume it was the office -- the officer was assigned to the office, he would find that part of his duties.

Q    During the time that you were a homicide detective, did you ever interview a witness who made inconsistent statements about what they saw relating to a crime?

MR. FUNK:  Objection.

A    I believe so.  I don't remember.

Q    If you had -- what was your practice as a homicide detective if you had a witness who stated at first that he did witness a crime but then later recanted that statement, what would you do with that



information?

MR. FUNK:  Objection.

A    I would put it into a Form 10 that would become part of the homicide investigation and would probably try to verify whether or not he was there, what he saw, what he was in a position to see, what other people saying was he part of the crime.  You know, it has to take it just a little bit further than there.

Q    Okay.  But you would put into your Form 10 that the witness had made inconsistent statements?

A    Yes.

MR. FUNK:  Objection.

A    And I would put in what they were.

Q    Okay.  Did you receive any training on how to do that?

MR. FUNK:  Objection.

A    On-the-job training.  I've seen -- well, no, on-the-job training.

Q    What kind of on-the-job training did you receive as a homicide detective?

A    Well, if I -- say my partner didn't show up for vacation or sick time or whatever it might be, you work with other people and then you just paid attention and see if their ideas were better than your ideas.



And this eventually came all the way back to putting it in the Form 10.

Q    Okay.  I think you said earlier -- was your partner Eugene Volk, did he come into the homicide unit as a detective around the same time you did?

A    Yes, ma'am.

Q    Okay.  Did he have any greater experience as a homicide detective than you did?

A    I think we were pretty evenly matched.  He could type faster than I could, but if we had a report here, you could rip them apart and come out with just about the same information.

Q    Okay.  When you became a homicide investigator or detective, did you receive any on-the-job training from more experienced detectives?

A    These -- Gene and I were the only two that I know of that came in to -- no, that's not true.  There was only four -- six people that came in relatively close to each other, but the other guys were old-timers.  I mean, they had been through the mill and they taught us just by us watching them how to do things.

Q    Do you remember the names of any of those old-timers?

MR. FUNK:  At what point in time?  When he



first started?

A     Yes.

Q     Yeah, when you first started.

A     Jim Koelliker.

Q     Is that K-o-e-l-l-i-k-e-r?

A     I believe so.  Dave Hicks.  I know Buddy Kovacic and Jimmy Cudo, but I'm not sure exactly when they hit the unit.  They might have been there at the same time or a little before or a little after.  That's about it.

Q     Okay.

MS. WANG:  Actually, can we take a five-minute break?

MR. LUSK:  Going off the record at 10:23.

(Whereupon, a brief recess was had.)

MR. LUSK:  We're back on the record.  The time is 10:32.

Q     (By Ms. Wang)  All right.  Mr. Cummings, your attorney told me during the break that you might have misspoken when you were talking about when you retired from the CPD.

A     Yes, ma'am.

Q     Okay.  Could you clarify that?

A     I left the department in 2003.  At the time -- and not in 2007 I think I said.  2008.



Q      2008.

A      That was wrong.

Q      Okay.  And if anything -- you know, during the deposition if at any time you think about or recall that there's something that you said that was not right, feel free to bring it up and we'll see if we can clarify it.  Okay?

A      Fine.

Q      All right.  So you left the Cleveland Police Department 2003?

A      Yes, ma'am.

Q      Okay.  And at that time was your position community relations?

A      Yes.

Q      Okay.  And then where did you -- did you work after that?

A      Yes, ma'am.

Q      Where did you work?

A      I worked for the attorney general for the victims of crimes compensation.  I was to investigate the incidents that people were supposedly injured or had property loss and report back to her office as to what was happening.  What the results of my investigation was.  That's better said.

Q      Okay.  And then you retired from that



800.211.DEPO (3376)
EsquireSolutions.com

position in --

A       No, ma'am.

Q       Oh, okay.

A       The Ohio Department of Taxation was reinstate- -- revitalizing their criminal enforcement unit which is a position that you are a law enforcement officer, your -- my duties were to check on whether taxes were paid on cigarettes and cigars that came into the state of Ohio.  And I discovered one of the biggest tax cheats.  They had no knowledge that this guy was running the scam on them.  And that's about it.

MS. WANG:  All right.  I am going to have this marked as Exhibit 1.

(Whereupon, marked for identification purposes, Exhibit No. 1.)

MS. WANG:  Terry, for the record -- well, I'll wait till the court reporter --

THE WITNESS:  Do you need?

MR. FUNK:  I have one too.

Q       (By Ms. Wang)  The court reporter has handed you what has been marked as Deposition Exhibit 1.  It is the -- it is the Rules of Conduct and Discipline for the Officers, Members and Employees of The Division of Police in the Department of Public Safety, 1950, City of Cleveland, Ohio.  And for the



record, it's Bates stamped Jackson 004682 through Jackson 004755.

Could you just take a look at that and -- you don't have to read the whole thing.  I'm just asking you to glance through it and see if it looks familiar to you.

A    Okay.  (Witness peruses document.)  Did you say there was a date on this, ma'am?

Q    On the front it says 1950.

A    Yes.  Okay.

Q    Okay.

A    Yes, ma'am.

Q    Okay.

A    I've seen it before.

Q    Okay.  Have you had a chance just to glance through that?

A    Glance, but not specific.

Q    Okay.  Have you seen that document before?

A    I believe so.

Q    Okay.  And was it the rules manual or the police department manual that you had back during the time that you were at the Cleveland Police Department?

MR. FUNK:  Objection.

A    I don't know.  1950, I can't say whether it was controlling the police department at the time.  I



just know that I have seen this.

Q    Okay.

A    And when it came into my career I don't know.

Q    You joined the Cleveland Police Department in 1967; right?

A    Yes, ma'am.

Q    Did you receive a copy of this manual dated 1950 when you joined the police department in '67?

MR. FUNK:  Objection.

A    I remember receiving a copy, but as to when it was I don't remember.  I don't think it was given to my immediately.

Q    Oh, okay.  Do you have any estimate as to how long after you started at the police department you may have been given a copy of rules of the conduct and discipline?

A    Not really.

Q    Okay.  Do you have any recollection of during what time period at the Cleveland Police Department -- or, sorry, strike that.

Do you have any recollection of -- well, strike that.

Do you remember having a copy of this manual in your possession during the time that you were



a Cleveland police officer?

MR. FUNK:  Objection.

A     Yes.

Q     Okay.  And was there ever a time when -- well, sorry.  Strike that.

Do you recall what time period that was that you had a copy of this?

A     Not specifically.  I don't remember whether it was a year after I was on the job or five.  I just don't remember.  I don't remember who gave it to me or where it was -- where I was at when I got it.  I just don't remember.

Q     Okay.  Do you know whether you had a copy of this 1950 manual when you were at the Cleveland Police Department in 1975?

MR. FUNK:  Objection.

A     I don't know.

Q     Do you recall there ever being a time that anyone ever told you that this 1950 rules of conduct and discipline was no longer in effect?

MR. FUNK:  Objection.

A     I do not remember that.

Q     Do you remember ever receiving any amendments or revisions to the rules that are set forth in this 1950 manual?



A       I really don't.

MS. WANG:  Would you mark this as Exhibit 2?

(Whereupon, marked for identification purposes, Exhibit No. 2.)

MS. WANG:  Sorry, I just have one copy of that one.

MR. MALLAMAD:  Okay.

MR. FUNK:  Right here.

MS. WANG:  No, they're two separate pages, but I'm clipping it together as one exhibit.

MR. FUNK:  I see.  Okay.

MS. WANG:  Sorry.  I don't have enough copies.

Q       (By Ms. Wang)  The court reporter has handed you what has been marked as Deposition Exhibit 2.  For the record, it is documents that were produced by the City of Cleveland, Bates stamped CLE000322, dash, through 323.  Two pages.  The first one is a General Police Order, No. 27-75, dated July 19th, 1975. The second one is No. 26-75, dated July 18th, 1975. Could you just take a look at those documents and let me know if you had ever seen them before.

A       (Witness peruses document.)

MR. LUSK:  Going off record.  The time is



10:43.

(Whereupon, an off-the-record discussion was had.)

MR. LUSK: We're back on the record. The time is 10:46.

Q (By Ms. Wang) Okay. Mr. Cummings, have you had an opportunity to look at Deposition Exhibit 2?

A Yes, ma'am.

Q Do you recall ever seeing those orders before?

A I believe I have.

Q Okay.

A I can't tell you when.

Q And let me ask you generally, during your time that you were a detective in the Cleveland Police Department, did you receive periodically general police orders such as this one?

A Yes.

Q Okay. And how would you receive them?

A Usually at roll call, which is the beginning of your day, workday. You would be handed them -- handed the papers from a supervisor usually and you would take it and put it in your book of police orders.

Q You had a book of police orders?



800.211.DEPO (3376)
EsquireSolutions.com

A     Yes, ma'am.

Q     And was it a book like Deposition Exhibit 1 or was it a book consisting of police orders that look like Deposition Exhibit 2?

A     Two.

Q     Okay.  And when you say "book," was it bound together or was it loose?

A     Binder.

Q     Okay.

A     Not a big one, just about that big (indicating).  Well, this would fit in it without any problem whatsoever.

Q     Okay.  So it was like a three-ring binder kind of thing?

A     I think there were five.

Q     Oh, five-ring binder.  Okay.  And did every police officer have one?

A     I don't know about every police officer, but I remember I did.

Q     Okay.  And what did you keep in that binder?

A     When -- I would keep general police orders.

Q     Okay.  Like the one that is Deposition Exhibit 2?

A     Yes, ma'am.



Q     Okay.  Were there ever any other kind of orders that you would be given at roll call or any other time, like special order or specific order, or other kind of directive or rule like this?

MR. FUNK:  Objection.

A     I don't know if they're like that.  You -- if your superior officer gave you an order to go arrest so-and-so, you best do it.

Q     And I'm talking specifically about would you agree that what's laid out in Deposition Exhibit 2 is a rule for how members of the department should conduct themselves?

MR. FUNK:  Objection.

A     I -- I believe that's true.

Q     Okay.  Were you ever given any other kinds of written rules?

A     Periodically, never on a -- you know, it wasn't a first of every month or anything --

Q     Sure.

A     -- but periodically.

Q     Sure.  And what I mean -- and what I'm trying to understand is just whether there were ever any kinds of written rules or policies that you received from the police department that didn't say general police order on top but said something else.



A    I'm sure there were, but I can't bring anything to mind.

Q    Okay.  If you look at Deposition Exhibit 2, on the first page it says in subject line, "Proper conduct in the performance of police duties and obedience to orders."  It says, to members -- "To the members of the department.  All members are expressly directed to give full compliance to Rules 39, 77-1-2-3, 78, 99-2, and 100-5."  Do you know what rules that order is referring to?

A    No.

Q    Okay.  If you turn to Deposition Exhibit 1 there's a Rule 39 on page 40.  And Rule 39 --

A    Hold on one second.

Q    I'm sorry.  I'm sorry about that.  It's on page 40.

A    That's what I'm looking for.  I have page 40.

Q    All right.  So Rule 39 on page 40, at the bottom there, says, "Officers and members are expressly commanded to cooperate with each other in the performance of public duty, irrespective of assignments, in order that the best interests of community and the Division of Police be served."

Then if you turn to Rule 70, which is on



page 51.

A    Getting better.

Q    Rule 70 says, "Officers and members shall give immediate obedience to all lawful orders issued to them by their Superior officers.  For the purpose of clarification, where a conflict of orders is apparent it shall be the duty of the officer or member knowing of such conflict to so apprise the officer or member issuing the latest order."

Now, just taking those two rules together, would you agree that those rules have to do with the proper conduct in the performance of police duties and obedience to orders?

MR. FUNK:  Objection.

A    I don't know why these rules were issued; so I read it, what you just read and it -- that's what it said.

Q    Would you agree that Rule 70 and Rule 39 have to do with officers having to obey lawful orders issued to them by their superior officers?

MR. FUNK:  Objection.

A    Yes.

Q    Okay.  And General Police Order 27-75, which is dated July 19th, 1975, relates --

A    Page?



Q    I'm sorry.  This one.  Deposition Exhibit 2.

A    Okay.

Q    This general police order relates to Rules 39 and 70 and the other rules that it states herein.

MR. FUNK:  Objection.

Q    Is that right?

A    I read it and I have no idea why it was issued.

Q    Oh, I'm not asking why it was issued.  I'm just asking whether general -- the general police order, which refers to Rules 39, 70, 77, et cetera, refers back to the manual of rules which is this exhibit?

MR. FUNK:  Objection.

A    Yes, ma'am.

Q    Okay.  Okay.  Can you think of any other manual of rules that you ever received from the Cleveland Police Department other than what is Deposition Exhibit 1?  Or, I'm sorry, Deposition -- yeah, Deposition Exhibit 1.

A    I really can't think of any.

Q    Did you ever receive any other version of the manual of rules other than the one that is Deposition Exhibit 1 dated 1950?



MR. FUNK: Objection.

A    As it's copied there I don't know. The one I had had a blue cover on it. It doesn't show that blue cover. I don't have it to compare; so I'm assuming that's right, but I don't know.

MS. WANG: Okay. I'm going to have this marked as Deposition Exhibit 3. That's a two-page exhibit.

(Whereupon, marked for identification purposes, Exhibit No. 3.)

MS. WANG: Sorry, I only have one copy of that one too. You have to share.

Q    (By Ms. Wang) For the record, Deposition Exhibit 3 is Bates stamped CLE000434 through 435. And at the top it says, General Police Order No. 2-75, dated January 25th, 1975, and the subject line is "Amendments to Manual of Rules."

Could you take a look at that, Mr. Cummings, and let me know if you had seen it before?

A    (Witness peruses document.) I have read. I didn't remember your comment -- your question.

Q    Okay. At first I was just asking if you had seen it before, if you recall seeing it before.

A    I don't recall seeing it before.



Q    Okay.  At the top it says, "Amendments to the Manual of Rules."  That's what the subject line says.  Do you recall ever seeing -- generally ever -- ever receiving amendments to the manual of rules in the form of a general police order?

A    I really can't remember having received any.  If I did -- was to receive them, I would have trimmed them down and put them in my book, which I no longer have.

Q    What do you mean trim them down?

A    So that it would fit in this book, the book that I had.

Q    Okay.

A    Just so -- it's just housekeeping, I mean, so it doesn't --

Q    Okay.

A    -- fall out.

Q    So in -- I just want to be clear.  This is obviously -- this Deposition Exhibit 3 is a 8-1/2-by-11 size piece of paper, but it's a photo copy of the original.

A    Yes.

Q    Do you recall the general -- the actual general police order as being smaller?

                MR. FUNK:  Objection.



MICHAEL CUMMINGS                                December 09, 2015
JACKSON v. CITY OF CLEVELAND                                    50

A     I don't.

Q     Okay.  Do you recall ever receiving any amendments to the manual of rules in any other form than a general police order?

MR. FUNK:  Objection.

A     I don't remember any of them.  I mean, I'm sure I did, but I don't remember getting them.

Q     Okay.  In May of 1975 what was your position with the Cleveland Police Department?

A     I'm trying to think.  I believe I was in homicide detective at that time.

Q     Was your partner still Eugene Volk?

A     He could have been, but the way we were set up if I was off, he might would -- he would work with someone else.  If he was off, I would work with someone else.  Most of the time -- I won't even say most of the time.  If possible, we were partners on a daily basis.

Q     Okay.  What platoon did you work, do you recall, in May of '75?

A     We didn't have platoons.

Q     Oh, you didn't?

A     No.

Q     What shift did you work?

A     Depends on what you're assigned.  The sergeant would put you on most probably days or



afternoons, and usually one unit -- not one unit, one set of partners would be assigned to the third shift or the midnight shift.

Q      Okay.  And what was the -- what hours was the day shift?

A      I believe 7 to -- well, it depends on which roll call you get.  It's different in the district than it is in the homicide unit or in the S.W.A.T. unit, you know.  It's 8-hour shift and there's sometimes you didn't leave for two days because you -- you had a lot of work that had to be done and had to be done now, not three weeks from now.  Do you understand what I --

Q      Sure.

A      Okay.

Q      Was the day shift generally 7 to 3 or 8 to 4?

MR. FUNK:  Objection.

A      Either/or.  Could have been both.

Q      Okay.  And the afternoon shift, do you recall what hours generally that was?

A      Three to 11, 4 to 12.

Q      Okay.  And which one did you usually work?  Did it vary?

A      Varied probably every month.

Q      In May of 1975 what other partners do you



recall working with other than Eugene Volk?

A       I don't remember.  I don't -- it's a long time ago.  I -- I just don't remember.

Q       Did you ever work with Eugene Terpay?

A       If you mean as a partner, no.  If you mean in the same office, yes.

Q       And in what way did you work with Eugene Terpay in the same office?

MR. FUNK:  Objection.

A       We would both be in the office.

Q       Okay.  And that's what I'm just trying to understand is that you would just be in the office at the same time --

A       Yes.

Q       -- or you would actually work cases together?

A       No, we wouldn't work cases.  That -- again, I can't even say that.  If Gene's off and Terpay is without a partner, I may be working with him.  I don't recall working with him, but --

Q       Okay.  But you don't recall specifically?

A       Right.

Q       All right.  Did you ever work with James Farmer?

A       When I was in homicide, James Farmer was



the office man.

Q    Was the what?

A    Office man.

Q    What does that mean?

A    He would file away the reports.  He would just do the office work.  Keep the books up to date, record the new homicides, record any assaults on police officers, just the regular routine business that we do.

Q    And what do you mean by file reports?

A    Filing cabinets in the homicide unit against one wall.  I believe there were eight filing cabinets, maybe ten.

Q    What would go into those filing cabinets?

A    Homicide investigations.

Q    Like the Form 10s?

A    Yes, ma'am.

Q    Any other types of documents?

A    Well, there could be the actual crime reports which were on a different type of paper.  Usually a different color.  And that's about all I can tell you about.

Q    Did you ever work the position of office man?

A    I'm sorry, I didn't hear you.

Q    Did you ever work as an office man?



A    No.

Q    Okay.  Do you remember if Farmer was the office man in around 1975?

A    I think it was later than that.  The office man was Joe Fishback (phonetically).

Q    In 1975?

A    I believe so.

Q    He was a detective as well?

A    Yes.

Q    Okay.  Do you remember how to spell Fishback?

A    No, I don't.

Q    Okay.  Were there any secretaries that were responsible for filing reports in the homicide unit?

A    Not that I'm aware of.

Q    Did you ever work with Detective John Staimpel?

A    Just the same way I did with Farmer, you know, we'd be in -- we were never partners.

Q    And going back to Farmer for a minute, when you said he was an office man, would you give him reports in your cases, your homicide cases, to file in the cabinets?

A    After the sergeant approved them, he would give them.  I wouldn't.



MICHAEL CUMMINGS  December 09, 2015
JACKSON v. CITY OF CLEVELAND  55

Q   Okay.  All right.  So it's Farmer's responsibility to file those reports away?

MR. FUNK:  Objection.

A   As far as I know.

Q   Okay.  Do you remember who your sergeant was in May of 1975?

A   I can just think -- I know there's three different sergeants that it could have been, but do I remember for sure?  No.

Q   Did you have a sergeant named Peter Comodeca?

A   Yes, ma'am.

Q   Was he your sergeant in May 1975?

MR. FUNK:  Objection.

A   I don't remember whether he was or not.

Q   Do --

A   Could have been.

Q   Sure.  Do you remember what time period Sergeant Comodeca was your sergeant?

A   Until he was reported -- promoted to lieutenant and I don't know when that was.  I don't remember when that was.

Q   Did -- when -- during the time period that Sergeant Comodeca was your sergeant, what kinds of things would he do to supervise you?



MR. FUNK:  Objection.

A       What -- he -- all three of them, they review the reports and they'd say, you know, why didn't you talk to this guy or did you find him or whatever wasn't done on the case that should have been done and we screwed up.  He was kind of the stop that says, no, go get it, fix it up.

Q       Okay.

A       That's the wrong terminology, but I mean he would read each and every report, and he would sit there and all of a sudden he'd say, well, did you do this?  No.  Why not?  We got called to another shooting.  Whatever the excuse was, it was not deliberately done, it's just we ran out of time.  But he was pretty good at that.  He would pick it up fast.

Q       Okay.

A       He had been there a long time.

Q       Comodeca had?

A       Yes.

Q       Do you know how long he had been in the homicide unit?

A       Long before I got there.

Q       Do you remember there being a Sergeant Walter Dugan?

A       Sure.



MICHAEL CUMMINGS                                    December 09, 2015
JACKSON v. CITY OF CLEVELAND                                      57

Q     Was he ever your sergeant?

A     No -- well, that's hard to say.  Nobody was ever my sergeant.

Q     Okay.  Did it just depend on what shift, what shift you were on and what shift the sergeant was on?

A     That's exactly right.

Q     Okay.

A     And the sergeant usually didn't go out.  He would be in there doing his office, making assignments, some making notes on what has to be done yet.  Just things that sometimes slipped through the cracks.

Q     Okay.

A     And they're pretty good at catching them.

Q     Okay.  What about sergeant -- was there a Sergeant Koelliker?  Was Koelliker ever a sergeant?

A     No, ma'am.

Q     Okay.

A     We had Detective Koelliker, but no sergeant.

Q     What about Sergeant Vincent.  Was there a Sergeant Vincent?

A     Not that I know of, ma'am.

Q     Okay.  In general when you were investigating a case, would you ever just talk to your



sergeants about what was going on?  And by that what I'm trying to ask is, you know, you described a process where once you finished a report, you would turn it in to your sergeant and he might talk to you about what else you could be doing on it, but did you ever have that kind of conversation with your sergeants outside of the context of a report?  You know, you would just talk to him about what's going on in an investigation.

MR. FUNK:  Objection.

A     No, I don't remember that ever happening.

Q     Okay.  Do you know if other homicide detectives ever had those kinds of conversations with their sergeants?

MR. FUNK:  Objection.

A     I don't.

Q     In May of 1975 were you ever responsible for conducting lineups?

A     Not that I remember.

Q     Did you ever conduct a lineup concerning Ricky Jackson or Wiley Bridgeman?

A     Not that I remember.

Q     Did you ever conduct any lineups at all during your career?

A     It depends on what you mean by conduct a lineup.  Sergeant conducts the lineup.  I could escort



a witness in to view it, and depending on what time period it was, it would be either on the sixth floor, new justice center, or on the fourth floor, the old jail.  And they're two different areas, two different conditions, two different claiming standards.

Q    Okay.  So let me specify the time period then.  In May of 1975 would lineups have been conducted in the old jail?

A    I don't remember when the change came.  It could have been, yes, but I don't really know that for sure.

Q    All right.  So were you ever present then for any lineup involving Ricky Jackson or Wiley Bridgeman?

A    Not to my recollection.

Q    You described earlier that you might have been involved in lineup to the extent that you may have taken a witness in to view a lineup?

A    Or other things that has to be done. Depending on which jail you're using, the -- you may be asked to go back and try to find the same size guys, same color skin, and pull them away and put them into the line-up room which was behind either a fence or a glass partition.

Q    Okay.  And is that -- are you talking -- is



MICHAEL CUMMINGS                                    December 09, 2015
JACKSON v. CITY OF CLEVELAND                                      60

what you described in the old jail or the new justice center?

A     One in each.  The lights and glass are in the new jail.  The wire -- it was screened, and it depended on just about anything, the changes.  I conducted -- I didn't conduct them, but I got prisoners for both.

Q     Okay.

A     Sometimes they were my lineups; sometimes I was giving somebody else a hand.

Q     Okay.  Do you ever remember giving Detective Staimpel and Stoiker a hand in any lineup?

A     Say that again now.

Q     Did you ever assist Detective Staimpel or Stoiker in any lineup?

A     Not that I can remember.

Q     Do you recall the shooting of a money order salesman in May of 1975 that took place outside of a convenient store?

A     No.

Q     Did you ever have any role in investigating the shooting of any money order salesman that took place in May of 1975 outside of a convenient store?

A     I don't believe so.

Q     Okay.  Are you familiar with the name



Harold Franks?

A     I'm sorry?

Q     Are you familiar with the name Harold Franks?

A     No, ma'am.

Q     Are you familiar with the name the Fairmount Cut Rate Drugstore?

A     No, ma'am.

Q     Did you ever work with Detective Stoiker, Frank Stoiker?

A     No, ma'am.

Q     Are you familiar with him?

A     I know him.  He was in the unit.

Q     Did you ever do any lineups for him or assist him with any?

MR. FUNK:  Objection.  Asked and answered.

A     I don't believe so.

Q     Did you ever work with Detective John -- did I ask you this?  I don't remember.  I'm sorry.  Did you ever work with John Staimpel?

MR. FUNK:  You did ask that question.

A     No.

Q     No?

A     No.

Q     Okay.  Did you ever work with Jerold



Englehart?

A    No.

Q    Do you know who he is?

A    Yes, ma'am.

Q    Okay.  Did you ever -- did you ever work on any case where Detective Englehart typed up a statement of a witness or a suspect for you?

A    No, ma'am, not that I can remember.

Q    Okay.  Did you ever have the responsibility of typing up witness statements?

A    Did I?

Q    Yeah.

A    No, ma'am.

Q    Okay.  Do you know if Detective Englehart was responsible -- had that as a responsibility at some point in time?

A    I don't know that that's true, but could be.

Q    Okay.  You don't know?

A    No.

MR. FUNK:  I need you to continue to look forward, I think, to the camera.  You're kind of shifting a little bit.

THE WITNESS:  Oh, I'm sorry.

MR. FUNK:  That's okay.  You're fine.



Q     (By Ms. Wang)  In May of 1975 how tall were you?

A     5'18".  I'm sorry.  6'6".

Q     6'6".  And do you recall approximately how much you weighed then?

A     Probably 350, 360 pounds, in that neighborhood.

Q     Okay.  Do you recall ever dealing with a juvenile witness named Edward Vernon in May of 1975?

A     No, ma'am.

Q     Do you recall ever being present during any lineup involving a juvenile, a 12-year-old boy, African-American boy named Edward Vernon?

        MR. FUNK:  Objection.

A     No.  Juveniles wouldn't be in the adult lockup.

Q     Oh, no, I mean a witness.  Do you -- Edward Vernon was a witness.

A     Okay.

Q     Do you recall, have any memory of being present during any lineup that Edward Vernon, a 12-year-old boy in 1975, viewed?

A     No.

Q     Okay.  Do you remember somebody named Karen Smith who was approximately a 15-year-old girl back in



May of 1975?

A    No, ma'am.

Q    Were you ever present during any lineup that was conducted where Karen Smith viewed -- viewed a lineup?

A    No, ma'am, not that I can remember.

Q    Did you ever during your career as a homicide detective conduct or not conduct, but were you ever present for any lineups where juvenile witnesses were reviewing the lineup?

A    Not that I remember.

Q    Were there any procedures for having juveniles view lineups that were any different than any procedures used for adults?

A    Just what I said before that if they were just a witness we would still contact their family because they were kids, then the parents would be there if there was a lineup to be taken of juveniles.  And -- or they may have -- if the suspects were also juveniles, it would have been conducted at the juvenile detentions facility, not at the adult jail.

Q    Okay.  Did you have any role in the homicide investigation involving Harold Franks?

A    Who?

Q    Did you have any role in the homicide



investigation involving Harold Franks?

MR. FUNK:  Asked and answered.  Go ahead.

A     I don't believe so.

(Whereupon, marked for identification purposes, Exhibit No. 4.)

Q     (By Ms. Wang)  The court reporter has handed you what's been marked as Deposition Exhibit 4.

A     Yes, ma'am.

Q     It is a -- it is your responses to the plaintiff's --

MR. FUNK:  Before you get into this topic, can we take a break because I need to use the restroom.

MS. WANG:  Oh, okay.

MR. FUNK:  It won't be very long.

MR. LUSK:  We're going off record.  The time is 11:20.

(Whereupon, a brief recess was had.)

MR. LUSK:  We're back on record.  The time is 11:22.

Q     (By Ms. Wang)  The court reporter has handed you what's been marked as Deposition Exhibit 4. It is your objections and responses to plaintiff's first set of interrogatories to you.  Could you just take a minute to look through that and let me know if you've seen it before.



A        (Witness peruses document.)

MR. FUNK:  Just for the record, this exhibit, I guess, was copied front and back.

MS. WANG:  Yeah.

MR. FUNK:  It was produced on a one-sided fashion, but this copy is different than what form in which it was produced.  Other than the fact that it is front and back, it looks to be the same.

Are you wanting him to read the whole document?  Because it looks like he's reading --

Q        (By Ms. Wang)  Oh, I don't -- I mean, I'm just -- I just want to know if you have seen it before.

A        Yes, ma'am.

Q        Okay.  You have seen it before?

A        Yes, ma'am.

Q        All right.  So did you -- and on the last page, it's not attached, but the last page is a verification.

A        Give me a minute.

Q        The very last loose-leaf page.  I guess it's right there too.  Yes, the last page is a verification.  It says, "I, Michael Cummings, hereby verify that the foregoing Answers to Plaintiff's First Set of Interrogatories are true and correct to the best of my information, knowledge, and belief."  Is that



your signature there?

    A    Yes, ma'am.

    Q    Okay.  And so did you sign that verification after reviewing these interrogatory answers?

    A    I didn't hear you.  I'm sorry.

    Q    Did you -- did you sign this verification after reviewing the interrogatory answers to make sure that they were true and correct?

    A    Yes, ma'am.

    Q    Okay.  Taking a look at Question No. 2.  It's on page 4.

    A    One second.  Yes, ma'am.

    Q    Okay.  This question asks about any complaints that have ever been filed against you, like citizen's complaints, relating to any acts on your part, any misconduct on your part.  And in your response you state in -- that you are unaware of any complaints brought against -- "Cummings states that he is unaware of any complaints brought against him in connection with his employment as a law enforcement officer with the City of Cleveland Police Department."  As you sit here today, do you recall any complaints that were made against you, citizen's complaints?

    A    I don't believe so.



Q     Okay.  Then you talk about there was some kind of intra-department inquiry of a number of Cleveland police officers in the early 1990s relating to parking tickets.

A     Yes.

Q     What -- did you have anything to do with that?

A     I read in the newspaper, I believe it was the Plain Dealer, that I had two outstanding parking tickets that had been voided.  That's the first time I ever had any knowledge of it.  That was the first time I've ever had any complaint put against me.  And it was -- it was a supervisory officer who decided that he saw my name, pulled -- put me up on charges and never told me or never asked for a response or an explanation or anything.

As it was, I was at the Fraternal Order of Police office.  It was during the negotiations for pay raises.  I was the treasurer of the FOP Lodge No. 8 which is the bargaining unit for officers.  CPAPA does the patrolmen, FOP does all of the officers.

I received notice that I was up on charges. I walked into the chief's office and I -- and who are you?  Michael Cummings.  Oh, no, back there, you're okay.



I was doing police department business using my own car because they didn't have extra vehicles to -- and that's it.  As soon as I sat down, it was dismissed.  There was nothing to it.  And there wasn't.

I was taking people who are also here working on the contract -- I'm sorry.  I misstated there.  I was working on the contract and wage negotiations and I had to get some people from the airport because FOP business and a restaurant because we had been there for, like, six, seven hours.  And I stopped at the deli down on 17th Street and apparently I got a ticket, but I never saw it.  And that was it.  Dennahan (phonetically) says, "We know where you were.  You're doing a good job."  And that was it.  No retraction in the paper, nothing, but what -- I wanted to be fair and tell you about this stuff and I did.

Q    Okay.  During the time that you were a Cleveland police detective, were the acts that you committed during the time that you were on the job in good faith?

A    I believe so.

Q    The -- on page 6, No. 6, No. 6 asks, "Is it your position that Ricky Jackson committed or participated in the Harold Franks robbery or homicide,



the shooting of Anna Robinson, or any other illegal act relating to the incidents described in Plaintiff's Complaint?"  And in your answer you state at the end, "Cummings states that he has no personal knowledge as to whether Ricky Jackson committed or participated in the Harold Franks robbery or homicide, the shooting of Anna Robinson, or any other illegal act."  Is that true?  That answer true?

A    Yes, ma'am.

Q    Okay.  Do you have any belief one way or another as to whether Ricky Jackson had any role in the Harold Franks robbery and murder?

A    I have no way of knowing.

Q    Okay.  You had never heard of Ricky Jackson before being served in this lawsuit?

A    No, ma'am.

Q    Okay.  Had you ever heard anything -- and you had not heard anything about this robbery and murder involving Harold Franks; right?

A    No, ma'am.

Q    You have no evidence one way or another as to whether Ricky Jackson is guilty or innocent of the crime that he was accused of?

A    No.

Q    You have no evidence one way or another as



to Wiley Bridgeman had any role in the robbery or murder of Harold Franks in May of 1975?

A       No, ma'am.

Q       You have no evidence one way or another as to whether Ronnie Bridgeman played any role in the robbery or murder of Harold Franks in May of 1975?

A       I never investigated the case, ma'am.

Q       Okay.

A       I don't.

Q       You have no knowledge of it whatsoever?

A       No, ma'am.

Q       You're not going to come to trial -- if this case goes to trial, you're not going to come to trial and have your attorney claim that Mr. Jackson is guilty, are you?

MR. FUNK:  Objection.

A       I don't know what that means.  I mean, I don't have enough information.

Q       You don't intend -- as you sit here today, you don't intend to testify at trial, if this case goes to trial, you don't intend to testify at trial that Ricky Jackson is guilty.

A       I have nothing --

MR. FUNK:  Objection.

A       I have nothing to testify to.



Q    Okay.  You have no knowledge one way or another?

A    No, ma'am.

Q    Okay.  And the same goes with the Bridgeman brothers, Wiley Bridgeman and Ronnie Bridgeman.  Do you know anything about whether they had any role at all in the murder of Harold Franks?

A    I don't know those people, and I have never had any dealings with them.  I don't know anything.  Which my wife tells me all the time.

Q    All right.  On page 10, Question 14 --

A    Still 4?

Q    Question 14, page 10.

A    But Document 4?

Q    Yes.  Yes.  All right.  So Question 14, Interrogatory 14, states "Is it your position that Edward Vernon did, in fact, witness Ricky Jackson participate in the robbery and/or murder of Harold Franks?"  And your answer states -- it states in part, "Cummings states that he has no personal knowledge as to whether Edward Vernon witnessed Ricky Jackson participate in the robbery or murder of Harold Franks."  Is that true?  Is the answer true?

A    Let me reread it, please.

Q    Okay.  Sure.



A       (Witness peruses document.)  And your question, ma'am?

Q       My question is, is your answer true that you have no knowledge as to whether or not Edward Vernon witnessed Ricky Jackson participate in the robbery or murder of Harold Franks?

A       I don't believe so.

Q       Okay.  Do you have any evidence one way or another as to whether Edward Vernon did, in fact, witness Ricky Jackson participate in the robbery or murder of Harold Franks?

A       Same answer.  No.

Q       Okay.  Are you going to testify at trial as to whether you think Edward Vernon witnessed Ricky Jackson commit the robbery or murder of Harold Franks?

MR. FUNK:  Objection.

A       I have no knowledge of these folks you just mentioned.

Q       You have no knowledge of Edward Vernon or Ricky Jackson?

A       That's correct.

Q       Or Harold Franks?

A       (Moved head up and down.)

Q       All right.  What documents did you review to prepare for today's deposition?



A       There was -- I'm trying to figure out.  The best I can answer that is I met with my attorney --

Q       No, I don't want to hear anything that you discussed with your attorney.  I just want to know if you --

A       I wasn't going to tell you that.

Q       Okay.  Great.

A       Met with my attorney, he had --

MR. FUNK:  Hold on.  Don't discuss what we did or what we talked about --

THE WITNESS:  Okay.

Q       (By Ms. Wang)  I just want to know what documents you review, if anything.

MR. FUNK:  -- or what we did.  She's just asking separate from your conversation with me did you review any document.

MS. WANG:  Well, no, I'm entitled --

A       I had --

Q       (By Ms. Wang)  Hold on.  Let me just --

A       I'm sorry.

Q       I'm asking during -- I'm not asking about your communications with your attorney, either what he said to you or you said to him.  I'm just asking if you reviewed any documents at all prior to your deposition?

MR. FUNK:  Right.  That's what I was



saying.  In preparation for your deposition.

A     There were two pieces of paper that he gave me.

MR. FUNK:  Again, don't talk about what you and I talked about, just identify the document.

THE WITNESS:  Well, that's what I'm trying to do.

MR. FUNK:  Okay.

A     It's the part that we looked at already that I was responding to something, I had to get them notarized.

Q     (By Ms. Wang)  Okay.  The thing with your signature?

A     No.  (Indicating).

Q     Oh, this.  Okay.  Okay.  Your verification.

A     Yeah.  I don't -- he had other papers.  I don't believe I read them.  I know I didn't read them.

Q     Okay.  Let me ask you this:  You were served with a copy of this complaint at some point; right?  The civil complaint in this case.

A     No.

Q     No.  Have you ever seen a copy of the complaint?

A     I don't believe so.  I got notified by my attorney.



Q     Okay.  Did you ever read the complaint in this case?

A     No, ma'am.

Q     Do you have any idea what the plaintiff, Ricky Jackson, is alleging in this case?

A     I do have after I read these.  No, I didn't know before.

Q     Going back to that document right there, Deposition Exhibit --

A     Page?

Q     -- 4, looking at the page 15 -- no, no, no. I'm sorry.  Page 11.  Page 11 has Interrogatory 15 on it.  It's quite long; so I'll ask you questions about it in subparts.

      In the first subpart it says, "Do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that, A, required" --

A     Ma'am, can you hold just one second --

Q     Oh, I'm sorry.

A     -- so I can follow you?

Q     Oh, sorry.

A     Where are you at?

Q     I'm reading right here (indicating).

A     Okay.



Q      Okay.  So I'm just going to ask you about part A for now.  It says there, "Do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that, A, required detectives or employees of the Cleveland Police Department to document or memorialize the various developments in an investigation in such a way that they would become part of the official file as the investigation proceeded?"  Do you see that subpart?  Did you follow along there?

A      Yes, ma'am.

Q      Okay.  Did the City of Cleveland have in place a policy like the one described in subsection A there?

A      I believe they do now.  I believe it was the book of rules that you showed me earlier and I may have been mistaken.

Q      Okay.  So you think that in the -- when you were referring to the book of rules, that's Deposition Exhibit 1, this book?

A      Yes, ma'am.

Q      Okay.  Do you know if this manual of rules has in it any policy like the one that's described in 15A?

A      I no longer have my book.  It was turned in



when I retired; so I have no way to go back and check it.

Q    Okay.  So I'm just asking you to rely on your memory.  Do you have any recollection of whether or not the Cleveland Police Department between 1950-1980 had any policy -- written policy or procedure like the one described in subpart A?

A    I don't know, plain and simple.

Q    Okay.  And let's go to subpart B.  It's -- so subpart B of Interrogatory 15 is asking whether or not the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that, "B, required detectives or employees of the Cleveland Police Department to place any witness statements in the official file or otherwise make them available to criminal defendants, defense counsel, or prosecutors."  Do you recall there being any such written policies in place during the time period of 1950 to 1980?

A    I don't believe so, or I don't believe this is because we never gave the defendant an opportunity to take statements or any part of our investigation.

Q    What do you mean by that?  I'm trying to understand your answer.

A    I'm saying if I was accused of a murder and I gave a statement for some reason, and I wanted to



MICHAEL CUMMINGS
JACKSON v. CITY OF CLEVELAND

December 09, 2015
79

come in with my attorney or whatever, we would never give the statements that he had made, the actual statements, to him or his attorney.  No, I'm sorry.  We would never give it to him.  We would never give it to his attorney.  It would have to come from the prosecutor.

I would never jeopardize a case by letting those statements or facts or what we believe our evidence was going to show, I would never talk to an attorney about that.  That's the prosecutor's job. Everything I did I put in the Form 10.

And that's what I'm saying, I -- I don't think I misconstrued what you said, but I just can't see that the book of rules would say they -- the defendant should get his whatever.

Q    Okay.  So just so I understand what you're saying, you're saying that if -- if there was a statement or some piece of evidence or some report that was pertinent to your investigation, you wouldn't give that directly to the defense -- to the defendant or the suspect or the defense counsel, but you would give it to the prosecutor?

A    I would give it to the prosecutor.

Q    Okay.

A    He makes the decisions what we're going



forward with.  You know, that's all I'm saying.

Q     Okay.  And was there any -- outside of the book of rules, what you're referring to as the book of rules, I will call it the book of rules, but the Deposition Exhibit 1, that's the Rules of Conduct and Discipline, do you recall there being any other written policies or procedures that said anything about putting reports or information into an official file so that prosecutors could get them?

A     What I know is that once we've completed our reports and gone to a city prosecutor and charges are issued, within a very short period of time that goes to the Cuyahoga County Prosecutor's Office and we no longer have it.  I mean -- so it has to happen before that.

Q     Okay.  So I'm just asking if there's any written -- you've described what I think is -- was your practice.  Your practice was to put everything in a Form 10 and then put it in the file and it would find its way to the prosecutor --

A     Yes, ma'am.

Q     -- as you understand it; right?

Was there any written policy that set that out as a rule for detectives in the department?

A     I do not know of any policy that -- I do



not know of any policy except -- no, I don't know any written policy.

Q    Okay.

A    I may be wrong, but I don't remember.

Q    Okay.

MS. WANG:  We can just change the tape now.

MR. LUSK:  We're going off record.  The time is 11:46.

(Whereupon, a brief recess was had.)

MR. LUSK:  We're back on the record.  The time is 11:47.

Q    (By Ms. Wang)  Going back to Question 15. I'm going to focus on subsection C.  It says -- 15C, Interrogatory 15C says, "Do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that, C, required detectives or employees of the Cleveland Police Department to document or memorialize photo or in-person lineups or otherwise govern the conduct of detectives or employees during photo or in-person lineups?"  Now, my question to you is was there any written policy or procedure at the Cleveland Police Department during that time period relating to documentation or conduct of lineups?

A    I don't remember any.



Q    Okay.  15D states, "Do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that, D, required detectives or employees of the Cleveland Police Department to disclose exculpatory evidence?"

A    I'm sorry.  What one?

Q    Sorry.  I just moved down to subsection D here.

A    I'm sorry.

Q    No problem.

So the question is just did the City of Cleveland during the time period of 1950 to 1980 have a written policy or procedure requiring detectives to disclose exculpatory evidence?

A    None that I know of.

Q    Okay.  Do you know what exculpatory evidence means?

A    I believe it means in favor of the defendant to -- that's all I have to say.

Q    Okay.  That's -- okay.

A    Is that --

Q    Sure.

A    Okay.

Q    Was it your understanding that detectives were required to disclose exculpatory evidence



MICHAEL CUMMINGS                                December 09, 2015
JACKSON v. CITY OF CLEVELAND                                   83

including state- -- inconsistent statements of witnesses?

A     They would be automatically included if we knew it.

Q     Okay.

A     You know, so if it happened on Monday, the statement was taken on Monday, and we didn't find out till Tuesday or Wednesday.

Q     Does that fall within the category of exculpatory evidence, as you understand it?

MR. FUNK:  Objection.

A     I have no idea.  I don't know what we're talking about.

Q     Inconsistent -- if a witness makes two different statements --

A     Okay.

Q     -- would that be considered exculpatory evidence?

MR. FUNK:  Objection.

A     No.  I don't have the ability to make that call.  If I was -- I go back to my Form 10 is all I'm telling you.  If I found out it was, it would go into a Form 10.  The prosecutor would make the decision, not me, that it was exculpatory evidence, you know.  He -- he or she would be the one who has to make the case in



trial.

Q    Did you believe that you had any responsibilities as a detective to determine what evidence or statements to turn over to the prosecution?

A    Every one that we take was turned over to the prosecutor.  At least I believe that's true.

Q    Do you recall any written policies or procedures about that?

A    No, I don't.

Q    Subsection E of Interrogatory 15 states, "Do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that, D, required detectives or employees of the Cleveland Police Department to document or memorial-" -- or, I'm sorry.

MR. FUNK:  E.

Q    Oh, I'm sorry.  I'm on E.  Strike that.

Okay.  So 15E.  We're on E now.

A    Yes, ma'am.

Q    "Do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that, E, required detectives or employees of the Cleveland Police Department to document or memorialize interrogations or interviews of suspects and witnesses, including but not limited to any



requirement that police officers retain notes of such interviews or otherwise govern the conduct of detectives or employees in the Cleveland Police Department during interrogations or interviews of suspects or witnesses?"

So that's kind of long, but basically it's asking if the City of Cleveland had a policy, a written policy and procedure between 1950 and 1980 relating to -- or requiring detectives to document interviews or interrogations with suspects or witnesses?

A     I didn't remember reading this.  Every -- I'm not saying I didn't get it, but I can't remember it.  And everything I handled I just -- I don't remember.

(Whereupon, marked for identification purposes, Exhibit No. 5.)

MS. WANG:  Actually, wait.  Sorry, I'm going to take that back.  I don't have an extra copy of that one.

MR. MALLAMAD:  Sure.

Q     (By Ms. Wang)  Okay.  The court reporter has marked Deposition Exhibit --

A     Five.

Q     -- 5 and handed that to you.  Could you take a look at that and let me know if you have seen it



before?

A    (Witness peruses document.)

Q    All right.  So just for the -- let me just say for the record that Deposition Exhibit 5 is a document Bates stamped CLE000452.  It's says at the top, "General Police Order, No. 19-73, dated July 18th, 1973."  And the subject line says, "Pretrial Discovery Rights of Defense Attorneys and Courts in Criminal Cases."  In this general order it states -- it's signed by Gerald Rademaker, chief of police at the time, and it apparently is directed to members of the department, and it states, "In a letter to this Department, County Prosecutor John T. Corrigan has defined the legal rights of defense attorneys and courts to statements, reports and other items in criminal cases."  And then it states, "His letter, as a part of this order, shall be considered an integral part of case preparation procedures and all members shall comply with its provisions."

There was no copy of the letter that was produced with this -- with this order.  Do you have any recollection of seeing this general order?

A    No, I don't.

Q    Okay.  Do you have any recollection of any letter that you had ever seen from the Cuyahoga County



Prosecutor's Office relating to this subject, pretrial discovery?

A     Not that I remember.

Q     Did you ever -- did the Cuyahoga County Prosecutor's Office ever conduct any trainings for officers at the police department?

A     Not that I can remember.

Q     Okay.  Were the trainings that you attended during your time as an officer in the department conducted by the police department itself?  Oh, besides the corner's office one that you mentioned.

A     Right.  But that's all I can remember.

Q     Okay.  Were there specific officers that were in charge of training, like training officers?

A     There was a police academy.

Q     Okay.  So there was specific trainers in the police academy?

A     Yes, ma'am.

Q     All right.  Let me ask you, I talked to you already about the police academy, but after going to the police academy, did you ever have any formal ongoing training?

A     Very little.

MR. FUNK:  Objection.

Q     Very little?



A     Yeah.

Q     You described a little bit as you became a homicide investigator, we talked about that earlier, but other than that, did you ever have any ongoing training during the time that you were a detective at the Cleveland Police Department?

A     As I told you that the corner's office provided some form on-the-job training which was provided by older, more experienced officers, and that's about it.

Q     Okay.  Turning back to -- well, strike that.  Just a minute.

MS. WANG:  Okay.  Let's take a quick break and then we'll see what's left.

MR. LUSK:  Going off record.  Time is 11:59.

(Whereupon, a brief recess was had.)

MR. LUSK:  We're back on record.  The time is 12:07.

Q     (By Ms. Wang)  Mr. Cummings, Eugene Volk, do you know if he's still alive?

A     Yes.

Q     Do you know where he is or if -- have you been in contact with him?

A     I haven't talked to him in years.



Q     Okay.  The last time you were in touch with him, do you know where he was living?

A     Mentor.

Q     Where?

A     Mentor, M-e-n-t-o-r, Ohio.

Q     Ohio.

A     It's in -- let me think.  It's in Lake County.

Q     Okay.  And when was -- at that -- what year was it approximately when you last were in touch with him?

A     I'd say year and a half ago.

Q     Oh, okay.  The trial in this case may not occur for -- it hasn't been set yet, but if there is a trial in this case, it may not occur for another year or longer.  Do you have any health problems that you can think of that would prevent you from being able to testify at the trial?

A     No.  I had some problems that are not the terminal kind.  I busted my knee and it's been a long time healed, but it's healed, so that's -- no, I shouldn't have any problem.

MS. WANG:  Okay.  Terry, I have no further questions.  I think Terry might have a few.

MR. GILBERT:  Yes, I do.



                        EXAMINATION

BY MR. GILBERT

        Q    Good afternoon, Mr. Cummings.

        A    Good afternoon, Terry.

        Q    How are you?

        A    Good.

        Q    I don't know if we've ever met.

        A    Oh, sure, we have in court.

        Q    Really?  Okay.  So my -- your memory is better than mine.

        A    Yeah.  I'm a big guy.

        Q    Okay.  Now I know, I think.

             Anyway, I just have one or two -- a couple of questions for purposes of clarification in my mind.

             When Ms. Wang was asking you about juveniles being interviewed and witnesses, I'm not talking about suspects, but just witnesses, that you would contact -- you would contact their parents, remember that question and answer?

        A    Yes, sir.

        Q    Okay.  And do you recall if you contacted their parents would you give them an opportunity to be with their child when they were interviewed?

        A    I would, yes.

        Q    All right.  Do you know whether others in



the homicide unit followed that -- that process?

A      No.

MR. FUNK:  Objection.

Q      Okay.

MR. FUNK:  Go ahead.

A      No, I do not.

Q      Okay.  Had you ever had a situation where you had a juvenile witness that did come down with their child during the process of an interview?

A      I don't understand what you're asking.

Q      In other words, do you recall having a homicide case where there was a juvenile witness and that witness gave a statement and was accompanied by a parent or guardian?

A      I can't think of one particular offhand.  I know I have had them and I know I let their parent stay with them.

Q      Okay.  Yeah, that's all I have.  Thank you very much.

A      Have a good day, sir.

Q      Oh, I'm sorry.  My -- I want to ask the same question, if you know whether in your experience a juvenile witness was brought down for a lineup and whether you remember having -- them having a parent or guardian with them?



MICHAEL CUMMINGS                                     December 09, 2015
JACKSON v. CITY OF CLEVELAND                                       92

MR. FUNK:  I'm going to object because I think it's asked and answered.  Go ahead.

A    I can't think of a case that I can quote you on, but, yes, I know it's happened.

Q    And you personally in your practice if a parent wanted to be present at a lineup with a juvenile witness, that wouldn't be a problem having them there; correct?

A    Not to me.

MR. GILBERT:  Okay.  Thank you very much. I have no further questions.

EXAMINATION

BY MR. MALLAMAD

Q    Mr. Cummings, I'm Shawn Mallamad.  I represent the City of Cleveland.  I know we've met.  I just have just a few questions for you.

Ms. Wang was asking you about I believe it's Exhibit 5, the interrogatory answers.  It's 4. Exhibit 4.

A    It's right there.

Q    It's at the bottom, yeah.

In particular, Ms. Wang was asking about Interrogatory No. 15 on page 11.  And I guess my question is after hearing your testimony is it your testimony that you don't remember one way or the other



whether there were written policies that covered these areas that Ms. Wang talked about?

MS. WANG: Objection. Asked and answered.

A     I -- I don't understand your question. I'm sorry.

Q     Okay. I believe you said you didn't recall if you had seen written policies about this. And my question is, is it your testimony that you don't know one way or the other whether written policies that covered these areas that Ms. Wang asked you about did, in fact, exist back then?

MS. WANG: Objection. Asked and answered. Form.

A     I have seen some GPOs, General Police Orders. And when new orders came out, I would read them, but I don't say I remember every one of them, and that's what I was trying to say.

Q     Okay. Mr. Cummings, you testified before that I think you referred -- you called them the old-timers or officers with more experience that you -- that you learned from, on-the-job training.

A     Yes, sir.

Q     Is that correct?

A     Yes, sir.

Q     And you had supervisors in the units where



you worked?

        A       Yes, sir.

        Q       Including the homicide unit?

        A       Yes, sir.

        Q       Did any supervisor ever train you to fabricate evidence, to make up evidence?

        A       Absolutely not.

        Q       Did any supervisor ever train you to coerce a witness to testify a certain way?

        A       No, sir.

        Q       Did any supervisor ever train you to physically abuse a witness --

        A       No, sir.

        Q       -- in any way?

                MR. MALLAMAD:  Those are all my questions. Thank you.

                MR. FUNK:  We'll review.

                MS. WANG:  I have some follow-up based on what Shawn said.

                        FURTHER EXAMINATION

BY MS. WANG

        Q       Did you ever receive any training -- sorry. Strike that.

                Did you ever receive any training on how not to feed witnesses information during an interview?



A       On -- feed?

Q       Feed.

A       Okay.

Q       Give information to a witness about a crime.  Did you ever receive any training about how you should not give information to a witness about a crime during your interview with the witness?

A       No, I have not received any training on that.

Q       Did you ever receive any training on not fabricating evidence?

A       No, ma'am.

Q       Did you ever receive any training on how juveniles are particularly susceptible to suggestive questioning?

A       No.

Q       Did you ever receive any written policies or procedures from the Cleveland Police Department explaining how juvenile witnesses may be particularly susceptible to suggestive questioning?

        MR. FUNK:  Objection.

A       I have interviewed children who are either a witness or a -- participated in someone's death.  I personally have been particularly careful when I'm speaking to a children -- child not to plant anything.



And that's just from experience, you know.

We were doing a couple of hundred homicides a year and that's a lot of work, but you learn a lot. And that's why I'm saying you know how to talk to people, not to trick them into saying something, but to try to get the facts and then let it speak for itself.

Q    So you're describing how you conducted yourself while you were a detective; right?

A    Yes, ma'am.

Q    Did you ever receive any training on avoiding suggestive questioning of juvenile witnesses from the Cleveland Police Department?

MR. FUNK:  Objection.

A    Not formal training, but from other officers I have found out how they would handle juveniles, and what was the most logical to me, that's what I would do if someone else -- if it wasn't illegal or banned completely.  I'm just saying a kid doesn't have to be tricked into saying something.

I've had one child that he was there, he participated in it, he -- he hid some of the evidence; so a participant.  What I did is until his parents got there I had talked to other people and found out that he did hide the gun and other things which he never told us about.  His parents got there and the father



MICHAEL CUMMINGS                                    December 09, 2015
JACKSON v. CITY OF CLEVELAND                                      97

said, "Talk to the man."  The kid opened up and said,

"I did it."  So it's a lot of experience you've got to

put into it and that's what I tried to do.

        Q       In that situation you waited until the

father arrived --

        A       Yes, ma'am.

        Q       -- before you spoke with the child?

        A       Yes, ma'am.

        Q       And why was that?

        A       I'm a father.  I -- I respected the law

enough that I would not interview any juvenile who is a

suspect without a parent there.  I put them in the

detention center and waited till the father came home

or if he was at work.  Still wouldn't talk to the kid,

interrogate the kid until there was someone there.

It's just plain and fair with the kid's life.

                MS. WANG:  Terry, do you have any further

questions?

                MR. GILBERT:  Nothing further.

                MR. MALLAMAD:  Nothing further.

                MR. FUNK:  Okay.  We'll review.

                MR. LUSK:  This concludes our deposition.

The time is 12:21.  This is the end of Tape 3 in the

deposition on Michael Cummings.

                FURTHER THIS DEPONENT SAITH NOT.
                                (Signature reserved.)



WITNESS CERTIFICATE

I, MICHAEL CUMMINGS, do hereby certify that I have read and examined the contents of the foregoing pages of record of testimony as given by me at the time and place herein aforementioned; that to the best of my knowledge and belief the foregoing pages are a complete and accurate record of all the testimony given by me at said time, except as noted on the errata sheet attached hereto.

I have _____ or have not _____ made corrections to the attached.

_____
MICHAEL CUMMINGS

STATE OF _____:
SS                    :
COUNTY OF _____:

I, _____, NOTARY PUBLIC for the County of _____, State of _____, hereby certify that the herein above named personally appeared before me this _____ day of _____, 20___, and that I personally witnessed the execution of this document for the intents and purpose herein above described.

Sworn to and subscribed before me this _____ day of _____, 20___.

_____
Notary Public

My commission expires: _____



REPORTER'S CERTIFICATE

STATE OF TENNESSEE:
                        : ss.
COUNTY OF HAMILTON:

        I, Kay R. Davis, RMR, LCR #221, and Notary Public, in and for the State of Tennessee, do hereby certify that the above deposition of MICHAEL CUMMINGS was reported by me and that the foregoing pages, numbered from 1 to 99, inclusive, is a true and accurate record to the best of my knowledge, skills, and ability.

        I further certify that I am not related to nor an employee of counsel of any of the parties to the action, nor am I in any way financially interested in the outcome of this case action.

        I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this the 3rd day of January, 2016.



_____
Kay R. Davis, RMR, LCR #221
Expiration Date 6/30/2014
Notary Public Commission Expires:  12/5/2017

Reference No.: 227197

Case:  JACKSON v. CITY OF CLEVELAND


DECLARATION UNDER PENALTY OF PERJURY


I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.


_____
Michael Cummings


NOTARIZATION OF CHANGES
(If Required)


Subscribed and sworn to on the _____ day of

_____, 20_____ before me,

(Notary Sign)_____

(Print Name)                          Notary Public,

in and for the State of _____



Reference No.: 227197

Case:  JACKSON v. CITY OF CLEVELAND


Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

Michael Cummings



Reference No.: 227197

Case:  JACKSON v. CITY OF CLEVELAND

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

Michael Cummings

