IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

RICKY JACKSON,

        Plaintiff,      JUDGE BOYKO
-vs-                  CASE NO. 1:15-CV-00989

CITY OF CLEVELAND, et al.,

        Defendants.
_____/

KWAME AJAMU, et al.,

        Plaintiffs,
-vs-                  JUDGE BOYKO
                        CASE NO 1:15-CV-01320
CITY OF CLEVELAND, et al.,

        Defendants.

_____/

Videotaped deposition of JEROLD ENGLEHART, taken as if upon examination before Makenzie J. Koman, a Notary Public within and for the State of Ohio, at the offices of Roetzel & Andress, 1375 East Ninth Street, 10th Floor, Cleveland, Ohio, at 9:46 a.m. on Friday, December 11, 2015, pursuant to notice and/or stipulations of counsel, on behalf of the Plaintiffs in this cause.

- - - -



EXHIBIT 26

APPEARANCES:

    Elizabeth Wang, Esq.
    Loevy & Loevy
    2060 Broadway, Suite 460
    Boulder, Ohio 80302
    (720) 328-5642,

    On behalf of the Plaintiff;
    Ricky Jackson;


    Terry H. Gilbert, Esq.
    Friedman & Gilbert
    55 Public Square, Suite 1022
    Cleveland, Ohio 44113
    (216) 241-1430,


    On behalf of the Plaintiffs,
    Kwame Ajamu and Wiley Bridgeman;

    Stephen W. Funk, Esq.
    Roetzel & Andress
    222 South Main Street
    Suite 400
    Akron, Ohio 44308
    (330) 376-2700,


    On behalf of the Individual
    And Estate Defendants;

    Shawn Mallamad, Esq.
    City of Cleveland Law Department
    601 Lakeside Avenue
    Room 106
    City Hall
    Cleveland, Ohio 44114
    (216) 664-2569,


    On behalf of the Defendant,
    City of Cleveland.

ALSO PRESENT:

Dan Edmondson - Video Reporter (888)598-4336



                          I N D E X
WITNESS                                                      Page

JEROLD ENGLEHART

        Examination by Ms. Wang........................  5
        Examination by Mr. Gilbert.................... 51
        Re-Examination by Ms. Wang................... 70

OBJECTIONS                                                   Page

By Mr. Funk............... 22, 25, 26, 29, 31, 32, 33,
                          35, 36, 41, 46, 47, 48, 54, 59,
                          61, 62, 63, 64, 65, 67, 68, 69

EXHIBITS                                                     Page

Deposition Exhibit 1                                         24
Deposition Exhibit 2                                         36
Deposition Exhibit 3                                         38
Deposition Exhibit 4                                         42



THE VIDEOGRAPHER:  We are now on the record.  This is Tape No. 1.  The deposition of Jerold Englehart in the matter of Ricky Jackson versus the City of Cleveland being heard before the United States District Court, Northern District of Ohio, Eastern Division, Case Number 1:15-CV-00989.  This deposition is being held at 1375 East Ninth Street, 10th Floor, Cleveland, Ohio.  Today's date is December 11, 2015.  The time on the record is 9:46 a.m.

Would you please state your appearance for the record?

MS. WANG:  Elizabeth Wang, W-a-n-g, for Plaintiff Ricky Jackson.

MR. GILBERT:  Terry Gilbert on behalf of Plaintiffs Kwame Ajamu and Wiley Bridgeman.

MR. MALLAMAD:  Shawn Mallamad for the City of Cleveland.

MR. FUNK:  And Stephen Funk, Roetzel and Andress, on behalf of all the other defendants including the witness, Jerold Englehart.



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                        5

                      THE VIDEOGRAPHER:  Will the witness be
          sworn?

                      JEROLD ENGLEHART,

     called by the Plaintiffs for the purpose of

     examination, as provided by the Ohio Rules of Civil

     Procedure, being by me first duly sworn, as

     hereinafter certified, was examined and testified as

     follows:

                          - - -

          EXAMINATION OF JEROLD ENGLEHART

BY MS. WANG:

Q.   Mr. Englehart, could you please state your name and
     spell it for the record?

A.   Jerold Thomas Englehart, J-e-r-o-l-d.  Middle
     initial, T.  Last name, Englehart, E-n-g-l-e-h-a-r-t.

Q.   Mr. Englehart, are you currently employed?

A.   No, I am not.  I'm retired.

Q.   And when were you last employed?

A.   2007, October.

Q.   Have you ever attended a deposition before?

A.   No.

Q.   So I'm the attorney for one of the Plaintiffs in this
     case, Ricky Jackson.  I'll be asking you some
     questions relating to the matter in which he has
     filed a lawsuit against the City of Cleveland and



some Cleveland police officers.

           If you need to take a break at any time, feel free to say that you'd like a break and we can take a break, just not when a question is pending.  Is that fair?

A.    Okay.

Q.    If you don't understand any of my questions, please let me know or ask me to clarify so that I can clarify a question for you.  Otherwise, I will assume that you understood my question that you've answered it.  Is that fair?

A.    Yes.

Q.    Because everything is being transcribed, please allow me to finish asking my question before you begin your answer.  That way the record will be clear.  Is that fair?

A.    Yes.

Q.    And please give verbal answers like yes or no, instead of shaking your head or saying uh-huh or huh-uh.  That way the record will be clear.  Is that fair?

A.    Okay.

Q.    When you retired in October of 2007, at that time -- before you retired, where were you employed?

A.    It was Cuyahoga County Court's Grand Jury.



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                        7

Q.   What were you doing for them?

A.   I was a bailiff for their Grand Jury.

Q.   What were your duties and responsibilities as a
     bailiff?

A.   Well, organized -- assisted the grand juries and
     anything in their needs and any problems that they
     had and questions with the judge, would go between
     and help them out, and also to set up scheduling of
     cases coming in to -- for presentation and swearing
     in the witnesses and victims and detectives for the
     Grand Jury.

Q.   How old are you, sir?

A.   75.

Q.   I forgot to ask you this earlier, but are you on any
     medications or anything today that would affect your
     ability to testify?

A.   No.

Q.   How long were you -- did you work as a bailiff for
     Cuyahoga County courts?

A.   15 years.  It really wasn't a bailiff as such.  It's
     for like the particular judge, but they called us
     bailiffs, the Grand Jury.

Q.   Okay.  So you weren't assigned to a particular
     courtroom necessarily?

A.   No courtroom.  Just a Grand Jury.



Q.    I got you.  So where did you work before that?

A.    Cleveland Police Department.

Q.    What was your date of retirement from the Cleveland Police Department?

A.    It was June 1992.  I don't remember the exact date. It was the 6th or 4th or somewhere in there.

Q.    And what was your position or your title at that time that you retired?

A.    I was a sergeant and I was in the Second District and I had a strike force.

Q.    A strike force?

A.    Yes.

Q.    And what was that?

A.    It was a smaller group of detectives, and we went out and handled particular types of problems in the district, special complaints to the commander of the station there.

Q.    What kinds of special complaints?

A.    If they had a community problem or something going on and things like that, or if there was a lot of robberies or burglaries in a particular area, we would stake it out and sit in the area, things like that.

Q.    Let's go back to when you first joined the Cleveland Police Department.  When was that?



A.    1964.

Q.    Do you remember approximately what month?

A.    I'm thinking August maybe.

Q.    Did you attend police academy?

A.    Yes, I did.

Q.    How long did that last?

A.    Four months.  I got out of there in December of '64,
the beginning of -- first week of December, I think
it was.

Q.    By the way, were you ever in the military?

A.    Yes.

Q.    When did you serve in the military?

A.    I was in the Marine Corps Reserves 1961, and then --
for just six months.  Then I was active reserves and
inactive reserves.  It was a total of a six-year
obligation, I believe.

Q.    So that was from about '61 to '67?

A.    Yes.

Q.    Were you ever deployed anywhere?

A.    No.

Q.    Were you discharged honorably?

A.    Yes.

Q.    When did you graduate from college, or did you
graduate from college?

A.    No.  I attended two years days and a year nights, and



that started in the fall of '58, and then, like I said, I went two years days and then a year nights.

Q.   And so what's the highest level of education you've completed?

A.   It was in the third year of college.

Q.   Did you ever obtain any vocational degrees or any other kind of degrees after attending college for a few years?

A.   No.

Q.   Prior to joining the CPD in 1964, did you ever work for another law enforcement agency?

A.   No.

Q.   Where did you work prior to joining the CPD?

A.   I was working for a coin company, Freedburg Coin Company, and they were out of New York, Minkus and Freedburg.  Minkus was stamps.  It was coins and stamps.  Minkus was the stamps and Freedburg was the coin, and I last worked at Higbee's downtown.  We worked in department stores.  They had a coin shop, numismatics.  It was at Higbee's.  And before that, it was O'Neil's in Akron, and when I first started doing this, I was at Halle Brothers in Cleveland downtown.

Q.   So going back to when you graduated from police academy, what was your -- did you become a patrolman?



A.    Yes.

Q.    Did you have a particular district that you worked in?

A.    Went to the Fourth District.

Q.    How long were you a patrolman before there was any change in your position at the CPD?

A.    Well, I got transferred to another district, and after two years in the Fourth District, I went to -- it was a task force for the City of Cleveland.

Q.    What kind of task force?

A.    Well, again, it was for high-crime areas, and we -- plain clothes detectives who worked out of the Second District.  Most of the time it was back over to the east side, and we were just to go where there was high crimes and any problems.

Q.    So during the time that you were on the task force, were you a detective?

A.    Yes.

Q.    So when did you become a detective, '66 about?

A.    Yeah, as this task force.

Q.    Before you became a detective, did you have to pass any tests --

A.    No.

Q.    -- or take any tests?

A.    No.  Just an initial test to get on the job, on the



police department, the entrance test.

Q.   That was back --

A.   Prior.

Q.   -- prior to --

A.   Prior to '64, yes.

Q.   Did you have to go to detective school when you became a detective?

A.   No.

Q.   Did you attend any kind of training courses that were specific to being a detective at any time in the beginning of your career as a detective?

A.   No.  It was all on-the-job training.

Q.   What kind of on-the-job training did you have to learn how to be a detective?

A.   It was just general practices that would be needed, and it was continuation of police duties.  I mean, things -- it was nothing extra.  You just had to go and take care of situations, problems.  We weren't doing investigating crimes as such.  We were eliminating problems when they first started up.

Q.   Were you -- okay.  So you were not investigating crimes as a detective?

A.   Initially in that task force, that wasn't our job. We were initially to settle down the situation at hand, and then it was turned over to basic patrol for



the initial reports and the detective bureau. Other detectives, general duty, would follow up.

Q. So when you mean -- when you were on the task force, part of your job was to settle down some situation that -- I'm trying to understand what that means. Could you give me an example?

A. Fights, uprisings, or if there was burglaries or something in progress, we would go in. There was five of us in a car.

Q. So the task force was just five of you?

A. In a car. There was a few cars, yes.

Q. In a car. Okay. I see.

But you were assigned to a particular car?

A. (No verbal response.)

Q. You were assigned a particular car?

A. Yeah.

Q. Do you remember who you were assigned with?

A. Not offhand. I don't remember all the names.

Q. After you were on that task force, what was your next assignment?

A. Sixth District.

Q. As a detective?

A. No.

Q. Okay.

A. In the uniform basic patrol.



Q.   You were a patrolman?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.

Q.   How long did you do that?

A.   That was about another two years.

Q.   So that's until about '68?

A.   Yes.

Q.   And then did you have a partner at that time?

A.   Yes.

Q.   Do you remember who it was?

A.   Michael Thiese.

Q.   Is that T-i-c-e?

A.   No.  It's T-h-i-e-s-e or something.  Tice, Thiese, something.

Q.   Like T-h-i-e-s-s?

A.   Something like that.

Q.   Something like that?

A.   I don't remember exactly.

Q.   And then after you were in the Sixth District as a patrolman, where did you go next?

A.   To the detective bureau in Downtown Cleveland, statement unit, criminal statement unit.

Q.   How did you get assigned to that unit?

A.   Well, I was asked to go.



Q.   Who asked you to go?

A.   The supervisor in charge, Frank Corrigan, Lieutenant.

Q.   Did you ever express an interest in joining the statement unit?

A.   When I talked to him, yes.

Q.   And how did he describe to you what the duties and responsibilities would be in the statement unit?

A.   It would be to take statements from -- typed-up statements from victims, witnesses and defendants.

Q.   At the time you joined the criminal statement unit, did you receive any training on how to take a statement from a witness, a defendant or a victim?

A.   Well, yes.  It was on-the-job training.  Again, the other detectives in there that were working assisted me, told me, you know, the basics, to tell the story just whatever way the witness was talking, talking and telling, and that would be the thing.

Q.   So it was about -- so you joined -- sorry.  I lost track.

     You joined the statement unit in '68 or in '70?

A.   '70, wasn't it?  Two years in the Sixth District was '68 to '70, I think, and then '70, I think, I went to the --

Q.   Did you receive any other kind of training to learn how to take statements other than on-the-job



training?

A.   No.

Q.   How many detectives were in the criminal statement unit?

A.   I believe there were nine.

Q.   Do you recall the names of the other detectives who were in that unit at that time?

MR. FUNK:  You're talking about 1970?

MS. WANG:  1970.

A.   1970.  Some of them -- there was -- yeah.  Elmer Walling -- I'm drawing a blank.  There were four of us on days, four on afternoons, and one regular night shift guy, and then somebody off of afternoons would fill in for the night shift.  They'd take turns.

Q.   And the hours for days, what were the hours for days?

A.   8:00 to 4:00.

Q.   And then afternoons?

A.   4:00 to -- 3:00 to 12:00.  There might have been a little overlap, and then the night shift was 11:00 to 7:00 or 12:00 to 8:00, whatever it was then.

Q.   In 1975, were you still in the criminal statement unit?

A.   Yes.

Q.   At that time, do you remember who the other detectives were in that unit?



A.   Again, Elmer Walling.  Who was it?  Jimmy Brinza, James Brinza.

Q.   Do you know how to spell the last name?

A.   B-r-i-n-z-a.  I can't think of all the names right now.

Q.   Who was your supervisor in the criminal statement unit in 1975?

A.   It was -- Frank Corrigan was the Lieutenant, and there was a sergeant.  I forget his name, too. Because I ended up taking his place.

Q.   So could you describe for me in 1975 what were your duties and responsibilities generally in the criminal statement unit other than what you've already talked about, which is to take statements from witnesses, suspects and victims?

A.   We took statements.  We kept the file, a jacket with the statements in it and which were also sent to the -- I numbered them.  They were in numbers in the file jackets.

Q.   The --

A.   Kept track of that, the charges and --

Q.   I'm sorry.  The what was numbered?

A.   The file numbers, the case file numbers, and we would take one of those statements and supply the county prosecutor with them.  Each day they would stop in



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                       18

and pick up statements or somebody from that
prosecutor's office.  That's the county prosecutor.
And that was about it.

Q.   During your time in the criminal statement unit, were
you responsible ever for going out and investigating
crimes?

A.   No.

Q.   How long were you in the criminal statement unit?

A.   Ten years.

Q.   So approximately 1970, 1980, or maybe '68 to '78?

A.   Yeah, something like that.

Q.   Did you ever receive any training as a typist?

A.   Just on the job.

Q.   And could you just describe to me the process of how
you would take a statement?

A.   Well, the detectives would bring in the witness,
whether it was the victim or some other witness or
the defendant, and you sit down and you set up the
format there.  Criminal statement, you put the time
and the date, and then we'd identify the person
making a statement, say who they were and where they
lived and give the vital statistics on the person
making the statement.  And then they would relate
whatever the incident was, was it about, and they'd
type it up verbatim of what they were saying.



After they got through with their particular statement, the detectives would ask questions of the witness. There'd be a question and answer period, and I would type in the question as it was stated and then the answer, as it was given to me by the witness.

At the end of it when they were all done, there was three copies; an original and two copies, and that was carbonized. And after we were done typing it up, we'd give it to the witness. I would give one copy to the witness to read, and they would make any corrections that they wanted to as they read it, if there was any corrections to be made, and go all down.

And after they were done, we would have them read out loud what the last question would be on the statement, saying, have you read the above statement and is it the truth? They would write their answer and sign their name. And also at the bottom would be the detectives who brought this individual in, their names with a line for them to sign on, and then at the bottom would be my name and the time, date, whatever the completion time, there.

Q.   So where would the statements be taken? Was there a specific room or --



A.    Yes.

Q.    -- area?

A.    There was a statement unit.

Q.    And if you were taking a statement from a witness, would it be in -- would it just be you, the witness and the detectives, or was it like a big area where there were other people?

A.    No.  That was it.  The room would be the detectives, the witness, and me.

Q.    If there were two detectives on a case, would it usually be both of them in the room, as well?

A.    Yes.

Q.    Was there any kind of policy that you're aware of about that?

A.    Policy, I don't know.  Practice, that's the -- they were the investigating officers, and that's -- there was always two.

Q.    When you were responsible for taking a statement from a witness, did you normally have any knowledge of what the case was about or what the witness was going to say?

A.    None at all.  We were cold, on the outside, you know, not informed of anything.  They just -- they sat down and they'd tell us whatever and we typed up whatever they said.



Q.  So if an investigating detective on a case had a witness who was going to give a statement, the detective would just call down to the statement unit or call up?  I don't know.

A.  Just come in.

Q.  Just come in?

A.  Come in.

Q.  And whoever -- whatever -- if you were on duty, you would take a statement?

A.  Right.  There was three rooms.  There was four of us working normally and three rooms, so they would have that.  And if we were like tied up, they'd just come back in a little bit.

Q.  And did you ever talk with the investigating -- in general, was it your practice to talk to the investigating detectives about what the crime was or anything before taking a statement?

A.  No.

Q.  Did you ever speak to the witness or whoever it was that was giving a statement before taking a statement?

A.  No.

Q.  Do you have any independent recollection of taking a statement from Edward Vernon in 1975?

A.  No.



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                      22

Q.   Do you have any independent recollection of taking a
     statement from a 12-year-old African American boy in
     May 1975?

A.   No.

Q.   Do you have any independent recollection of anything
     relating to the robbery or murder of Harold Franks at
     a convenient store in Cleveland in May 1975?

A.   No.

Q.   What documents did you review to prepare for the
     deposition today?

A.   Well, I saw the interrogatories.  There was a couple
     sets of those, and a statement that Vernon had made.

Q.   By the way, have you ever been sued in a lawsuit
     before?

A.   Yes.

Q.   When was that?

A.   Well, it was dropped really.  I mean, it started --
     you mean completely sued?

Q.   What year was it?

A.   In the late '80s.

Q.   What were the allegations against you?

               MR. FUNK:  Objection.  Go ahead.

A.   It was off duty.  I was working part time at -- and
     then it was dismissed.  I was working at a
     restaurant.



Q. So I just want to clarify.  Was it -- did the allegations have to do with something you did as a police officer while off duty, or it just -- it was a lawsuit unrelated to being a police officer?

A. No.  It was regarding police duty.  I was working part time and there was a fight, and they were saying that I didn't do enough or something or another, but then it dropped, like I said.

Q. So the claim had something to do with you not doing something to protect somebody or -- what do you recall about the allegation?

A. I really don't recall exactly what the allegation was, but it was something -- somebody had an altercation with another individual and they were complaining against the company, you know, and I was there taking care of the situation.

Q. Going back to the criminal statement unit -- all right.  So the statements would take place in a room, and earlier you described that the detectives would bring the witness to the statement unit and then you would sit down and the witness would recount whatever the witness had to say and you would type it up?

A. Yes.

Q. So was there normally a narrative period where the witness would just say what he had to say and then



you would type it up and then a question and answer, or what was the format generally?

A.   I would type up as the witness was giving the basis of the story, whatever basically happened.  After that, when they got through with talking, then the detectives would ask specific questions, and then I would type those in and whatever answers were given by the witness.

Q.   Let me show you --

          MS. WANG:  Let's have this marked as Exhibit 1.

                    - - -

(Whereupon, Deposition Exhibit 1 was marked for identification.)

                    - - -

Q.   Handing you what has been marked as Deposition Exhibit 1.  Could you take a look at that and let me know if you've seen it before?

A.   Yes, I have.

Q.   Is that the -- well, let me strike that.

     At the bottom it says, Englehart 242, 5-25-75, 1:27 p.m.  Is that your name?

A.   Yes.

Q.   What is that, your name -- and 242, was that your badge number?



A.    That was my badge number.

Q.    What does the fact that your name and badge number on here indicate?

         MR. FUNK:  Objection.

A.    Well, this would mean that I would be the one who typed up this statement here.  That was our policy in the statement unit.  After we typed that up, our name would be on the bottom and what time we completed there.

Q.    Do you have any independent recollection of typing up this statement?

A.    No.

Q.    The two witness signatures and names at the bottom, it says witness, Detective Staimpel, and witness, Detective Stoiker, and there's signatures there.  Did you know Detective Staimpel and Stoiker?

A.    At the time, yes.

Q.    And in what way did you know them?

A.    They were detectives who would come in from the homicide unit.

Q.    Did you ever take statements from them on other occasions -- or not from them.  But for them?

A.    Yes.  I believe I've taken them for them, yes.

Q.    Did you ever work with them on any cases other than just taking --



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                       26

A.    No.

Q.    -- statements for them?

A.    No, I didn't.

Q.    At the top of this statement, it says criminal statement unit, May 25th, 1975, 12:35 p.m.  What does the time at the top indicate?

A.    When we started the statement.

Q.    And then so at the bottom where it says 1:27 p.m., what does that indicate?

A.    Completed time of the statement.

Q.    And the date indicates the date that it was taken?

A.    Correct.

Q.    When you are taking a statement from a witness, are you typing up everything that is said in that room at that time, or just whatever it is the witness is saying his or her statement is?

            MR. FUNK:  Objection.

A.    I'm typing up what the witness is saying, you know, until it comes to the question and answer period.

Q.    Sure.  And what I'm asking you is, you know, is there conversation that occurs when your witness is -- in the criminal statement unit, is there conversation that occurs that's not being typed up?

            MR. FUNK:  Objection.

A.    I don't believe so.  Not that I know of.  If the



witness is giving the statement, that's what's typed.

Q. Did you ever type up a statement of a witness that a detective was recounting to you without the witness present?

A. No.

Q. And why wouldn't you do that?

A. That's not what we did.  It wasn't our procedure, our policy.  I mean, it was -- the person had to be there.

Q. Do you have any recollection of interacting with or speaking with Edward Vernon at all?

A. No.

Q. Did Detective Staimpel ever ask you to type up a witness statement that he was summarizing to you without the witness present?

A. No.

Q. Did the Cleveland Police Department have any policies or procedures relating to how witness statements should be taken?

A. Not that I know of.  And that was -- this was just on-the-job training.

Q. Do you know if Detective Staimpel -- or strike that.

Are you aware of any instance in which Detective Staimpel typed up his own statements?

A. No.



Q.   Did you ever work as an investigating detective on a case like not in the criminal statement unit?

A.   Yes.

Q.   Did you ever have occasion to bring suspects or witnesses to the criminal statement yourself for their statements to be typed up?

A.   No.

MR. FUNK:  Just so we're clear on the time frame, are you talking about after he worked in the statement unit?

MS. WANG:  Yes.

MR. FUNK:  Okay.

Q.   So you mentioned there would be three -- this statement, like Deposition Exhibit 1, would be carbonized.  Would there be sheets of carbon in between each copy?

A.   Yes.

Q.   So one copy would go to the witness, right?  Is that what you said?

A.   No.  Initially, to read, to sign.

Q.   To read, okay.

A.   To read over and make any corrections and to -- after they read that last statement, to sign their answer and their name.

Q.   And then so tell me where the three copies would go



JEROLD ENGLEHART                                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                                     29

after it was all done?

A.   Well, again, after that was signed also by the detectives who were also witnesses, the three copies, we made up a file, and there was the original and the two carbonized copies that were all signed individually.  They weren't carbonized signed through all.  Each one was signed.

The original and one copy would stay in this jacket.  The third copy would go be sent to the county prosecutor's office, would be picked up by the county prosecutor, and that was it.

Q.   When you worked in the criminal statement unit, did you have occasion to take statements from juvenile witnesses?

A.   Yes.

Q.   And was it the practice to have a parent or guardian present during the taking of a statement from a juvenile witness?

A.   No.

Q.   Why not?

A.   A lot of times kids don't like to talk in front of their parents to say what really happened.

Q.   Was that the policy of the Cleveland Police Department?

MR. FUNK:  Objection.



A.   I don't know about policy.  But that was our practice there.

Q.   That was the practice of the Cleveland Police Department?

A.   Well, of our statement unit, as far as for statement taking, just the detectives and the witness, whether it be a juvenile or an adult as a witness.

Q.   What about juvenile suspects, did they have -- was it the practice or policy to have parents present?

A.   Somebody else.  They didn't get involved with taking juveniles' statements as suspects.

Q.   Wait.  Sorry.  I didn't understand your answer.

A.   When juveniles were suspects --

Q.   Yeah.

A.   -- we didn't take their statements.

Q.   You didn't take their statements?

A.   No, not that I remember.

Q.   You mean you, personally, don't remember taking any juvenile suspect statements, or the unit just did not take juvenile suspect statements at all?

A.   I don't remember taking any personally.

Q.   But you're not aware of whether or not other people took statements from juvenile suspects?

A.   No, I'm not aware.

Q.   Are you aware of any policy or procedure in the



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                      31

Cleveland Police Department that requires a parent or guardian to be present when a juvenile witness is giving a statement?

MR. FUNK:  Objection.

A.   Policies, I don't know.  But talking to them, usually there's an adult present.  But again, not in the statement unit, so I don't know what was going on outside there.

Q.   Would you agree that juveniles may be more susceptible to suggestive questioning than adults?

MR. FUNK:  Objection.

A.   Personally, no.

Q.   You don't believe that?

A.   No.

Q.   Did you ever receive any training from the Cleveland Police Department that indicated that juvenile suspects or witnesses may be more susceptible to suggestive questioning than adults?

MR. FUNK:  Objection.

A.   No.

Q.   Did you ever receive any policies or procedures or rules from the Cleveland Police Department that informed you that juveniles who are either suspects or witnesses may be more susceptible to suggestive questioning than adults?



MR. FUNK:  Objection.

A.   Not that I know of.

Q.   After you were a detective in the criminal statement unit, where did you go next?

A.   I went to general duty for a couple of months --

Q.   Detective --

A.   -- when I was promoted to sergeant after -- from the statement unit, I was promoted to sergeant.  I went to general duty for two or three months, and then I went back to the fraud unit or checks and pawns, hotel and checks -- there was a combination of names -- in which the statement unit came under, and I was the sergeant in there when the sergeant retired, that I couldn't remember his name.  And then after, the lieutenant -- after a few months, four, five, six months, the lieutenant got promoted, and then I was in charge of the hotel and checks and statement unit.

Q.   What were your duties and responsibilities as a sergeant there?

A.   Assignments and review all reports, and just everything that -- just assignments, like I said, and staffing duties for the different officers and their shift.

Q.   Did you ever receive any training from the Cleveland



Police Department at any time between 1964 and 1975 on the susceptibility of juvenile witnesses to suggestive questioning?

MR. FUNK:  Objection.

A.   Not that I remember.

Q.   Did you ever receive any training from the Cleveland Police Department between 1964 and 1965 on how juveniles should be interviewed?

MR. FUNK:  Objection.

A.   Just on-the-job training from other detectives.

Q.   Do you remember the names of any specific detectives who gave you on-the-job training?

A.   No, I don't.  Many.

Q.   Many?

A.   Many.

Q.   Did you ever work with Detective Terpay, Eugene Terpay?

A.   No.  Other than the fact that he was in the homicide unit and would bring witnesses in.

Q.   So you had -- did you have occasion to take statements from people that Detective Terpay brought to you to get a statement from?

A.   Specifically, I don't remember, but most likely, because he was a detective in the homicide unit.

Q.   Did you ever have occasion to work with James Farmer,



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                       34

Detective Farmer?

A.  Again, he was a detective in the homicide unit, would come into the statement unit.

Q.  Any other way in which you might have worked with him?

A.  I believe he was in the reserve unit that I was in, Marine Corps Reserves.

Q.  Do you know if Detective Farmer had been in the police department for longer than you had?

A.  For what?

Q.  For a longer time than you had.

A.  Yes.  He was on the job before me, I believe.

Q.  Do you know how long Detective Farmer had been a detective by 1975?

A.  I have no idea.

Q.  How about Detective Terpay; do you know?

A.  Don't know.

Q.  Did you ever have occasion to work with Detective Staimpel other than taking a statement from somebody?

A.  That was it, just statements.

Q.  How about Detective Stoiker, Frank Stoiker?

A.  Same thing, statements.

Q.  Did you ever have occasion to work with Detective Cummings?

A.  No.



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                        35

Q.   How about Detective James White or Sergeant James
     White?

A.   I don't believe so.  I don't remember.

Q.   Did you ever have occasion to work with Sergeant
     Peter Comodeca?

A.   Well, he was the sergeant in homicide and we had
     conversations, I mean, different times.  And later on
     the job, I mean, I talked to him.  I never worked
     right with him, though.

Q.   Were you ever a detective in the homicide unit?

A.   No.

Q.   So what kinds of crimes -- besides what you've
     already talked about, what kinds of crimes did you
     work as a detective?

A.   Well, when I was in charge of the fraud unit, it was
     all types of frauds; checks, credit cards, con games,
     pawn unit.  We were -- I was in charge of pawn units
     and the statement unit.  Specific crimes, I mean,
     that was anything in there.

Q.   Did you ever receive any training from the Cleveland
     Police Department at any time from 1964 to 1975 about
     the obligation of detectives or officers to disclose
     exculpatory evidence?

                    MR. FUNK:  Objection.

A.   I don't know of anything like that.



Q. What is your understanding of exculpatory evidence?

A. It's evidence to -- that's -- well, let's see. To the benefit of the suspect saying that something wasn't -- didn't happen or contradictory to what was also said.

Q. So inconsistent statements?

A. Pardon me?

Q. So inconsistent statements?

          MR. FUNK: Objection.

Q. Is that what you mean, or what do you mean, contradictory?

A. No. It's something else that was said that would benefit the defense.

Q. Evidence that would benefit the defense?

A. I believe so.

Q. Did you ever -- strike that.

     Did the Cleveland Police Department ever have any policies about the obligation of detectives to disclose exculpatory evidence?

          MR. FUNK: Objection.

A. Not that I know of. Don't recall.

          MS. WANG: Let's have this marked as Deposition Exhibit 2.

                    - - -

(Whereupon, Deposition Exhibit 2 was marked for



JEROLD ENGLEHART
JACKSON v. CITY OF CLEVELAND

December 11, 2015
37

identification.)

- - -

Q.   And actually, another question occurred to me, which
     I'll ask you before I ask you about that.
          Do you know why it is that detectives were
     responsible -- were placed into the criminal
     statement unit to take statements as opposed to, say,
     secretaries or court reporters?

A.   It was just our practice.  We didn't have them doing
     -- everything was detectives, so -- I don't know of
     any stenographers available or court reporters for
     that particular type of thing.

Q.   Did you have secretaries in the --

A.   No.

Q.   In the department?  I mean in the department.

A.   In the department, no.

Q.   Yeah.

A.   In our unit, we didn't.  I don't know if there was a
     secretary somewhere or not.

Q.   Do you know if the Detective Bureau had secretaries?

A.   Secretary as opposed to a detective?

Q.   Yeah.

A.   Not that I know of.

Q.   Take a look at Deposition Exhibit 2.

          MS. WANG:  For the record, it's the



Cleveland Police Department rules and --

manual of rules dated 1950.

Q.    Just take a moment to glance through that and let me

know when you're finished.

A.    There's a lot in this.

Q.    You don't have to read -- I just wanted to ask you if

you recognized that document.

A.    No, not really.  No, I've never seen this completed

thing like this.

Q.    It's a photocopy, so it looks like the original may

have been a different size, a smaller size.  But do

you recall ever seeing a manual of rules like that

during the time that you were in the CPD?

A.    I don't recall.

Q.    Do you recall there being -- you know, more

generally, do you recall there being any kind of

procedure manual or book of rules that you had?

A.    General police orders is what I remember.  They would

always come out with different things and changes to

them, but I don't remember this.

Q.    Well, let's show you a general police order.

                    MS. WANG:  Could you mark this as

            Deposition Exhibit 3?

                          - - -

(Whereupon, Deposition Exhibit 3 was marked for



identification.)

- - -

Q. The court reporter has marked and handed you Deposition Exhibit 3.  It is general police order number 19-73 dated July 18, 1973.  It says, pretrial discovery rights of defense attorneys in courts in criminal cases, and before I ask you a specific question about this one -- and it's Bates stamped CLE00452 at the bottom.

Is this general format what you meant by general police order?

A. Yes.

Q. Do you remember receiving this specific general police order?  You could take a moment to read through it.

A. Okay.  No, I don't remember this in particular.

Q. The text of this one refers to a letter that the county prosecutor, John Corrigan, sent to the departments and then was apparently distributed to members of the department about the legal rights of defense attorneys in courts to statements, reports and other items in criminal cases.  Do you ever remember receiving a letter like that?

A. No.

Q. More generally about police orders, you said you do



recall receiving police orders?

A.   Yes.

Q.   General police orders?

A.   Yes.

Q.   And in what manner would you receive those orders?
     And I'm talking about the time frame of 1975.

A.   I really can't remember how we would get these
     things.

Q.   Did you get them at roll call?

A.   I don't remember.

Q.   Do you recall if you would actually get your own copy
     of it, or it would just be read to you at roll call
     or some other time?

A.   I don't remember.

Q.   Other than items -- strike that.

     Other than general police orders that had a
     format like this Deposition Exhibit 3, did you ever
     receive any other kinds of written policies or rules
     or orders from the police department in the time
     period leading up to 1975?

A.   I don't remember.

Q.   Do you remember ever receiving any departmental
     notices?

A.   Those were read at roll call.  I believe the notes
     and the orders, I believe, were read at roll call,



JEROLD ENGLEHART
JACKSON v. CITY OF CLEVELAND

December 11, 2015
41

something new.

Q.   And do you recall generally what was contained in departmental notices as opposed to police orders?

A.   No, I don't.

Q.   Did you ever receive any training bulletins from 1963 to 1975 -- or sorry.  1964 to 1975?

A.   I don't remember.

Q.   Do you remember there being training bulletins in general?

A.   I really don't remember.

Q.   After you attended the police academy, did you attend any other kind of training or courses to learn anything about how to be a police officer besides the on-the-job training that you've already discussed?

MR. FUNK:  Objection.

A.   Yes.  There were a couple other things.  It was something with the FBI.  I can't remember exactly.  It was on profiling or something like that.

Q.   Which decade was that?

A.   Well, that had to be after '75.  I'm sorry.  That's right.  You said before '75.  Not before.

Q.   Not before '75?

A.   No.

Q.   Did you ever attend any -- okay.  So you didn't attend any FBI trainings or anything before '75?



A.    No.

            MR. WANG:  Let's mark this as
Deposition Exhibit 3 -- or 4.

                  - - -

(Whereupon, Deposition Exhibit 4 was marked for
            identification.)

                  - - -

            MR. FUNK:  Again, for the record, that
these interrogatory answers were produced
single-sided.  This is a double-sided copy
from the original which was single-sided.

            MS. WANG:  Just trying to save some
paper.

            MR. FUNK:  I understand.  I just
wanted to make it clear.

            MS. WANG:  Okay.

Q.    Take a look at that.  And actually, I forgot to print
out the verification at the back.  But let's just
take a moment to look through Deposition Exhibit 4.

            MR. FUNK:  I don't think you need to
read the whole document.

            MS. WANG:  Yeah.

            MR. FUNK:  You can just look it over
and see --

A.    This looks like what I've seen before.



Q.   And I'm actually going to show you the verification on my computer because I did not print that out, but let me just hand you this.  I'm showing you a verification that has your signature --

A.   Yes.

Q.   -- and a date.

Is that your signature and date?

A.   Yes, it is.

Q.   And it's your verification that your answers to the interrogatories are true?

A.   Yes.

Q.   Now, turning to page 11 --

A.   Okay.

Q.   Page 11, number 15 -- Interrogatory 15.  I will ask you some questions about it, and I'm going to take it in subparts because it's lengthy.  But subpart A of Interrogatory 15 says:  Do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that, A, required detectives or employees of the Cleveland Police Department to document or memorialize the various developments and investigation in such a way that they would become part of the official file as the investigation proceeded?  All right.

So did the city have a policy or procedure in



place at that time?

A.   I don't remember a specific policy like that.  Could have been, but I don't remember.

Q.   Subpart B asks:  Do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that required detectives or employees of the Cleveland Police Department to place any witness statements in the official file or otherwise make them available to criminal defendants, defense counsel, prosecutors?

     Did the city have a policy, a written policy on that?

A.   I don't remember a written policy.  Could have been.  I don't remember if there was or there wasn't.

Q.   Were you ever trained -- and I'm going to step back from this for a second.

     Were you ever trained to document oral statements of a witness even if they weren't giving a formal written statement?

               MR. FUNK:  Are you talking about while he worked in Cleveland?

               MS. WANG:  Yeah.

A.   I don't quite understand your question.

Q.   While you worked as a detective --

A.   Yes.



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                      45

Q.   Well, let me back up for a minute.

     We've been talking about witness statements which are typed up and formalized through the criminal statement unit.

A.   Yes.

Q.   But as a detective investigating a case, a witness may say something to you orally before it's formalized in some kind of written form.

A.   Okay.

Q.   Is that fair to say?  I mean, did you ever have occasion to investigate a case and talk to a witness where the witness said something to you that you didn't then document in written form?

A.   I don't understand.  The witness would say something.  Then --

Q.   Let me ask you this --

A.   Wasn't what?

Q.   Did you have occasion to investigate cases where you were interviewing witnesses?

A.   Always.

Q.   Right.

A.   I mean, in the statement unit or --

Q.   No.  I'm not talking about in the criminal statement unit.  I just mean when you're out in the field investigating a case.



JEROLD ENGLEHART                                         December 11, 2015
JACKSON v. CITY OF CLEVELAND                                           46

A.    As a patrolman or as a detective?

Q.    As a detective.

A.    As a detective.

Q.    Right.  Okay.

A.    That would be much later after the statement unit.

Q.    Right.

A.    Okay?

Q.    Okay.  So during that time when you were a detective
      out in the field investigating cases, you had
      occasion to interview witnesses, right?

A.    Yes.

Q.    On those occasions, would you always document
      everything a witness said to you orally?

                    MR. FUNK:  Objection.

A.    Generally, you'd take down the information, I would
      imagine, as -- I don't quite understand what the
      question really -- yeah, you would write it down.
      It's your investigation.

Q.    Did you ever have occasion to interview a witness
      more than once or speak to a witness more than once?

A.    Personally, no -- well, yes, I had to of.  I don't
      remember exactly, but yes.

Q.    And what was your practice in terms of what you would
      document in terms of what the witness was saying to
      you on the different occasions that you spoke to a



witness?

              MR. FUNK:  Again, in his capacity as a

       detective after --

              MS. WANG:  Yes.

              MR. FUNK:  -- he worked in the

       criminal statement unit?

A.  Afterwards, I was a supervisor, and the investigating
    detectives would do that and I would review what they
    would say or what they were doing.  The individuals,
    I wouldn't personally be involved with writing up a
    report on what they said.  I might be present when
    they're talking to detectives.

Q.  As a supervisor, did you review reports written by
    detectives including accounts of what witnesses told
    them during the course of their investigation?

              MR. FUNK:  Objection.

A.  I would review their reports, yes.  Anything that
    they would write up, I had to review them.

Q.  Did detectives in investigating a case ever turn in
    their handwritten notes to you?

A.  No.

Q.  Was it the policy or procedure of the Cleveland
    Police Department not to turn in -- not to place
    handwritten notes into the official file?

              MR. FUNK:  Objection.



A.    I don't know if there was a policy or not.

Q.    Going back to Interrogatory 15, subpart C says:  Do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that required detectives or employees of the Cleveland Police Department to document or memorialize photo or in-person lineups or otherwise govern the conduct of detectives or employees during photo or in-person lineups?

      Did the City of Cleveland have a written policy or procedure like that in place?

A.    I am not aware of the written policy.

Q.    Interrogatory 15, subpart D says:  Do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that required detectives or employees of the Cleveland Police Department to disclose exculpatory evidence?

                  MR. FUNK:  Objection.

A.    Again, I don't remember whether they did or they didn't.

Q.    Interrogatory 15, subpart D -- or E, I'll paraphrase. It says, do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that required detectives of the Cleveland Police Department to document or



memorialize interrogations or interviews of suspects and witnesses?

A.    Again, I don't remember whether they did or didn't.

            MR. FUNK:  Do you want to keep going, take a break --

            MS. WANG:  I'm almost done, I think, or we can take a quick break and then I'll let Terry --

            MR. FUNK:  Okay.

            THE VIDEOGRAPHER:  We're off the record at 10:55.

                    - - -

      (Whereupon, a recess was taken.)

                    - - -

            THE VIDEOGRAPHER:  We're back on the record at 11:02.

Q.    Do you know who Ricky Jackson is?

A.    Ricky?

Q.    Jackson, the Plaintiff in this lawsuit.

A.    No.

Q.    Did you review a copy of the Complaint in this case?

A.    Yes.

Q.    Do you have any knowledge of any of the allegations in the Complaint?

A.    None at all.



JEROLD ENGLEHART                                       December 11, 2015
JACKSON v. CITY OF CLEVELAND                                          50

Q.  Do you know who Wiley Bridgeman is?

A.  No.

Q.  Do you know who Ronnie Bridgeman is?

A.  No.

Q.  Do you have any information one way or another as to whether or not Ricky Jackson, Ronnie Bridgeman or Wiley Bridgeman committed the crime of robbing and murdering Harold Franks?

A.  No, I don't.

Q.  Do you have any knowledge one way or another as to whether or not Edward Vernon, the supposed witness in this case, witnessed anything regarding the crime?

A.  I do not.

Q.  Do you have any knowledge one way or another as to the actions or inactions of detectives who were investigating this case, including Eugene Terpay, James Farmer, John Staimpel or Frank Stoiker?

A.  No, I don't.

MS. WANG:  I have no further questions.

MR. GILBERT:  I have a few questions.

THE VIDEOGRAPHER:  Off the record.

- - -

(Whereupon, a recess was taken.)

- - -



JEROLD ENGLEHART                                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                                      51

THE VIDEOGRAPHER:  Back on the record.

- - -

EXAMINATION OF JEROLD ENGLEHART

BY MR. GILBERT:

Q.    Good morning, Mr. Englehart.

A.    Good morning.

Q.    As I indicated earlier, my name is Terry Gilbert and I represent Wiley Bridgeman and Kwame Ajamu in this case.

Have you and I ever met before?

A.    I don't know.  I've heard your name once or twice, I think.

Q.    I'm sure.  So I'm going to ask you a few questions. I won't take too long.  You have the written statement there -- I think it's Exhibit 1 -- in front of you.

A.    Yes.

Q.    And I know you don't remember this particular case, so I'm not going to ask you to recall what occurred on May 25th between 12:35 and 1:27 p.m.  I'm just going to ask you about the process.  Fair enough?

A.    Okay.

Q.    Am I to understand that the practice at the time in 1975 was not to tape record the statements of witnesses or suspects in a crime; is that correct?



A.   Yes.

Q.   Did the criminal statement unit have the equipment to record the interview process between a detective and a witness?

A.   No.

Q.   There were tape recorders back then, were there not, in existence?

A.   I think there were, yes.

Q.   Do you know why these interviews were not actually taped back then?

A.   No.

Q.   Now, did you -- I think Ms. Wang asked you what training you might have had in terms of being in the statement unit, and you said on-the-job training; is that correct?

A.   Yes.

Q.   You are not a trained stenographer; is that correct?

A.   Correct.

Q.   And you had no formal training outside the statement unit on how to type; is that correct?

A.   Yes.

Q.   And when you -- and you used a typewriter.  Was it an electric typewriter back then?

A.   Yes.

Q.   And when there were mistakes made, how did you



correct those mistakes?

A.   Had to X out.

Q.   You couldn't do a white-out because there was a
     carbon; is that right?

A.   Correct.

Q.   So if you misspelled a word, you'd X it out and then
     write it again?

A.   Yes.

Q.   When you would type, did you use two fingers?

A.   I used them all, but not the correct way in which an
     educated typist might do it.

Q.   So where your finger would go to specific characters
     of the alphabet; is that right?

A.   No.  It would, you know, vary.

Q.   This was a one-page statement; is that right?

A.   Apparently.

Q.   Was it -- did you do more than -- did you do
     interviews where their statements were longer?

A.   Yes.

Q.   And typically, what was the average number of pages
     of a statement?  Do you have any sense of that?

A.   I don't remember.

Q.   Did you ever do statements that went on for five,
     ten pages?

A.   I don't remember that, anything that long.



Q.   So approximately anywhere from one to three pages?

             MR. FUNK:  Objection.

A.   I really don't remember.  Usually it was on one page.

Q.   Usually it was on one page.

     And in connection with this Harry Franks case, which is what we're talking about here, do you remember if you took -- would have taken more statements than just Edward Vernon on this case?

A.   I do not know.  Don't remember.

Q.   Now, you mentioned that when you finished a statement, that you would put it in a file with some kind of number.

A.   Uh-huh.

Q.   What was that number?  Was it the case number?

A.   A criminal statement unit number.

Q.   So a different number than the case number, right?

A.   I'm not sure what the case number is, where that --

Q.   Well, okay.  So you're familiar with the fact that in any investigation, there is a supplemental report, form tens, things like that?  You knew about that?

A.   Yes.

Q.   And they could go on for a number of pages, correct?

A.   Yes.

Q.   That -- those detective reports would have a case number, would they not?



JEROLD ENGLEHART                                        December 11, 2015
JACKSON v. CITY OF CLEVELAND                                          55

A.   I believe that would be with the original number that
     the report was made on the Complaint.

Q.   Exactly.

A.   I think that's the case number, what you're talking
     about.

Q.   Now, when you got the statement, though, you did not
     have a reference to the case number?

A.   That's correct.

Q.   You had your own number.  Is that what you're saying?

A.   Yes.

Q.   So this statement or any other statement would go
     into a manila folder?

A.   Yes.

Q.   Of many statements; is that right, or would it be
     just for this case?

A.   Just this case.  Each case had its own file and
     number.

Q.   Now, the statement itself would not -- would one of
     the copies of the statement go back to the detective
     that was in charge of the case?

A.   No.

Q.   How would they have access to it, the detectives?

A.   They would come in and request it from us and sign
     out for it.

Q.   Was that a usual occurrence?



A.    If they were going to court, that would be when they would take it for preliminary hearings and things.

Q.    So the detective file would be separate from the statement file?

A.    Yes.

Q.    Do you know why that was -- why it was done that way?

A.    No.  I don't know why, but I would imagine that it would get really cumbersome with all reports in the statement unit files.

Q.    Did you ever keep the statements permanently in the area where -- in a file cabinet, let's say, at the statement unit?

A.    Yes, until they backed up, and then we would box them up and put them in another location after they age, you know.

Q.    So at some point, there were numerous files --

A.    Uh-huh.

Q.    -- that were -- were they originally kept in a file cabinet?

A.    Initially, they were in the file cabinet, right.

Q.    And then at some point, they were collected, put in a box and shipped to a storage area; is that right?

A.    Yes.  They would number -- the box would be numbered and it would go with the other filed statements.

Q.    Now, looking at this date, May 25, 1975, do you know



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                      57

whether this was taken at the old police station or the new one?

A. Offhand, I don't remember the dates of the move.

Q. You remember that the Justice Center was built around 1975 or became occupied around 1975, right?

A. I don't remember the dates.  I know that I was there during the move, yes.

Q. So when you were in the statement unit, you did that kind of work in the old police station as well as the new one; is that right?

A. Yes.

Q. But you don't know from this date whether this particular statement was conducted in the old building or the new building?

A. Now, I'm just thinking now that I believe I was promoted to sergeant when we had the move.  So if I took this statement in the statement unit, I was still at Central Police Station.

Q. That was on Payne?

A. On Payne, yes.

Q. 21st and Payne?

A. Yes.

Q. And there was a line-up room in there at 21st --

A. Not yet.  It was at the jail.  The line-ups were in the jail.



Q. Where was -- down the street on 21st, that jail or --

A. Yeah.  That's where Central Police Station was with the jail.  The detective bureau was on the, what, second or third floor, and the jail was above it.

Q. On the third floor.  We're not talking about the county jail.

A. I know, yeah.

Q. We're talking about the city jail.

A. Yeah, city jail.  I'm sorry.  Did I say county?

Q. No.  No.  You didn't.  I just want to make sure.

So looking at the exhibit again, the first paragraph is the identification information that you were speaking of earlier; is that right?

A. Yes.

Q. And who gives you that identification information, the witness?

A. The witness.

Q. But was somebody asking what he needed to say for that identification information?

A. Yes.  I don't know whether that would be me or the detectives, say, all right.  Your name and address and date of birth.

Q. So somebody would have to ask the witness --

A. Yeah.  Otherwise, he don't know what --

Q. -- what that information --



A.   Yes, to get the basics.

Q.   But that question was not included in the statement. The question to the witness about what his --

A.   What is your name?

Q.   -- address, name --

A.   No.  We're going to say, we're going to start the statement and we need your name, address and date of birth.

Q.   So not everything that goes on in the interview room from start to finish is verbatim recorded, correct?

         MR. FUNK:  Objection.

A.   Yeah, I would say so.

Q.   You would agree?

A.   Yes.

Q.   Now, getting to the -- where it says Edward James Vernon, you see where it says that?

A.   Yes.

Q.   And there's a paragraph.  Was there a question posed to Mr. Vernon that would elicit an answer to that first paragraph?

         MR. FUNK:  Objection.  Are you talking about general practice or his memory of this?

         MR. GILBERT:  Of course general practice.  He doesn't have any memory.



MR. FUNK:  Right.  Okay.  I just want to make sure.

MR. GILBERT:  All these questions are.

A.  I would imagine you'd have to say where you're going to start.  You would say, start on the day in question and where you were and what time it was.

Q.  But that only accounts for the first sentence in that paragraph?

A.  Then I'd say, then what happened?  What did you see?

Q.  So there's more than one question to get that paragraph?

A.  Well --

Q.  I'm not saying there's anything bad about it.  I just want to try to find how it worked.

A.  Yeah.  Well, you have to direct the guy what he's going to be talking about.

Q.  So to get that paragraph, there has to be some -- at least one question or two or three --

A.  Yes.

Q.  -- to get the basic summary of what the witness observed, correct?

A.  Yes.  Unless they already talked to him and said, hey, we're going to take your statement.  You tell us -- before he comes in to see me, they might have said, you know, you tell him -- we're talking about



JEROLD ENGLEHART                                      December 11, 2015
JACKSON v. CITY OF CLEVELAND                                        61

on a particular day and tell us what you saw.

Q.    So there could have been a discussion before he
      actually comes into the witness room with the
      detectives?

A.    I would imagine there would be, yes.

Q.    And that's not recorded?

A.    No.

Q.    So this -- to get this particular paragraph could
      have been a result of a question and answer
      interaction with the witness before he even walks
      into the interview room, correct?

A.    Could have been.

            MR. FUNK:  Objection.

A.    Or just say, hey, you know, we're talking about the
      day that this happened here, when it was and what
      time it was and what you were doing.

Q.    In any event, there were -- you've seen it both ways
      where they walk in and they immediately say what they
      remember about the incident or there's actually a
      question asked in your presence, right?

A.    There's some talking going on, yeah.

Q.    And that talking -- which I'm talking about the
      detectives --

A.    Yeah.

Q.    -- is not always recorded for that first paragraph,



correct?

A.   Yeah, probably.

Q.   Now, if you look at the first sentence -- and remember, we all know this is a 12-year-old boy because it's indicated on the top there, right?

A.   Uh-huh.

Q.   You have to say yes.

A.   Yes.  I'm sorry.

Q.   And so where after it says Edward James Vernon:  "On Monday, May 19, 1975, at about 3:50 p.m., you see that?

A.   Yes.

Q.   Is that the way the witness talked?

            MR. FUNK:  Objection.

A.   Yes, as I remember.

Q.   So if you're saying it's a verbatim account, then that witness, a 12-year-old boy, said on Monday, May 19, 1975, at about 3:50 p.m. -- he actually said those words?  That's what you would be --

A.   Yes.

Q.   -- doing?

            MR. FUNK:  Objection.

A.   I would believe so, yes.

Q.   12-year-old kids talk like that, use the word -- using 3:50 p.m. and give the specific date and the



day, or could this have been paraphrased?

MR. FUNK:  Objection.

A.    I don't know other than the fact that he's -- somebody said, all right.  We want to talk about the date and the time and what you were doing and what happened, what you saw.

Q.    Well, you might have known the date and time, but it was put down in a quite specific formal way.

A.    Uh-huh.

Q.    Right?

A.    Just getting in, yeah.

Q.    So this couldn't -- this particular line here might have been paraphrased by you for convenience, correct?

MR. FUNK:  Objection.  Calls for speculation.

A.    I don't know.  I --

Q.    Okay.  And to get to -- and as far as the information that was in that paragraph, to get the first summary before any questioning -- specific questioning occurred, requires sometimes the detective asking for clarification or more information, right?

MR. FUNK:  Objection.

A.    Not that I know of.  I don't know.

Q.    I mean, a person just doesn't walk in a room and just



start giving Monday, May 19th, 3:50 p.m., talk about two guys and where they were walking and who shot who, and all that, without some guidance and questioning as to what information is needed, correct?

MR. FUNK:  Objection.

A.   No.  This is what he said.  This is how you would type it.  What he's doing --

Q.   A 12-year-old boy?

A.   Yeah.  He was getting -- what he's doing and what he saw.  He was getting off a bus and he saw --

Q.   I understand.  But your testimony is that never in your career as a statement guy, you never paraphrased the information to put it in typewritten form on this statement?

A.   No.  They would have to say it.

Q.   Now, if you look at the middle of the statement down where it says, question, did you pick any of these males as being involved in this crime -- do you see that question?

A.   Yes.

Q.   Would you agree with me that that question requires a yes or no answer?

MR. FUNK:  Objection.

Q.   Did you pick any of these males as being involved in



the crime?  That would require a yes or a no
response.

                    MR. FUNK:  Objection.

A.   Well, yes.

Q.   But the witness not only gives the answer no, but
gives a reason why he didn't pick out these males.
Do you see that in your type --

A.   Yes.

Q.   Did anybody ask him why he didn't pick out any of the
individuals?

                    MR. FUNK:  Objection.

A.   Not at this time that I know of.

Q.   So the way it looks here, the way it's written, the
witness volunteered why he didn't pick out anybody in
the crime, correct?

A.   Yes.  I would suspect that if somebody -- if he
didn't at the time of the picking, that they would
ask him why -- when it was over, why didn't you pick
somebody out?  Why didn't you pick out --

Q.   I understand.  But in this question and answer --

A.   No.  He just said this.  This is what he said.

Q.   So not only did he give the answer no, but he went on
to give an explanation?

A.   Yes.

Q.   Now, the date -- the time that this interview



started, when did you put 12 -- when do you normally put the time down?  Here you have 12:35 p.m., right?

A.   You sit down, put the paper in there and start.

Q.   So before you write anything --

A.   Yes.

Q.   -- you put the time down?

A.   Well, the time is after the criminal statement unit and the date.

Q.   So before you even get to the identification --

A.   Yes.

Q.   -- that date -- that time and date is already on there?

A.   Yes.

Q.   And then when you put the conclusion time, that's after the signature is -- the signature is affixed and the witness signatures are put in there; is that right?

A.   That would be before.  It's when I'm done typing up the statement.

Q.   So those lines are blank?

A.   Yes.

Q.   And then the signing process is not included in the overall time; is that right?

A.   Correct.

Q.   Do you have any reason why this statement took almost



JEROLD ENGLEHART                                       December 11, 2015
JACKSON v. CITY OF CLEVELAND                                         67

an hour, close to an hour, being only one page?

MR. FUNK:  Objection.

A.    No, I don't.

Q.    You would agree with me that there aren't that many questions and not that many answers, and it's pretty -- it's all included in one page?

MR. FUNK:  Objection.

A.    Yes.

Q.    Right?

    If you look at the last question, have you read the above statement and is it the truth, what is the answer there?  Can you --

A.    Yes.

Q.    That's a yes?

A.    Yes.

Q.    You could tell that that's a yes?  I can't -- I don't know.  It looks like there's an L in there.  There's an I in there.

A.    That's a y-e-s.

Q.    Well, you see there's a dot over a ridge there?

A.    Well, there's break-ups in the whole thing there, and this particular copy, there's breakups in there, and that looks like the top of the Y as far as I can -- I can see Y, E and S.

Q.    Looks like there's one, two, three, four, five



characters in that.

                    MR. FUNK:  Objection.

A.   I don't see that.

Q.   So if you'll also look at a question where it says, how long have you known Buddy and Ricky Jackson, do you see that there?

A.   Yes.

Q.   Would you agree with me that that question would require an answer that talks about a time frame?

                    MR. FUNK:  Objection.

Q.   Based on your years of experience of typing down questions and answers and your educational background, and assuming that you are literate, when it says, how long have you known somebody, that requires an answer of a time frame, right?

A.   I would -- some time, some -- yes.

Q.   Yet, that paragraph goes into a whole lot of other information, does it not?

A.   Yes.

                    MR. FUNK:  Objection.

Q.   Do you know -- so what you're saying is in answer to that question, the witness went on and answered other -- gave other information than was required by the question?

                    MR. FUNK:  Objection.



JEROLD ENGLEHART                               December 11, 2015
JACKSON v. CITY OF CLEVELAND                                69

Q.   Would you agree with me?

A.   Well, he's explaining how he knew them for those --
how he could know them for the three years or so, his
involvement with him.

Q.   And no one asked him that question?

A.   Well, how long have you known him, and he says three
years.

Q.   But then he gives more information, right?

A.   Yeah.  And how he knew him, yeah.

Q.   And based on the way you drafted this thing --

A.   Yeah.

                    MR. FUNK:  Objection.

Q.   -- no detective asked him about being -- that he
didn't know them being -- and never had any trouble
with them, about last names, about cousins or
brothers or any of that.  According to that question,
that was never asked, correct?

                    MR. FUNK:  Objection.

A.   It doesn't look that way.

Q.   So from this, a 12-year-old boy could take a simple
question about how many years he's known somebody and
go into an extended answer with much more
information?

                    MR. FUNK:  Objection.

Q.   Right?



JEROLD ENGLEHART                                    December 11, 2015
JACKSON v. CITY OF CLEVELAND                                      70

A.    Uh-huh.

Q.    Okay.

A.    Yes.

            MR. GILBERT:  I have no further
      questions at this time.

            MS. WANG:  I just have a couple, going
      back to your employment with the CPD.

            MR. GILBERT:  One second.  You got to
      have the --

                        - - -

      RE-EXAMINATION OF JEROLD ENGLEHART

BY MS. WANG:

Q.    I didn't quite finish --

            MR. FUNK:  I'll allow a limited amount
      of -- I don't want you guys going back and
      forth forever.  Go ahead.

Q.    I just have some additional follow-up about your
      employment with the CPD because I didn't quite finish
      the background stuff.

      So you told me about where you worked after
      being in the criminal statement unit.  And then after
      that, where -- what other division did you go to in
      the CPD?

            MR. FUNK:  I think this was asked and
      answered, but go ahead.  If you're looking



          for clarification --

A.   The statement unit -- after I was a detective in the statement unit, I got promoted to sergeant.  I worked in the general duty of the detective bureau for a few months.  Then I was moved back to the hotel and checks, fraud unit, whatever you want to call it, every combination of names, and then I became in charge of that for quite awhile.

     And then after that, I was -- went over to the -- they changed things around and I went to the major offense bureau for the detectives, when they send all the detectives out to the districts instead of having them all centralized.  I was a sergeant in the major offense bureau.  After that -- I don't remember how long that was.  After that, I went out to the First District for a couple years, and then I ended up in the Second District as a sergeant.  First and then a sergeant in the Second District for a couple years.  That's when I retired in '92.

Q.   So that takes you to your retirement in '92?

A.   Yes.

Q.   You said you typed statements up on an electronic typewriter?

A.   Yes.

Q.   Did the other detectives who were not in the



statement unit have access to the typewriters?

A.    No.

Q.    So if a detective wanted to type something up, he would have to go to the criminal statement unit to do it?

A.    Yes.  At that time, that's what they did.

Q.    How would the detectives type up their form tens if they didn't have access to a typewriter?

A.    Not our electric typewriters, no.  They had their own typewriters.

Q.    Okay.  So there were typewriters available for the other detectives?

A.    Yeah, in the detective bureau.

                    MS. WANG:  I have no further
              questions.

                    MR. MALLAMAD:  I have no questions.

                    MR. FUNK:  We will review.

                              - - -

              (Deposition concluded at 11:33 a.m.)

                              - - -



SIGNATURE OF DEPONENT

I, the undersigned, JEROLD ENGLEHART, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

PAGE    LINE    CORRECTION          REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____   NO CHANGES

SIGNATURE:

_____     DATE:_____
JEROLD ENGLEHART



CERTIFICATE

State of Ohio,                )
                              )
County of Ashtabula.          )

        I, Makenzie J. Koman, a Notary Public within and for the State of Ohio, do hereby certify that JEROLD ENGLEHART was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth, and that the above deposition was recorded stenographically by me and reduced to typewriting by me.

        I FURTHER CERTIFY that the foregoing transcript of the said deposition is a true and correct transcript of the testimony given by the said witness at the time and place specified hereinbefore.

        I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

        IN WITNESS WHEREOF, I have hereunto set my hand seal of office at Cleveland, Ohio on this 29th day of December, 2015.


        _____
        Makenzie Koman

        Notary Public in and for the State of Ohio

        My Commission Expires September 19, 2018

