Case: 1:15-cv-00989-CAB  Doc #: 114-29  Filed: 03/01/17  1 of 134.  PageID #: 5322

DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                          1

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OHIO, EASTERN DIVISION


RICKY JACKSON,

            Plaintiff,
                                    JUDGE BOYKO
    -vs-                             CASE NO.1:15-CV-989


CITY OF CLEVELAND, et al,

            Defendants.

KWAME AJAMU & WILEY BRIDGEMAN,

            Plaintiffs,
                                    JUDGE BOYKO
    -VS-                             CASE NO.1:15-CV-1320


CITY OF CLEVELAND, et al,

            Defendants.

                    - - - -

    Videotaped deposition of DOMINIC J. DEL BALSO taken as if upon examination before Chana Margareten, a Notary Public within and for the State of Ohio, at Friedman & Gilbert, 55 Public Square, Suite 1055, Cleveland, Ohio 44113, at 9:35 a.m., on Tuesday, December 2, 2015, pursuant to notice and/or stipulations of counsel, on behalf of the Plaintiffs.

                    - - - -



EXHIBIT 29

APPEARANCES:

    Elizabeth Wang, Esq.
    Loevy & Loevy
    311 North Aberdeen, 3rd Floor
    Chicago IL 60607
    (720) 638-0924

    Terry H. Gilbert, Esq.
    Jacqueline Greene, Esq.
    David Mills, Esq.
    Friedman & Gilbert
    55 Public Square, Suite 1055
    Cleveland, Ohio 44113
    (216) 241-1430

      On behalf of the Plaintiffs;

    Stephen W. Funk, Esq.
    Roetzel & Andress
    1375 East Ninth Street
    One Cleveland Center, 10th Floor
    Cleveland, Ohio 44114
    (216) 623-0150

    Shawn M. Mallamad, Esq.
    615 West Superior Avenue
    Cleveland, Ohio 44113
    (216) 774-5610

      On behalf of the Defendants,

    Edmund W. Searby, Esq.

    Baker Hostetler

    127 Public Square, Suite 2000

    Cleveland, Ohio 44114

    (216) 621-0200

      On behalf of the witness.



DOMINIC J. DEL BALSO                              December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                      3

          INDEX

EXAMINATION

DOMINIC J. DEL BALSO

BY MS. WANG                                       5

EXAMINATION

DOMINIC J. DEL BALSO

BY MR. GILBERT                                    86

EXAMINATION

DOMINIC J. DEL BALSO

BY MR. FUNK                                       94

RE-EXAMINATION

DOMINIC J. DEL BALSO

BY MS. WANG                                       124



DOMINIC J. DEL BALSO                                December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                       4

THE VIDEOGRAPHER:  This is tape number one to the videotaped deposition of Dominic J. Del Balso, in the matter of Ricky Jackson V. City of Columbus, and Kwame Ajamu and Wiley Bridgeman V. The City of Cleveland -- I'm sorry, I said Columbus -- being heard before the U.S. District Court for the Northern District of Ohio, Eastern Division, Case Number 1:15-CV-989 and 1:15-CV-1320.

This deposition is being held at 55 Public Square, Cleveland, Ohio, on December 2, 2015, and the time is 9:35.

My name is Joshua Scott, and I'm the videographer.  The court reporter is Chana Margareten.  Counsel, will you please introduce yourself and affiliations, and the witness will be sworn.

MS. WANG:  I'm Elizabeth Wang, that's W-a-n-g, attorney for Ricky Jackson.

MR. GILBERT:  Terry Gilbert, attorney for Wiley Bridgeman and Kwame Ajamu.

MS. GREENE:  Jacqueline Greene, attorney for Kwame Ajamu and Wiley



Bridgeman.

MR. MILLS:  David Mills, attorney for Kwame Ajamu and Wiley Bridgeman.

MR. MALLAMAD:  Shawn Mallamad, attorney for the City of Cleveland.

MR. FUNK:  Stephen Funk, attorney for all of the defendants except for the City of Cleveland.

MR. SEARBY:  Edmund Searby, Baker Hostetler, for the witness.

DOMINIC J. DEL BALSO, of lawful age, called by the Plaintiff for the purpose of Examination as provided by the Ohio Rules of Civil Procedure, being by me first duly sworn, as hereinafter certified, deposed and says as follows:

- - - -

EXAMINATION OF DOMINIC J. DEL BALSO
BY MS. WANG:

Q.  Could you please state your name and spell it for the record?

A.  Dominic J. Del Balso.  D-o-m-i-n-i-c, J for Joseph, D-e-l B-a-l-s-o.

Q.  Have you ever given -- been a witness in a deposition before?

A.  No.



Q. So just -- I'll just cover some basic ground rules regarding questions during depositions. As you could see, we are here to ask you some questions relating to the case of Ricky Jackson, Wiley Bridgeman, and Kwame Ajamu.

You should try to give verbal answers instead of shaking your head or going uh-huh or huh-uh, because then the court reporter can't take down your answers; is that fair?

A. (Shaking).

Q. You need to answer verbally.

A. Yes. Started off wrong.

Q. We could take a break at any time that you wish, except when a question is pending; is that fair?

A. Yes.

Q. Are you on any medications or anything today --

A. No.

Q. -- that would affect your ability to --

A. No.

Q. -- comprehend or answer questions?

A. No.

Q. If any of my questions don't make sense to you or you don't understand my question, please ask me for clarification, otherwise I will assume that you understood my questions; is that fair?



Case: 1:15-cv-00989-CAB  Doc #: 114-29  Filed:  03/01/17  7 of 134.  PageID #: 5328

DOMINIC J. DEL BALSO                                        December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                              7

A.   Yes.

Q.   Please allow me to finish asking my question before you begin your answer, so that the record is clear; is that fair?

A.   Yes.

Q.   All right.  Are you represented for purposes of this deposition?

A.   Yes, by Mr. Searby.

Q.   Okay.  And when did you retain Mr. Searby?

A.   I didn't retain him.  I had called the -- this office.  I spoke to you.  I wanted to know the name of the attorney that will be representing the City, and you provided me with a name, Funk I think it was, was it?

MR. SEARBY:  You were just asked when you retained me.

THE WITNESS:  Oh.

MR. WANG:  I'm sorry, is there an objection?

MR. SEARBY:  Yes, there is.

MS. WANG:  What's the objection?

MR. SEARBY:  He is not responding to your question.  I am asking him to --

MS. WANG:  Could you please just state --



MR. SEARBY: -- respond to your question.

MS. WANG:  Please do not give speaking objections during this deposition. If you have an ob --

MR. SEARBY:  Don't lecture me.

MR. WANG:  If you have an objection -- if you have an objection, please state your basis, and the basis, just as you would in court.

Q.  You're saying, I had a conversation with you prior to today, correct?

A.  Correct.

Q.  All right.  And you asked me -- what did we talk about during our conversation?

A.  The reason I called was to ask who was representing the City, so I didn't know if I was going to be represented during the deposition. You provided me with a couple of names.  I called those individuals, and they indicated that I should talk to Ned Searby, that he would be representing me during the deposition.

Q.  Who told you that you should get representation for this deposition today?

A.  Who told me?



Q. Yeah, who did you speak with that put you in touch with Mr. Searby?

A. Well, there was a fellow from the prosecutor's office, Hagaman, Hagman, Hamon.

Q. Hannan?

A. Hannan, that is it. He is the one.

Q. Okay. What conversation did you have with Mr. Hannan regarding your deposition here today?

A. I said I'm was subpoenaed to be deposed, and I wanted to know if I'm going to be represented. He said, yes.

MR. SEARBY: I will object, and instruct you not to answer at this point.

THE WITNESS: Okay.

Q. Was Mr. Hannan your attorney?

A. No.

Q. Okay. Could you please answer my question?

MR. SEARBY: Hang on, I think you called -- he called for legal advice. He may not be clear, but he was seeking legal advice.

Q. I'm sorry, did you understand my question when I asked you whether Mr. Hannan was your attorney?

A. And I said, no.

Q. He was not your attorney?



A.  No.

Q.  Okay.  Was he providing you legal advice when you asked him if you would be represented for purposes of today's deposition?

A.  I wouldn't consider it legal advice.

Q.  Okay.  You have an attorney, right?

A.  Right.  I just wanted a name.

Q.  Sure.  All right.  So did Mr. Hannan provide you with the name of Mr. Searby?

A.  I believe he did.

Q.  Did you speak with Mr. Funk, Stephen Funk?

A.  Yes.

Q.  When did you speak with Mr. Funk?

A.  Not long ago.  A week ago, maybe.

Q.  And what did you discuss with him in that conversation?

A.  Who is going -- if I was going to be represented during the deposition, that's all.

Q.  And what did he say to you?

A.  I don't recall what he said.

Q.  Okay.  Did he provide you with the name of Mr. Searby?

A.  He might have.

Q.  Did you speak with Mr. Mallamad?

A.  No.



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
11

Q.  Shawn Mallamad?

A.  No.

Q.  Okay.  Have you ever met him before?

A.  No.

Q.  Have you ever met Mr. Funk before, in person?

A.  No.

Q.  Had you ever met Mr. Searby before today?

A.  No. Well before today, yesterday.

Q.  Did you meet with Mr. Searby before yesterday?

A.  No.

Q.  Did you speak with Mr. Searby before yesterday?

A.  No.

Q.  How long did you meet with Mr. Searby yesterday?

A.  About an hour-and-a-half.

Q.  Was it in person?

A.  In person.

Q.  Did you review any documents during your meeting with Mr. Searby?

A.  No.

Q.  Do you know whether Mr. Searby is being paid today by the City of Cleveland to represent you for purposes of your deposition?

A.  No idea.

Q.  Do you know if Mr. Searby is being paid at all in order to be here today?



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

MR. SEARBY: If any of the questions she asks you, if you should answer --

Q. I'm sorry, did you understand my question --

MR. SEARBY: No, hang on. I'm going to --

MS. WANG: Do you have an objection?

MR. SEARBY: Yes, I do. I'm going to protect the attorney/client privilege.

MS. WANG: Okay. I have not asked him any questions --

MR. SEARBY: No, stop interrupting me.

MS. WANG: I have not -- you are not to --

MR. SEARBY: Be quiet.

MS. WANG: You are not --

MR. GILBERT: Hey, hey, let's calm down here. Go off the record. Go off the record right now, and let's get this thing straightened out.

THE VIDEOGRAPHER: We are off the record at 9:41.

- - - -



(Thereupon, a recess was had.)

- - - -

THE VIDEOGRAPHER:  We are back on the record at 9:45.

Q.  Mr. Del Balso, do you know if Mr. Searby is being paid to represent you today in this deposition?

A.  No.

MR. SEARBY:  Answer the question only from non-privileged conversations.

A.  No.

Q.  Okay.  How long was your -- how long did your conversation with Mr. Funk last?

A.  Approximately an hour-and-a-half.

Q.  Oh, Mr. Funk?

A.  Oh, no.  I'm sorry, Mr. Funk, a couple of minutes.

Q.  Did you meet with Mr. Searby at all, other than yesterday?

A.  No.

Q.  Did you meet with any other attorney in preparation for your deposition here today?

A.  No.

Q.  Did you speak with anybody else besides Mr. Funk, myself, and Mr. Searby, and Mr. Hannan regarding your deposition here today?



A.  No.

Q.  Okay.  Have you reviewed any documentary material
    at all prior to your deposition here today?

A.  No.

Q.  Did you do anything to prepare for your
    deposition today besides meeting with Mr. Searby?

A.  No.

Q.  You are an attorney; is that right?

A.  Yes.

Q.  You were an attorney with the Cuyahoga County
    Prosecutor's office?

A.  Yes.

Q.  How long did you work in that office?

A.  30 years.

Q.  From what dates to what dates --  what dates?

A.  Started October 22, 1973, and I left the office
    August 30, 2002; two months shy of 30 years.

Q.  Okay.  When did you graduate from law school?

A.  Probably '71, 1971.

Q.  Where did you go to law school?

A.  Cleveland State, John Marshall at the time.

Q.  It's called John Marshall at the time?

A.  Yes.

Q.  And between 1971 and 1973, did you have legal
    employment?



A.  Yes, I worked.  Yeah.

Q.  Where did you work?

A.  I worked for the Cuyahoga County Welfare
Department.  I was assigned to the juvenile
court, in the non-support division.

Q.  In the juvenile division, you said?

A.  In the juvenile court building.

Q.  What was your title then?

A.  Just attorney.

Q.  What kind of cases did you litigate?

A.  Non-support.

Q.  Like child support?

A.  Yes.

Q.  Those were civil matters?

A.  Yes.

Q.  And then --

A.  They could be criminal, too.

Q.  Okay.  But the work that you were doing, was that
civil?

A.  Well, you would present criminal, I guess.  I
never thought about it.

Q.  Okay.  And, then, did you go directly from that
position to the Cuyahoga County Prosecutor's
Office?

A.  Yes.



Q.  Okay.  And what was your title -- what was your title when you first started?

A.  Assistant county prosecutor.

Q.  What kind of cases did you prosecute in the beginning?

A.  In the beginning, they were more low file -- or low profile cases.  Nothing real serious; thefts and cases like that.

Q.  Misdemeanors or --

A.  No, we don't do misdemeanors.

Q.  Okay.  You mean the prosecutor's office does not do misdemeanors?

A.  No, not the county prosecutor's office.

Q.  And were you assigned to a particular courtroom or how were your cases assigned to you?

A.  You were assigned to a -- various courtrooms, usually lasting three months, along with a lead prosecutor and one or two other assistants.

Q.  Besides theft, what other kinds of cases do you recall prosecuting in the beginning of your career?

A.  Assault, robbery, burglary, fraud.

Q.  How long did you work on those kinds of cases before you were promoted or moved up in terms of your responsibilities?



A.  Several years.

Q.  From approximately '73 through -- could you estimate?

A.  Maybe two years.  I don't know.

Q.  At the time, do you recall prosecuting Ricky Jackson?

A.  Yes.

Q.  Okay.  And do you recall what kinds of cases you had prosecuted during the time -- you know, at the time that you were assigned the Ricky Jackson case, what kinds of cases were you working on then?

A.  Same.  Robbery, burglary, auto theft, grand theft.

Q.  Had you prosecuted a homicide case before?

A.  No.

Q.  Was Ricky Jackson's case the first homicide case you had?

A.  Yes, it was.

Q.  Had you ever prosecuted any death penalty cases before?

A.  No.

Q.  So Ricky Jackson's case was the first death penalty case you had?

A.  Yes.



Case: 1:15-cv-00989-CAB  Doc #: 114-29  Filed:  03/01/17  18 of 134.  PageID #: 5339

DOMINIC J. DEL BALSO                                        December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                              18

Q. Who made the decision to seek the death penalty in Ricky Jackson's case?

A. Who made the decision?

Q. Do you know?

A. Well, it was indicted as a death penalty case, so the office would have made that determination, not me.

Q. Do you know who in the office?

A. At that time, no.  I don't know who the grand jury prosecutor was.  I don't recall.

Q. Okay.  By the way, were you ever in the military?

A. No.

Q. Do you recall how you were assigned Ricky Jackson's case?

A. No.  Whoever makes the assignments -- oh, specifically that case?

Q. Yeah.

A. No, I don't recall.

Q. Okay.  Generally, how did you get your case assignments at that time?

A. Well, there is a sheet out, that you -- they hand you once a month.  You read the sheet, and you see what judge or judges you are assigned to, and what prosecutors you will be working with.

Q. Okay.  And that sheet also had information about



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
19

cases you would get or --

A.  No, just the judge's names and who you were working with.

Q.  Okay.  So you were assigned to a courtroom?

A.  Yeah, two courtrooms.

Q.  You had two courtrooms at the time?

A.  Yeah.

Q.  And then you would just prosecute whatever cases came through that courtroom?

A.  Yeah, usually there was a lead prosecutor.  He might assign different cases to those working under him.

Q.  In May of 1975, were you -- at the time that you were prosecuting Ricky Jackson's case, were you the lead prosecutor in that courtroom?

A.  I don't recall.

Q.  Do you recall working with another prosecutor named James Sweeney?

A.  Yes, but that wasn't the Ricky Jackson case.

Q.  That was Wiley Bridgeman -- was that in Wiley Bridgeman's case?

A.  I believe so.

Q.  Did you ever work with Charles Masey?

A.  I believe I did.

Q.  Did you ever work with him on either Ricky



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
20

Jackson or -- I'm sorry.  Strike that.  Did you ever work with him on Wiley Bridgeman or Ronnie Bridgeman's cases?

A.  I don't recall.

Q.  Have you ever held an elected office?

A.  No.

Q.  Since 2002, have you been retired?

A.  I worked five years as a per diem magistrate at juvenile court for five years.

Q.  Okay.  And what were your responsibilities there?

A.  It was a number of responsibilities.  You worked juvenile traffic.  Sometimes you would try cases involving juvenile offenses.  Also, paternity situations.  There was a drug court you would work.  About seven different assignments.  You worked the arraignment room.  A little bit of everything.

Q.  Okay.  And then that was until about 2007?

A.  I think I -- the first year, I didn't do anything.  I did not work at all.  Then the following year, I think is when I started with the -- as interim magistrate.

Q.  After that, did you work at all as an attorney?

A.  No.

Q.  Have you been enjoying your retirement?



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
21

A.  Very much so.

Q.  I would like to discuss with you whether you were aware of your obligation as a prosecutor to disclose exculpatory evidence under Brady.  Are you aware of that obligation?

A.  Certainly.

Q.  Were you aware of it in May of 1975?

A.  Definitely.

Q.  And would it be fair to say that you were familiar with the cases that were also dealing with the prosecutor's obligations to disclose exculpatory evidence under Brady such as Giglio?

A.  Yes.

Q.  Giglio was decided in 1972?

A.  Yeah.

Q.  Okay.  And you were familiar with those cases back in 1975?

A.  I would assume so.

Q.  How did you fulfill your Brady obligation as a prosecutor back in 1975?

A.  Well, whenever you're assigned a case, they give you a discovery sheet.  This you send to the defense counsel when they file a motion for discovery.  At the top of that sheet, you list the names of all of the witnesses you intend to



call.

Also, on that sheet it indicates whether or not the defendant made any written or oral statements.  If they have, you would Xerox those and forward them to the counsel.  And at the bottom of the statement, there is a part whether or not there is any exculpatory evidence that you find in a file.  And if there is, you are supposed to disclose that to the counsel.

Q.  Okay.  Let me just try to under -- at the bottom of the -- the statement?

A.  At the bottom of the sheet, the discovery sheet, there is a specific question, is there any exculpatory evidence present in the case, you would answer yes or no.

Q.  And this was true in 1975?

A.  Yes.

Q.  Okay.  Who created the discovery sheet?

A.  I have no idea.  It was in existence before I was there.

Q.  Okay.  Who put -- who was responsibile generally for putting information on that discovery sheet?

A.  I would be.

Q.  Okay.

A.  It would be my case, so I'd have to read the file



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
23

and fill out the discovery. We would also file a motion on discovery on our own to defense attorneys.

Q. You would seek discovery from them, they would seek discovery from you?

A. Correct.

Q. Okay. So how would you go about putting on the discovery sheet what evidence you thought might be exculpatory?

A. Probably wouldn't put it on the discovery sheet. I'm not certain, but you would discuss it when you're in pre-trials.

Q. Discuss it with?

A. The attorneys representing the defendant.

Q. Okay. You would inform them at that time?

A. Yes.

Q. And how would you get police reports and other documents from the police officers?

A. When we are assigned a case to be tried or pled out, they give us all of the police reports, and my job is to go through them and read the reports.

Q. In May of 1975, what was the process for you to receive documents, such as police reports or witness statements from the police department?



A.  I'd just be handed a file and stick it on my desk.

Q.  Handed a file by whom?

A.  Whoever hands out files.

Q.  I'm --

A.  Usually they are secretaries, you know what I'm saying?

Q.  Okay.  I'm just trying to understand the mechanics of how the police reports and other documents the police have might get from their possession --

A.  Yeah.

Q.  -- to your possession?

A.  Well, they give it to the prosecutor's office. If I'm assigned a case, probably one of the girls in the prosecutor's office would pull that file and put it on my desk.

Q.  Okay.  Did you rely on the police to give all of the witness statements, documents, and other police reports in a case?

A.  Yes.

Q.  Okay.

                MR. FUNK:  Objection.

                MR. WANG:  What's the basis?

                MR. FUNK:  It's overly broad.  Go



ahead.

Q.  Did you rely on the police to give you any exculpatory evidence that was in their possession?

MR. SEARBY:  Objection to form.

A.  It would be in the file.

Q.  That the police gave you?

A.  I read the file, and I -- there was exculpatory evidence in the file, and that's how I would be aware of it.

Q.  Right.  I'm just saying, if the police decided not to give you a piece of exculpatory evidence that was in their possession, but not your possession, you wouldn't know about it; is that right?

MR. FUNK:  Objection.

MR. SEARBY:  I'll join.

A.  Do you mean like, do I beat my wife?

Q.  No. I'm just saying, if you relied on the police to give you information that was in their possession, right?

A.  Yes.

MR. FUNK:  Objection.

Q.  Okay.  And they decided not to give you a piece of information that was exculpatory, you would



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
26

not have any way of knowing that?

MR. FUNK:  Objection.

MR. SEARBY:  Objection to form.

A.  That's obvious.

Q.  Yes?

A.  Yes.

Q.  Okay.  Were you aware of any exculpatory evidence in Ricky Jackson's case at the time you prosecuted him?

A.  Yes, I believe there was exculpatory evidence.

Q.  What exculpatory evidence?

A.  I don't recall what it was, but I think there was some exculpatory evidence.

Q.  You don't recall what it was?

A.  No.

Q.  Were you aware that -- in 1975, at the time that you prosecuted Ricky Jackson, were you aware that the police had threatened Eddie Vernon?

MR. FUNK:  Objection.

MR. SEARBY:  Objection to the lack of --

A.  You are assuming that they threatened him.

Q.  I'm just asking:  Were you aware of any threats against Eddie Vernon at the time of your prosecuting Ricky Jackson?



A.   None at all, no.

Q.   Okay.  Were you aware that the -- what was your -- in May of 1975, what was your understanding of what Eddie Vernon's statement was?

            MR. FUNK:  Objection.

A.   Basically he was at the location where the crime occurred, and he had witnessed the crime.

Q.   And how did you learn that information?

A.   It was in the police file.

Q.   It was in the police report?

A.   Yeah.

Q.   Did you speak with Eddie Vernon at any time between the date of the murder of Harold Franks on May 19, 1975 until charges were brought on May 28, 1975?

A.   No.

Q.   When did you first speak with Eddie Vernon?

A.   When I received the file and was told that I was to try the case at that time.

Q.   Do you recall approximately how long after the crime occurred that was?

A.   No.

Q.   Do you know how long before trial that was?

A.   Not really, no.

Q.   Do you recall how long you had the materials to



prepare for Ricky Jackson's trial, which occurred in July and August of 1975?

A.  I had a good amount of time.

Q.  Were you -- at the time that you prosecuted Ricky Jackson, were you aware that Edward Vernon had told the police that he did not, in fact, witness the crime?

MR. FUNK; objection.  Assumes facts not in evidence.

A.  No.

Q.  If you had known that the police had made threats against Eddie Vernon, and told him that they would take his parents to jail if he did not testify falsely against Ricky Jackson, would you have stopped the prosecution?

MR. FUNK:  Objection.

A.  I would have gone to John T. Corrigan, my boss, and told him that's what I was told, and let him deal with it at that point.

Q.  Would you have disclosed that information to the defense attorneys or to the judge?

MR. FUNK:  Objection.

A.  I would disclose it to my boss, John T. Corrigan.

Q.  Would -- do you believe that you would have recommended to John T. Corrigan that the



prosecution should be stopped at that point?

MR. FUNK: Objection.

A. Of course.

Q. And why?

A. Why? I don't believe in prosecuting innocent people. There is no justice.

Q. At the time that you first got Ricky -- were assigned Ricky Jackson's case to prosecute, would it be fair to say that the charges had been filed at that point?

A. When I received, oh, yeah, he was indicted, charges filed. I don't get the file until it's all set to go to pre-trial.

Q. Do you know who or remember who handled the charges against -- who brought the charges initially against Ricky Jackson?

A. No.

Q. Okay. Who was responsibile generally for bringing a case to a grand jury at that time?

A. They have different grand jury prosecutors on a rotating basis.

Q. Do you remember the names of any of them?

A. It was 40 years ago, no.

Q. And did you ever hold that position? Were you ever a grand jury prosecutor?



A.   No.

Q.   Are you familiar with what their duties or responsibilities were?

A.   Vaguely.

Q.   Okay.  What is your understanding of what their responsibilities were?

A.   Go before the grand jury, present whatever is available to the grand jury, let them decide if they will be charged or not charged, bail or no bail.

Q.   Okay.  I am handing you what has been marked as Plaintiff's Exhibit 1.

          MS. WANG:  I didn't bring enough.

Q.   This is a copy of police reports that were in the Cuyahoga County Prosecutor's Office, that office's possession, which were recently subpoenaed.

     And I would like to ask you a general question, and then some specific questions.  But my general question is:  Where would the police reports that you would have received from the Cleveland Police Department be kept, in your office or in the prosecutor's office?

A.   File cabinet.

Q.   And did you receive police reports as they were



created or --

A. Normally not.  Usually the investigation is pretty much completed when I receive them.

Q. Okay.

MR. SEARBY:  Excuse me for one second.  Is the witness loud enough for the video?

THE VIDEOGRAPHER:  Um-hmm.

MR. SEARBY:  Okay.

Q. If other reports were created after you initially got the file, how would you get those reports?

A. The police would give them to me, the detectives.

Q. The detectives would give them to you?

A. Yeah.

Q. If we could turn to, there is some very tiny numbers on the bottom, but -- actually there are some bigger numbers.  If you could turn to about a third of the way through, there is a document Jackson009201.

A. What page is this?

Q. 9201.

MR. SEARBY:  I could show him, 9201.  On the bottom, you see the numbers?

THE WITNESS:  Yeah.

MR. SEARBY:  She's directing you



to 9201.

Q. Okay.  So this is a police report that has the names of Detectives J. Staimpel and F. Stoiker at the bottom, the date at the top.

                MR. FUNK:  What number again?

                MS. WANG:  9201.

Q. Okay.  This is Jackson009201, the date at the top is 5/28/75, and the names of the investigating offices typed at the bottom are Detectives J. Staimpel and F. Stoiker.

   In the narrative section of this report it states that this date, 5/28/75, while assigned to car 9237, further investigated the above crime and spoke with the City prosecutor, A. Johnson who issued papers charging the two arrested males with aggravated murder and felonious assault. Charged with the above crime, Ricky Jackson and Wiley Bridgeman.  They are to appear in court nine a.m., 5/29/75.

   Now my question to you is:  Do you recall working with a police prosecutor named Almeta Johnson?

A. I know Almeta very well.  She is now deceased. But I didn't really work with her.  I knew her, went to law school with her.  And she was a



police prosecutor.  I knew her in that position.

Q.  Okay.  And so was she a City employee or County employee?

A.  I believe she was a City.

Q.  Okay.  And how -- what -- how did you know her?

A.  Went to law school with her.

Q.  Okay.  But did you work with her in your capacity as --

A.  Not at all.

Q.  Okay.  And you -- when the police report says that she issued papers, Johnson issued papers charging the two arrested males with aggravated murder and felonious assault, do you know -- do you understand what that means that she issued papers?

A.  Right.

Q.  What does that mean?

A.  Apparently, she had enough to feel she should charge them with these offenses.

Q.  Okay.  And so what forms would the charges take?  Was that a -- my question is:  Was that a decision to bring it to the grand jury or --

A.  I would assume that.

Q.  Okay.  So -- and I'm just trying to understand how the grand jury worked.  So was it somebody --



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
34

what was her role relative to bringing something to the grand jury, as opposed to somebody in your office?

A. Well, sometimes the cases go through the police prosecutor.  The City prosecutors, they only handle misdemeanors.  If there is any felonies, they won't deal with it.  So my charge here is brought to our office's attention, and then we would bring it to the grand jury to see if they are going to indict or not.

Q. Okay.  And do you recall how many different grand jury prosecutors there were in around May 1975?

A. They sometimes had several grand juries going at the same time, and there were a couple.  I never worked grand jury.  It was an alternating position.

Q. Okay.  Is it your understanding that in order for Almeta Johnson to issue papers charging Ricky Jackson and Wiley Bridgeman with aggravated murder and felonious assault, she would have been presented evidence by the detectives?

MR. FUNK:  Objection.

A. She would have to have something in order to bring the charges.  I don't know what that would be, but --



DOMINIC J. DEL BALSO                          December 02, 2015
JACKSON vs. CITY OF CLEVELAND                              35

Q.  Do you know whether or not the police prosecution ever investigated cases on their own?

A.  Not to my knowledge.

Q.  Is it your understanding that they would rely on the information brought to them by detectives --

          MR. FUNK:  Objection.

Q.  -- in order to decide whether to charge?

          MR. SEARBY:  Objection.  Calls for speculation.

A.  I have no idea.

Q.  If you turn to Jackson009212.

          MR. SEARBY:  Turn to the one that ends in 212.

          THE WITNESS:  What numbers are you looking at?

          MR. SEARBY:  These ones at the bottom.

Q.  Okay.  This is a police report that's signed by John Staimpel at the bottom --

          MR. FUNK:  Which number are you on?

          MR. WANG:  Huh?

          MR. FUNK:  Which number are you on?

          MR. WANG:  9212.



Q.   This is the police report that's signed by
     Detective John Staimpel at the bottom.  And at
     the top it's dated May 24, 1975.  And in the
     narrative section it states, this date, 5/24/75,
     while assigned to car 9237 in company with
     Detective Sergeant Comodeca and Detective Stoiker
     further investigated the above crime.  Consulted
     with Chief Police Prosecutor Almeta Johnson.  And
     after relating the facts to her, she stated that
     there was not enough grounds to issue a search
     warrant.

          What's your understanding of what the police
     prosecuting role was in deciding whether to issue
     a search warrant?

A.   If it's her job to issue, it's her job to issue.

Q.   I guess my question is:  What was her role, as a
     police prosecutor -- did your office ever do
     that?

A.   What?

Q.   Decide -- get evidence -- did you --

A.   Well, we get --

Q.   -- approve search warrants?

                    MR. SEARBY:  Allow Ms. Wang to
          finish the question.

                    THE WITNESS:  Okay.



DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                          37

Q.  Did you ever approve search warrants?

A.  Yes, if we needed a search warrant, we would get the information.  There was a form to fill out.  And you would present it to the judge.  He would read through it, and if he thought there was sufficient facts to warrant a issue of a warrant, he would do that.

Q.  Okay.  And did you ever work with Almeta Johnson in any capacity at all?

A.  Just tried a couple of cases against her.

Q.  Oh, you tried cases against her?

A.  It wasn't pleasant.

Q.  Was she on the defense side?

A.  Yes.

Q.  And that was when you were a prosecutor?

A.  Yes.

Q.  Did you have an opinion of her as an attorney?

A.  She was a good attorney, very thorough.

Q.  Would you describe her as an ethical attorney?

A.  A what?

Q.  Ethical attorney.

A.  I assume she was.

Q.  Okay.  Are you aware of any instance where any prosecutor in your -- any prosecutor in your office has withheld exculpatory evidence or



impeachment material from the defense?

A.  No, I'm not.

Q.  And have you ever in your career withheld any exculpatory evidence or impeachment material from the defense?

A.  Never.

Q.  The discovery sheet that you described earlier, was that kept somewhere?

A.  It was kept in the file.

Q.  In the prosecutor's office file?

A.  Yeah, it would be part of the file.  All motions or whatever are kept in the file.

Q.  Okay.  Would a copy of it ever been kept with the court file?

A.  I don't know.

Q.  Do you know anything about your office's retention policies?

A.  No.

Q.  At the time that you were -- well, let me ask you this way:  Was there a discovery sheet in Ricky Jackson's case?

A.  Yes.

Q.  How about Wiley Bridgeman's case?

A.  Yes.

Q.  Do you know if there was one in Ronnie



Bridgeman's case?

A.  I didn't --

Q.  You didn't prosecute Ronnie Bridgeman?

A.  I didn't prosecute him.

Q.  Just to be clear, sorry, you didn't prosecute Ronnie Bridgeman?

A.  No.

Q.  Okay.  At the time that you were finished with Ricky Jackson's prosecution, would the discovery sheet still have been in the file?

A.  It should have been.

Q.  Okay.  So it was not lost or destroyed at any time that you were on the case?

A.  Not that I'm aware of.

Q.  What about Wiley Bridgeman?

A.  Not that I'm aware of.

Q.  Were there any other documents besides the discovery sheets that you could think of that would have listed or described in that kind of form what exculpatory evidence there was in the prosecutor's file?

A.  Not that I'm aware of.

Q.  Do you recall if Ricky Jackson's attorney filed a motion for discovery in your case?

A.  Yes, he would have.



Case: 1:15-cv-00989-CAB  Doc #: 114-29  Filed:  03/01/17  40 of 134.  PageID #: 5361

DOMINIC J. DEL BALSO                                December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                     40

Q.  He did?

A.  He did.

Q.  And do you recall anything specific about it?

A.  Just a motion, piece of paper.

Q.  Okay.  And it would have asked for what discovery there was in the case?

A.  Yes.

Q.  And you would have turned over --

A.  Yes.

Q.  -- whatever evidence you had?

A.  We have the sheet, we go through the sheet, and provide the names, addresses, if there is any oral or written statements, we would indicate that.  We would give them a Xerox copy of that. If there was any exculpatory evidence, we would check the box.

Q.  Were you the primary attorney responsible for Ricky Jackson's case?

A.  Yes, I was.

Q.  Did you have a second chair?

A.  I don't remember.

Q.  When you worked on Wiley Bridgeman's case, were you more senior or less senior to James Sweeney?

A.  We were in the office at the same time, so I'm not sure who carried the bulk of the case, but we



Case: 1:15-cv-00989-CAB Doc #: 114-29 Filed: 03/01/17 41 of 134. PageID #: 5362

DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                          41

were equal in seniority and talent, considerable talent.

Q. When -- after Ricky Jackson's trial was over, do you recall what additional role you had in his case at all?

A. Just no additional role.

Q. There's some documents from his appeal that indicates your name was on the appellate brief. Do you recall briefing that?

A. Yes. If I lose a case, you are always going to appeal the decision. So I would have been notified, they would have sent me a copy of their brief, and then I would have to respond to it.

Q. Do you recall if Ricky Jackson filed a post-conviction petition back in the late '70s?

A. I don't recall.

Q. Do you recall anything about handling anything related to the post-conviction that he filed?

A. No.

Q. Would it be fair to say that your office had separate files than the police department files on homicide investigation?

A. I believe we did.

                    MS. WANG: Let's take a ten-minute
            break.



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
42

THE VIDEOGRAPHER:  We are off the record at 10:19.

- - - -

(Off the record.)

- - - -

THE VIDEOGRAPHER:  We are back on the record at 10:30.

Q. Earlier you mentioned you had met with Edward Vernon at some point prior to trial?

A. Prior to trial, yes.

Q. Do you recall how long prior to trial that was?

MR. SEARBY:  Objection.  Asked and answered.

A. No.

Q. How many times did you meet with Edward Vernon?

A. Probably four times.

Q. The first time you met with Edward Vernon, where did you meet?

A. I would always meet him in my office, at the prosecutor's office.

Q. So each of the four times you met with him was in your office?

A. Yes.

Q. The first -- just focusing on the first time that you met with Edward Vernon, was it just you and



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
43

him, or was there anybody else there?

A. There would be a -- a detective was there. Normally a detective would bring him into the office.

Q. So one of the detectives brought Edward Vernon to your office?

A. Yes.

Q. Do you know which detective that was?

A. Probably Gene Terpay.  He was the lead detective.

Q. And do you recall if there were any other detectives present for the first meeting that you had with Mr. Vernon besides Terpay?

A. No.

Q. Did Terpay usually have his partner with him --

A. No --

Q. -- James Farmer?

A. -- not that I recall.

Q. Do you recall James Farmer at all?

A. I remember who he was.

Q. Do you recall him being at any of the meetings with Edward Vernon?

A. I don't recall.

Q. Do you recall Detective John Staimpel?

A. I know who he was.

Q. Do you recall whether he ever brought Mr. Vernon



DOMINIC J. DEL BALSO                                December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                     44

          to your office?

A.   Not that I recall.

Q.   What about Frank Stoiker?  Do you remember
     Detective Frank Stoiker?

A.   Knew them all, but --

Q.   Did he ever bring Edward Vernon to your office?

A.   Not that I recall.

Q.   Okay.  So going back to that first meeting that
     you had with Edward Vernon, was there anybody
     else present besides yourself, Mr. Vernon, and
     Detective Terpay?

A.   I don't recall.

Q.   Okay.  Was one of Mr. Vernon's parents there?

A.   I don't recall.

Q.   How long did you meet with him?

A.   At least an hour.

Q.   Do you recall what you discussed with him?

A.   What he saw on the day in question, his testimony
     as to the identification of the parties
     responsibile.

Q.   Did you -- do remember any specific questions
     that you asked him?

A.   Why he was there, how he was there, how far away
     he was from the parties, lighting conditions, how
     long a point of time did he have to observe the



events, the time lapse, whether or not he was acquainted with any of the people.

Q. Do you recall Detective Terpay saying anything to Mr. Vernon during this meeting?

A. No.

Q. Did you ever ask Edward Vernon if he was scared?

A. I never did, no.

Q. Do you know if anybody else ever did?

A. Not aware.

Q. Did Edward Vernon seem scared when he was meeting with you?

A. No.

Q. And do you remember having any conversation with Detective Terpay about Eddie Vernon either before -- immediately before or after that meeting with Mr. Vernon?

A. Could you rephrase that?

Q. Do you recall having any conversations with Detective Terpay about Vernon either immediately before or after that meeting?

A. No.

Q. The second time that you met with Edward Vernon, how long after the first time was it?

A. I don't recall, to be honest with you.

Q. Was Detective Terpay there, too?



DOMINIC J. DEL BALSO                                December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                     46

A.   I assume he was.

Q.   Okay.  Did he bring -- did Detective Terpay bring
     Edward Vernon to your office?

A.   I believe so, yes.

Q.   How long did you meet the second time?

A.   At least an hour.

Q.   Okay.  Do you recall what you discussed during
     that second meeting?

A.   I went over basically the same facts to see
     whether or not there were any changes or
     inconsistencies from our first meeting, determine
     whether or not there were new facts that were
     brought to light during the first meeting.

Q.   Did Detective Terpay take any notes during that
     second meeting?

A.   I don't think so.

Q.   Did he take any notes during the first meeting?

A.   I don't recall that.

Q.   Do you recall there being any inconsistencies
     during your second meeting from what Mr. Vernon
     told you in the first meeting?

A.   I don't recall.

Q.   Okay.  Did you have all of the police reports --
     did you have the police reports in that -- sorry,
     strike that.  Did you have the police reports at



Case: 1:15-cv-00989-CAB  Doc #: 114-29  Filed:  03/01/17  47 of 134.  PageID #: 5368

that point?

A.   Yes.

Q.   Okay.  Do you recall receiving any police reports
     from the police after that date, the second
     meeting, with Mr. Vernon?

A.   I don't remember.

Q.   Okay.  The third meeting that you had with
     Mr. Vernon, how long after the second meeting was
     it?

A.   Probably an hour or more.

Q.   Actually going back to the second meeting for a
     minute, was one of Mr. Vernon's parents there?

A.   I don't recall.

Q.   Okay.

             MR. SEARBY:  Objection.  The
     answer was not responsive.  I'll move to
     strike it.

             MS. WANG:  He doesn't recall?

             MR. SEARBY:  No, the answer
     before, he misunderstood your question.  It
     was about the time issue.

             MS. WANG:  Oh, about the third
     meeting, we will get to that in a second.

Q.   Did you ever speak with Mr. Vernon's parents?

A.   No.



DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                         48

Q.  Did you ever try to call them?

A.  No.

Q.  Had you ever dealt with a 12 year-old witness
    before?

A.  Yes.

Q.  Prior to this case?

A.  Yes.

Q.  On how many occasions?

A.  I have no idea.

Q.  Why didn't you ever call Mr. Vernon's parents?

A.  Didn't feel it was necessary.

Q.  Why didn't you think it was necessary?

A.  Because it wasn't necessary.  They were welcome
    to come to my office, obviously.

Q.  Did you ever invite them to your office?

A.  No.

Q.  During your third meeting with Mr. Vernon, did
    Detective Terpay bring him to that meeting, as
    well?

A.  He got there somehow, so I assume he did.

Q.  Okay.  And Detective Terpay was present during
    the third meeting, as well?

A.  I believe so, yes.

Q.  Could you speak up a little bit?

A.  Okay.



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
49

Q. Thank you. Do you recall how long after the second meeting that the third meeting took place?

A. No.

Q. Okay. Do you recall approximately -- strike that. How long did your third meeting last?

A. Same amount of time, hour or more.

Q. Okay. And was there anyone present besides yourself, Mr. Vernon, and Detective Terpay?

A. Not that I'm aware of.

Q. What did you discuss with Mr. Vernon in that meeting?

A. His testimony.

Q. Did Detective Terpay say anything during that meeting?

A. Not that I recall.

Q. Were you preparing him for trial at that point?

A. He was always being prepared for trial.

Q. Okay. Was there ever a point where you were trying to determine whether Mr. Vernon was telling the truth?

A. Of course.

Q. And was that -- did that happen during any of these meetings, or was that --

A. First, second, and third. There are certain things I say to witnesses, and I said them to



Eddie.

Q.   What are those?

A.   I says, Eddie, all I want is the truth out of you.  There is only one version of the truth, Eddie, but there are many versions of lies, so if you tell the truth, you have nothing to worry about.

I tell my witnesses that if you testify to 100 things, and one of those things you testify is a lie, and they caught that lie, the jury might not believe all of the other things you said, so don't lie, because they will discredit some of your other testimony.  I says, I'm interested in prosecuting the right guy and not the wrong guy, so whatever you do, don't lie to me.

Q.   During your fourth meeting with Mr. Vernon, was Detective Terpay present, as well?

A.   I assume.

Q.   And did he bring Mr. Vernon to the meeting?

A.   I assume.

Q.   How long did that meeting last?

A.   Well, the last meeting would probably have been the date of the trial, you know, would have talked to him then, the date of the trial, so



probably not as long as the others.

Q. Do you recall anything specifically that you discussed with him at that meeting?

A. His testimony.

Q. Was a parent present for that meeting?

A. I don't recall.

Q. Did you have any other meetings with Mr. Vernon to prepare for any of the trials of the Bridgeman brothers or Ricky Jackson after those meetings?

A. I assume I would have talked to him when we tried Wiley Bridgeman.

Q. The second time?  I believe you were involved in the second trial.

A. Okay.  That would have been the time I would naturally have to go over his testimony, because it had been several years since he testified.

Q. Do you recall how many meetings you had with Mr. Vernon prior to Wiley Bridgeman's second trial?

A. Probably at least three.

Q. Was Detective Terpay present for those meetings, as well?

A. I assume he was.

Q. Do you recall how long those meetings were?

A. A hour or more.



DOMINIC J. DEL BALSO                                December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                      52

Q.   Were they in your office, also?

A.   Yes.

Q.   All three of them?

A.   Yes.

Q.   And detective -- did Detective Terpay bring
     Mr. Vernon to your office on those three
     occasions?

A.   I assume he did.

Q.   Was there a parent of Eddie Vernon's present
     during any of those meetings?

A.   The only other people would have been J.J.
     Sweeney.

Q.   Oh, James Sweeney?

A.   Right.

Q.   Do you recall if he was present at any of those
     meetings?

A.   He would be, yes.  He was trying the case.  We
     were trying it together.

Q.   Okay.  Do you recall anything specific that was
     discussed during any of those three meetings?

A.   His testimony.

Q.   Did you ever meet with Eddie Vernon alone without
     a detective?

A.   No.

Q.   Did you ever call Eddie Vernon on the telephone



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
53

to speak with him, just you and him?

A.  No.

Q.  Prior to -- or at any time during the prosecution of either the Bridgeman brothers or Mr. Jackson, did you ever go to the crime scene?

A.  Yes.

Q.  Okay.  Do you recall when, like before which trial?

A.  That would have been the first trial.

Q.  Before Ricky Jackson's trial?

A.  Yes.

Q.  Did you go there with anyone?

A.  Probably Gene Terpay took me.

Q.  Do you recall if there was any other detectives present?

A.  I don't recall.

Q.  Where did you go?  Do you recall?

A.  I think it was 102nd and something.  It was the corner -- corner building that the store was on. I'm not certain of the exact street.

Q.  Okay.  So you --

A.  Fairhill, I think it was.

Q.  So you went to where the store was?

A.  Yes.

Q.  The Fairmont Cut-Rite?



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
54

A.  Yeah.

Q.  Okay.  And what did you -- what did you look at while you were there?

A.  Just wanted to see the layout of the store, determine where Eddie was at the time he observed these events, the distance he would have been from the actual crime scene, that was why.

Q.  And how long did your observations at the scene last?

A.  15, 20 minutes.

Q.  Do you recall what discussion you had with Detective Terpay while you were there?

A.  Not really, no.

Q.  Did you ever go back to the scene again a second time?

A.  I don't believe so.

Q.  Do you recall speaking with any other witnesses prior to trial besides Mr. Vernon?

A.  Did I?

Q.  Yes.

A.  Certainly.

Q.  Do you recall which ones?

A.  Well, I would have discussed the case with the initial patrol officer who arrived at the scene, the detectives, I would have discussed it with



Mr. and Mrs. Robinson, actually, who were the other victims, Mrs. Robinson.

Q. Do you recall which detectives you had conversations with before trial?

A. No.

Q. When did you first speak with Detective Terpay regarding Ricky Jackson's case?

A. After I received the file, I contacted Detective Terpay. He came to my office, discussed the case. I told him, I wanted to interview Eddie Vernon, so he would have been the person that would have brought Eddie over for the purposes of interview.

Q. Do you recall anything else that you and Mr. Terpay discussed during that meeting?

A. Just credibility of the -- Eddie.

Q. Do you recall anything specifically that Detective Terpay told you in that meeting?

A. Thought he was a pretty brave kid and very credible.

Q. Did Detective Terpay ever tell you that he made any threats against Mr. Vernon?

A. No.

                    MR. FUNK:  Objection.

                    MR. SEARBY:  Objection.



Q. Did Detective Terpay ever tell you that Vernon had told him that he had not actually witnessed the crime?

MR. FUNK:  Objection.

MR. SEARBY:  Objection.

A. No.

Q. Was Detective Farmer present during this first meeting that you had with Detective Terpay?

A. I don't believe so.

Q. When is the last time you talked to Detective Terpay?

A. Probably when he brought Eddie the first time.

Q. And after that, do you recall what your next interaction with Detective Terpay was?

A. No.

Q. Other than the times that Detective Terpay brought Mr. Vernon to your office for the interviews that you had with Vernon, do you recall any other interactions that you had with Detective Terpay?

A. No.

Q. Did you prepare Mr. Terpay to testify at trial?

A. Yeah, I interviewed him for purposes of testimony.

Q. Do you recall how long before trial that was?



DOMINIC J. DEL BALSO                              December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                    57

A.   Well, we had discussed the case, you know, all four times and once before, so he would have been well aware what the questions would be.

Q.   And how long were your meetings with Mr. Terpay to test -- to prepare for trial?

A.   Not long, because we talked to him consistently, so not much preparation needed.  We went over the facts every time Eddie was there, so --

Q.   Did you ever -- do you recall any conversations that you ever had with Detective Farmer about the case?

A.   No.

Q.   Do you remember Detective Farmer being present at all during any of your meetings with witnesses?

          MR. FUNK:  Objection.

A.   I don't recall.

Q.   What about Detective Staimpel, do you recall having any interaction with him in relation to the Ricky Jackson case?

A.   Well, if they were involved in some capacity, I would have interviewed Farmer and Staimpel and whoever.  I'd interview all of them, especially if they were to testify, naturally, I had to interview them.  So we did discuss their testimony.



Q.  So if Detective Staimpel testified at trial, you would have prepared him for his testimony?

A.  I don't know -- I don't like the word, prepare, I would have discussed his testimony.

Q.  Discussed his testimony with him?

A.  Yeah.

Q.  Did you ever have any interaction with Detective Stoiker, Frank Stoiker, relating to this case?

A.  I don't recall that, no.

Q.  Did you say before that you knew Detective Stoiker?

A.  No.

Q.  Oh, you didn't?

A.  No.

Q.  Did you ever have any interaction with Detective Stoiker outside in any other case?

A.  I don't recall.

Q.  Okay.  How about Detective Terpay, did you ever have any --

A.  I think that was the first time I ever had a case with him.

Q.  Okay.  Let me just finish the question so the record is clear.  Did you ever have any interaction with Detective Terpay, other than this case?



A.  No.

Q.  Okay.  Did you ever have any interaction with Detective Farmer, other than this case?

A.  No, not that I recall.

Q.  And did you ever have any interaction with Detective Staimpel, other than this case?

A.  Not that I recall.

Q.  Did you know a detective, Michael Cummings?

A.  Yes, I did.

Q.  How did you know him?

A.  He's about 6 feet 6, 400 pounds, and he has been a witness in cases.

Q.  Did you ever work with him in any capacity prior to this case?

A.  I don't recall if I worked with him prior to this case, but I worked with him on other cases.

Q.  Okay.  Did you ever recall having -- did you ever have any interaction with Mr. -- Detective Cummings related to this case?

A.  Excuse me, could you repeat that?

Q.  Did you ever have any interaction with Detective Cummings related to this case?

A.  Not that I recall.

Q.  Okay.  Did you know a detective named Jerold Englehart?



DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                         60

A.  I'm not familiar with that name.

Q.  Did you know a detective named James White, a sergeant?

A.  I don't believe so.

Q.  Did you know a sergeant, Peter Comodeca?

A.  Yes.

Q.  How did you know him?

A.  His name appeared on quite a few files.

Q.  Is that because he was signing the police reports as supervisor?

A.  Whatever.  I don't know.  I just heard the name quite often.

Q.  Did you ever have anything to do with him relating to this case?

A.  Not that I remember.

Q.  Did you ever interview any of the kids that were on the bus going home?

A.  I don't remember.

Q.  Earlier you were talk -- strike that.  Did you ever interview Karen Smith?

A.  I don't recall.

Q.  Do you recall who Karen Smith was?

A.  Excuse me?

Q.  Do you recall who Karen Smith was?

A.  No.



Q.  Do you recall there being a witness who testified that she had gone into the store just before the shooting and she seen two guys standing outside who were not Ricky or Ronnie?

MR. FUNK:  Objection.

A.  I don't recall.

Q.  Earlier you were talking about there being exculpatory evidence in the case, that you recall?

A.  Yes.

Q.  And you don't recall anything specific about that evidence?

A.  No.

MR. SEARBY:  Objection.  Asked and answered.

Q.  So what did you mean there was exculpatory -- there was evidence supporting the defense, or what did you mean by that?

A.  There was exculpatory evidence.  I don't recall what it was.  I don't recall any physical exculpatory evidence.

Q.  Do you recall any physical inculpatory evidence?

MR. FUNK:  Objection.

A.  I don't recall.

Q.  Was there any evidence that supported probable



cause to charge Ricky Jackson, other than the testimony of Eddie Vernon?

MR. FUNK:  Objection.

A.  I don't recall.

MR. GILBERT:  What is the reason for your objection?

MR. FUNK:  It's an unfair question.  You are asking him to recall all of the evidence at the trial from 1940 --

MR. GILBERT:  It wasn't what she asked.

MR. FUNK: -- and make a legal conclusion about whether or not there was probable cause.

MR. GILBERT:  We have to get an answer if he knows or doesn't.

MR. FUNK:  You asked me the basis of my objection.  I gave it to you.

Q.  You understand what it means to have probable cause to charge in a case, right?

A.  Yes.

Q.  And you are familiar with that, because you've been -- you were a prosecutor for 30 years?

A.  Yes.

Q.  Okay.  And you understand what it means to have



Case: 1:15-cv-00989-CAB Doc #: 114-29 Filed: 03/01/17 63 of 134. PageID #: 5384

DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                         63

probable cause to continue a prosecution; is that right?

A.   Yes.

Q.   Okay.  Is the calling for some knowledge outside of -- some information outside of your knowledge if I ask you whether you understand what it means to have probable cause to continue a prosecution?

A.   No.

Q.   Okay.  As you sit here today, do you recall any evidence that was inculpatory against Ricky Jackson against the testimony of Edward Vernon?

          MR. FUNK:  Same objection.

A.   I don't recall.

Q.   Do you recall there being kids on the bus who testified at trial saying that they were on a different bus than the one that Edward Vernon said he was on?

A.   No.

Q.   Was that at all the exculpatory evidence you were thinking of?

          MR. SEARBY:  Objection.

          MR. FUNK:  Objection.

A.   No.

Q.   Do you recall that the Bridgeman house and Ricky Jackson's were searched?



Case: 1:15-cv-00989-CAB  Doc #: 114-29  Filed:  03/01/17  64 of 134.  PageID #: 5385

DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                          64

A.  No.

Q.  Okay.  Was there any money orders found?

A.  Not that I recall.

Q.  Okay.  Was there ever any money orders found in
    Ricky Jackson's possession?

             MR. FUNK:  Objection.

A.  Not that I recall.

Q.  Were there any money orders found in Wiley
    Bridgeman or Ronnie Bridgeman's possession?

A.  Not that I recall.

Q.  Was there ever a green car that was found in
    either Ricky Jackson's possession or --

             MR. FUNK:  Objection.

Q.  -- or the Bridgeman brothers' possession?

A.  Not that I recall.

Q.  Was there ever a tan briefcase that was found in
    Ricky Jackson's possession?

A.  Not that I recall.

Q.  Was there ever a tan briefcase found in Wiley
    Bridgeman's possession?

A.  Not that I recall.

Q.  Was there ever a tan briefcase found in Ronnie
    Bridgeman's possession?

A.  Not that I recall.

Q.  Do you recall if Mrs. Robinson could identify



Case: 1:15-cv-00989-CAB Doc #: 114-29 Filed: 03/01/17 65 of 134. PageID #: 5386

DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                          65

Ricky Jackson?

A.   I don't recall.

Q.   Okay.  Did you speak with Ricky Jackson's defense
attorneys in this case outside your interactions
at trial?

A.   Pre-trials.

Q.   And by that, what do you mean?

A.   Get together before a trial, you discuss the
case, you provide any exculpatory evidence, if it
exists.  They want to know about your witnesses,
and the strength of your case.  You know, what we
wanted to do, proceed as a death penalty case or
not.  There are numerous pre-trials before a
trial.

Q.   Okay.  And Mr. Jackson's defense attorneys were
Robert Loeb and Garver -- and Mr. Garver.  Do you
recall them at all?

A.   Yes.

Q.   Did you ever work on any other cases with them?

A.   I don't -- I worked on cases, but I don't know if
any before the Jackson case.

Q.   Do you recall any specific conversations you had
with either of Mr. Jackson's defense counsel
about this case?

A.   The facts, as we had them.



Q.   Do you know if the prosecution ever offered to
take the death penalty off the table for
Mr. Jackson?

               MR. FUNK:  Objection.

A.   I don't believe they did.

Q.   Do you recall there ever being any plea
discussions?

A.   There is always plea discussions.

Q.   Do you recall if there were any in the case of
Ricky Jackson?

A.   Yes.

Q.   Do you -- were you involved in any of those?

A.   I would have been involved, yes.

Q.   Do you recall anything about those conversations?

A.   Not really.

Q.   Did you yourself ever conduct any independent
investigation of the -- of the case?

A.   No.

Q.   Okay.  Did you receive a list of the defense's
witnesses before trial?

A.   Yes.

Q.   Would you have attempted to interview them?

A.   Normally, we don't.

Q.   Why not?

A.   Because they don't talk to us.



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

Q.  Did your office have investigators?

A.  We have investigators at the prosecutor's office.

Q.  They are separate from the police?

A.  Yes.  They are normally former homicide officers.

Q.  Do you recall if there were any investigators assigned to this case?

A.  No, I don't recall.

Q.  Okay.  Would you have been able to ask any of the investigators to interview any of the defense witnesses if you wanted to?

A.  We could have.

Q.  But you didn't -- don't recall doing that in this case?

A.  No.

Q.  Did the Cuyahoga County Prosecutor's Office, in 1975, have a policy of disclosing exculpatory evidence of which it was aware?

A.  Could you repeat that?

Q.  In 1975, did the Cuyahoga County Prosecutor's Office have a policy of disclosing exculpatory evidence of which it was aware?

A.  The policy was to disclose it.

Q.  And that was the policy of the office?

A.  Yes.

Q.  It was not just your policy?



DOMINIC J. DEL BALSO                                   December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                        68

A.   No, the office policy.

Q.   Okay.  Were you at any point during the prosecution of Ricky Jackson aware that the police engaged in any kind of misconduct?

          MR. FUNK:  Objection.

A.   No.

Q.   Were you aware at any time during the prosecution of Ricky Jackson that detective Staimpel made threats to Edward Vernon?

          MR. FUNK:  Objection.

A.   No.

Q.   Were you aware of any gifts made -- given to Eddie Vernon in exchange for his testimony?

A.   No.

Q.   Would you have given any gifts to him in exchange for his testimony?

A.   No.

Q.   Were you at any point during the prosecution of Ricky Jackson ever aware that the police had fed facts about the crime to Edward Vernon?

          MR. FUNK:  Objection.

          MR. SEARBY:  Objection.

A.   No.

Q.   Do you know whether or not the police had -- had shown single photos to Edward Vernon, single



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
69

photos of the suspects?

MR. FUNK:  Objection.

A.  I don't recall.

MR. SEARBY:  Can we take just a short five-minute break?

THE VIDEOGRAPHER:  We are off the record at 10:57.

- - - -

(Thereupon, a recess was had.)

- - - -

THE VIDEOGRAPHER:  We are back on the record at 11:05.

Q.  If you could take a look at Deposition Exhibit 1, toward the end there is a document, there is some very small --

A.  What page is this?

Q.  It's very small numbers on the right-hand corner that say, CCPO000729.

A.  729.  Okay.  720 -- Okay.  I have it.

Q.  Okay.  So this is a copy of a statement that Mr. Vernon supposedly gave to the police detectives in this case.  Could you just take a look at it and see if it looks familiar to you?

A.  Okay.  Yes, I have read it.

Q.  Okay.  Do you remember that document?



DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                          70

A.  Not really.

Q.  Do you recall there ever being any other statement of Edward Vernon?

A.  Not that I remember.

Q.  Was there only one statement of Edward Vernon?

A.  As far as I recall.

Q.  Okay.  Do you recall if it was signed?

A.  Excuse me?

Q.  The statement that you had of Edward Vernon, was it signed?

MR. SEARBY:  Let me just say on the record that this statement doesn't appear to be complete.

A.  I have a one-page statement.  It's not signed.

Q.  Do you recall having -- this is from the prosecutor's file.  The Bates stamp at the bottom, CCPO00729, are the Bates stamps that the prosecutor's office put on it before they produced the documents to me in this litigation.

And I'm just asking if you recall there being a signed version of this statement?

A.  Yes, there would be one.

Q.  Would that have been -- let me ask you this:  If that -- if a signed version of Edward Vernon's statement was introduced as an exhibit at trial,



would that have been kept with the court file or would that have gone back to the prosecutor's file?

A. That would have been part of the court's file.

Q. The original document?

A. Yes.

Q. Okay.  Would the prosecutor's office have had a copy of it?

A. Certainly, yes.

Q. Okay.  Do you know who would have testified at the grand jury hearing against Ricky Jackson?

A. Just the police officers, detectives.

Q. Do you know if a witness like Edward Vernon would have testified at such a hearing?

A. I don't know.

Q. Do you recall ever doing any investigation into any potential alternate suspect in this case?

A. No.

Q. Does the name Paul Gardenshire sound familiar to you?

A. Sounds familiar.

Q. Do you recall anything about him?

A. No.

Q. How about Ishmael Hixon?

A. Sounds familiar.



DOMINIC J. DEL BALSO                                December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                      72

Q.   Do you recall anything about him?

A.   No.

Q.   How about the King brothers?

A.   No.

Q.   Do you recall ever receiving a memorandum for --
     strike that.  Do you ever recall receiving a
     document from the Cleveland Police Department
     indicating that they had gotten a call from the
     FBI stating that there were four alternate
     suspects?

A.   No.

                    MR. FUNK:  Objection.

Q.   Did you ever learn from any of the detectives in
     this case that the FBI had spoken to them about
     alternate suspects?

                    MR. FUNK:  Objection.

A.   No.

Q.   Did you have any -- ever have any knowledge of
     any FBI tips given to the Cleveland Police
     Department regarding this case?

A.   No.

Q.   If the FBI had called the Cleveland Police
     Department, and told the detectives that they had
     some alternate suspects would you have looked
     into that?



MR. FUNK:  Objection.

A.   Me personally?

Q.   Yes.

A.   I would look at -- the detective would have to look into it, not me.

Q.   You would have -- would you have been interested in asking the detectives to look into it?

MR. FUNK:  Objection.

A.   Yes.

Q.   Is that something -- would you have wanted to speak with the FBI agent or ask somebody to speak with the FBI agent on your behalf?

MR. FUNK:  Objection.

A.   No.

Q.   Can you think of any reason why -- well, strike that.  Do you recall ever having any conversation with Detective Terpay about any information from the FBI?

A.   No.

Q.   Did you have any conversation with Detective Staimpel about any information from the FBI?

MR. FUNK:  Objection.

A.   No.

Q.   Did you have any conversation with Sergeant Peter Comodeca about information from the FBI?



DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                        74

MR. FUNK:  Objection.

A.  No.

Q.  At any point in this investigation, did you ever learn from any Cleveland Police detectives that the FBI had provided them a tip about alternate suspects?

MR. FUNK:  Objection.

A.  No.

Q.  If -- if the police had given you another signed statement from Edward Vernon, would you have kept that with your file?

MR. FUNK:  Objection.

A.  Yes.

Q.  Can you think of any reason that statement would have been destroyed during the course of your prosecution of Ricky Jackson?

MR. FUNK:  Objection.

A.  Could you repeat that?

Q.  Can you think of -- if you had gotten another statement, another signed statement from Edward Vernon, you would have kept it with your file, right?

MR. FUNK:  Objection.

A.  Yes.

Q.  Can you think of any reason that statement would



have been destroyed, but the other statement that is here from the prosecutor's file would have been retained?

     MR. SEARBY: Objection. Lack of foundation.

A. No.

Q. Can you think of any reason why any police reports that may have been given to the Cuyahoga County Prosecutor's Office from the Cleveland Police Department would have been destroyed?

     MR. FUNK: Objection.

A. No.

Q. And, in fact, Deposition Exhibit 1 indicates -- is a collection of police reports that are still in the prosecutor's file; is that correct?

     MR. FUNK: Objection.

A. I assume.

Q. Did you have any -- sorry, strike that. Did the prosecutor's office have any role in preparing pre-sentence investigation reports?

A. Pre-sentence?

Q. Yes.

A. The court does. I don't know if the prosecutor is directly involved.

Q. Do you recall having anything to do with any



pre-sentence reports in this case?

A.   No.

Q.   Did you ever -- was there ever a gun recovered in relation to this case?

MR. FUNK.  Objection.

A.   Not that I recall.

Q.   Were Ricky Jackson's fingerprints found anywhere at the scene?

A.   Not that I recall.

Q.   Were Wiley Bridgeman's fingerprints found at the scene?

A.   No, not that I recall.

Q.   What about Ronnie Bridgeman?

A.   Not that I recall.

Q.   Are you aware that the criminal charges in this case against Ricky Jackson were dismissed last year?

A.   Yes.

Q.   Okay.  Are you aware that the criminal charges against Wiley Bridgeman and Ronnie Bridgeman were also dismissed last year?

A.   Yes.

Q.   And are you aware that the State did not oppose the dismissal of the charges?

A.   No, I wasn't aware of that.



Q.  Did you -- were you present at the hearing that occurred in November of last year relating to the post-conviction in these cases?

A.  No.

Q.  You were not present?

A.  No.

Q.  Were you subpoenaed to testify?

A.  No.

Q.  Did you have any conversations with anybody from the prosecutor's office regarding testifying at the hearing last year?

A.  No.

Q.  How did you hear that charges against Ricky Jackson, Wiley Bridgeman, and Ronnie Bridgeman were dismissed?

A.  Plain Dealer.

Q.  The Cleveland Plain Dealer?

A.  Yes.

Q.  Nobody from the prosecutor's office consulted you prior to that happening?

A.  No.

Q.  Okay.  I am handing you what has been marked as Exhibit 2.  Just take a moment to review that and I'll ask you a question about it.

A.  Okay.



Q.  All right.  So this is a journal entry from the
court of -- this is a journal entry from the
court of -- signed by Judge Richard McMonagle, in
the Court of Common Pleas, Cuyahoga County, Ohio
in the criminal case involving State of Ohio
versus Ricky Jackson.  It states -- it's stated,
November 21, 2014, and it states, hearing held
11/21/2014, State of Ohio moves to dismiss this
case.  Motion to dismiss is granted.  Case is
dismissed.  Case is dismissed as to all counts.
Defendant was released.

My question is:  This document shows that the
State of Ohio moved to dismiss this case; is that
right?

A.  Yes.

Q.  And nobody consulted you prior to doing that?

A.  No.

MR. SEARBY:  Objection.  Asked and
answered.

Q.  The -- are you aware that Ricky Jackson then
filed a claim in the Court of Claims to be
declared an innocent person who has been
wrongfully imprisoned?

A.  No.

Q.  Okay.  And are you aware that the State of Ohio,



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
79

the prosecutor's office, did not oppose the motion to have Mr. Jackson declared a wrongfully imprisoned person?

MR. FUNK:  Objection.

A.  No.

Q.  Okay.  I am going to hand you what has been marked as Plaintiff's Exhibit 3.  Just take a moment to review that, and I'll ask you a question about it.

A.  I read it.

Q.  Okay.  This is a journal entry signed by Judge McMonagle on December 10, 2014, in the State of Ohio versus Ricky Jackson, which says, upon review, the notice filed by Cuyahoga County Prosecutor, Timothy McGinty, and pursuant to R.C. 2743.48(A)(5), this court determines that the underlying charged offense, including all lesser included offenses was not committed by the defendant, Ricky Jackson.

A.  I read that.

Q.  Did you hear anything about this at the time this was entered?

MR. FUNK:  Objection.

A.  No.

Q.  Okay.  Are you aware of what Edward Vernon is



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
80

test -- had testified to at the hearing last year on the post-conviction proceeding?

A.  Only what I recall reading in the newspaper a little bit.

Q.  And what was that?

A.  He --

MR. FUNK:  Objection.  Go ahead.

A.  He recanted his testimony, something about consulting with some minister, and decided to come forward now, because of his guilty conscience, and to indicate that he did not, in fact, see the Wiley brothers or Ricky Jackson commit this crime.

Q.  Has anyone ever told you about the affidavit that he signed in this case --

A.  No.

Q.  -- or in the -- in the criminal case of Ricky Jackson?

A.  No.

Q.  Okay.  I am handing you what has been marked as Deposition Exhibit 4.  Can you take a moment to review that, and let me know when you are finished?

A.  Okay.

Q.  Have you ever been shown that affidavit before?



A.   No.

Q.   At any point during the prosecution, were you aware of Mr. Vernon's allegations in paragraph 12 of his affidavit about a detective yelling at him and slamming his hands on the table?

A.   No.

Q.   At any point during your prosecution of Ricky Jackson, were you aware of Mr. Vernon's allegations in paragraph 13 where he says detective would arrest his parents for perjury if he backed out?

A.   No.

Q.   At any point during your prosecution of Ricky Jackson were you aware of Mr. Vernon's allegations in paragraph 12 where he said he was crying and a detective told him, don't worry, we could fix this?

A.   No.

Q.   Would you have gone along with the prosecution if you would have known those things?

          MR. FUNK:  Objection.

A.   No.

Q.   You would have recommended to your supervisor that the prosecution be stopped?

          MR. FUNK:  Objection.



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
82

A.   I would have notified my prosecutor, John T. Corrigan, of what I learned.  His determination would be what would count, as far as what to do with the case.

Q.   If you believed that Mr. Vernon had been threatened by the police, would you have wanted to be involved in that prosecution?

          MR. FUNK:  Objection.

A.   No.

Q.   Handing you what's been marked as Plaintiff's Exhibit 5.  Take a look at that, and when you are done reviewing it, I'll ask a question about it.

A.   Yes, I read it.

Q.   Okay.  This document is Bates stamped on 000088 and it is a complaint in the case of State of Ohio verus Ronnie Bridgeman.  It is a complaint signed by Detective John Staimpel, charging Mr. Bridgeman with the crime involved in this case.

     And my question to you is:  Is this a true and accurate copy of the complaint; do you know?

          MR. FUNK:  Objection.

A.   I'm not aware of it.

Q.   Would you have see a copy of the complaint prior to -- would it have been in your file?



                    MR. FUNK:  Objection.

A.  It would have, if I prosecuted that case, the
    indictment would have been in the file.

Q.  The indictment would have been in the file?

A.  Yeah, I don't know if that exact document.

Q.  Where does the criminal complaint go, a document
    like this?

A.  I don't know.

Q.  Okay.  Let me ask you this:  Did you have a
    complaint like this for Wiley Bridgeman?

A.  I don't recall.

Q.  Did you have a complaint like this for Ricky
    Jackson?

A.  I don't recall.

Q.  Do you know where the criminal complaint would
    have been kept?

A.  No.

Q.  Earlier you were just saying, a copy of the
    indictment would have been in the prosecutor's
    file?

A.  Yes.

Q.  But does that mean a copy of the complaint, the
    criminal complaint?

A.  I don't recall seeing the criminal complaint,
    just the indictment.



Q.  Okay.  This document states that it's -- well, it was -- it's signed by John Staimpel as the complainant, and then it's sworn to you by the deputy clerk, which you signed at the bottom.  It says, it's subscribed and sworn to you before and made by Detective Staimpel, this 28th day of May 1975.

    Do you have any reason to believe that the date that is on this complaint is inaccurate?

            MR. FUNK:  Objection.

A.  I have no idea.

Q.  Okay.  Do you have any reason to believe that this is not a true and accurate copy of the complaint?

            MR. FUNK:  Objection.

A.  No idea.

Q.  Okay.  As a matter of general practice, would there have been a criminal complaint signed by a detective against Ricky Jackson and Wiley Bridgeman?

            MR. FUNK:  Objection.

A.  Not that I would have been aware of.

Q.  It would have gone directly to a grand jury?

A.  The only information I have in the file is the grand jury indictment.



Q.   Okay.  And was Almeta Johnson a City prosecutor?

A.   Yes, she was.

Q.   She was a police prosecutor?

A.   Well, she was both, so I don't know what she was at that time.  She was a City prosecutor and then she was the police prosecutor.

Q.   What is the difference?

A.   One you are a boss, one you are not.  I don't know.  I think she was held more in one position.

Q.   Okay.  As a police prosecutor, she would have been part of the police department?

A.   Well, if she was a police prosecutor, she would have been like an assistant, and she would have had a boss.  I mean, that's what I think.

Q.   Okay.  And if Ms. Johnson had decided to bring charges against Wiley Bridgeman and Ricky Jackson, would copies of any documents related to those charges have been provided to your office?

          MR. FUNK:  Objection.

A.   I have no idea.

Q.   Did you normally get documents from the police prosecutor when they decided to bring charges?

A.   I don't recall getting documents like that, no.

          MS. WANG:  Let's take another five-minute break?



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
86

THE VIDEOGRAPHER:  We are off the record at 11:33.

- - - -

(Thereupon, a recess was had.)

- - - -

THE VIDEOGRAPHER:  We are back on the record at 11:43.

Q.  During the time that you prosecuted Ricky Jackson's case, did you -- do you recall ever reading any documents or police reports involving the King brothers?

A.  The who?

Q.  King brothers.

MR. FUNK:  Objection.

A.  That name, I don't recall.

Q.  Arthur King, does that name sound familiar?

A.  No.

Q.  A Skip King?

A.  No.

Q.  Railroad King?

A.  No.

MS. WANG:  Okay.  I have no further questions at this time.

- - - -

EXAMINATION OF DOMINIC J. DEL BALSO



BY MR. GILBERT:

Q.  Good morning, Dominic.

A.  Good morning, Terry.

Q.  I represent Wiley Bridgeman and Ronnie Bridgeman, now known as Kwame Ajamu.  So I'm going to ask you just a few questions, not many.

    If I'm not mistaken, I remember seeing you a year ago in the courtroom of Richard McMonagle during the time of the hearing on a motion for new trial for Ricky Jackson.  Am I incorrect about that?

A.  I don't recall being there, but I might have been.  I don't recall, actually.

Q.  Okay.  So just so I'm clear about it, you were not --

A.  Oh, wait a minute.  I was subpoenaed one time to testify.  Okay.  You are right.  And I went down there, and I waited around forever, and they told me they would not need my testimony, and they told me to leave.  You are right.

Q.  I was wondering if I was losing it --

A.  No, it was me.

Q.  -- because I saw you there.

A.  It was me.

Q.  We chatted, we said, hello, right?



A.  Right.

Q.  And you -- you know, you were subpoenaed, but you were not called to testify; is that right?

A.  Right.

Q.  Did you speak to any of the prosecutors that were handling the case for the State?

MR. SEARBY:  Answer that question yes or no.

A.  I don't recall actually, no.

Q.  Do you remember Mary McGrath?

A.  I remember Mary McGrath.

Q.  And without disclosing any -- any substance, did you talk to her about the case?

A.  I think I did, yes.

Q.  Did you listen to any of the testimony in that hearing?

A.  No.

Q.  All right.  You were assigned to try Wiley Bridgeman's second case --

A.  Yes.

Q.  -- second trial?

A.  Yes.

Q.  Do you recall why that case came back for another trial?

A.  No, I don't recall.



Q.  Was there a Court of Appeals decision, if you recall?

A.  I would assume, but I don't recall exactly.

Q.  Was the evidence in the Harry Franks murder any different between the two prosecutions?

A.  Not that I'm aware of, no.

Q.  So there -- is it your recollection that there was no additional evidence between 1975 and 1977 when Wiley was tried again?

A.  No.

Q.  And am I to understand that the case against all three of these defendants was basically the same, the same evidence?

            MR. SEARBY:  Objection.

            MR. FUNK:  Objection.

A.  Yes.

Q.  There was no distinction in the case between Wiley, Ronnie, or Ricky; was there?

            MR. SEARBY:  Objection to form.

            MR. FUNK:  Objection.

A.  I don't understand the term --

Q.  Okay.  Was the evidence basically the same for all three defendants?

            MR. FUNK:  Objection.

            MR. SEARBY:  Objection to form.



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
90

A.  I don't recall, actually.

Q.  Did the case hinge on the testimony -- did the case against Ricky Jackson hinge on the testimony of Eddie Vernon?

MR. FUNK:  Objection.

A.  Yes.

Q.  Without Eddie Vernon, I understand, am I right in -- am I correct in saying that without Eddie Vernon, there would be no case?

MR. FUNK:  Objection.

A.  You are right.  Correct.

Q.  Okay.  And without Eddie Vernon, there would be no case against Wiley Bridgeman, correct?

MR. FUNK:  Objection.

A.  Correct.

Q.  And without Eddie Vernon, there would no case against Ronnie Bridgeman, correct?

A.  Correct.

MR. FUNK:  Objection.

Q.  You testified that you met with Eddie Vernon to go over his testimony four times?

A.  Yes.

Q.  How do you remember that number so many years later?

A.  Because of the seriousness of a case, I always



Case: 1:15-cv-00989-CAB Doc #: 114-29 Filed: 03/01/17 91 of 134. PageID #: 5412

DOMINIC J. DEL BALSO                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                          91

interview my witnesses more than one time. And since he was a young kid, I felt it was necessary to, you know, make sure I talked to him a number of times, because of his age.

Q.  And was another factor that he was the only witness that could tie these three men to the crime?

MR. FUNK:  Objection.

A.  Yes.

Q.  Is that right?

A.  Yes.

Q.  Do you typically speak to a witness four times, four separate times, in connection with a trial?

A.  No.

Q.  A usual case, how many times would you talk to a witness that you met with and discussed their testimony?

MR. FUNK:  Objection.

A.  It depends on the nature of the case and the age or maturity of a witness and the importance of his testimony.

Q.  Now, in 1977 before the trial of Wiley Bridgeman, you indicated that you spoke to Eddie Vernon three times; is that correct?

A.  Approximately, yes.



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

Q.  And each time Detective Terpay was -- had brought him down?

A.  I assume he did.

Q.  And was in the room at the time of the interview; is that correct?

           MR. SEARBY:  Objection.  Asked and answered.

A.  I assume he was.

Q.  So that is seven times that you met with -- in connection with your role in these prosecutions, seven times that you met with Eddie Vernon, correct?

A.  Correct.

Q.  And seven times he was always accompanied by Eugene Terpay; is that correct?

           MR. FUNK:  Objection.

A.  I don't recall the second trial if he was always accompanied by him.

Q.  Was there always someone in the room, other than yourself?

A.  There would have been J.J Sweeney, because we tried the case together.

Q.  And you are not sure if Terpay was in there at the time?

A.  No.



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
93

Q.  Ms. Wang asked you questions about the affidavit of Eddie Vernon that came -- surfaced many years later where he indicated that he was threatened by the detectives.

             MR. FUNK:  Objection.

Q.  Do you remember that question?

A.  Yes.

Q.  I just want to make sure that had you known that this information, prior to Wiley's second trial, that you -- whether or not you would have provided that or notified your supervisor, John T. Corrigan, or provided that to the defense?

A.  I'm not sure I understand.

Q.  Let me rephrase it.  Had you known about the exculpatory information that Eddie Vernon was threatened and coerced to testify in the trial that he did not see the crime, would you have reported that?

             MR. FUNK:  Objection.

A.  Of course.  Of course.

Q.  And can we assume that you did not get such information in connection with the second trial of Wiley Bridgeman?

             MR. FUNK:  Objection.

A.  Yes, I did not receive such information.



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
94

MR. GILBERT:  I don't have any further questions.  Thank you.

- - - -

EXAMINATION OF DOMINIC J. DEL BALSO

BY MR. FUNK:

Q.  Okay.  Do you want to take a break or --

A.  No, I'm fine.

Q.  All right.  My name is Steve Funk.  I represent the defendants, the individual defendants and the State defendants, other than the City of Cleveland.

Just for the record, how old are you today?

A.  71.

Q.  71.  And this trial would have occurred back in 1975, which is about over 40 years ago, right?

A.  Right.

Q.  Many times the questions are asked to you, you give the answer, I don't recall.  And when you say you don't recall, what does that mean?

A.  It means, I don't remember.

Q.  So does that mean you don't remember whether it is true or not true?

A.  Correct.

Q.  Okay.  And a couple of times you said you assumed something happened.  Do you have -- when you say



you assumed something, does that mean you know it to be true?

A.  When I say, assumed, it is based on the procedure I would follow during the course of a trial.  I do certain things with all cases, and so I would assume I did this with Ricky Jackson's case.

Q.  Okay.  The very outset of the deposition, you were asked a question about my conversation with you.

Do you recall that I referred you to Charles Hannon who is the chief of the Civil Division of the County Prosecutor's Office?

A.  That's correct.

Q.  Okay.  I never mentioned Mr. Searby or --

A.  No.

Q.  I am going to hand you -- we have got the cover pages and indexes of the first four -- of the four trials from the 1970s.  I will mark these as Exhibits as 1 -- I'm sorry, let's do A, B, C, D.

- - - -

(Thereupon, Defendant's Exhibit A, B, C, and D was marked for purposes of identification.)

- - - -

Q.  Handing you what has been marked as Exhibit A.

MS. WANG:  Could you say again



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
96

what each exhibit was?

        MR. FUNK:  Yes.

        MS. WANG:  Or you will when you ask him.

A.  Okay.

Q.  Okay.  Handing you Exhibit A is the cover page and index of the transcript for State of Ohio versus Ricky Jackson.

A.  Okay.

Q.  Exhibit B is the cover page and index for the criminal trial of Ronnie Bridgeman.

A.  Okay.

Q.  Exhibit C is the cover page and index of the criminal trial of Wiley Bridgeman in 1975.  And the last one is Exhibit D, which is the cover page and index of the criminal trial of Wiley Bridgeman in 1977.

And the reason I brought these out, I want to ask you about certain names of people on the file.  So looking at Exhibit A first -- if you could just put them in order.  So looking at Exhibit A first, are you there?

A.  Yes.

Q.  Robert Loeb, do you know if he is deceased?

A.  I don't know.



Q.   Okay.  Joel Garver?

A.   I don't know.

Q.   What about John Corrigan?

A.   John T. Corrigan is deceased.

Q.   Exhibit B, now this is the transcript of the Ronnie Bridgeman trial.  As I understand, you were not involved in that trial.

A.   Okay.

Q.   Is that right?

A.   Yeah, my name is on there.

Q.   No, Exhibit B, are you on B?

A.   B?

Q.   Yeah.  Are you there?

A.   Right.

Q.   Ronnie Bridgeman.

A.   I have that, yes.

Q.   Okay.  And you're not listed as attorney in that case?

A.   Correct.

Q.   So you were not involved in that trial?

A.   Not at all.

             MR. SEARBY:  Are you asking actually participated?

             MR. FUNK:  Yeah.

Q.   Did you participate in that trial in any way?



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
98

A.   No.

Q.   Okay.  Now, Charles Neathy and James Sweeney, do
     you know those gentlemen?

A.   Yes, I do.

Q.   Do you know whether or not they're still alive?

A.   I don't know.

Q.   You don't know whether they passed away or not?

A.   No.

Q.   What about Tom Shaughnessy and Samuel Agnello?

A.   They are both deceased.

Q.   You knew them?

A.   Yes.

Q.   Okay.  And Exhibit C, which is the first Wiley
     Bridgeman trial?

A.   Yes.

Q.   And on page 2, it indicates Attorney Jerry Milano
     and Daniel McCarthy?

A.   Yes.

Q.   Do you know either of those two gentlemen?

A.   Jerry Milano is deceased.  I don't -- I think
     McCarthy is also deceased.

Q.   And they were the attorneys on the second trial
     of Ronnie Bridgeman, as well, right?

A.   Yes.

Q.   Okay.  Now you were asked questions about the



DOMINIC J. DEL BALSO                                December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                      99

procedure for indicting the individuals.  For all four of these, these were felony charges, they all were subjected to a grand jury indictment?

A.  Correct.

Q.  And you did not participate in this grand jury procedure?

A.  No.

Q.  So you don't have any personal knowledge about who actually testified in the grand jury procedure?

A.  No.

Q.  And you -- I think you indicated that you thought the detectives testified.  You don't have any personal knowledge of what the detectives testified in the grand jury?

A.  No.

Q.  You just assumed that?

A.  Someone has to present the government's story.

Q.  Do you know whether or not any other witnesses testified at the grand jury?

A.  No.

Q.  When you get a file, do you normally get the grand jury transcript?

A.  No.

Q.  Now, in this case, and I'm going to really focus



on Ricky Jackson for the moment, the Ricky Jackson case, there was a grand jury indictment, right?

A.  Yes.

Q.  And there was also a motion at trial for acquittal?

A.  At the end of all of the evidence.

Q.  Right.

A.  Yes, Rule 29 motion.

Q.  Right.  There would have been.  And the judge denied that motion?

A.  Correct.

Q.  And then that judgment, ultimately the jury, after hearing all of the evidence, found Mr. Jackson guilty?

A.  Correct.

Q.  And that jury verdict was then affirmed on appeal by the Court of Appeals, right?

A.  Correct.

Q.  And they wrote an opinion?

A.  Yes, they did.

Q.  At any point in your prosecution of the case, did you have any belief that there wasn't probable cause for the charges?

A.  No, I always felt there was probable cause.



Q. We talked a little bit about the discovery process.  You had received -- I think you testified that you had received the entire police file --

A. Yes.

Q. -- was that your general practice?  And that would just be transmitted as a matter of course?

A. Yes.

Q. You don't know who actually delivered the file?

A. No, I receive a file with the party's name on it, and find in that file all of the reports, police reports, forensic reports, any and all reports.

Q. Now, do the police -- in the course of transmitting the file, do the police identify or make any determination about -- this is back in 1975.  Did the police, in giving you -- did the police department in giving you a file --

A. They don't give me the file.

Q. Okay.  Who gives you the file?

A. The prosecutor's office.

Q. Okay.  You then make the determination, you, being the prosecutor, make the determination as to what is exculpatory evidence that should be disclosed or not?

A. Correct.



Q.   The police officers do not make the determination as to what was exculpatory evidence?

          MR. GILBERT:  Objection.

A.   No.

Q.   So let me be more specific, when you get the file, did the file --- from the police department or when you receive the file from -- the file from the police department eventually came to you?

A.   Right.

Q.   Does the police file itself have anything in it that specifically identifies what is exculpatory evidence and what is not?

A.   No.

Q.   You review it to make that determination yourself?

A.   Yes.

Q.   Now, you were shown Exhibit 1 -- actually, let me backtrack before I talk about Exhibit 1.

     In this case, are you able to recall 40 years later every document that you would have received from the police department?

A.   No.

Q.   Is it -- and I want to hand you -- or what has been marked as Exhibit 1, was a set of documents



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
103

that were clipped, I think it is in the bottom of your pile here.

A. Police report documents?

Q. Yeah.

A. Yes.

Q. Now, are you able to -- and let me just ask you without necessarily looking at it: Are you able to verify, even if you were to look at all of that, whether or not that's the complete -- whether that actually, Exhibit 1, is the complete record you received from the police department?

A. No.

Q. After you're done with the case, who keeps the custody of your files?

A. Actually, I would keep them.

Q. Okay. At some point -- so, for example, this was tried in 1975. What happened --

A. Actually, I would keep them. I would write on the file the disposition and hand them in and they would keep it in their file.

Q. When you say, they, you mean --

A. The prosecutor's office.

Q. The prosecutor's office. So after the case is over, the jury verdict is affirmed on appeal, would you keep the file, keep custody of the



file?

A.   No.

Q.   So from the 1970s until today, would you know
     what happened with the records that were provided
     to the police -- to the County Prosecutor from
     the police department?

A.   No.

Q.   Would you be able to verify what records were
     kept, and how they were kept?

A.   No.

Q.   And you have not been at the prosecutor's office
     since 2002, right?

A.   Correct.

Q.   From 19 -- from the time that you stopped working
     on the Ricky Jackson in the 1970s until the
     present day, would you have ever had reason to
     look at the Ricky Jackson file?

A.   No.

Q.   Now, there was some questions about handwritten
     notes.  Back in 1975, you would receive typed
     police reports from the police department,
     correct?

A.   Yes.

Q.   All right.  If a detective had handwritten notes
     that they used to type up their police report,



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
105

essentially typing up what they had written down in handwritten form --

A.  Right.

Q.  -- was it the custom in 1975 to receive both the police report and the handwritten notes?

A.  No.

Q.  Did you ever have that happen during your time while you were a prosecutor?

A.  No.

Q.  And why is that?

A.  It is their procedure.

Q.  Okay.  So the handwritten notes that were used to prepare the police report, the typed up police report, you would not receive those?

A.  No.

Q.  And that was the practice in every case?

A.  Every case.

Q.  And that was the practice in every case all the way up until 2002 when you left the prosecutor's office?

A.  Yes.

Q.  And, again, the handwritten notes, the assumption is that the handwritten notes are -- the substance of the handwritten notes is actually incorporated into the typed report?



                    MS. WANG:  Objection.  Form.

          Foundation.

Q.  Correct?

A.  Yes.

Q.  Now I think that you talked about the discovery

     sheet that would be provided to the defense.

     That was a form, right?

A.  Right, it was a form.

Q.  You filled that out yourself?

A.  Yes.

Q.  That was not provided to you by the police?

A.  No, it was the prosecutor's office.

Q.  Okay.  So when we talked about the discovery

     sheet, that was a prosecutor's form?

A.  Correct.

Q.  And, in the course of providing that discovery,

     would you provide the original police records to

     the defense, this is back in the 1970s?

A.  Police records?

Q.  Right.

A.  No, records were not discoverable.

Q.  Okay.  So when you received the file from the

     police department back in the 1970s, it was not

     practice to turn that file over?

A.  No, the police reports were never turned over.

Q.  So what you would turn over would be, if there was something that you determined was exculpatory?

A.  Right.

Q.  And then you provided a list of witnesses?

A.  A list of witnesses and --

Q.  Statements of defendants?

A.  Yeah, statements, oral or written, of the defendant.  And there was a block, was there any exculpatory evidence, if there was, you would check the block.

Q.  Now, in this case, do you have any specific knowledge or personal knowledge of -- or memory of what you actually turned over to the defense for the Ricky Jackson trial?

A.  No.

Q.  Is it possible that you would have turned over more evidence than you otherwise have done in a typical case?

            MR. SEARBY:  Objection to form.

A.  No.

Q.  It's not possible?

A.  That I would have turned over more?

Q.  Well, let's say, that you would have -- you don't know what you turned over?



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
108

A.   Correct.

Q.   Okay.  So if there was exculpatory evidence, what format would you normally -- how would you normally disclose that?

A.   As I recall, I would not -- if it was documentary or exculpatory evidence, I would not turn that over as I would the oral or written statements. I would divulge that to defense attorneys during pre-trial.

     And then, you know, if I could provide a written copy of that, if it was necessary as to so and so said this, or someone said that, whatever was exculpatory, but I wouldn't forward it with the initial discovery.

Q.   Now, do you recall during the Wiley Bridgeman or Ricky Jackson trial any of the defense attorneys raising an issue with the judge --

A.   Yes.

Q.   -- with respect to discovery?

A.   Yes, Jerry Milano.

Q.   What do you recall about that?

A.   He complained about, he wasn't denied full discovery, and then I think it was Judge Zangali, if I'm not mistaken --

Q.   This is in the Wiley Bridgeman trial?



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
109

A.  Yeah, told me, turn over all of the police reports, and I objected.  And he said, turn them over, and I turned them over.

Q.  Okay.  So you turned them over to the defense?

A.  Yes.

Q.  And that was based upon the judge's decision?

A.  Correct.

Q.  And do you recall any issues like that during the Ricky Jackson trial?

A.  No.

Q.  So Ricky Jackson's attorney did not, to your knowledge, make any objections about the amount of discovery they received?

A.  No.

Q.  Now, there was an extensive amount of questions about your interviews or your meetings with Eddie Vernon?

A.  Correct.

Q.  And I think you said you wanted to interview Eddie Vernon?

A.  Of course.

Q.  Now, in the course of those interviews, were you the one asking the questions?

A.  Yes.

Q.  Did you ask leading questions?



A.   No.

Q.   And did -- do you recall the detectives answering the questions for Mr. Vernon?

A.   No.

Q.   He gave you his testimony in response to your questions?

A.   Yes.

Q.   And you did that on multiple occasions?

A.   Yes.

Q.   And during the course of your interviewing of him, did you make any of your own independent determinations about Mr. Vernon's credibility?

A.   I found him to be credible and a nice kid.

Q.   Did you feel that he answered the questions sufficiently that you felt he had -- that he had sufficient foundation to testify to the facts that he was saying?

A.   Yes, I did.

Q.   You felt that he was an eyewitness of the crime?

A.   Yes.

Q.   And what did you base that on?

A.   Just his knowledge of the occurrence, the fact that he was present at the scene, it was broad daylight, and that he indicated he had known the defendants from the neighborhood, so it put him



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
111

in a position to see what he testified to, and the defendants were not strangers to him, and just his general demeanor.

Q. Now, when you were questioning him, do you specifically recall Detective Terpay being there?

MS. WANG:  Objection.  Asked and answered.

A. He would have been there, yes.

Q. What's that?

A. Yes.

Q. Okay.  Well, you answered the question to --

A. Are you talking about Wiley?

Q. During preparing for Wiley Bridgeman's trial, he was not?

A. I don't recall him being there all of the time at Wiley, but he was there during Ricky Jackson. Somebody had to bring Ricky to see me.  He was only 12 years old.

MR. SEARBY:  You mean Eddie?

THE WITNESS:  Huh?

MR. SEARBY:  Not Ricky.

THE WITNESS:  Yeah, Eddie.

Q. Now, but do you recall him sitting in during the entire interview?

A. No.



DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                        112

Q.  Okay.  So he -- would you have interviewed --
    prior to Ricky Jackson, would you have
    interviewed Eddie Vernon alone?

            MS. WANG:  Objection.  Asked and
        answered.

A.  I would have if the detective had to leave for
    some reason.

Q.  Okay.  Well, just explain that, because she is
    saying, asked and answered.  Do you have a
    specific memory of Detective Terpay being there
    during the entire interview?

            MS. WANG:  Objection.  Asked and
        answered.

A.  Not necessarily the entire interview.

Q.  So you would have had an opportunity to speak
    with Eddie Vernon alone?

A.  Correct.

Q.  Did you notice any change in Mr. Vernon's
    demeanor when he was speaking with you alone
    verus when he was with Detective Terpay?

A.  No.

Q.  Was there anything in the body language or the
    English that would suggest that Detective Terpay
    was somehow threatening or coercing Eddie Vernon?

A.  No.



DOMINIC J. DEL BALSO                                December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                    113

Q.  Any indication at all?

A.  No.

Q.  And that was on four different occasions that you interviewed him?

A.  Correct.

Q.  How did they interact, Eddie Vernon and Mr. Terpay, in your observation?

A.  Seemed to get along fine, friendly relationship.

Q.  Okay.  Did you ever see detective Terpay yell at Eddie Vernon?

A.  No.

Q.  Did you ever see him correct him?

A.  No.

Q.  Did he ever correct any of his answers?

A.  Did Eddie?

Q.  No. Did Detective Terpay ever correct any of Eddie Vernon's answers to your questions?

A.  Not that I recall.

Q.  Okay.  Did Eddie Vernon in any way seem uncomfortable?

A.  No.

Q.  Now, I think that during the trial of -- the Ricky Jackson trial and actually the other trial as well, Eddie Vernon stayed at a hotel; do you recall that?



A.  I don't recall.

Q.  You don't know one way or the other?

A.  I don't remember.

Q.  Did -- now Eddie Vernon's mother, would you ever have had occasion to see her at any of the trial proceedings?  Do you recall?

A.  Not that I recall.

Q.  Did you ever recall Eddie Vernon's mother, who I think her name was Sue Vernon; do you remember that?

A.  No.

Q.  All right.  Do you recall Eddie Vernon's mother ever contacting you or saying anything to you to suggest that she thought her son should not testify or any problems with his testimony?

A.  No.

Q.  Anything at all?

A.  No.

Q.  And then his father, James Vernon, do you recall that he actually testified at the trial of Ricky Jackson?

A.  I don't recall.

Q.  Okay.  Do you recall Eddie Vernon's father ever saying anything to you to indicate that Eddie Vernon did not see the crime or was not telling



the truth?

A.  No.

Q.  Do you recall Eddie Vernon's mother ever saying anything to you that Eddie Vernon did not see the crime or was not telling the truth?

A.  No.

Q.  So they never -- is that something that if the mother or the father had actually come forward and told you that their son did not witness the crime and was not telling the truth, that you would have done -- that would have caused you to say something to your prosecutor and supervisor?

A.  Yes, it would have been important information.

Q.  So if that would have happened, that would be something you would have remembered?

A.  Correct.

Q.  So you had the opportunity to interview Eddie Vernon, but he also testified at the trials, right?

A.  Yes.

Q.  And he was subject to extensive cross-examination?

                    MR. GILBERT:  Objection.

A.  Yes.

Q.  Based upon everything you remember about this



case, did you -- how would you assess how Eddie Vernon held up to the -- or how would you assess Eddie Vernon's credibility at the trial?

MR. GILBERT:  Objection.

MS. WANG:  Objection.

A.  Apparently he was credible, because Ricky was convicted.

Q.  Okay.  But I'm asking you from your own personal --

A.  He seemed credible.  I was not concerned about his answers, responses, or demeanor while he was being cross-examined.

Q.  So you don't recall any moment during the trial where you yourself had a concern about Eddie Vernon lying or not telling truth?

A.  No.

Q.  Now if you look at Exhibit A, which is just the cover sheet and index of Ricky Jackson's trial, and I want you to turn to page 3, which is the --

A.  Witness list?

Q.  Yeah.  And I want to ask you about Robert Robinson, who is in the list of the States witnesses?

A.  Correct.

Q.  Do you see that?



A.  Yes.

Q.  And you recall him as being the owner of the
Fairmount Cut-Rate store?

A.  Yes -- well, actually Anna Robinson -- oh, here
is Robert.  Okay.  Yes.

Q.  Anna was his wife?

A.  Yes.

Q.  Okay.  And do you recall Mr. Robinson's testimony
about his interactions with Eddie Vernon?

A.  No, I don't recall.

Q.  Okay.  You haven't had a chance to review the
transcript?

A.  No.

Q.  His testimony -- his testimony would speak for
itself, I guess.  Let me just ask you this:  Do
you recall there being testimony about
Mr. Robinson offering $50 to Eddie Vernon if he
were to testify and tell the truth?

A.  No.

Q.  You don't recall that coming out.  If it was in
the transcript, would that refresh your
recollection?

A.  It would.

Q.  So when you say you don't remember, it is just
you don't have a memory of it?



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
118

A.    I don't have an independent memory of it.

Q.    And do you recall -- right above his name is Robert Hassle?

A.    Yes.

Q.    And do you recall Robert Hassle as being a police officer?

A.    Yes.

Q.    And do you remember what the substance -- or do you remember generally what he was called to testify to?

A.    I think possibly he was one of the original officers at the scene.  And I believe Eddie Vernon came up to him and indicated he was a witness to the events.

Q.    Okay.  And that was -- that would have been, Eddie Vernon indicated he was a witness to the events before he ever had any interactions with any of the detectives?

A.    Correct.

Q.    Now, you were asked to look at Eddie Vernon's affidavit?

A.    Yes.

Q.    Which was Exhibit 5, I think?

                    MS. WANG:   4.

Q.    I'm sorry, 4.



MR. GILBERT:  Can we take a 30-second break.  I'm leaving.  I didn't want to go into the video.

THE VIDEOGRAPHER:  We are off the record at 12:22.

- - - -

(Thereupon, a recess was had.)

- - - -

THE VIDEOGRAPHER:  We are back on the record at 12:24.

Q.  Okay.  I think I had -- when we took a break I had handed you the affidavit of Eddie Vernon.

A.  Yes.

Q.  And if you read paragraph 7, he said, I don't exactly know why I went to the police at first. Do you see that?

A.  Yes.

Q.  Okay.  So based upon your memory of the trial, it is your understanding that Eddie Vernon was the one who approached the police saying he witnessed the crime?

A.  Correct.

Q.  Now, during the trial and any of the other matters surrounding the trial, would you have seen Edward Vernon or Eddie Vernon talking with



any of the other police officers or detectives, other than Detective Terpay?

A. No.

Q. And you were asked questions about some of the other detectives' names.  If you look at Exhibit A, which is the Ricky Jackson transcript. Exhibit A, if you look at the page 3 and 4.

A. Okay.  Okay.

Q. Okay.  In looking at the index of witnesses, Detective Terpay is listed --

A. Right.

Q. -- Eugene Terpay.  And John Staimpel is listed as a witness.

A. Okay.

Q. James Farmer is not on that list as a witness at that trial, right?

A. I don't see his name.

Q. Okay.  And I think you were asked whether you recall ever having any conversations with James Farmer.  And do you have any specific memory of any specific conversations with James Farmer?

A. No, I don't recall any specific.

Q. And if he was not a witness at the trial, would you have any reason -- would you have any reason to speak with him?



A.  No.

Q.  And the same true for Frank Stoiker, you don't recall any specific conversation with Frank Stoiker?

A.  Correct.  Ronald Ashcroft --

MR. SEARBY:  Wait for a question.

THE WITNESS:  I know.

Q.  You were asked some questions about your visit to the crime scene?

A.  Yes.

Q.  Why did you go to the crime scene?

MS. WANG:  Objection.  Asked and answered.

A.  I always go -- usually I'll go to a crime scene if it will help me in the prosecution of the case.

Q.  Okay.

A.  Mainly to determine where people were at the time they witnessed events.

Q.  So it was in preparation for trial?

A.  Yes.

Q.  To familiarize yourself with the surroundings?

A.  Yes.

Q.  You weren't doing any investigation?

A.  No.



DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                        122

Q.  You were asked questions about the FBI contacting
    the City of Cleveland Police Department?

A.  Yes.

Q.  Do you remember that?

A.  Yes.

Q.  And I think your answer was that you did not
    recall.  Are you able to sit here 40 years later
    to say that you did not -- or that the
    prosecutor's office did not receive any records
    from the City of Cleveland Police Department that
    referenced the FBI?

A.  I don't recall.

Q.  You don't recall one way or the other?

A.  Right.

Q.  Okay.  So when you said you don't recall, you
    meant you don't recall one way or the other?

A.  That's correct.

Q.  And also about there was reference to King or Art
    King?

A.  Right.

Q.  You said you don't recall.  Is that you don't
    recall one way or the other?

A.  I don't recall one way or the other.

Q.  Now, generally when -- all right.  Let me --

                    MR. FUNK:  Give me a couple --



let's take a five-minute break.  I'll just go over my notes.  I should be done.

THE VIDEOGRAPHER:  We are off the record at 12:29.

- - - -

(Thereupon, a recess was had.)

- - - -

THE VIDEOGRAPHER:  We are back on the record at 12:33.

Q.  Okay.  So just I want to make sure we are clear about the testimony, your testimony regarding the FBI.

A.  Yes.

Q.  What is your testimony?  Is it something you recall one way or the other, or is it something that you don't have a -- in your specific memory did not occur?

MS. WANG:  Objection.

A.  I don't recall.

MS. WANG:  Objection.  Form. Asked and answered.

A.  I don't recall one way or the other.

Q.  Okay.  Now in all of your interactions with Detective Terpay during the trial, did you find any reason to believe that Detective Terpay was



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
124

not honest and trustworthy?

           MS. WANG:  Objection.  Form.
Foundation.

A.  None whatsoever.

Q.  None whatsoever.  Did you ever -- in your
interactions with John Staimpel, did you have any
indication that Detective Staimpel was not honest
and trustworthy?

           MS. WANG:  Objection.  Relevance,
form, and foundation.

A.  I don't recall speaking to Detective Staimpel.

Q.  Okay.  He was one of the witnesses at the trial?

A.  Sure, but I don't recall.

Q.  But you don't have a memory of it?

A.  Correct.

Q.  Do you recall Detective Terpay or Detective
Staimpel ever using any racially derogatory
words?

A.  No.

           MR. FUNK:  Okay.  I have no
further questions.  Thank you.

           -  -  -  -

RE-EXAMINATION OF DOMINIC J. DEL BALSO

BY MS. WANG:

Q.  Earlier Mr. Funk was asking you about your



responsibility as a prosecutor to review the materials you had received from the police and determine whether it should be disclosed to the defense; is that right?

A.   Yes.

Q.   Now, your responsibility in that regard was to review what the police gave you; is that right?

A.   Correct.

Q.   So if there was exculpatory material, whether it's documentary or information that the police decided not to give you, you would have no way of knowing; is that right?

          MR. FUNK:  Objection.

A.   Correct.

Q.   If the police had taken notes of interviews that they had, handwritten notes of interviews that they had with Eddie Vernon, and they did not give those to you, you could not have disclosed it to defense, right?

          MR. FUNK:  Objection.

A.   Correct.

Q.   And earlier you also said in response to the question about typed police reports versus handwritten notes of the police, you said that it's their procedure, referring -- was that



referring -- strike that.  That was a bad question.  Mr. Funk asked you whether the police would have given you their handwritten notes in addition to typewritten reports; is that right?

A.  Correct.

Q.  And you had stated that -- your answer was, it's their procedure in terms of not giving you the handwritten notes?

A.  Correct.

Q.  Okay.  When you were referring to, they, who were you referring to?

A.  Police officers in general.

Q.  Okay.  So it was the Cleveland police officers' procedure not to give you their handwritten notes?

A.  Correct.

Q.  Was it your understanding that that was City of Cleveland's procedure at the time in 1975 not to disclose to the prosecutor their handwritten notes?

                MR. FUNK:  Objection.

                MR. MALLAMAD:  Objection.

A.  I don't recall what the City's procedure was.

Q.  Okay.  And how are you familiar with the police officers' procedure, meaning the Cleveland --



A.   Trying --

Q.   -- Cleveland police officers' procedure?

A.   Trying numerous cases, I never received any handwritten notes that they used to prepare their police reports or statements or documents.

Q.   And if the police officers, the handwritten notes had different information or exculpatory information that they decided not to put into their typewritten police reports, you would have not had any way of knowing; is that right?

            MR. FUNK:  Objection.

A.   Correct.

Q.   You could only know the information the police decided to disclose to you?

            MR. FUNK:  Objection.

A.   Sure.

Q.   Did you ever see any handwritten notes of any of the detectives involved in Ricky Jackson's case or the Bridgeman brothers' cases?

A.   No.

            MR. SEARBY:  Objection.  Asked and
       answered.

Q.   You were -- earlier when Mr. Funk was asking you a question about the list of witnesses at Ricky Jackson's trial, you were about to say something



about Ronald Ashcroft?

A. Yes.

Q. Do you recall what that was?

A. Ronald Ashcroft was killed in an automobile accident along with a friend of mine 12 years ago.  And I was surprised when I saw his name.

MS. WANG:  Let's just take a quick break, a couple minutes, and I'll confer and --

THE VIDEOGRAPHER:  We are off the record at 12:38.

- - - -

(Thereupon, a recess was had.)

- - - -

THE VIDEOGRAPHER:  We are back on the records at 12:42.

Q. Just a couple of other questions.  Mr. Del Balso, earlier you testified that Detective Terpay brought Eddie Vernon to meet with you at the prosecutor's office?

A. Correct.

Q. And would Detective Terpay, did he bring him home as well?

A. I -- I don't recall.

Q. Okay.  Do you recall any -- either of



Case: 1:15-cv-00989-CAB  Doc #: 114-29  Filed:  03/01/17  129 of 134.  PageID #: 5450

DOMINIC J. DEL BALSO                          December 02, 2015
JACKSON vs. CITY OF CLEVELAND                              129

Mr. Vernon's parents coming to pick him up?

A.   I don't recall that.

MS. WANG:  I have no further

questions.

THE WITNESS:  Okay.

MR. FUNK:  Nothing further.

THE VIDEOGRAPHER:  This concludes

our video deposition at 12:43 with the

conclusion of disk two.

MR. SEARBY:  Let me just state on

the record that we have the right to read

the transcript and at least at this point

we will reserve that right, so we will

read.



DOMINIC J. DEL BALSO
JACKSON vs. CITY OF CLEVELAND

December 02, 2015
130

SIGNATURE OF DEPONENT

I, the undersigned, DOMINIC DEL BALSO, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

PAGE    LINE         CHANGE              REASON

_____

Dominic J. Del Balso



C E R T I F I C A T E

The State of Ohio, )   SS:
County of Cuyahoga.)


     I, Chana Margareten, a Notary Public within and for the State of Ohio, authorized to administer oaths and to take and certify depositions, do hereby certify that the above-named witness was by me, before the giving of their deposition, first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition as above-set forth was reduced to writing by me by means of stenotypy, and was later transcribed by computer-aided technology under my direction; that this is a true record of the testimony given by the witness; that said deposition was taken at the aforementioned time, date and place, pursuant to notice or stipulations of counsel; that I am not a relative or employee or attorney of any of the parties, or a relative or employee of such attorney or financially interested in this action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

     IN WITNESS WHEREOF, I have hereunto set my hand and seal of office, at Cleveland, Ohio, this ____ day of _____, A.D. 20 ___.




_____

Chana Margareten, Notary Public, State of Ohio

55 Public Square, Suite 1332

Cleveland, Ohio 44113

My commission expires March 10, 2021



800.211.DEPO (3376)
EsquireSolutions.com

DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                        132

Reference No.: 359849


Case:  JACKSON vs. CITY OF CLEVELAND


        DECLARATION UNDER PENALTY OF PERJURY


     I declare under penalty of perjury that
I have read the entire transcript of my Depo-
sition taken in the captioned matter or the
same has been read to me, and the same is
true and accurate, save and except for
changes and/or corrections, if any, as indi-
cated by me on the DEPOSITION ERRATA SHEET
hereof, with the understanding that I offer
these changes as if still under oath.


        _____
        Dominic J. Del Balso


        NOTARIZATION OF CHANGES
              (If Required)

Subscribed and sworn to on the _____ day of

_____, 20_____ before me,

(Notary Sign)_____

(Print Name)                          Notary Public,

in and for the State of _____



DOMINIC J. DEL BALSO                                    December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                       133

Reference No.: 359849

Case:  JACKSON vs. CITY OF CLEVELAND


Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

Dominic J. Del Balso



DOMINIC J. DEL BALSO                                      December 02, 2015
JACKSON vs. CITY OF CLEVELAND                                          134

Reference No.: 359849

Case:  JACKSON vs. CITY OF CLEVELAND


Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

Dominic J. Del Balso

