IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

RICKY JACKSON,

        Plaintiff,

                       JUDGE BOYKO

  -vs-               CASE NO. 1:15-CV-00989

CITY OF CLEVELAND, et al.,

        Defendants.
_____/
KWAME AJAMU, et al.,

        Plaintiffs,

  -vs-           JUDGE BOYKO
                  CASE NO 1:15-CV-01320

CITY OF CLEVELAND, et al.,

        Defendants.
_____/

Videotaped deposition of JAMES WHITE, taken as if upon examination before Brian A. Kuebler, a Notary Public within and for the State of Ohio, at the offices of Roetzel & Andress, 1375 East Ninth Street, 10th Floor, Cleveland, Ohio, at 10:41 a.m. on Thursday, December 10, 2015, pursuant to notice and/or stipulations of counsel, on behalf of the Plaintiffs in this cause.

- - - -



EXHIBIT 35

APPEARANCES:

    Elizabeth Wang, Esq.
    Loevy & Loevy
    2060 Broadway, Suite 460
    Boulder, Ohio  80302
    (720) 328-5642,

        On behalf of the Plaintiff;
        Ricky Jackson;

    Terry H. Gilbert, Esq.
    Friedman & Gilbert
    55 Public Square, Suite 1022
    Cleveland, Ohio  44113
    (216) 241-1430,

        On behalf of the Plaintiffs,
        Kwame Ajamu and Wiley Bridgeman;

    Stephen W. Funk, Esq.
    Roetzel & Andress
    222 South Main Street
    Suite 400
    Akron, Ohio  44308
    (330) 376-2700,

        On behalf of the Individual
        And Estate Defendants;

    Shawn Mallamad, Esq.
    City of Cleveland Law Department
    601 Lakeside Avenue
    Room 106 City Hall
    Cleveland, Ohio  44114
    (216) 664-2569,

        On behalf of the Defendant,
        City of Cleveland.

ALSO PRESENT:

    David Tackla - Videographer (216)241-3910



                    I N D E X

EXAMINATION
JAMES WHITE
BY MS. WANG                                6

Plaintiff's Exhibit 1                     11
Plaintiff's Exhibit 2                     12
Plaintiff's Exhibit 3                     22
Plaintiff's Exhibit 4                     56
Plaintiff's Exhibit 5                     67
Plaintiff's Exhibit 6                     67
Plaintiff's Exhibit 7                     69
Plaintiff's Exhibit 8                     78

                  OBJECTION INDEX

MR.  FUNK                                 18
MR.  FUNK                                 19
MR.  FUNK                                 25
MR.  FUNK                                 26
MR.  FUNK                                 36
MR.  FUNK                                 37
MR.  FUNK                                 37
MR.  FUNK                                 38
MR.  FUNK                                 39
MR.  FUNK                                 43
MR.  FUNK                                 44
MR.  FUNK                                 44
MR.  FUNK                                 45
MR.  FUNK                                 45
MR.  FUNK                                 46
MR.  FUNK                                 47
MR.  FUNK                                 47
MR.  FUNK                                 48
MR.  FUNK                                 48
MR.  FUNK                                 48
MR.  FUNK                                 48
MR.  FUNK                                 49
MR.  FUNK                                 49
MR.  FUNK                                 50
MR.  FUNK                                 50
MR.  FUNK                                 51
MR.  FUNK                                 52
MR.  FUNK                                 53
MR.  FUNK                                 53
MR.  FUNK                                 63
MR.  FUNK                                 63



JAMES WHITE
RICKY JACKSON vs. CITY OF CLEVELAND

December 10, 2015
4

MR.  FUNK                                                64
MR.  FUNK                                                66
MR.  FUNK                                                71
MR.  FUNK                                                72
MR.  FUNK                                                73
MR.  FUNK                                                73
MR.  FUNK                                                73
MR.  FUNK                                                74
MR.  FUNK                                                75
MR.  FUNK                                                75
MR.  FUNK                                                76
MR.  FUNK                                                77
MR.  FUNK                                                77



THE VIDEOGRAPHER: We're on the record.  Today's date is December 10th, 2015.  The time is now 10:41:55.  This is the beginning of Tape No. 1.

This is the case captioned Ricky Jackson, Plaintiff, versus the City of Cleveland, et al, Defendants.  It is being held in the United States District Court, Northern District of Ohio, Eastern Division.  Case Number 1:15-CV-00989.

Will everyone please introduce themselves and state who they represent on the record.

MS WANG:  Elizabeth Wang, W-a-n-g.  Attorney for Plaintiff Ricky Jackson.

MR. GILBERT:  Terry Gilbert on behalf of Kwame Ajamu and Wiley Bridgeman in Case Number CV -- 15-CV-1320.

MR. MALLAMAD: Shawn Mallamad representing the City of Cleveland in both cases.

MR. FUNK:  Steve Funk representing the other defendants in the case including the witness here today, Mr. White.

THE VIDEOGRAPHER:  Sir, can you



please raise your right hand to be sworn in.

JAMES WHITE, of lawful age, called by the Plaintiff for the purpose of examination, as provided by the Rules of Civil Procedure, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF JAMES WHITE

BY MS. WANG:

Q.  Could you please state your name and spell it for the record.

A.  James White.  W-h-i-t-e.

Q.  Do you have a middle initial?

A.  E.

Q.  Are you retired, sir?

A.  Pardon?

Q.  Are you retired?

A.  Yes, I am.

Q.  How long have you been retired?

A.  Since 1988.

Q.  Where were you employed at the time that you retired?

A.  Cleveland Police Department.

Q.  Have you ever given a deposition before?

A.  No, I have not.



Q.  So, I'm an attorney for the Plaintiff Ricky Jackson in this case, and as you can see we'll be asking you a few questions about the events at issue in this lawsuit.

At any time that you want to take a break, feel free to ask for a break unless there's a question pending.  Is that fair?

A.  That's fair.

Q.  Because everything is being transcribed, please allow me to finish asking my question before you begin answering, that way the record will be clear.  Is that fair?

A.  Yes, ma'am.

Q.  If there's something that I ask that you don't understand or that's not clear to you, please feel free to ask me for clarification, otherwise I will assume that you understood my question and that you've answered it.  Is that fair?

A.  Yes, ma'am.

Q.  Okay.  Are you on any medications or anything today that would affect your ability to testify?

A.  No, ma'am.

Q.  Do you have any trouble hearing or anything?

A.  Pardon?

Q.  Do you have any trouble hearing?



A. A little bit.

Q. Okay. A little bit. I didn't mean to ask that more quietly than I asked my other questions --

A. Yes.

Q. -- but, okay, I just want to -- I'll speak up, but I don't want to do that if it's not necessary.

A. Okay.

Q. Okay. All right. What's your highest level of education?

A. I have a master's degree in criminal justice.

Q. When did you obtain that?

A. 1985.

Q. From what institution?

A. University of Central Missouri State.

Q. And do you also have a bachelor's degree?

A. Yes. Cleveland State University.

Q. When did you obtain that?

A. I can't recall right offhand.

Q. All right. How old are you, sir?

A. I will be 78 next week.

Q. When did you first join the Cleveland Police Department?

A. 1963.

Q. Do you remember what month?



A.  December.

Q.  And were you ever employed as a law enforcement
officer before joining the Cleveland Police
Department?

A.  No, I was not.

Q.  Were you ever in the military?

A.  Yes, I was.

Q.  When did you serve in the military?

A.  1958 to 1962.

Q.  What position did you hold in the military?

A.  I was in the United States Coast Guard and I was
a chief petty officer.

Q.  Did you ever --

A.  Administrative position.

Q.  Okay.  Did you ever go abroad?

A.  Not with the coast guard, no.

Q.  Okay.  At the time that you joined the Cleveland
Police Department -- or actually let me back up
just a little.

Were you discharged from the military at some
point?

A.  Yes, I was.

Q.  Honorably?

A.  Yes.

Q.  Back in 1963 when you joined the Cleveland Police



Department, were you employed prior to joining the CPD?

A.  Yes, I was.

Q.  Where were you employed?

A.  I worked for the State of Ohio, the Air National Guard.

Q.  International -- oh, Air National --

A.  Air National Guard.

Q.  Air National Guard?

A.  Yes.

Q.  How long were you in that position?

A.  Probably about six months before I went on the police department.

Q.  And prior to Air National Guard were you employed?

A.  In the coast guard.

Q.  Okay.  Did you obtain your bachelor's degree before or after your time in the coast guard?

A.  After.

Q.  After.  Do you recall when you graduated from high school?

A.  1956.

Q.  And from 1956 to 1958, what did you do?

A.  I worked for the Air National Guard at that time for a while and then I went out to California and



worked at Walt Disney and then I returned to Ohio and joined the United States Coast Guard.

Q. Okay. When you joined the Cleveland Police Department in 19 --

A. '63.

Q. -- 63, did you attend police academy?

A. Yes, I did.

Q. How long did the police academy take?

A. I believe it was 12 weeks, ma'am.

Q. 12 weeks.

MS. WANG: Let me have you mark this as Exhibit 1.

- - - -

(Thereupon, Plaintiff's Exhibit 1 was marked for purposes of identification.)

- - - -

Q. All right. The court reporter has handed you what's been marked as Deposition Exhibit 1. It is Bates stamped CLE000787 through 784 -- it's in reverse order. It's general police order number 58-63, dated December 10th, 1963. In the subject line it says "notification of police applicants."

And if you will just take a look at page 3. It says there: Second District, James E. White, 11635 Glendora Lane, Parma Heights, Ohio. Is



that you?

A.   That's correct.

Q.   Okay.  So, is it fair to say that this is a document that shows that you were a police applicant at this time and it was directing the applicants in this notice to report for duty?

A.   Uh-huh, yes.

Q.   Is that fair?

A.   That's correct.

Q.   Okay.  What did you have to do to apply for the police department, do you recall?

A.   I have to go down to the civil service and make out an application, take the civil service exam, and wait for the results.

Q.   Okay.  All right.

         MS. WANG:  Let's have this marked as Exhibit 2.

                 - - - -

     (Thereupon, Plaintiff's Exhibit 2 was marked for purposes of identification.)

                 - - - -

Q.   For the record this is a document Bates stamped CLE000781.  It says at the top general police order number 61-63, December 19th, 1963.  Says appointments-assignments.  And it states the



following persons have been appointed to the

position of patrolman, division of police,

department of public safety, effective Monday,

December 16th, 1963, and assigned to the police

academy until further notice.

     And in this list in alphabetical order is the

name James E. White.  Is that you?

A.   That's correct.

Q.   The number 1726, was that your badge number?

A.   That was my badge number, yes, ma'am.

Q.   Okay.  Did your badge number stay the same

     throughout your time at the police department?

A.   As a patrolman.

Q.   Okay.  And then when you obtained a different

     position it changed?

A.   Yes.

Q.   Okay.  How long were you a patrolman for?

A.   I was promoted to sergeant in 1974.

Q.   Okay.  So, for about 11 years and then you

     were --

A.   Yes.

Q.   -- promoted to sergeant?

A.   Uh-huh.

Q.   Were you -- was your title detective/sergeant?

A.   Yes.



Q.  What does that mean that you were detective/sergeant?

A.  That means that I was a sergeant working in the detective bureau.

Q.  Okay.  So, did you have -- as a detective/sergeant did you have investigative responsibilities like the other detectives or were you more --

A.  Supervisor responsibilities of investigations.

Q.  Okay.  So, you were in charge of supervising investigations?

A.  Yes.

Q.  Were you ever a detective prior to being a sergeant?

A.  Yes.

Q.  Okay.  And what years did you hold that position?

A.  1970 to 1974.

Q.  Okay.  And at that time was there a position called "detective"?

A.  Yes.

Q.  Okay.  When you were promoted from patrolman to detective in 1970, did you have to take any kind of test or go to detective school?

A.  There's no test.  It's not a promotion, it's just a change of duties.  And we went to -- we were



on-the-job training mostly.

Q.  What kind of on-the-job training did you have to become a detective?

A.  When you went to the detective bureau, your supervisor and a detective with experience -- you were assigned with a detective with more experience and then you had your supervisory officers to give you training.

Q.  Backing up for a moment.  Did you -- in the police academy, did you receive any training about how to conduct juvenile interrogations?

A.  I beg your pardon?

Q.  When you were in the police academy, did you receive any training on how to conduct interviews or interrogations of juveniles?

A.  Not that I recall.  I may have, but I'm not sure.

Q.  When you were in the police academy, did you receive any training on the obligation of police officers to disclose exculpatory evidence?

A.  I don't recall any, but there may have been, but I don't recall it at this time.

Q.  Do you understand what I mean by exculpatory evidence?

A.  I have an idea, yes.

Q.  What's your idea of it?



JAMES WHITE                                          December 10, 2015
RICKY JACKSON vs. CITY OF CLEVELAND                              16

A.   It's evidence that has to be presented to the
     court.

Q.   Are you familiar with the case Brady versus
     Maryland?

A.   No, I'm not.

Q.   Did you ever receive any training from the
     prosecutor's office at any point in time?

A.   Not that I recall, no.

Q.   During your time in the police academy, what
     generally do you recall about the training that
     you received there?

A.   I remember there was training on civil -- not
     civil but the traffic laws, misdemeanors,
     felonies, weapons training, first aid training.
     I said firearms training, I think I said that.
     Arrest procedures.  Report writing.

Q.   Going back to the time period when you were
     receiving on-the-job training in order to become
     a detective -- well, let me clarify, actually.
         When you say on-the-job training, are you
     describing on-the-job training that you received
     from more senior detectives after you became a
     detective --

A.   Yes.

Q.   -- or before you became a detective?



A.  No, after I became a detective.

Q.  Okay.  Do you recall who -- were you partnered with somebody who was more senior when you first became a detective?

A.  Yes.

Q.  And who was that?

A.  I don't recall him anymore.  That was a long time ago, ma'am.

Q.  Okay.  And was there a particular division or types of cases you were assigned to work as a detective between '70 and '74?

A.  You -- there was what they called the general duty detective section.  And then there was other specialized units, but when you first came into the bureau, you worked general duty.

Q.  And what did that mean?

A.  That means you had the crimes that the narcotics didn't work, the homicide people didn't work.  You worked most burglaries, robberies, assaults.  That kind of crime.

Q.  All right.  And so could you describe what you mean by on-the-job training that you received?

A.  That's pretty hard to describe.  You had a supervisor, you had a senior detective.  When you went out to work on a crime, he'd say this is



what we're going to do and this is how you're going to do it, and that's on-the-job training, ma'am.

Q. All right.  Did you -- during the time period of 1970 to 1974, did you have just one more senior detective who was giving you on-the-job training or more than one?

A. No.  I --

                    MR. FUNK:  Objection.

A. No.  He didn't -- I had the senior -- I had the senior detective working with me for a short period of time and after that I was on my own.

Q. Oh, okay.  And what -- how long was it that you had the senior detective working with you?

A. Well, I don't recall.  Maybe six months.

Q. When you first -- and this is I'm jumping back again, but going back to when you first joined the department as a patrolman, did you receive a manual of rules?

A. Yes.

Q. And was it your own copy to keep and refer to?

A. I don't recall offhand.

Q. Okay.  Did you receive any other -- well, let me strike that.

        Taking a look at Deposition Exhibit 2,



it's -- you know, it's a general police order.

A.   Uh-huh.

Q.   Do you recall receiving general police orders at any time during your -- you know, from the time that you joined the CPD until 1975?

A.   General police orders were coming out almost daily.  And if you don't receive them necessarily, they'd be read to you at rollcall, shown to you, but you don't have a booklet that you carry around with all the general police orders in.

Q.   Okay.  Was there a copy -- well, let me strike that.

     What kind of things would be referred to in the general police orders?

                    MR. FUNK:  Objection.

A.   I can't recall at this time.

Q.   Do you remember if there were amendments to the manual of rules that were in the general police orders?

A.   I can't -- I couldn't tell you, I don't know.

Q.   At any time that you were at the Cleveland Police Department -- well, let me strike that.

     From the time you joined the Cleveland Police Department in 1963 until 1975, during that period



of time was the manual of rules ever amended, to your knowledge?

A. To my knowledge, I can't say for sure, but I imagine it was.

Q. And do you recall in what manner it was amended, that is, did you receive an amendment via a police order or some other kind of written method?

A. I don't recall.

Q. During the time period of 1963 to 1965 when you were at the Cleveland Police Department, do you recall any rules in the manual of rules being rescinded?

A. I don't recall.

Q. Okay.  During the time period of 1963 to 1975, did you ever receive any general police orders referring to the obligations of officers to disclose exculpatory evidence?

A. Personally I didn't receive any.  There may have been some out, but I didn't receive any personally, that I can recall.

Q. Do you recall there being any discussed at roll call?

A. Not right offhand, no.

Q. Other than the manual of rules and the general



police orders, was there any other form in which rules or regulations or policies that the police department took?

A.  I believe there was a detective bureau procedure manual.

Q.  What was in this detective bureau procedure manual?

A.  I don't recall at this time.

Q.  Do you have any recollection of generally what was in the manual?

A.  Just general procedures that -- administrative procedures that the detectives would have to follow in investigating a case I would say.

Q.  Do you remember anything else about what was in the manual?

A.  Not right offhand, no, ma'am.

Q.  Let me -- all right.  Let me just finish that topic.

So, other than the manual of rules, general police orders, and the detective bureau procedure manual which you believe existed then, is there any other form in which polices, procedures or written rules that the department took or were issued?

A.  GPOs.



Q.  Okay.  GPOs, General Police Orders?

A.  Right.

Q.  Anything else?

A.  Not that I can recall.

Q.  Do you recall receiving any departmental notices during this time period of 1963 to 1975?

A.  It sounds familiar.  I don't remember any offhand, but I think there was notices put out also.

Q.  Do you have any recollection of what kinds of things would be discussed in departmental notices?

A.  No, I don't.

Q.  All right.

               MS. WANG:  All right.  So, let's have this marked as Exhibit 3.

                          -  -  -  -

     (Thereupon, Plaintiff's Exhibit 3 was marked for purposes of identification.)

                          -  -  -  -

Q.  The court reporter has handed you what has been marked as Deposition Exhibit 3.  For the record, it is the rules of conduct and discipline for the Cleveland Police Department that's dated 1950. Could you just take a moment to glance through



that.  You don't have to read the whole thing, just glance through it and let me know if it looks familiar to you.

MR. FUNK:  You don't have to read every page.  I think the question is just does it look familiar to you.

THE WITNESS:  Okay.

MR. GILBERT:  He's ready.

Q.  Oh, you're ready?  Okay.  All right.  Does it look familiar to you?

A.  Yes, it does.

Q.  Okay.  And is that the rules manual that you were referring to earlier?

A.  No, not the procedure manual for the detective bureau.

Q.  No, not that one.

A.  Yes, this is the rules manual that I was referring to, yes.

Q.  And that's different than the detective --

A.  Yes.

Q.  -- bureau procedure manual, right?

A.  Yes.

Q.  Okay.  And just a reminder, just let me finish asking the question before you start answering so the record will be clear.



JAMES WHITE                                    December 10, 2015
RICKY JACKSON vs. CITY OF CLEVELAND                          24

         Okay.  All right.  So, that manual, is that
    the one that you got when you joined the CPD in
    1963?

A.  Yes, I believe it is.

Q.  Okay.  And just so the record is clear, the
    detective bureau procedure manual is different
    than that one?

A.  Yes, ma'am, it was.

Q.  Okay.  When you became a detective, did you
    receive any training besides on-the-job training?

A.  There were several courses that occasionally
    would come out that you might be assigned to, and
    I believe I've went to several of them.

Q.  Do you remember what they were?

A.  Not right offhand, no.

Q.  Were they courses for detectives specifically or
    just anyone in the department who wanted to
    attend?

A.  Mostly for detectives.  I do remember one now, I
    went to a school for antiterrorism.

Q.  Really?

A.  Uh-huh.

Q.  Okay.  And that was back in what time period, '70
    to '74?

A.  Later than that I would say.  Around '78, '79,



something like that, at the Illinois State Police Academy.

Q. Okay.  So, and let me ask you this:  Do you remember attending any courses that were conducted -- or that were held by law enforcement agencies other than the Cleveland Police Department?

A. Yes, I attended the FBI National Academy.

Q. Okay.  When did you go there?

A. 1956 -- 1966, excuse me.

Q. What did you -- what kind of training did you receive there?

A. Boy, we did firearms training.  We did constitutional law.  We did evidence collection. There was others, but I can't recall them offhand.

Q. What did you learn in your course on constitutional law?

A. I don't recall anymore, that was a long time ago.

Q. Okay.  From the time period of 1963 through 1975, did you ever attend any course, or receive any training in which you learned that officers have an obligation to disclose exculpatory evidence to criminal defendants or prosecutors?

MR. FUNK:  Objection.



A.  Not that I recall.

Q.  During the time period of 1963 to 1975, did you ever receive any training or attend any courses in which you learned how to conduct interviews of juveniles?

MR. FUNK:  Objection.

A.  Not that I recall.

Q.  During the time period of 1963 to 1975, did you ever receive any training or attend any courses on the topic of conduct -- how to conduct a lineup?

A.  I may have, but not that I recall.

Q.  Okay.  In -- during your time as a detective before you made detective/sergeant, but during the time period of 1970 to 1974, did you receive any other kind of training that we haven't already discussed?

A.  Not that I recall, no.

Q.  Okay.  And then do you remember approximately when in '74 you were promoted to sergeant?

A.  Around April I think.

Q.  What did you have to do to be promoted?

A.  You take a civil service exam.

Q.  Anything else?  Is that it?

A.  Yeah.



              MR. FUNK:  You have to answer
          "yes" or "no", I mean verbal answers.
A.    Yes.
Q.    Okay.  And then in April of '74 you became a
      sergeant.  Was there a particular district that
      you became a sergeant in or bureau or area of the
      city?
A.    No.  I was reassigned -- I was assigned -- well,
      when I became sergeant, I went to communications
      for six months.  And after the six months I
      returned to the detective bureau and was assigned
      to general duty again.
Q.    Okay.  Six months.  What was communications?
A.    Radio, police radio.
Q.    All right.  So, you went back to general duty at
      the detective bureau in about October of '74?
A.    That's correct, ma'am.
Q.    Now, at that time in October of '74 when you were
      detective/sergeant, what generally were your
      duties and responsibilities?
A.    I supervised the detectives in District 3 and
      District 6 on Platoon A of the detective bureau
      general duty section.
Q.    And what was Platoon A?
A.    Pardon?



Q.  What was Platoon A?

A.  I still didn't hear you.

Q.  What was Platoon A?  What shift was that?

A.  That's a shift.

Q.  Right.

A.  You rotate.  You had three shifts, A, B and C, you rotate every month, days, nights, afternoons. A was the particular shift that I was -- platoon that I was on.

Q.  Was that days?  Was that days, Platoon A?

A.  No.  A is a platoon that goes from days to nights to afternoons.

Q.  Oh, I see.  Okay.  I was thinking platoon is correlated with a particular shift, but you're saying it rotates shifts?

A.  Right, it rotates shifts, yes, ma'am.

Q.  So, who was -- was there particular people assigned to Platoon A?

A.  Yes.

Q.  Okay.  Who were those people, do you know?

A.  Oh, I don't recall anymore.  Many.

Q.  Do you recall approximately how -- there were detectives I assume assigned to Platoon A?

A.  Yes.  They're all detectives --

Q.  Okay.



A. -- they were all detectives in the detective bureau.

Q. Right.  Okay.  Okay.  By the way, was there just one detective bureau at the time?

A. There's one bureau, different sections to it, yes.

Q. How many different sections were there?

A. I don't recall an exact number.

Q. Do you recall approximately how many detectives total there were in 1975?

A. No, I cannot tell you that.  I have no idea.

Q. Okay.  So, in May of 19 -- in May of -- I'm going to May of 1975 now -- were you still assigned to Platoon A, do you recall?

A. May of 1975?  Yes.

Q. Was Eugene Terpay in Platoon A in 1975?

A. No, he was not.

Q. How about James Farmer?

A. No, ma'am.  They were both homicide detectives.

Q. Okay.  So, they were not in the general duty bureau?

A. No, they were not.

Q. Or general duty division.

A. Detective bureau, right.

Q. I got it.  Okay.  So, there were no homicide



detectives that were assigned to your platoon?

A.  No.

Q.  Is that right?

A.  That's right.

Q.  Okay.  Did you conduct lineups generally as a part of your duty as a detective/sergeant?

A.  Yes, I did, ma'am.

Q.  Okay.  And did you begin doing lineups as soon as you made sergeant?

A.  Shortly after.

Q.  And how did you learn how to conduct lineups?

A.  I was instructed by a previous sergeant and a lieutenant.

Q.  Do you remember who they were?

A.  The lieutenant was Lieutenant Lauerhaus.

Q.  How do you spell that?

A.  L-a-u-e-r-h-a-u-s, I believe.  He's deceased.

Q.  Do you remember the other person?

A.  I can't bring his name up right now.  If I think of it, I'll let you know.

Q.  Okay.  What were you taught about how to conduct a lineup?

A.  Well, you were taught that you never put more than one person to view a lineup at a time.  You always try to get the people in the lineup who



are similar in height, weight, race, age.  And that they always have an investigating detective at the lineup because it's his responsibility to make the reports on the lineup.  And you're advised on what to tell the witness or victim before going into the lineup.

Q.  Anything else?

A.  That's about it.

Q.  Okay.  What were you -- what did you learn about -- strike that.

What were you instructed about what to tell a witness or victim before going in to view a lineup?

A.  My normal procedure is to tell the victim or witness that they're going to view a lineup.  That there will be six, seven, whatever number of individuals there that are in the lineup.  They'll be on one side of the screen, you'll be on the other.  You can see them, they can't see you.  I'm going to ask each individual to step forward, face in all four directions, and step back.

When I finish with the last individual, I will ask you if you can identify anybody involved in this crime.  At that time simply state the



number that the individual is standing under. That's it.

Q. Okay.  And this conversation that you had with the witness or victim, is that -- was that in a separate area before going into the lineup room?

A. Yes.  It was in an interview room, yes.

Q. Was it your practice to just have that conversation be between you and the person viewing the lineup or would the investigating detectives also be there?

A. One investigating detective would be there.

Q. Do you know why they would have one investigating detective there?

A. Yes.  He has to make that information -- put that information into his investigative report.

Q. Did you normally do lineups in your own cases, that is, in cases that you were investigating yourself?

A. No, ma'am.

Q. Why not?

A. Because you want an impartial person doing the lineup.

Q. And so as the sergeant in charge of doing a lineup, were you responsible for getting people, you know, people to be in the lineup --



A.  No, ma'am.

Q.  -- the fillers?

A.  That's the jailers job.

Q.  Oh, the jailer's job?

A.  Yes.

Q.  Okay.  So, tell me how that process worked.

A.  All right.  The detectives would call up to the general duty -- take the homicide detectives, they would call the general duty and say we want to conduct a lineup, we need a supervisor to come down to conduct a lineup or go up actually to conduct the lineup.  And I'd say, okay.  Go ahead and put your witnesses in the interview room, advise the jail who you need in the lineup and tell them to get additional people into the lineup, so they can view more than -- you don't want just one person in a lineup.  So they would do that.  Then they'd call up to say, okay, Sergeant, we're ready for the lineup.

Q.  Wait.  I'm a little -- "they" meaning --

A.  The detectives --

Q.  Okay.

A.  -- investigating detective.  And then I would go up to the jail, go into the interview room, tell the people what I just told you before, inform



them what to do.  Then one detective, myself, and the victim or witness would walk across the hall and into the interview -- the lineup room.

Q. Okay.  So, if a homicide detective needed a lineup done, he would call you and then you would call down to the jailer?

A. They would call the jailer.

Q. They would call the jailer?

A. And the jailer would get the people out of the cells and bring them into the lineup.

Q. Okay.  So, it was the investigating detective's job to tell -- well, let me -- the jailer wouldn't know -- well, let me strike that.

You had said earlier that one of the things you learned about doing a lineup is that you want to have people who are similar in height, weight, age and race --

A. Right.

Q. -- in the lineup, right?

So, the jailer is not somebody who is investigating the case or who knows who is suppose to be in the lineup --

A. No.

Q. -- and what the height, weight, age or race would be, right?



JAMES WHITE
RICKY JACKSON vs. CITY OF CLEVELAND

December 10, 2015
35

A.   That would be the detectives would go down speak to the jailer and say we want Joe Jones, we want Tom Smith and we want four other people who are similar in height, weight.  And they have cards, booking cards, and they can go say, okay, this guy is six foot six, we don't want him.  This guy is five ten, he meets the description.  And they go to the cell, get the gentleman out, bring him up, put him in the lineup.

Q.   Okay.  So, and I just want to make sure that I understand, so the detective would go down to the jail and speak to the jailer and then the detectives would be responsible for looking at the booking cards and seeing I want this person, this person, this person, is that how it --

A.   Well, not responsible.  The jailer would look at the booking cards and he'd say I've got this guy, and then he'd bring them up.  And if the detective said, no, we don't want this guy, he doesn't fit the description, they put him back.

      And then they put him -- and then when I came down, I would also, before I'd start the lineup, I would check them to make sure that they were fairly synonymous with what the people were looking for.



Q.  Okay.

A.  Many times the officer, the supervisor who's running the lineup, wouldn't even know which ones are the suspects in the crime.

Q.  Okay.  That would be you --

A.  Right.

Q.  -- like if you were running the lineup, you wouldn't know.

A.  I wouldn't necessary know who they were looking for, right.

Q.  Okay.  Was it a policy not to have you know who they were looking for?

                    MR. FUNK:  Objection.

A.  I wouldn't say it was a policy, but it was the way that they did things.

Q.  That was the practice?  That was the practice?

A.  Practice, right.

Q.  All right.  Did you ever when you -- was it your practice when you were conducting lineups, was it your practice to have two suspects in one lineup together?

A.  It wasn't a practice, no.

Q.  And why not?

A.  I have no idea.

Q.  If you had -- let's say that there was a crime



that had, that involved two suspects and both of those suspects had been arrested and they were in custody, would you have put them both in the same lineup if they didn't look alike?

MR. FUNK:  Objection.

A.  I would have nothing to say about who goes into the lineup except -- unless they did not look like the people that they wanted.  That was up to the detectives to decide.

Q.  So, the detectives would decide who would go into the lineup?

A.  Yeah.

MR. FUNK:  You have to --

A.  Yes, ma'am.

Q.  Is that a yes?  Okay.

But -- well, let me ask you this:  So, let's say the detective had some people in the lineup who did not look alike.  As the sergeant who was conducting the lineup would you say, this is not proper, you know, these people don't look enough alike, we need to get somebody else in here?

MR. FUNK:  Objection.

A.  I might.  I've had that happen, but they'd say, but we need that man in the lineup, he's one of our suspects.



Q.   Okay.  And you would defer to the detective?

A.   Yes.

                    MR. FUNK:  Objection.

Q.   So, ultimately it was the detective's call as to how the lineup would look?

A.   No, not ultimately.  But they had a lot of input into it.

Q.   Why wouldn't you have more than one person view a lineup at a time?

A.   Because if you have two, you have a possibility that the first one would say, No. 1, and the other one may not be sure, but because the first person said No. 1 they'd say, yeah, it's No. 1 and we didn't want that.

Q.   Okay.  So, you wanted -- if there were two witnesses, you wanted them to look at the lineup separately?

A.   Separately, correct.

Q.   And generally who was in the room -- at the time that you had a witness view a lineup, who was in the room besides yourself, the investigating detective, the witness, and then the lineup people on the other side?

A.   No one.

Q.   And if there were two detectives involved in a



case, would they both be in the room?

A.   No, ma'am, just one.

Q.   Just one.  And was that a policy just to have one?

MR. FUNK:  Objection.

A.   That was the procedure we used.

Q.   Why was that the procedure?

A.   It -- I'm not sure why they did it that way, I would have an idea that it would be easier to control.  We didn't want any conversation between two detectives while the individual was viewing the lineup, it might distract them or something like that.

Q.   Okay.  So, earlier you were talking about what you would tell a witness -- strike that.

So, once you're in the lineup room and you've got the lineup set up and you've got the witness in there, one of the investigating detectives and yourself, is that when you would say -- what would you say to the people in the lineup to begin the lineup, you know, the procedure?

A.   I would be standing to the -- usually stood to the left of the person viewing a lineup, close to the screen, and I would say, No. 1 step forward, turn to your right, turn to your right, turn to



your right.  Step back.  No. 2 step forward.  Go right down the line like that until I was finished.  And then I would ask the witness or victim, is there anybody in this lineup that you can identify as being involved in this crime?

Q.  Right there in the lineup room?

A.  Yes, ma'am.

Q.  Okay.  Could the people in the lineup hear?

A.  Yes, they could.

Q.  Could you describe the screen a little more?

A.  The screen was painted black.  And on the inside there are several very strong lights shining into the people who are standing in the lineups' face, so they cannot see through the screen to see who was on the other side.

Q.  Is there any other conversation that would occur in the lineup room besides what you've discussed?

A.  No, ma'am.

Q.  What would happen after -- after that?  Well, let me ask you this:  If the witness said I can't identify anybody, what would happen after that?

A.  The detective in the lineup room would take them out.

Q.  And then is your job over at that point?

A.  I would tell the jailer, they can take the people



back to their cells and I would leave, yes, ma'am.

Q. Well, let me ask you this:  Is the jailer who brings the people up to be in the lineup, is he in the room, too?

A. No.  There's a door that goes behind the screen, so they get in right behind the screen.  He's standing at that door.

Q. On the other side of the door?

A. On the other side of the door.

Q. And then what would you do after -- you said the investigating detectives would leave the room with the witness?

A. With the witness, yes.

Q. And then what would you do after that?

A. I'd go back to my office.

Q. Did you ever do any follow-up as to what happened with the witness after that?

A. No.  No, ma'am.

Q. During that time that you were a detective, did you ever have occasion to investigate a case where you wanted a lineup set up?

A. Yes, ma'am, I did.

Q. And did you do that pretty frequently?

A. Quite often, yes.



MR. FUNK:  Is this a good time for a break?

MS. WANG:  Sure.

THE VIDEOGRAPHER:  We're going to go off the record.  The time is now 11:27:48.  Off of the record.

- - - -

(Thereupon, a recess was had.)

- - - -

THE VIDEOGRAPHER:  We're back on the record.  The time is now 11:32:39.  On the record.

BY MS. WANG:

Q.  All right.  Earlier you testified that you did have occasion during the time that you were a detective to arrange for a lineup in one of your own cases, right?

A.  Yes, ma'am.

Q.  Would you, as the investigating detective in those situations, would you be responsible for writing a report about the lineup?

A.  Yes, I would.

Q.  Okay.  And what was your practice in terms of what you would put in the report about what occurred at the lineup?



JAMES WHITE                                    December 10, 2015
RICKY JACKSON vs. CITY OF CLEVELAND                          43

A.  You normally you would put in that you attended a lineup, it was conducted by sergeant or lieutenant so and so, so and so.  At that time if they could not identify anybody, you'd put that in the report.  If they did identify anybody, you would put that in the report.

Q.  Was it your practice to also write down the names of the people who were the fillers in the lineup?

A.  No, it was not.

Q.  Why not?

A.  I don't know, ma'am.  They just -- that wasn't the policy at the time -- or the procedure at the time.

Q.  Did you ever take pictures of the lineup so that, you know, people would know later what the lineup looked like?

A.  No, ma'am.

Q.  Were you -- are you aware of any policy at the Cleveland Police Department between 1963 and 1975 that required detectives to document who was in a lineup?

          MR. FUNK:  Objection.

A.  Not per se document a person who were in a lineup, no, ma'am.

Q.  Were you aware of any policy or procedure in the



Cleveland Police Department between 1963 and 1975 that required detectives to document how a lineup looked by say taking a photograph of the lineup?

MR. FUNK:  Objection.

A.  I have no -- no recollection of that, no, ma'am.

Q.  Would it be fair to say that without documentation of who was in a lineup, it would not be possible later for a defense attorney to know if the other people who are in the lineup looked similar or dissimilar to the suspects?

MR. FUNK:  Objection.

A.  I would say probably they would not know, yes.

Q.  When you were a detective, did you ever have occasion to have a juvenile witness view a lineup?

A.  Yes, ma'am.

Q.  And on those occasions did your practice in terms of how you treated the juvenile witness, was your practice different than how you treated an adult witness?

A.  No, ma'am.

Q.  Would you ask that -- would you -- well, let me ask you this:  Was it your practice to have a parent or guardian present when a juvenile witness was viewing the lineup?



A.  No, ma'am, it was not our practice.

Q.  Why not?

A.  Because the procedure was only one person -- we don't want anybody influencing the victim -- the witness to make a certain decision.  And the parents, they would have a big sway over what comes out of the juvenile's mouth I think.

Q.  When you were dealing with juvenile witnesses, would you call a parent or guardian to have them be present at a police station --

        MR. FUNK:  Objection.

Q.  -- while they were viewing the lineup even if they weren't in the room?

        MR. FUNK:  Objection.  If I can just clarify.  Are you talking about in his capacity as an investigating detective --

        MS. WANG:  Yeah.

        MR. FUNK:  -- or as a supervisor in the lineup?

        MS. WANG:  Investigating detective.

A.  As investigating detective, yes, we would talk to the parents before we used the juvenile.

Q.  I'm sorry, I missed the last part of what you said.



A.   We would talk to the parents before we use a juvenile for a witness in the lineup room.

Q.   Okay.  And what would you say to the parents?

A.   We explain to them what we're going to do, what takes place.  That the child is in no danger.  That she cannot -- he or she cannot be seen by the people on the other side of the screen.  The same thing that I would tell the adults almost.

Q.   Would you ask that the parent come down to the station to just be there with the juvenile even if he wasn't in the room?

A.   If it was possible for them to come down, yes, ma'am.

Q.   Would you -- if a parent could not come down to the station, would you go ahead and conduct the lineup anyway?

A.   With their approval.

Q.   What if they didn't give you their approval?

                    MR. FUNK:  Objection.

A.   Well, we would try to convince them and make arrangements where maybe they can come down with the child and be in the interview room while the lineup was going on.  We never seemed -- we never had too many problems with that.

Q.   And what do you mean, "we never had too many



problems with that"?

A.  If they couldn't make it the day we wanted to have the lineup, we'd accommodate them and so they would accommodate us.

Q.  Okay.  When you were an investigating detective, did you ever have occasion to interview juvenile witnesses to crimes?

A.  Yes, ma'am.

Q.  And on those occasions, would you -- was it your practice to interview the juveniles alone or would you ask that their parent or guardian be present?

MR. FUNK:  Objection.

A.  We did both, alone and with the parents.

Q.  And when you say, "we did both", do you mean you would -- what do you mean by that?

A.  Well, sometimes the parents would be there and other times the parents would not be there.

Q.  Okay.  Was there a policy that you were aware of at the Cleveland Police Department between 1963 and 1975 that required parents to be present when juveniles are being interviewed?

MR. FUNK:  Objection.

A.  I knew of no policy, I just know of the procedures we used.



Q.  And the procedure you used was that sometimes you would have the parents there and sometimes you wouldn't?

A.  Right.

Q.  Okay.  So, there was no requirement that the parents be present then?

MR. FUNK:  Objection.

A.  Not, to my knowledge, there was no requirement, yes, ma'am.

Q.  And why would you ever interview a juvenile without a parent present?

MR. FUNK:  Objection.

A.  It depends on the situation.

Q.  And can you discuss what you mean by that?

MR. FUNK:  Objection.

A.  On the streets, parents not around.  If the parent didn't want to be there.  If the parent couldn't make it and we wanted to proceed and the parent said it was all right, we would interview them without the parent being there.

Q.  Would you agree that juveniles can be more susceptible to suggestive questioning than adults?

MR. FUNK:  Objection.

A.  I would think I would agree to that, yes.



Q.   If a parent told -- of a juvenile witness -- told you that he or she did not want their child to be interviewed without them, what would you do in that situation in terms of whether to proceed with the interview or not?

               MR. FUNK:  Objection.

A.   If they said they did not want to be -- their child interviewed without them present, we would not speak to the child until the parent could be present.

Q.   And that was your practice?

A.   That was our practice.

Q.   Are you aware of whether that was the practice of other investigating detectives?

A.   I am not aware --

               MR. FUNK:  Objection.

A.   -- of that.

Q.   By the way, did you say you were in -- did you do homicides?  Did you investigate homicides?

A.   No, ma'am, I've never been a homicide detective.

Q.   Okay.  It was general duty?

A.   Yes, ma'am.

Q.   Were the procedures for interviewing witnesses and suspects as a homicide detective any different than as a general duty detective, do



you know?

MR. FUNK:  Objection.

A.  I have no knowledge of what the procedures of the homicide unit was.

Q.  Did you ever learn at any time when you were a detective that the procedures of the homicide unit were different than a general duty detective?

MR. FUNK:  Objection.

A.  I've never had any information come to me about the difference between any of the units.

Q.  Did you ever work with --or strike that.

Do you know Eugene Terpay, or did you know Eugene Terpay?

A.  I knew the name, I didn't know the man myself personally.

Q.  Okay.  And you knew the name just from being in the department around the same time?

A.  Yes.

Q.  Okay.  Did you ever have occasion to work with him on any cases?

A.  I don't believe so, no, ma'am.

Q.  Did you know James Farmer?

A.  I knew the name, didn't know the man.

Q.  Did you ever have occasion to work with him on



anything?

A.  No, ma'am.

Q.  Did you know John Staimpel?

A.  Again, I knew the name, but didn't know the man
    personally.

Q.  You didn't work with him?

A.  No.

Q.  Did you know Frank Stoiker?

A.  No, ma'am.

Q.  That was Staimpel's partner.

            MR. FUNK:  Objection.

A.  I don't recall the name offhand.

Q.  Okay.  Did you know Peter Comodeca?

A.  Yes, ma'am.

Q.  How did you know him?

A.  I knew him from when I first went up to the
    detective bureau, he was in the detective bureau
    before he went to homicide I believe.

Q.  Okay.  And did you ever work with him on any
    cases?

A.  No, I did not.

Q.  In what capacity were you familiar with him?

A.  Just from around the police station.

Q.  How about Detective Gerald Engelhart, did you
    know him?



A.   Yes, ma'am.

Q.   How did you know him?

A.   He came on the job with me.  We were in the academy together.

Q.   Were you ever working -- did you ever work on any cases together?

A.   No.  No, ma'am.

Q.   How many people were in your academy at the same time?  Whatever is on that form?

A.   Whatever is on this form, yes, ma'am.

Q.   Okay.  Have you maintained any kind of relationship with Detective Engelhart over the years?

A.   No, ma'am.

Q.   Do you know in the time period of '74 and '75 what section or division Detective Engelhart was assigned to?

A.   I believe he was in the statement unit.

Q.   What was your understanding of his responsibilities in the statement unit?

          MR. FUNK:  Objection.

A.   Take statements from suspects and victims.

Q.   Were you ever in the statement unit?

A.   No, ma'am.

Q.   Was the statement unit comprised of detectives?



A. Yes, ma'am.

Q. Do you know if they received any training to learn how to take statements?

MR. FUNK:  Objection.

A. I have no idea, ma'am.

Q. Do you know why secretaries didn't type up the statements?

A. No, ma'am.

Q. Or court reporters?

MR. FUNK:  Objection.

Q. Did they have court reporters back then, do you know?

A. Did they have court reporters --

Q. Yeah --

A. -- back then?

Q. -- to take statements back then?

A. There was court reporters in the court, none in the police department.

Q. Okay.  When you were an investigating detective, did you ever have occasion to have a detective from the statement unit take a statement of a witness or a suspect?

A. Yes, I did.

Q. And tell me how that would work.  If you needed a statement taken, how would you go about getting



that done?

A.   All right.  We would go down and take our victim or down to the statement unit after the investigation with our investigative reports. We'd go over the crime and what we wanted to ask them with the statement man.  And most of them were pretty knowledgeable, so they'd say, okay, well, maybe we ought to ask this, maybe you ought to ask that in case we forgot something.  Then we'd say, no, this is what we want to ask.

So, he would sit down.  We would ask the questions of the victim or person who witnessed the crime, and we'd ask the question and he would type it up.  And they answer the question, he would type the answer in there.

And when it was all through, you take the statement, you give it to the witness or the victim and say read this over, is this what you said?  Are you sure about this?  They'd say yes, or if they want to change something, we'd go back and we'd change it.  That made an addendum to it. And then they would sign the statement.

And then that statement would go into the file and that would go to the prosecutor with all the other reports.



Q.  And this would take place in a different area, in the statement unit?

A.  Yes.

Q.  Okay.  And that was a special area where all the statements were taken?

A.  Yes.

Q.  When you were an investigating -- when you were investigating cases as a detective and you wanted to get a statement from a witness, did you ever just go down to the statement unit and get something typed up and bring it back to the witness to sign?

A.  Absolutely not.

Q.  Why not?

A.  It's not legal.

Q.  Why isn't that legal?

A.  You've got to have the words of the person that's making the statement and he'd have to sign that in front of us that this is what they said. We're not going to put words in their mouth.

Q.  Did you ever have Detective Engelhart type up a statement for you?

A.  I can't recall.

Q.  What -- did you review any documents in preparation for your deposition here today?



A.  Yes, ma'am.

Q.  What documents did you review?

A.  I read the Complaint and I read the answers from the attorney, from my attorney to --

Q.  The numbered paragraphs?

A.  Yes, uh-huh.

Q.  The interrogatory answers?

A.  Yes.

Q.  Anything else?

A.  I think that's about it.

Q.  Have you spoken with anyone other than your attorney about your deposition today?

A.  No, I have not.

Q.  Okay.  Have you spoken with anyone other than your attorney about this lawsuit?

A.  About what?

Q.  This lawsuit?

A.  No, ma'am.

                    MS. WANG:  Let's have this marked as Exhibit 4.

                         -  -  -  -

        (Thereupon, Plaintiff's Exhibit 4 was marked for purposes of identification.)

                         -  -  -  -

                    THE VIDEOGRAPHER:  Two minutes of



tape.

MS. WANG:  Okay.  Do you want to just change it now or --

THE VIDEOGRAPHER:  We're going off the record.  The end of Tape No. 1.  The time is now 11:48:28.  Off of the record.

- - - -

(Off the record.)

- - - -

THE VIDEOGRAPHER:  We're back on the record.  This is the beginning of Tape No. 2.  The time is now 11:49:27.  On the record.

BY MS. WANG:

Q.  The court reporter has handed you what's been marked as Deposition Exhibit 4.  Could you just take a moment to look at that, if you haven't already, and just let me know if -- let me know when you're finished.

A.  Okay.

Q.  All right.  This is a -- for the record this is -- these are excerpts from the trail transcript of the State of Ohio versus Wiley Bridgeman in Wiley Bridgeman's first criminal trial.  And the portion of the transcript I have here is your



testimony from I believe it is August 4th, 1975 in Wiley Bridgeman's trial.

If you turn to the page that says page 56 at the top.

A.  All right.

Q.  All right.  So, here is the beginning of your testimony.

Now, after having taken a look at this transcript, do you recall anything about your testimony on this occasion?

A.  After reading this do I recall anything?  I don't recall even doing this to tell you the truth, ma'am.

Q.  All right.  There was no other James White in the department at that time that you're aware of?

A.  Not that I know of, no.

Q.  Okay.  Do you recall anything about the case involving Wiley Bridgeman, Ronnie Bridgeman and Ricky Jackson?

A.  No, I do not.

Q.  Do you know anything about the investigation of the homicide of Harold Franks?

A.  No, I do not.

Q.  Do you recall anything about a robbery and murder that occurred at a drugstore called the Fairmount



Cut-Rate in May of 1975?

A.  No, I do not.

Q.  Do you recall ever doing any lineups for
Detective Staimpel or Stoiker in May of 1975?

A.  I don't recall, but apparently, I did, according
to this, but I don't recall it, no.

Q.  Okay.  So this doesn't refresh your
recollection --

A.  No.

Q.  -- this transcript?

A.  No.  I did hundreds of lineups.

Q.  Okay.  And let me ask you this:  On page -- on
page 57 to 58 you're asked whether -- by -- you
were asked by the prosecutor I believe whether
you remember a lineup on May 25th, 1975 where a
young boy did not make an identification at that
lineup, but then afterwards he did and then you
answered at the top of page 58, "No, I'm afraid I
do not."

So, is it fair to say that even at that time
you did not recall anything about this lineup?

A.  That's correct.

Q.  Okay.  And as you sit here today, you don't
recall anything about this lineup?

A.  That's correct.



Q.  Do you have any -- do you have any recollection of interacting at all with a young witness, a 12-year-old African American boy who came in to view a lineup on May 25th --

A.  No, I do not.

Q.  -- 1975?  The name Edward Vernon or Eddie Vernon doesn't -- doesn't --

A.  It doesn't mean anything to me.

Q.  -- mean anything to you?

            MR. FUNK:  Let her finish her
        question before you answer.

            THE WITNESS:  Okay.

Q.  It doesn't mean anything to you?

A.  No, ma'am.

Q.  Okay.  Now, on page 59 of the transcript there's a question and answer -- well, actually let me back up a little bit.  On page 58, let's go back to page 58.  At the bottom where it says cross-examination, there's a question, question: Sergeant, are you on the fourth floor?  Answer: No, I work on the third floor.

    Do you recall was the lineup, were they generally conducted on the fourth floor?

A.  I can't remember.  I can't recall.  I believe the detective bureau was on the fourth floor and the



jail was on the third floor.

Q.  Okay.  And then the next page there's an answer where you say:  "That particular day I was the desk sergeant.  That was part of my duty, but you don't know who is exactly in it and you don't care if it's a homicide case, it's their headache."

Do you remember anything about being a sergeant, a desk sergeant on May 25th, 1975?

A.  Yes, ma'am.  I remember being a desk sergeant in 1975.

Q.  Okay.  What were your duties generally as a desk sergeant?

A.  Normally it was have a lieutenant on the desk. When the lieutenant was off, sick, on furlough, days off, one of the sergeants had to fill in. And my duties was to control the office, answer the phones and do lineups.

Q.  Did you have any supervisory role at all in the homicide investigation of --

A.  None what --

Q.  I just want to finish asking my question then you can answer.

Did you have any supervisory role over the homicide investigation of Harold Franks?



JAMES WHITE
RICKY JACKSON vs. CITY OF CLEVELAND

December 10, 2015
62

A.   None whatsoever.

Q.   So, according to the transcript, you may have conducted the lineup, but you have no memory whatsoever of anything else relating to it?

A.   That's correct.

Q.   You have no evidence, one way or another, of Ricky Jackson, Wiley Bridgeman, or Ronnie Bridgeman are guilty of the robbery and murder of Harold Franks?

A.   I have no way of knowing what they did.

Q.   Okay.  And you have no knowledge, one way or another, as to what statements Edward Vernon, the 12-year-old boy who witnessed the lineup, what he said or didn't say to the detective, you have no idea?

A.   That's correct, ma'am.

Q.   Okay.  And no detectives ever told you anything about their investigation of the homicide of Harold Franks?

A.   No, ma'am.

Q.   The -- on page 59 of the transcript towards the top, the first full question there it says: Question, "The only question I have is do you remember on the date of the 25th, who the man from the homicide unit was that requested a



lineup, do you remember that?  That's what we are interested in."  Answer:  "The officer who just left."  Question:  "Terpay?"  Answer:  "Terpay, that's right."

Did you -- were you asked those questions and did you give those answers?

MR. FUNK:  Objection.

A. Apparently I did.

Q. Do you have any -- and as you sit here today, you don't actually remember?

A. I don't actually remember.

Q. Okay.  But do you have any reason to -- can you think of any -- can you think of any reason that you wouldn't have told the truth during your testimony as reflected in this transcript?

A. I would not -- I would not tell a lie.

Q. Okay.  So, would it be fair to say then that based on your testimony in August of 19 -- on August 4th of 1975, Detective Terpay was the man from the homicide unit who requested a lineup on May 25th, 1975?

MR. FUNK:  Objection.

A. I don't recall, but if it's there, that's probably what the facts are.

Q. Okay.  And that's what you testified to under



oath in 1975?

A.  Yes, ma'am.

Q.  Okay.  Do you recall ever receiving any training bulletins from the Cleveland Police Department between 1963 and 1975?

A.  I don't recall at this time, no, ma'am.

Q.  Okay.  Do you recall ever receiving any other kinds of training documents from the Cleveland Police Department between '63 and '75?

A.  What do you mean by "documents"?

Q.  If it's not called a training bulletin, any other kind of training manual or anything else that provided some kind of instruction or training.

A.  No, ma'am.  I don't recall.

Q.  Between 1963 and 1975, did you ever receive any training from the Cleveland Police Department on how to preserve witness statements, so that they would be disclosed to the prosecutor's office?

           MR. FUNK:  Objection.

A.  How to preserve them?

Q.  How to insure that witness statements were disclosed to the prosecutor's office?

A.  There was a procedure that witness statements would always be given to the prosecutor's office along with all the other reports.



Q.  During 19 -- well, were you ever -- when you were investigating a case as a detective, would you be responsible yourself for making sure that your reports got to the prosecutor's office?

A.  Yes, ma'am.

Q.  That was your job?

A.  Yes, ma'am.

Q.  Okay.  And how would you go about making sure that your reports were given to the prosecutor's office?

A.  I don't understand your question, ma'am.  You're doing your investigation, you keep all of your reports together, they're in a file.  And when you're ready to go to the prosecutor's office, you close the file, take it down, put it on his desk.

Q.  And you would personally do that?

A.  That's correct.

Q.  All right.  So, you'd just walk it over there?

A.  Right.

Q.  That's all I wanted to know.

A.  Okay.

Q.  When you were investigating a case as a detective, would you take notes?

A.  Yes, I did.



Q.  And they were handwritten notes?

A.  Yes, they were.

Q.  What would you do with your notes?  Would you put them in a file?

A.  If it was information that was necessary for the prosecutor -- prosecution, you would type up a report and put that information into the report, send your report to the prosecutor, not the notes.

Q.  Why wouldn't you send your notes?

A.  That wasn't the procedure that was used.  You typed -- you typed the same information into your report.

Q.  Okay.  Were you aware of any procedure or policy at the Cleveland Police Department between '63 and '75 where you were required to include your notes to the prosecutor's --

                    MR. FUNK:  Objection.

Q.  -- in your file to the prosecutor's office?

A.  I'm not aware of any at this time, no, ma'am.

Q.  Did you discard your notes after you typed up your reports?

A.  You probably kept them in your own file cabinet for a while.

Q.  What else would you have in your own file



cabinet?

A.   You had copies of the reports that you sent to the prosecutors in case they lost them.

Q.   Did you ever keep any reports or documents in your -- well -- in your personal file that were not handed over to the prosecutor?

A.   No, ma'am.

- - - -

(Thereupon, Plaintiff's Exhibit 5 was marked for purposes of identification.)

- - - -

Q.   The court reporter has marked and handed you what is Deposition Exhibit 5.  For the record, it's a photo of Ricky Jackson dated --

MR. GILBERT:  May 27th.

Q.   May 27th, 1975.  Does that person look familiar to you at all?

A.   No, ma'am, he does not.

Q.   No.  Okay.  Do you recall ever conducting a lineup where he was in it?

A.   I don't recall him at all, no, ma'am.

- - - -

(Thereupon, Plaintiff's Exhibit 6 was marked for purposes of identification.)

- - - -



Q.  The court reporter has handed you what's been marked as Deposition Exhibit 6.  It is a photograph of Wiley Bridgeman dated February 10th, 1975.  Does the person in that photograph look familiar to you at all?

A.  No, ma'am.  I can only repeat myself, I've conducted over a hundred lineups.  This man doesn't strike any memory of any of the lineups I recorded.

Q.  Okay.  According to the little name -- the little sign that Wiley Bridgeman is wearing in this, on this mugshot, it says 20, 5'7", 180.  Do you know what those figures refer to?

                    MR. FUNK:  Does it says 180 or 150?

Q.  Or 160.

                    MR. FUNK:  150 is what I read.

Q.  Oh, 150.  20, 5'7", 150.

A.  Yes.

Q.  Okay.  Is that --

A.  He's 20 years of age, five foot seven and weighs approximately 160 pounds.

Q.  Okay.  Going back to other photograph, the one of Ricky Jackson, it says I believe 18, 5'6" and 134.  And what do those numbers reflect?



A.  That's his age, height and weight.

MS. WANG:  Let's mark this as Exhibit 7.

THE COURT REPORTER:  The whole thing?

MS. WANG:  I think -- wait.  Hold on.  No, wrong one.

- - - -

(Thereupon, Plaintiff's Exhibit 7 was marked for purposes of identification.)

- - - -

Q.  The court reporter has handed you what's been marked as Deposition Exhibit 7.  Could you just take a look at that and let me know when you've finished reviewing it.

MR. FUNK:  And just for the record, I just want to reflect that the copy that was produced was just one sided.  This is a copy of the document that is two sided.  That the original was one sided.

Q.  And you don't have to read the whole thing, I just want to know if it looks familiar to you.

A.  Okay.

Q.  All right.  Does it look familiar to you?

A.  Yes, I've seen this before.



Q.  And on the very last page under verification, is that your signature?

A.  Yes, it is.

Q.  And so you signed these interrogatories under oath?

A.  Yes.

Q.  Now, turning to page 11.  At the bottom of 11 is an Interrogatory No. 15, and there's several subparts, so I'll ask you questions about each subpart individually.

    Subpart A says, do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that (A), required detectives or employees of the Cleveland Police Department to document or memorialize the various developments in an investigation in such a way that they would become part of the official file as the investigation proceeded.

    And what's your answer as to whether or not Cleveland had such a policy or procedure in place during that timeframe?

A.  I don't know if they had a policy, but that was the procedure, yes.

Q.  The procedure of the department was to document developments in investigations?



A. Yes.

Q. Okay. And how did you become aware that that was the procedure?

A. You were taught when you went into the bureau. I believe it was also in this manual right here (indicating) that you showed me earlier, that everything should be documented.

Q. Which rule in the manual is it?

A. Pardon?

Q. Which rule in the manual is it?

A. I have no idea, ma'am.

Q. If it -- if there's not a rule in the manual, the manual that is marked as Deposition Exhibit 3, is there any other place that such a rule would be?

MR. FUNK: Objection. Are you talking about written?

MS. WANG: Yes.

A. You're talking about written?

Q. Right.

A. There probably is, but I'm not aware of it at this time.

Q. Okay. Subpart B of Interrogatory 15 says, Do contend that the City of Cleveland had in place between 1950 and 1980 a written policy or



JAMES WHITE
RICKY JACKSON vs. CITY OF CLEVELAND

December 10, 2015
72

procedure that (B) required detectives or employees of the Cleveland Police Department to place any written -- any witness statements in the official file or otherwise make them available to criminal defendants, defense counsel or prosecutors.

So, that's the question:  Did the City of Cleveland have a written policy or procedure like that in place?

A.  I have no idea.

Q.  Subpart C asks whether the City of Cleveland had between 1950 and 1980 a written policy or procedure that required detectives or employees of the Cleveland Police Department to document or memorialize photo or in-person lineups or otherwise governed the conduct of detectives or employees during photo or in-person lineup.

And I believe earlier you answered that -- I asked you about this earlier and you said there wasn't any written policy?

MR. FUNK:  Objection.

A.  I don't know of any written policy offhand.  It was the procedures that we used and it was the detective's responsibility to do just that.

Q.  To document the lineup?



A.  That's correct.

Q.  Okay.  But there was no written policy that required -- required detectives to document who was in the lineup?

A.  Not that I know of --

MR. FUNK:  Objection.

A.  -- at this time.

Q.  Okay.  And as far as you're aware, there is no procedure either that required detectives to document who was in the lineup?

MR. FUNK:  Objection.

A.  At this time I don't recall any such thing.

Q.  And no photographs -- it was not a policy or procedure to take photographs of the lineup, so everybody would know what it looked like?

MR. FUNK:  Objection.

A.  No, there was no policy or procedures to take photographs of the lineup.

Q.  The subpart D of Interrogatory 15 asks -- and I'm just going to paraphrase here -- whether the City of Cleveland had between 1950 and 1980 a written policy or procedure that required detectives of the Cleveland Police Department to disclose exculpatory evidence?

A.  Disclose to whom?



Q.  To prosecutors.

A.  I don't know if there was a written policy, but they -- all evidence had to be given to the prosecutor's office.

Q.  Was there any policy that required disclosure to criminal defendants?

A.  I didn't catch that.

Q.  Was there any policy that required disclosure of exculpatory evidence to defendants?

A.  I don't know of any at this time.

Q.  Okay.  And I think you said it was the procedure to disclose to prosecutors?

A.  Yes.

Q.  Okay.  In 1975 what was your understanding of what was included within the scope of exculpatory evidence?

        MR. FUNK:  Objection.

A.  Well, our procedure was that all evidence was given to the prosecutor regardless of whether it was for or against the particular individual who was being accused.

Q.  And that was your practice?

A.  Yes.

Q.  Okay.  And were you ever taught that by anybody at the police department?



A.  We were taught it when we got into the detective bureau, yes.

Q.  And that was --

A.  On-the-job training.

Q.  Through on-the-job training?

A.  Yes, ma'am.

Q.  And was that for -- you were taught it during on-the-job training; is that right?

A.  Yes' ma'am.

Q.  Are you aware of whether other detectives were taught that during their on-the-job training?

MR. FUNK:  Objection.

A.  I'm not aware, but I presume they were.

Q.  Okay.  Well, different detectives were taught by different people, right?

A.  That's correct.

Q.  And the detectives that taught you were not necessarily the same as the ones who taught all the other detectives?

MR. FUNK:  Objection.

A.  That is correct.

Q.  And actually the detectives who taught you were not in the homicide unit, right?

A.  No, they were not.

Q.  Okay.  So, you don't know, one way or another,



what the detectives in the homicide unit were taught?

A.  I have no idea what they were taught, no, ma'am.

Q.  Subpart E of Interrogatory 15 states -- and I'll paraphrase again because it's kind of long.  Do you contend that the City of Cleveland had in place between 1950 and 1980 any written policies or procedures that required detectives of the Cleveland Police Department to document or memorialize interrogations or interviews of suspects and witnesses?

    Did the city have such a policy at that time?

            MR. FUNK:  Objection.

A.  I don't know if there was a policy, but it was the procedure that we take notes and turn them all over to the prosecutor's office.

Q.  Your notes, your handwritten notes, would not be turned over to the prosecutor's office though --

A.  No, they would not.

Q.  -- is that right?

    Okay.  You -- your practice was to type up what was in your notes into your typed report and then you'd give those to the prosecutor's office?

A.  That's correct.

Q.  And you're not aware, one way or another, of what



JAMES WHITE                                    December 10, 2015
RICKY JACKSON vs. CITY OF CLEVELAND                          77

the practices of the detectives in the homicide unit were?

A.   That's correct, I have no idea what they did.

Q.   And there was no written policy of the Cleveland Police Department that required a detective, including detectives in the homicide unit, to turn over --

          MR. FUNK:  Objection.

Q.   -- to insure that all of their handwritten notes were typed up into typed reports?

          MR. FUNK:  Objection.

A.   I don't recall it at this time, but I'm sure there was a policy out there for that somewhere.

Q.   Okay.  Well, you were never in the homicide unit, right?

A.   I was never in the homicide unit.

Q.   You don't know one way or another what their policies were?

A.   No, I don't know one way or the other.

          MS. WANG:  Let's take a quick break.

          MR. FUNK:  Okay.

          THE VIDEOGRAPHER:  We're going to go off the record.  The time is now 12:15:36.  Off the record.



                              -   -   -   -

                    (Thereupon, a recess was had.)

                              -   -   -   -

              (Thereupon, Plaintiff's Exhibit 8 was marked

                 for purposes of identification.)

                              -   -   -   -

                         THE VIDEOGRAPHER:  We're back on

                 the record.  The time is 12:22:53.  On the

                 record.  Back on.

        BY MS. WANG:

    Q.  The court reporter has handed you what's been

        marked as deposition Exhibit 8.  Could you just

        take a look at that and let me know if you've

        seen that before.

    A.  I don't recall, but I may have.

    Q.  Okay.  Deposition Exhibit 8 is Bates stamped

        CLE000452.  It is General Police Order No. 19-73,

        dated July 18th, 1973.  Subject line is pretrial

        discovery rights of defense attorneys and courts

        in criminal cases.

            It refers -- the text of it I'll just

        summarize -- refers to a letter from the county

        prosecutor, John Corrigan, about the rights of

        defense attorneys and courts to statements,

        reports and other items in criminal cases.



Do you recall ever receiving any letter like that?

A.  I don't recall offhand, no.

Q.  Okay.  As you sit here today and you're looking at that General Police Order, does it refresh your recollection at all about what that letter may have said?

A.  I can read what it says, yes.  I don't remember ever seeing it before, no.

Q.  Okay.  All right.  How long were you a sergeant?  From '74 until when?

A.  '88.

Q.  Okay.  And then in '88 what position did you have?

A.  I retired.

Q.  Did you work somewhere else after you retired?

A.  Yes, ma'am.  I went back in the military.

Q.  Oh.  What did you do there?

A.  I was an officer in the United States Coast Guard.  I did several jobs.

Q.  Okay.  And then when did you leave the coast guard?

A.  1995 I retired.

Q.  And then did you work again after that?

A.  No, ma'am.



Q.    If this case goes to trial it may -- there's no trail date set yet, but if this case goes to trial it may not be for a while, another year or more before a trial is set.  Do you have any medical conditions or anything that you can think of that might prevent you from testifying at trial?

A.    I have arthritis and high blood pressure, that's about it.

Q.    Okay.

A.    I don't think that would stop me from testifying at any trial.

            MS. WANG:  I have no further questions.

            MR. GILBERT:  We have no further questions.

            MR. MALLAMAD:  I have no questions.

            MR. FUNK:  Okay.  We'll review the transcript.  Thank you.

            THE VIDEOGRAPHER:  We're going off the record.  This is the end of the tape. The time is now 12:25:55.  Off the record.



Case: 1:15-cv-00989-CAB  Doc #: 114-35  Filed:  03/01/17  81 of 82.  PageID #: 5548

JAMES WHITE                                          December 10, 2015
RICKY JACKSON vs. CITY OF CLEVELAND                              81

            SIGNATURE OF DEPONENT


    I, the undersigned, JAMES WHITE, do hereby

certify that I have read the foregoing

deposition and find it to be a true and

accurate transcription of my testimony, with

the following corrections, if any:

PAGE   LINE        CHANGE              REASON




                        _____
                        JAMES WHITE



C E R T I F I C A T E

The State of Ohio, )   SS:
County of Cuyahoga.)

I, Brian A. Kuebler, a Notary Public within and for the State of Ohio, authorized to administer oaths and to take and certify depositions, do hereby certify that the above-named witness was by me, before the giving of their deposition, first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition as above-set forth was reduced to writing by me by means of stenotypy, and was later transcribed by computer-aided technology under my direction; that this is a true record of the testimony given by the witness; that said deposition was taken at the aforementioned time, date and place, pursuant to notice or stipulations of counsel; that I am not a relative or employee or attorney of any of the parties, or a relative or employee of such attorney or financially interested in this action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office, at Cleveland, Ohio, this ____ day of _____, A.D. 20 ___.



_____
Brian A. Kuebler, Notary Public, State of Ohio
55 Public Square, Suite 1332
Cleveland, Ohio 44113
My commission expires June 12, 2017