THE CLEVELAND POLICE DEPT

By

CLEVELAND (OHIO).  DEPARTMENT OF POLICE.
DEPARTMENT OF PUBLIC SAFETY

EXHIBIT 46

CLE001027

Cleveland Public Library

## TABLE OF CONTENTS

I.   Status of the Cleveland Police Department

   A.   Present Status

   B.   Historical Overview 1970 - 1980

        1.   Manpower
        2.   Vehicles
        3.   Communications Equipment
        4.   Crime Statistics


II.  Major Priorities of the Department

   A.   Response Time

   B.   Personnel

   C.   Vehicles

   D.   Communications

   E.   Future Projections


III. Improvements in Police Service

   A.   1980 Improvement Plan

        1.   Task Force Recommendations

   B.   Resource Allocation

   C.   Citizen Complaint Procedure

   D.   Equal Employment Opportunities


IV.  Proposed Activities

   A.   Civilianization

   B.   Auxiliary Police

   C.   Federal Grants, External Assistance

   D.   Communications

        1.   911 Implementation


   C.   Fiscal Overview

PUBLIC ADMINISTRATION   FEB 17 1981

CLE001028

I.  STATUS OF THE CLEVELAND POLICE DEPARTMENT

CLE001029

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 4 of 78. PageID #: 6105

PERSONNEL STATUS

CLEVELAND POLICE DEPARTMENT

NOV 1 79 - SEP 1 80

| 1 80 | MAR 1 80 | APR 1 80 | MAY 1 80 | JUN 1 80 | JUL 1 80 | AUG 1 80 | SEP 1 |
|------|----------|----------|----------|----------|----------|----------|-------|
| 08   | 1898     | 1881     | 1869     | 1861     | 1856     | 1849     | 1889  |
| 17   | 10       | 12       | 8        | 5        | 8        | 12       |       |
| 49   | 0        | 0        | 0        | 0        | 0        | 52       |       |

CLE001030

# PERSONNEL STRENGTH 1957-1980

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 5 of 78. PageID #: 6106

CLE001031

| Year | Personnel Strength |
|------|-------------------|
| 1957 | 1851 |
| 1958 | 1927 |
| 1959 | 1957 |
| 1960 | 1959 |
| 1961 | 1947 |
| 1962 | 1928 |
| 1963 | 1919 |
| 1964 | |
| 1965 | 2029 |
| 1966 | 2046 |
| 1967 | 2215 |
| 1968 | 2206 |
| 1969 | 2406 |
| 1970 | 2478 |
| 1971 | 2456 |
| 1972 | 2326 |
| 1973 | 2465 |
| 1974 | 2427 |
| 1975 | 2336 |
| 1976 | 2208 |
| 1977 | 2029 |
| 1978 | 2031 |
| 1979 | 1896 |
| 1980 | 1908 |

08-11-2

PERSONNEL STATUS

## 1980

| | PATROL OFFICER | SERGEANT | LIEUTENANT | CAPTAIN | DEPUTY INSPECTOR | INSPECTOR | CHIEF | TOTAL |
|---|---|---|---|---|---|---|---|---|
| AUTHORIZED: | 2,500 | 189 | 75 | 25 | 7 | 4 | 1 | 2,801 |
| ACTUAL: | 1,595 | 168 | 66 | 22 | 6 | 3 | 1 | 1,861 |
| PERCENT DIFFERENCE: | −36% | −11% | −12% | −12% | −14% | −25% | − | −34% |

## 1972

| | PATROL OFFICER | SERGEANT | LIEUTENANT | CAPTAIN | DEPUTY INSPECTOR | INSPECTOR | CHIEF | TOTAL |
|---|---|---|---|---|---|---|---|---|
| AUTHORIZED: | 2,499 | 207 | 90 | 26 | 11 | 4 | 1 | 2,838 |
| ACTUAL | 1,956 | 201 | 89 | 26 | 11 | 4 | 1 | 2,288 |
| PERCENT DIFFERENCE: | −21% | −3% | −1% | − | − | − | − | −19% |

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 6 of 78. PageID #: 6107

CLE001032

Recent statistics have demonstrated that the City of Cleveland is losing population annually, and the most recent U. S. Census Bureau projection has indicated that the population of the city is currently 560,000.  The loss of police personnel has exceeded the reduction of population of the city significantly.

The Federal Bureau of Investigation compiles statistical data which compares major municipalities in the area of police strength.  The most recent report indicates that municipalities the size of Cleveland report an average of 3.6 sworn officers per 1,000 population.  At the present time, the City of Cleveland has a ratio of 3.2 officers per 1,000 population, or 11% lower than the national average.  The following charts demonstrate this comparision:

## Cleveland Population



| 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 |
|------|------|------|------|------|------|------|------|------|------|------|

```
750,000
725,000
700,000
675,000
650,000
625,000
600,000
525,000
550,000
```

## Police Personnel

```
3.60
3.55
3.50
3.45
3.40
3.35
3.30
3.25
3.20
```

## Police Personnel
## National Average

| 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 |
|------|------|------|------|------|------|------|------|------|------|------|

```
3.7
3.6
3.5
3.4
3.3
3.2
```

Another factor which has a direct impact on police service is the current status of police vehicle resources.  The Cleveland Police Department

CLE001033

currently is assigned a total of 820 vehicles, consisting of the following:

306 marked police cruisers
267 unmarked vehicles
 37 station wagons
 56 trucks
106 scooters
 29 motorcycles
  5 watercraft
 14 trailers

At the present time, this number has dwindled to a total of 774 serviceable vehicles, of which 197 are out of service. The Department, therefore, has a total of 577 serviceable vehicles to satisfy the requirements of 820 vehicles. This represents a nearly 30% reduction in service.

An additional problem is the age of the vehicles currently assigned to the Department. The majority of vehicle resources were purchased during 1973 and 1975, and these vehicles are in poor condition with extremely high mileage. The newest vehicles currently in service were purchased in 1978. However, the demands of routine patrol duties have aged these vehicles considerably.

The anticipated delivery of 35 new police vehicles will certainly enhance the vehicle resources of the Department, but it will not serve to make a significant impact on the overall problem. The Department is in need of a significant replacement of vehicles in the very near future, since the present problems will only be compounded in time

The number of police vehicles has not changed significantly over the past several years, but the condition of these vehicles has changed dramatically. During 1972, the Department was assigned a total of 408 marked patrol vehicles. However, the age of these vehicles were comparatively newer than what we presently are operating. It is critical that this resource be enhanced, as soon as possible, due to the factors of safety, morale and the rapid response to calls for assistance.

Another area to be considered is the area of radio communications equipment. The present police radio system was purchased in 1969, and is currently in need of enhancement. The Department currently operates approximately 800 mobile vehicular radios, the majority of which were purchased in 1969. These radios are serviceable. However, many are in need of repair and spare parts. The Department originally purchased 850 portable hand held radios, but over the 11 year period, the majority of them have gone out of service. At the present time, only 250 of these portables are still considered serviceable, along with 180 new portable radios purchased from General Fund monies during the last year. The most critical need is in the area of portable radios, since each officer on duty is in need of communications each time he leaves his vehicle. The lack of portable equipment does not permit each officer to be issued a unit, which has serious implications in the area of rapid response and officer safety.

The final area of comparision is the incidence of major crime in Cleveland. During the past several years, the City of Cleveland has reported a total of approximately 52,000 major crimes each year. This number varies

CLE001034

each year. However, despite a significant decline during 1973, the level of crime has been fairly consistent over the past ten years.

A significant factor to be noted, however, is the dramatic increase of the number of crimes, despite the reduction of population. A review of the attached chart indicates the dramatic increase of criminal activity during a period of population decline.

The chart indicates that the level of crime has not diminished, although it has varied from year to year. Although the population of the city has declined, and the number of police officers has also declined, the level of crime has remained consistent, and during 1979, demonstrated a 1.5% increase when compared to 1972.

Another significant variable is the fact that the type of crime has altered as well. The following chart indicates that the amount of violent crime has increased a total of 16.4% during the period of 1972 - 1979, while the amount of property crime declined 1.3% during this same period.

In summary, the level of crime has not changed significantly, although the requests for services have continually increased. Not only is the level of crime consistent, but the type of crime is also more violent and demanding of police services.

The following table demonstrates the changing patterns of crime during the past eight years.

CLE001035

MAJOR CRIMES IN CLEVELAND

PART I OFFENSES



1953 1954 1955 1956 1957 1958 1959 1960 1961 1962 1963 1964 1965 1966 1967 1968 1969 1970 1971 1972 1973 1974 1975 1976 1977 1978 1979

SOURCE:  Cleveland Police Department Annual Reports, 1953 - 1979.

CLE001036

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 11 of 78. PageID #: 6112

# UNIFORM CRIME COMPARISION

## 1972 -- 1979

| | TOTAL CRIMES | MURDER | RAPE | ROBBERY | AGGRAVATED ASSAULT | VIOLENT CRIMES | BURGLARY | LARCENY THEFT | AUTO THEFT | PROPERTY CRIMES |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 51,565 | 307 | 462 | 5,639 | 1,988 | 8,396 | 10,446 | 12,860 | 17,526 | 43,169 |
| 3 | 42,140 | 277 | 440 | 4,621 | 1,967 | 7,305 | 9,109 | 13,058 | 12,668 | 34,835 |
| 4 | 52,022 | 306 | 441 | 6,113 | 2,728 | 9,588 | 12,791 | 16,003 | 13,640 | 42,434 |
| 5 | 57.806 | 288 | 491 | 7,100 | 2,524 | 10,403 | 13,001 | 19,496 | 14,906 | 47,403 |
| 6 | 53,141 | 236 | 498 | 5,453 | 2,309 | 8,496 | 13,150 | 18,882 | 12,613 | 44,645 |
| 7 | 54,995 | 249 | 508 | 6,466 | 2,198 | 9,421 | 15,734 | 16,536 | 13,304 | 45,574 |
| 8 | 50,953 | 214 | 507 | 6,354 | 2,623 | 9,698 | 14,234 | 14,364 | 12,657 | 41,255 |
| 9 | 52,379 | 274 | 613 | 5,794 | 3,093 | 9,774 | 14,751 | 14,311 | 13,543 | 42,605 |
| CHANGE | +1.5% | -10.7% | +32% | +2.7% | +55.5% | +16.4% | +41.2% | +11.2% | -22.7% | -1.3% |

CLE001037

II.  MAJOR PRIORITIES OF THE POLICE DEPARTMENT

CLE001038

Response time is an area that is currently being given a great deal of attention by the Cleveland Police Department. The amount of time that it takes the police to respond to a call for assistance is one of the most critical services provided by law enforcement agencies.

There are a variety of factors that influence the length of time required to respond to a call for service. Due to the high volume of calls for service, it is necessary to prioritize calls, based on the nature of the incident. During the past year, The Cleveland Police Department received 1.1 million calls for service, which averages over 3,000 calls per day.

In order to provide the most rapid response to these request, the Department has established there time response categories. Any serious incident that poses a threat to a person or property, or any serious criminal activity that is in progress at the time of the call is classified as priority 1 emergency. Examples of this type of call would include a crime in progress, a man with a gun, shots fired or a serious accident. A recent study of response time indicates that priority 1 calls are responded to on an average of between 5 and 17 minutes. I would like to point out that these are averages, and that shorter as well as longer times are commonly experienced.

The second priority is classified as non-emergency, and in this instance, the first available car, not involved in a priority 1 assignment would be dispatched. Examples of this type of call would include suspicious activity, stolen auto recovery, a loud party or disorderly conduct. The average response time to this type of incident ranges between 17 and 91 minutes. These response times vary depending on a number of variables, including time of day, day of week and the number of previous assignments.

The final category is calssified as general calls for service, These calls do not pose a threat and are dispatched as soon as cars are available. These calls average from several hours to the next day, or even longer, depending on the type of incident. Examples of these calls include abandoned vehicles, barking dogs and ball games on the street.

There are a variety of factors that influence the length of time required to respond to a call for service. Response time is generally a product of a number of factors which are related to one another. These factors include available manpower, vehicle resources, the status of communications equipment, the amount of crime reported to the police, and the volume of police activity during any given period.

Simply stated, rapid police response requires sufficient manpower to do the work, sufficient vehicles for reliable transportation to the scene of various incidents, reliable communications equipment that permits the rapid and clear exchange of information, and well rrained complaint operators and radio dispatch personnel.

CLE001039

If any of these components of the system breaks down, the entire system suffers.  Each component is related to the next, and a failure in one area is felt throughout the system.

The Cleveland Police Department is not currently suffering from one weak component, but rather from a breakdown in all components.  The Department is seriously undermanned, the status of police vehicles is deplorable, the communications system is inadequate, and the volume of work on occasion is impossible to complete.

CLE001040

II.   RESPONSE TIME STUDY

A.   CURRENT RESPONSE TIME STUDIES

(1)   Explanation of priority calls for police service.

The calls for police service are assigned a priority classifications.
Category one is divided into Category 1A-highest emergency priority and
Category 1B-high priority and Category 2-non emergency, to be handled
as soon as possible.

Category 1A (highest emergency priority) calls are: abduction; accident
(fatal & non fatal); alarm; assist police officer (emergency); body found,
violence suspected; bomb threats; crime, casualty on scene; crime,
suspect there, in progress; female screaming; fight in progress;
information-suspect there now; large crowds and fights; live wires
down or other hazards; man with a gun; obstetrics-ambulance service;
policeman in trouble; prowlers; shots fired.

Category 1B (high priority) calls are: accident; blood run; broken window,
business closed; working fire; injured person as ambulance; intoxicated
driver; male attempting to lure or exposed; male down; male refuses
to leave; mental case disturbing; missing child; emergency notification;
person, slumped over wheel; some kind of trouble-not disclosed; strange
male at the door; sudden illness as a ambulance; trespasses in shcool.

Category 2 (non emergency-handle as soon as possible) calls are:
Abandoned refrigerator; assist police no emergency; assist in getting
property; assist to get into house; body haul-meet E.M.S.; child abuse
or neglect; customer trouble; damage accident or hit skip; disorderly
conduct; disturbance; drag racers; family trouble; grand theft-motor
vehicle or recovery report; holding lost juvenile or gaged person; loud
party; male dumping rubbish now; missing children over ten years;
neighbor trouble; patient transfer-mental prisoner; place entered;
rowdies; shoplifter; suspicious activity; suburban police holding
prisoner wanted by C.P.D.; tennant trouble; threats; victim at hospital-
crime or traffic; crime-no suspect or suspect gone.

(2)   Explanation of response time

Response Time is calculated by adding "Dispatch Lag" (time elapsed between
receipt of call in the Communications Control Center, to the time the
call is dispatched to a  zone car), and by adding "Arrival Time" (time
elapsed from receipt of the assignment by a zone car and the actual
arrival of a zone car to the location of the call).

(3)   Current Response Time Studies

Included are twelve charts showing average response times for Categories
1 & 2 for four randomly selected dates in June of 1980.

CLE001041

Chart # I

CATEGORY I A

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|---|---|---|---|---|
| FIRST | 5.45 | 14.16 | 30.83 | 17.14 |
| SECOND | 5.33 | 14.81 | 10.37 | 12.39 |
| THIRD | 11.25 | 8.50 | 7.42 | 8.33 |
| FOURTH | 5.14 | 10.94 | 13.53 | 10.76 |
| FIFTH | 5.30 | 17.00 | 23.66 | 14.97 |
| SIXTH | 5.75 | 10.14 | 19.04 | 15.43 |

| CITY AVG. |
|---|
| 13.35 |

CLE001042

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 16 of 78. PageID #: 6117

CLE001043

Chart # 2

AVERAGE RESPONSE TIME BY CATEGORY

CATEGORY 1B

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|---|---|---|---|---|
| FIRST | 00.00 | 00.00 | 00.00 | 00.00 |
| SECOND | 00.00 | 5.00 | 00.00 | 5.50 |
| THIRD | 00.00 | 3.66 | 3.00 | 3.50 |
| FOURTH | 8.00 | 2.66 | 00.00 | 4.00 |
| FIFTH | 18.00 | 10.50 | 00.00 | 14.25 |
| SIXTH | 14.00 | 42.50 | 8.00 | 26.75 |

| CITY AVG. |
|---|
| 11.38 |

Chart # 3

CATEGORY 2

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|---|---|---|---|---|
| FIRST | 27.04 | 75.41 | 76.18 | 64.64 |
| SECOND | 35.13 | 138.53 | 107.97 | 100.50 |
| THIRD | 25.87 | 39.95 | 39.96 | 35.10 |
| FOURTH | 64.56 | 152.02 | 79.79 | 110.63 |
| FIFTH | 28.45 | 96.77 | 83.40 | 82.34 |
| SIXTH | 57.52 | 127.02 | 162.15 | 120.76 |

| CITY AVG. |
|---|
| 86.80 |

CLE001044

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 18 of 78. PageID #: 6119

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 19 of 78. PageID #: 6120

AVERAGE RESPONSE TIME BY CATEGORY

Chart #__k____

Date 6/23/80 Monday

CATEGORY __1A_____

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|----------|-------------|-------------|-------------|------------------|
| FIRST | 00.00 | 11.00 | 10.20 | 10.66 |
| SECOND | 7.00 | 18.66 | 11.30 | 12.94 |
| THIRD | 6.00 | 10.94 | 5.20 | 8.79 |
| FOURTH | 5.00 | 13.61 | 13.86 | 11.97 |
| FIFTH | 00.00 | 12.90 | 18.25 | 13.75 |
| SIXTH | 10.00 | 11.00 | 11.50 | 11.06 |

| CITY AVG. |
|-----------|
| 11.45 |

CLE001045

Chart # 5

AVERAGE RESPONSE TIME BY CATEGORY          Date  6/23/90 Monday

CATEGORY 1B

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|---|---|---|---|---|
| FIRST | 00.00 | 14.00 | 00.00 | 14.00 |
| SECOND | 7.00 | 00.00 | 30.00 | 12.33 |
| THIRD | 39.00 | 12.00 | 14.66 | 17.83 |
| FOURTH | 00.00 | 49.00 | 00.00 | 49.00 |
| FIFTH | 6.00 | 7.00 | 00.00 | 6.90 |
| SIXTH | 7.00 | 9.00 | 00.00 | 8.33 |

| CITY AVG. |
|---|
| 14.00 |

Case: 1:15-cv-00989-CAB  Doc #: 114-47  Filed: 03/01/17  20 of 78.  PageID #: 6121

CLE001046

Chart # 6

CATEGORY 2

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|----------|-------------|-------------|-------------|------------------|
| FIRST | 39.21 | 57.95 | 35.42 | 49.35 |
| SECOND | 30.96 | 116.68 | 161.60 | 104.96 |
| THIRD | 79.55 | 76.32 | 29.42 | 66.64 |
| FOURTH | 232.05 | 127.70 | 82.55 | 154.41 |
| FIFTH | 42.91 | 75.00 | 71.16 | 64.48 |
| SIXTH | 99.50 | 135.87 | 57.23 | 107.27 |

| CITY AVG. |
|-----------|
| 94.06 |

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 21 of 78. PageID #: 6122

CLE001047

Chart # 7

CATEGORY 1

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|----------|-------------|-------------|-------------|------------------|
| FIRST | 23.00 | 24.17 | 16.69 | 21.06 |
| SECOND | 17.00 | 38.12 | 9.66 | 25.33 |
| THIRD | 9.25 | 23.07 | 6.72 | 14.67 |
| FOURTH | 21.45 | 32.31 | 12.61 | 22.43 |
| FIFTH | 14.14 | 28.76 | 21.71 | 23.47 |
| SIXTH | 14.33 | 16.00 | 27.92 | 19.68 |

| CITY AVG. |
|-----------|
| 21.31 |

CLE001048

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 23 of 78. PageID #: 6124

AVERAGE RESPONSE TIME BY CATEGORY

Chart # 9

CATEGORY 1B

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|----------|-------------|-------------|-------------|------------------|
| FIRST | 4.00 | 15.00 | 5.50 | 10.00 |
| SECOND | 137.00 | 00.00 | 8.00 | 72.50 |
| THIRD | 29.50 | 00.00 | 00.00 | 29.50 |
| FOURTH | 13.00 | 18.00 | 00.00 | 17.16 |
| FIFTH | 10.00 | 72.00 | 00.00 | 41.00 |
| SIXTH | 00.00 | 491.33 | 8.50 | 248.50 |

| CITY AVG. |
|-----------|
| 80.83 |

CLE001049

Case: 1.15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 24 of 78. PageID #: 6125

Chart # 2

AVERAGE RESPONSE TIME BY CATEGORY

CATEGORY 2

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|----------|-------------|-------------|-------------|------------------|
| FIRST | 63.28 | 87.45 | 47.66 | 75.31 |
| SECOND | 54.43 | 176.85 | 82.27 | 113.66 |
| THIRD | 68.08 | 62.41 | 61.18 | 64.43 |
| FOURTH | 115.63 | 135.30 | 121.10 | 124.25 |
| FIFTH | 137.94 | 93.96 | 81.87 | 106.49 |
| SIXTH | 72.00 | 140.36 | 28.00 | 102.06 |

| CITY AVG. |
|-----------|
| 102.44 |

CLE001050

Chart # 11

Date 6/27/80 Friday

CATEGORY 1B

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|----------|-------------|-------------|-------------|------------------|
| FIRST | 6.00 | 35.50 | 6.00 | 20.75 |
| SECOND | 13.00 | 10.33 | 5.83 | 7.90 |
| THIRD | 16.00 | 6.00 | 1.00 | 7.66 |
| FOURTH | 00.00 | 11.50 | 11.00 | 11.25 |
| FIFTH | 13.00 | 6.50 | 00.00 | 9.75 |
| SIXTH | 00.00 | 8.50 | 2.00 | 6.33 |

| CITY AVG. |
|-----------|
| 10.28 |

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 25 of 78. PageID #: 6126

CLE001051

Chart # 12

AVERAGE RESPONSE TIME BY CATEGORY

Date 6/27/80 Friday

CATEGORY 2

| DISTRICT | 1ST PLATOON | 2ND PLATOON | 3RD PLATOON | DISTRICT AVERAGE |
|----------|-------------|-------------|-------------|------------------|
| FIRST | 157.30 | 68.16 | 29.23 | 83.76 |
| SECOND | 76.20 | 98.75 | 82.51 | 87.92 |
| THIRD | 72.70 | 34.71 | 17.50 | 38.06 |
| FOURTH | 122.26 | 126.14 | 56.08 | 110.69 |
| FIFTH | 122.26 | 123.02 | 106.50 | 120.00 |
| SIXTH | 85.00 | 99.38 | 44.96 | 82.09 |

| CITY AVG. |
|-----------|
| 91.22 |

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 26 of 78. PageID #: 6127

CLE001052

II.  B.  Response Time History

The Cleveland Police Department conducted a number of response time studies in 1976 and 1977. These studies were conducted by the Department's Bureau of Inspection and are useful for comparison purposes.

There was a difference in methodology by which the studies were conducted. The recent response time studies, presented in charts one through twelve, reflect a three category breakdown of calls for service. Category 1A, Category 1B, and Category 2. The response time studies from 1976 and 1977 reflect Category 1 (a consolidation of Categories 1A & 1 B) and Category 2.

The 1976 and 1977 response time studies revealed the following "bottom line" statistics:

1976

Study covering 24 hour period: Thursday, April 29, 1976

    Category 1    Response Time 7.85 minutes
    Category 2    Response Time 16.51 minutes

Study covering 24 hour period: Friday, August 27, 1976

    Category 1    Response Time 9.80 minutes
    Category 2    Response Time 21.62 minutes

1977

Summary of four studies:  Thursday, May 5, 1977

    Category 1    Response Time  11.01 minutes
    Category 2    Response Time  21.57 minutes

                  Thursday, July 28, 1977

    Category 1    Response Time   5.51 minutes
    Category 2    Response Time  15.97 minutes

                  Thursday, October 13, 1977

    Category 1    Response Time  15.33 minutes
    Category 2    Response Time  38.38 minutes

                  Thursday, November 17, 1977

    Category 1    Response Time  12.77 minutes
    Category 2    Response Time  32.24 minutes

CLE001053

In order for the Department to correct the problems that it faces, as well as to improve the level of police service, it will be necessary to commit a significant level of resources to the Department in the next two years.

The manpower shortage is at a critical stage at the present time. The police department averages between seven and ten retirements and seperations from the Department each month. Over the next two year period, the Department anticipates losing a minimum of 200 sworn officers through normal attrition.

If 100 sworn officers were employed each year for the next two years, the Department wwould merely keep pace with attrition. The level of police service is directly related to the manpower available for street assignments. Although other changes are taking place to make the Department more efficient, additional manpower is the key to improved services.

As previously stated, the vehicle resources are also at a critical level. The majority of law enforcement agencies trade in police vehicles when they reach between 18 and 24 months of age. With the exception of the 35 new vehicles purchased in August, and the 10 Traffic cars leased through Federal funds, all police vehicles are at least 2 years old, with the vast majority of them between 3 and 6 years old. The average police vehicle becomes eligible for trade after 45,000 miles. The majority of Cleveland's patrol fleet has doubled that figure, and many vehicles have in excess of 100,000 miles.

In order to restore a fleet of police vehicles that is reliable and well maintained, it will be necessary to replace 200 vehicles per year for each of the next four years. The importance of this priority must be emphasized, due to the fact that the condition of the present vehicles is deteriorating rapidly. Since January 1, 1980, a total of 58 police vehicles have been scrapped due to overuse and inadequate maintenance.

The Department is currently reviewing vehicle allocation and maintenance procedures through a resource allocation project currently funded by the Cleveland Foundation. A summary of the project is detailed in Section III of the report.

Finally, the police communications system of the Cleveland Police Department requires upgrading in order for a reduction in response time as well as an improved level of service. Communications is one of the three basic necessities of the Department, in addition to manpower and vehicle resources.

CLE001054

The ability to communicate clearly and rapidly is one of the most critical necessities of the law enforcement profession. The present statue of communications equipment precludes that necessity. The majority of radio equipment is twelve years old, and many of the protable radios presently in service are unreliable.  Of the 800 portable radios allocated to the Department, only 200 are less than one year old.

It is necessary that an additional 200 portables be purchased immediately, in order to provide effective communications and insure the safety of police personnel.  An additional 100 portables per year for the next three years will be necessary to complete the transition  to reliable communications equipment.

In the event that these resources are not made available to the Department, the deterioration of the Department will not only  continue, but will accelerate in time.  The manpower shortage presents adequate manpower from being assigned to patrol duties at the present time.  Any further reduction in manpower will result in reductions of service, longer response time, and increased workloads.

The failure to replace vehicles, communications equipment and other support equipment will result in the total breakdown of the system.  The Department has already been faced with the situation in which manpower resources exceeded vehicle resources, and the situation could become a reality in the immediate future.

A great deal is taking place in order to make the most efficient use of existing resources, however thre is a limit to internal resource allocation.  That limit has been reached, and the situation has been critical for some time.  Without additional resources, the system will not be able to support the level of activity required of it.

If these resources are made available to the Department, a number of related changes will also take place.  The morale of the Department is related to the level of commitment in the area of resources. Adequate manpower and resources will enhance the level of services significantly, through the ability to provide basic services as well as the increased pride and professional conduct on the part of the patrol officer.

CLE001055

III.  IMPROVEMENTS IN POLICE SERVICE

CLE001056

1980 PLAN FOR THE CLEVELAND POLICE DEPARTMENT

A Report on Changes and Directions
in the
Cleveland Police Department

A Perspective

In many respects, the police department is critical to the quality of life in a city. It is not merely that citizens rely on the police for protection, and that the presence of police officers gives them a feeling of security which is fundamental to their willingness to live in the city and use it. Even more important, perhaps, is the fact that when they have a problem, they regard as urgent, many people call the police.

There are good reasons for their doing so. The police will respond to anyone's problem without asking, "Is that our job?" The police can come quickly because they are mobile and spread around the city. They are available all the time, even at times when most social service agencies are closed. And they have the capacity to use force which makes them particularly useful in dangerous or ambiguous situations.

So people call the police all the time -- 2,750 times a day in Cleveland. They call if there is a traffic accident, a lost child, a drunk lying on the sidewalk, a burglary, a traffic jam, a sick person, a menacing neighbor, a lost key, a loud argument, a mugging, a threatened suicide, a stray dog. In every conceivable kind of personal or interpersonal problem, the police are asked for help.

They respond -- perhaps not quickly, and sometimes perhaps not effectively. Sometimes the response is limited to a piece of information delivered by telephone; sometimes it is a referral to another agency. But in response to forty seven percent of the calls it receives, the Cleveland Police Department sends a police officer to the citizen who called to ask the police to do something about that problem.

That is what citizens expect. When they call, they want a police officer to come. They want that officers to be polite and responsive, and to help them with their problem. Sometimes their expectations are unrealistic. They expect police officers to solve problems which they, counsellors, lawyers, and courts cannot solve. But in many cases, all they want is immediate assistance and understanding.

There are two things on which the quality of police response depends. The first is a well-developed patrol. It rarely exists. It is a truism of the police field that "the patrolman is the most important person in the police department." Police administrators are fond of saying that; and in doing so, they make a bad situation worse. For, however, deeply they believe it, saying it only makes the patrol officer aware that the organization does not treat him/her like an important person.

Police departments share an unfortunate characteristic with other service-delivering organizations: They are upside down. The most important work of the

CLE001057

organization is done by people at the bottom of it.  Indeed, the purpose for which the police department exists -- delivery of police services -- is performed only by people at the bottom of the department.  Everyone else is engaged in organizational work.

What makes this a problem is that police officers, on whom the quality of police services depends, have little status or power in the organization.  They are paid less than everyone else, have less control over their work lives than everyone else and can influence the organization less than everybody else.

Their low organizational status is even more of a problem since outside the organization -- on the streets of the city, in performing their work -- they are actually very powerful.  Indeed, they are in fact more powerful than the administrators who oversee them.  Only patrol officers (and, occasionally, detectives) respond to emergency calls.  Only they make the most critical decisions made by the police:  Whether to intervene, how to intervene, how to treat people, whether to serve them, whether to use force or arrest people.

The disparity between organizational power and community power is a persistent problem for patrol officers.  It is they who are best informed about the problems of their community; yet they have little influence over the decisions the organization makes to serve the community.  It is they who have the greatest need for the resources of the department -- cars, information, supervision -- but they have the least ability to affect the distribution of those resources.  Everything in the organization communicates to them that rewards lie not where they are, at the bottom of the organization, but at the top.  So regardless of rhetoric, they are encouraged to leave patrol and seek organizational advancement.  It is the only route to self-improvement.

They should not have to do that.  Good patrol officers do not necessarily make good managers.  Good people ought not to have to leave the job in which the most important work of the organization is performed.  But there is little reason for able people to stay at the patrol level.  There is little reason for them to feel good about being there.  So many of them compete for advancement in the organization although they would prefer to do patrol work.

Thus one way to improve police response is to improve the lot of patrol officers by returning power and status to them.  By giving organizational power to patrol officers, by increasing the rewards given to them, by giving the best resources to them, by giving them reason to feel better about their organization, it is possible to improve the quality of the services the patrol officers deliver to citizens.  That is going to be one theme of this administration.

A second way to improve response is to improve the quality of the technical services on which response also depends.  A police department, like any other organization, rests on a base of technical development.  Technical achievement is not an end.  Those police departments which aspire for higher and higher technical proficiency sometimes forget that the end product of policing is service, not technology.

But citizens needing police service must be able to reach the police department by telephone.  They must be able to call at any hour of the day, and reach a complaint operator quickly.  The operator must be skillful in eliciting information and equally skillful in soothing the citizen.  The complaint operator is the citizen's first contact with the police department.

CLE001058

Complaint operators ought to be able to tell calling citizens how long they will wait before a car arrives. That too depends on technical development. The operator can predict arrival time only if the dispatchers know where cars are, what police officers are doing, and if the cars and officers are spread around the city in efficient ways. So service depends on radios and the allocation of patrol officers.

It also depends on the availability of cars which function. Police fleet operations are complex. Police officers drive their specially equipped cars in ways which are hard on the cars. They also drive them a lot. Under the best of circumstances, if those cars are carefully maintained, they must be replaced after eighteen months. But in the absence of good preventive maintenance and corrective maintenance, the cars deteriorate even faster.

Technical development also requires a paperwork system which serves the needs of the organization without burdening the patrol officers. The organization's needs are formidable. Detectives rely on the reports of patrol officers; crime analysis depends on them; so do an array of specialized units. Yet that paper work must be managed so that patrol officers can devote their time to service, rather than to report-writing.

Technical development does not ensure quality policing. It does not ensure that police officers will want to work, will care about the problems of the citizens to whom they respond, or that officers will be supervised by helpful sergeants. But it is clear from the experiences of police officers in Cleveland and other cities that poor equipment makes police officers feel that the department does not care about their welfare. It is clear that poor communications deprives both police officers and citizens of a vital link, and misallocation of patrol officers makes good response impossible.

A second theme of this administration is going to be improving the quality of the department's technical services so that citizens who need police officers can reach the department by telephone, so that police officers have cars in which to get there, so that officers have radios with which to communicate, and so that they are relieved of all but the minimum of organizational paper work.

A Picture of the Cleveland Police Department

At this moment the department is deficient in most of the areas alluded to.

— The personnel of the communications system are mostly new employees. Of the seventy-nine people who work in the Communications Division, fifty percent have been hired during the past year. They have been given one week of training, their policy guidance is sketchy, and their supervision is uneven.

— The department currently allocates its patrol officers evenly among the three shifts. They are assigned to fifty beats. During some periods of the day, there are half the number of police officers needed to answer citizen calls. There has never been a professional personnel allocation study.

— At present, 140 cars are assigned to patrol. At any given time, thirty-five percent of them are in the shop awaiting repair. Although most police departments buy new cars regularly, replacing all cars after eighteen months of use, the Cleveland Police

— 3 —

CLE001059

Department has not bought any cars since 1977.

— The department is under federal court order to increase its percentage of minorities. Although the minority population of Cleveland is forty-eight percent of the total population, the minority percentage of the police department is only fifteen percent.

— In order to feel challenged by career opportunities, many police departments give salary incentives to patrol officers. Some departments hold promotional examinations yearly. In Cleveland there is no salary incentive for patrol officers after their third year, and promotional examinations are given at best only every two years.

— Patrol officers need supervision which is instructive and supportive. Sergeants are on-the-street coaches, available to advise patrol officers, work with them in difficult situations, and discipline them when necessary. The sergeants in the Cleveland Police Department work without a clear conception of their role, and frequently do the same things as the patrol officers they supervise.

— Patrol officers need clear guidance from their department in the form of written rules which lay out the department's expectations for their behavior. Sometimes those rules are called policy; sometimes they are called general orders. In Cleveland, the orders have been added on top of one another over a thirty year period, and no one in the department has an up-to-date rule book.

These are some of the problems of the department. They have developed over a twenty year period. During that period, only at moments has there been a committed department leadership, fully supported by the city's administration, accountable for improving the quality of police service in Cleveland, and evaluated on its achievements. During the past twelve years there have been ten Chiefs of Police. None has held office more than two years, and most have served only a matter of months. Thus the department has not had the advantage of purposeful leadership during the worklives of most of the people who serve there.

It is not surprising, then, that the department's quality has deteriorated. A police department cannot perform well without leadership. Nor can it perform well without the support of its city. Although the total budget of the Cleveland Police Department is sixty-one million, the department ranks twenty-sixth among the police departments of the nation's largest cities in per capita expenditures for police services. Although it is not clear that the city, with its terrible budgetary problems, can support the department at significantly higher levels, it will be necessary to make some increases.

The department will not expect higher levels of support, however, until it shows that it is using its resources as well as they can be used. That is the challenge before us. During the next two years, the department will begin making systematic improvements in its management, operations, and services. Our aspiration will be to demonstrate to the citizens of Cleveland and our elected government that this police department is performing as well as possible.

We shall make many changes. They will not be made abruptly, arbitrarily, or without good reason. We are not going to create a disorderly organization in which people feel that change is being made simply because we are dissatisfied with our past. Changes will be planned: they will be planned with the participation

CLE001060

of large numbers of police officers at all levels of the department; and before they begin, they will be explained. We shall be sensitive to the good traditions of this department, and confident that the people in the department want to enhance those traditions.

We shall also be sensitive to the complexity of making changes in a police department. Many changes cannot be made without other changes which must occur at the same time. The communications center can be as efficient as imaginable; but if police officers are misallocated, there will be no police officers for dispatchers to dispatch. Personnel allocation can be as effective as possible; but if cars do not function police officers will not be able to respond to calls.

So some changes will have to be made simultaneously. That is a great burden on any organization, and particularly burdensome in one which has not been called upon to make amny changes. It places a higher level of responsibility on the Chief and his immediate subordinates to plan changes carefully, administer them sensitively, and monitor them carefully.

This department is not striving to break new ground. We are not going to be at the forefront of police technology; we are not going to experiment with team policing, proactive patrol, or undercover operations. We are going to return to traditional values of public service, working to do as well as possible the things which citizens depend on the police to do -- be there when they are needed, be helpful and sensitive, give good service, and be honest in our work as well as in our acknowledgment that we are not perfect.

The program for the next two years is divided into three sections: Improving the department's response to citizens, improving the department's response to its own personnel, and developing the leadership of the department.

During the past eight months, a great deal of activity has taken place in order to determine the problems of the Department, the solutions to these problems , and to implement an effective long range plan to improve the Department.

Two major efforts have been implemented in order to increase the level of service, and to enable the Department to operate as efficiently as possible. These efforts are the Departmental Improvement Plan, developed by Chief Hanton, and the implementation of the Operations Improvement Task Force Recommendations.

The Departmental Improvement Plan has been in the developmental stage for several months. All aspects of daily administration and operations of the Cleveland Police Department were thoroughly reviewed and analyzed prior to fromulating the various components contained in this document. Each level of the Cleveland Police Department has been consulted during the preparation of the plan, and has taken an active role in setting the long range goals that are specified.

The Department has worked closely with the Operations Improvement Task Force, and this plan reflects the combined efforts of the Task Force and the Cleveland Police Department.

The Department shall make many changes. They will not be made abruptly, arbitrarily, or without good reason. We are not going to create a disorderly organization in which people feel that change is being made simply because we are dissatisfied with out past. Changes will be planned: They will be planned with the participation of large numbers of police officers at all levels of the department; and before they begin, they will be explained. We shall be snesitive

CLE001061

to the good traditions of this department, and confident that the people in the department want to enhance those traditions.

We shall also be sensitive to the complexity of making changes in a police department. Many changes cannot be made without other changes which must occur at the same time. The Communications Center can be as efficient as imaginable; but if police officers are misallocated, there will be no police officers for dispatchers to dispatch. Personnel allocation can be as effective as possible; but if cars do not function, police officers will not be albe to respond to calls.

So, some changes will have to be made simultaneously. That is a great burden on any organization, and particularly burdensome in one which has not been called upon to make amny changes. It places a higher level of responsibility on the Chief and his immediate subordinates to plan changes carefully, administer them sensitively, and monitor them carefully.

. This department is not striving to break new ground. We are not going to be at the forefront of police technology; we are not going to conduct experiments as a result of this plan. We are going to return to traditional values of public service, working to do as well as possible, the things which citizens depend on the police to do -- be there when they are needed, be helpful and sensitive, give good service, and be honest in our work as well as in our acknowledgment that we are not perfect.

The program for the next two years is divided into three section: Improving the Department's response to citizens, improving the Department's response to its own personnel, and developing the leadership of the Department.

These three sections are further divided into twelve program areas which are detailed in the plan. These program areas are as follows:

I.  Personnel Evaluation and Allocation

   This project will analyze the work of all patrol and quasi-patrol operations. A staffing plan will be developed. The Department will calculate its need for patrol officers, will redraw patrol zones, and will make decisions about patrol priorities. This project will give the Department the leadership of the city and the citizens a precise look at the personnel needs for policing Cleveland.

II.  Recruitment

   This administration is strongly committed to taking affirmative action to increase the minority employment of the Cleveland Police Department. The current Civil Service list for patrol officers expires on July 24. Some time before that, a new examination will be requested. We shall increase the staff of the Minority Recruitment Unit which will be vigorous in finding minority applicants, assisting them in the application process, facilitating their taking the test, and retaining their interest after the test.

   The Department shall request the Civil Service Commission to allow our participation in selecting the entrance examination (since there are examinations which have been validated by Federal Courts as non-discriminatory); and if our participation is accepted, we shall attempt to find entrance examination tools which are beyond reproach.

CLE001062

III.  Vehicle Acquisition and Maintenance

In this project, a vehicle maintenance program will be created by the Department.  It may be administered by the Department; or it may be administered by the City Garage.  It will include some simple computer tracking of vehicle performance.

In addition, the Department's fleet will be planned.  Alternatives to full sized vehicles, use of scooters and light cycles will be considered/ The Department will develop a replacement program.

IV.  Communications Operations

To address existing communications problems, we will make minor improvements in the physical/technical environment, evaluate 911, establish a complaint operator staffing pattern by time of day, based on work load, create written policy and procedure which includes alternatives to physical response to the scene, develop and conduct a dispatcher/complaint operator training program, and develop and conduct a supervisor training program.

V.  Promotion and Career Development

The Department intends to ask the Civil Service Commission to allow us to work with it in development of new promotional examinations.  We shall review the criteria for promotion, supplement traditional tests with new tests, participate, if permissible, in the construction and administration of the examinations.  After establishment of a list and prior to promotion, we shall require applicants on the list to complete successfully a rigorous training program constructed to help them prepare for their new responsibilities.

VI.  Supervision

The Department shall take steps to improve first-line supervision in the Department.  Our objective will be to refine the notions of what first-line supervision is for, help sergeants develop their own training programs, find for them the tools and equipment they need, and give them support in performing their job.

VII.  Policies and Procedures

The Department shall create a program of administrative rule making in which the Department sets out the important areas of policy, and creates policy.  In this project, the Department will do that in a careful and open way, section by section, taking advantage of the work already done here, and of the work done in other police departments.

VIII.  Field Reporting

In this project, the Department will document its paper work needs. It will follow a paper work simplification process used by many other police departments.  Staffing patterns will be developed for the typing pool, supervision improved, and the staff will be trained.  The project will be particularly attentive to the needs of patrol officers for a simple paper work system which consumes a minimum of their time, but leaves them with a record of their work.

IX.  Traffic Enforcement

CLE001063

In this project, the Department will develop a traffic enforcement program which focuses on speeding, other serious violations, youthful offenses, and driving while intoxicated.  It will be a program carefully planned, widely publicized, and vigorously enforced.  It is likely that the patrol forces of the Department will be trained in traffic enforcement, and that they will be expected to conduct much of the campaign.

X. Management Improvement

The Department shall institute a Management Improvement Program which will be an on-the-job program.  It will involve formal learning, but the majority will consist of small group work and coaching.  People will be trained in their natural work groups, beginning with the Chief and his immediate subordinates.  It will include evaluation of managers by the subordinates, and will be calculated to promote a more open management style in the Department.  Most of all, it is going to be designed to increase the Department's tolerance of, and receptivity to change.

XI. Leadership Development

The Department shall make a concentrated effort to identify the young people at the lower ranks of the Department who are interested in leadership.  We shall invite them, formalize the program, make it clear that those who excel will move faster.  Obviously, we must respect the fairness and independence of the Civil Service process, and are not proposing to undermine it.  We shall work within it to give development opportunities to those who want them.

XII. Public Relations

In this project, we shall plan and execute a Department Public Relations Program which attempts to inform the public about the improvements being made in the Department and what can be expected from them.

The operations Improvement Task Force conducted a four month study concerning all operations of the Cleveland Police Department.  A total of 89 recommendations were made in order to improve the operations of the Department and to enhance the productivity.

The following summary indicates each recommendation; and its statue of implementation, as of August 1, 1980.

CLE001065

IMPLEMENTATION OF THE EIGHTY-NINE (89)

MAYOR'S TASK FORCE RECOMMENDATIONS

| Recommendation | Implemented | In-Progress | Forthcoming |
|---|---|---|---|
| Chief to prepare budget | | 1 | |
| Consolidate General Police Orders | | 2 | |
| Establish Legal Advisor Position | | 3 | |
| Contract Services of Police Chief | | | 4 |
| Relocate Community Response/CMHA Es-ate Sections | | 5 | |
| List of Minimum Rank Requirements | | 6 | |
| Posting of Job Bidding Procedure | 7 | | |
| Pagers for off-duty SWAT personnel | | | 8 |
| Separate SWAT Radio Channel | 9 | | |
| Standardize Vehcile Equipment | | 10 | |
| Site harden armored vehicle storage place | | | 11 |
| Consult with Civil Service Commission to Establish schedule of promotional exams | 12 | | |
| Specify availability of open assignments, Read at District and Unit Roll Calls | 13 | | |
| Consult with Civil Service Commission to reduce time of promotional eligibility list | | 14 | |
| Establish Master Patrolman Position | | 15 | |
| Extend Job Bidding to Lieutenants and Sergeants | | | 16 |
| Chief follows personnel list for special assignments | 17 | | |
| Conventional Weaponry for SWAT Operations | 18 | | |
| Uniform Dress Code Identification | 19 | | |
| Public Information Unit Established | 20 | | |
| Comprehensive Study of Non-Patrol Functions | | 21 | |
| Detectives and Investigators initiate complaint when necessary | 22 | | |
| Ranking results available to position applicants | 23 | | |
| Copy of Supervisory complaints sent to commanding officer and Bureau of Inspections | 24 | | |
| Monthly meetings between Chief and Patrolmen | 25 | | |
| Disabled Officers taken off unit rosters and reassigned | | 26 | |
| Overtime reduction Program | | 27 | |
| Equitable Distribution of Sworn Personnel | | 28 | |
| New Organizational Structure | | 29 | |
| Position of Night Commander AKA Operations Officer | 30 | | |
| Reinstitute Tuition Reimbursement Program | | | 31 |
| Include District Detectives in job bidding procedure | | | 32 |
| Police Office Apprenticeship Program | | 32A | |
| Dissolve Transport Unit | | 33 | |
| Update/Upgrade Senior & Executive Officer Job Discription | | 34 | |
| Signature procedure for semi-annual personnel evaluation | 35 | | |
| Manage Planning & Research Unit per established order | | 36 | |
| Establish Capitol Equipment Inventory Control Center | | 37 | |
| Replace sworn personnel in Medical Unit with Civilian Clerical Personnel | | 38 | |
| Establish time limits for detailed officers | 39 | | |
| Develop career path planning program | | 40 | |
| Initiate two year job rotation program | | 41 | |
| Staff deployment charts circulated | 42 | | |
| Establish on-going recruitment program | | 43 | |

CLE001066

IMPLEMENTATION OF THE EIGHTY-NINE (89)

MAYOR'S TASK FORCE RECOMMENDATIONS

| Recommendation | Implemented | In-Progress | Forthcoming |
|---|---|---|---|
| Develop Computer Assisted Dispatching (C.A.D.) | | | 44 |
| Develop Geographic Base File (G.B.F.) | | | 45 |
| Improve R.C. - 1 Crime Reporting system | | | 46 |
| Develop On-line Booking System | | | 47 |
| System of fines for alarm companies with excessive false alarms | | | 48 |
| Consolidation of City Hall, Police, and Convention Center PBX Telephone Systems | | 49 | |
| Create position Communications Operations and Maintenance Manager (Consolidates Police & Fire Signal & Radio Repair) | | 50 | |
| Radio replacement program | 51 | | |
| Zone cars are now reporting arrival and completion times to radio dispatch | 52 | | |
| A. Consolidate Police and Fire Dispatching | | 52A | |
| B. Abandon Kustom Computer Terminal System | 52B | | |
| Organize one shif special warrant team in each district | | 53 | |
| Rescind Ordinance which prohibits one-man cars | | | 54 |
| Enforce Rule  requiring field supervisors to monitor | 55 | | |
| Recommendation 56 not used | | | 56 |
| One Vehicle to be used for evidence and prisoner transport | | 57 | |
| Private Tow Companies to service specific police dispatched tows. | | 58 | |
| Establish functional rank of Captain as Minimum level Executive Officer | | | 59 |
| Return Clerical Sworn Personnel to Police Duties | | 60 | |
| Complement of Ports and Harbors Unit increased | 61 | | |
| Appoint Lieutenant as Tow Unit Commander | | 62 | |
| A. Permit soliciting of equipment for Mounted Unit | | 62A | |
| Install High Band VHF Radio Base Station | 63 | | |
| Bell Boty pagers for M.O.B. Commanders | | | 64 |
| Appoint Civilian S.I.U. Lab Technicians | | | 65 |
| Funds for Explosive Protection Suit | | 66 | |
| Funds for swival crane for explosive device trailer | | 67 | |
| Provide building and auto parts for auto theft unit | | 68 | |
| Four telephones for Homicide Unit | 69 | | |
| Discontinue Taxi-driver applicant fingerprinting | | | 70 |
| Fraud Unit reinstituted | 71 | | |
| Redesign of R.C. - 1 Printout Format | | 72 | |
| Make Prosecutor available during other than normal business hours | | 73 | |
| Add Lieutenant and Three Sergeants to Crime Analysis Unit | | 74 | |
| Recommendation was not used | | | 75 |
| Improve medical care for prisoners | | 76 | |
| Funds collected for outstanding parking tickets | | | 77 |
| Part time doctor for police jail | | | 78 |
| Develop/systemize field inspection objectives | | 79 | |
| Reassign officers in Speakers Bureau to Districts | | | 80 |

CLE001067

IMPLEMENTATION OF THE EIGHTY-NINE (89)

MAYOR'S TASK FORCE RECOMMENDATIONS

| Recommendations | Implemented | In-Progress | Forthcoming |
|---|---|---|---|
| Move pension consultation & Computation to Headquarters Personnel Unit | | 81 | |
| Augument Phase I of PRMS to include overtime pay analysis capabilities | | | 82 |
| Plan and initiate in-service training for all personnel | | 83 | |
| Relocate Ordinance Unit at Justice Center | | 84 | |
| Install weapons register listing all issued & approved weapons | | 85 | |

CLE001068

IV    IMPROVEMENT IN RESOURCE ALLOCATION

It is a primary objective of the Department to allocate civilian and uniformed personnel in a manner which equalizes the exisitng workload and assigns duties commensurate with the skills required to perform certain tasks.

There has never been a professional patrol allocation in Cleveland - a quantitative analysis of workload and a beat restructuring.  Some areas of the city are chronically short of cars necessary to respond to citizens calls while in other areas of the City, officers are less busy.  That situation varies by time of day and day of week.

Moreover, because of continual reliance of the department on federal funds solicited for special-purpose patrolling (task force, housing, etc.) and because of past leadership practices in basic patrol, a large number of police officers of the department are assigned to patrol activities other than basic response.

In addition, while many police departments have increased substantially the use of civilians in clerical functions, thereby returning patrol officers to patrol duties; the Cleveland Police Department has not considered the broad use of civilians in clerical and administrative functions.

Today, many police departments have automated field reporting, a geographic base file, and computer aided dispatch.  Using the data collected by these systems plus some special purpose computer programs, the majority of the clerical work in a personnel allocation system can be automated.

Cleveland does have a basic computer system for recording and reporting police patrol activity.  There is also a partially completed geographic base file.

It is our intention to utilize these resources as a base.  We will supplement them through statistical sampling and projecting techniques, which has been accomplished in other major cities.

At the conclusion of these efforts, personnel will be reassigned in accordance with the findings of this project.  The following issues will be addressed during the course of this project:

1.  What are the actual street assignments currently being performed?  Is this consistent with department priorities?

2.  How much patrol officer time is being spent on follow-up activities like report wirting and court appearances, transporting prisoners, and the like?

3.  What are the actual patterns of citizen demands for services?

CLE001069

4.  What times are required to handle each kind of call, and are these times reasonable?  Are there bottlenecks, eg. report-writing unit, which can be eliminated?

5.  Statistically, how many patrol cars must be fielded by area of the city and time of day to assure acceptably quick response to citizen calls?

6.  How many police officers are required to field these units (allowing for days off, vacations, and sick leave)?

7.  What level of service will be delivered to the citizens by the number of police officers, if the department cannot afford to have this many patrol officers?

8.  Are current district workloads so unbalanced that boundaries should be redrawn?

9.  Where should patrol beat boundaries be drawn?

The resources to conduct these activities are being made available through a grant from the Cleveland Foundation.  A total of S104,400 has been made available for expenses associated with the research, development, and completion of this program.  The project is entitled Field Personnel Allocation Study, Grant Number 80-429-44U, Cleveland fund number 967.0.

The project is scheduled to be completed by June 30, 1981, however, it is anticipated that significant progress will be made in this area prior to January 1, 1981.

The project will be continually monitored and evaluated by the Police Department and the Department of Public Safety, and it is anticipated at this point, that a visible product may be delivered by early 1981.

Progress in this peoject will be made available to members of Council through monitoring reports submitted to the Department of Public Safety.

CLE001070

V.    Revised Citizen Complaint Investigation Procedures

Shortly after assuming the office of the Chief of Police, it became apparant that necessary changes be made in the procedures by which our department investigates and responds to personnel complaints lodged by citizens.  Research was initiated and a study conducted of the complaint investigation process used by major cities across the country.  The research findings were than formulated into procedural changes that also reflected the constructive criticisms levied by City Council members and thecitizenry at large.

On June 5, 1980, a comprehensive procedural change in the regulations for handling the investigation of citizen complaints regarding departmental conduct became effective.  These changes were incorporated into Chapter 24 of the Departments Manual of Rules and Regulations. They are now established policy for which our officers and members are accountable.

This action is the first step in establishing a basic creditibility with citizens of Cleveland.

Included in the procedural changes are the following mandates:

*    Requirements that all citizen complaints concerning improper conduct or police service be taken immediately in a written report and forwarded for investigation.

*    Requirements that complaints lodged be investigated by a central complaing investigation unit, rahter, than the supervisor of the officer who is the subject of the complaint.

*    Provisions that all complaints be investigated and the complainant notified of the investigative results within a required two weeks after receipt of the complaint.  Investigations which necessitate a delay in completion now require progress notifications to the Chief and complainant.

*    An analysis of causative factors for the complaint and corrective measures are now required in all cases.  This measure will hopefully eliminate future complaints of a like nature.

*    A review process of all complaint investigations is conducted by the Commanding Officer of the Bureau of Inspection and ultimately by the Chiefs Office.

The indicated procedural changes were instituted to give redress to aggrieved citizens and to monitor departmental responsiveness to community needs.

I can now assuredly say that the citizen complain investigation process is open and accessable to those in need of its service.

CLE001071

VI.   IMPROVEMENTS IN EQUAL EMPLOYEMENT OPPORTUNITIES

   a.   Initial Hiring Improvements:  1977, 1978, 1980

      The past three years have seen a significant improvement in the Cleveland Police Department's ability to attract and appoint minority and female officers.

      Early 1977, the department employed 9.69% minority officers; as of August 1, 1980, 5.52% minority officers will be employed in the service of the Cleveland Police Department.

      The indicated improvements are only the first stage of a program which will ultimately result in a police d epartment which truly reflects the racial composition of our community.

   b.   Promotions

      The previous mentioned employement accomplishments will be extended to the police department's promotional process.  The minority officers on the department will have both access to and representation on the supervisory and command officer staff, as provided for in the consent decree with the Federal Court.  A joint effort is in progress with the Civil Service Commission to establish a validated system of promotional testing.  This will furnish a more acurate measure of supervisory ability and will create increased opportunities for minority promotions.

   c.   Future Commitments

      The attainment of our future minority hiring and promotional goals is directly related to budget allocations for hiring personnel.  As new personnel replace those who have left the department, our minority composition significantly increases, as non-minority officers are being replaced by groups of recruits that are comprised of three minority officers for every four non-minority officers appointed.  The appointment of additional personnel not only allows the department to achieve improved service levels, but increases the speed in which the department attains the decreed minimum minority goal of 35.8% of the total departmental personnel strength.

CLE001072

EQUAL EMPLOYMENT OPPORTUNITY ANLYSIS OF PERSONS HIRED AS PATROL OFFICERS FOR THE YEAR 1977

APPOINTMENTS 1977

| WHITE MALES | WHITE FEMALES | BLACK MALES | BLACK FEMALES | HISPANIC MALES | TOTAL |
|---|---|---|---|---|---|
| 90 | 24 | 47 | 22 | 4 | 187 |

ANALYSIS OF PERSONS HIRED BY PERCENT

The 90 white males hired comprised 48.1% of the total 187 persons hired in 1977

The 24 white females hired comprised 12.8% of the total 187 persons hired in 1977

The 47 black males hired comprised 25.1% of the total 187 persons hired in 1977

The 22 black females hired comprised 11.7% of the total 187 persons hired in 1977

The 4 hispanic males hired comprised 2.1% of the total 187 persons hired in 1977


The appointment of 73 minorities comprised 39.03% of the total 187 persons hired in 1977

The appointment of 46 females comprised 24.59% of the total 187 persons hired in 1977

CLE001073

EQUAL EMPLOYEMNT OPPORTUNITY ANALYSIS OF PERSONS HIRED AS PATROL OFFICERS IN 1979 AND AS OF AUGUST 18, 1980

| White Males | White Females | Black Males | Black Females | Hispanic Males | Total |
|---|---|---|---|---|---|
| 81 | 27 | 47 | 31 | 4 | 190 |

Analysis of Persons hired by percent

The 81 white males hired comprised 42.6% of the total 190 persons hired in 1979-80

The 27 white females hired comprised 14.2% of the total 190 persons hired in 1979-80

The 47 black males hired comprised 24.7% of the total 190 persons hired in 1979-80

The 31 black females hired comprised 16.3% of the total 190 persons hired in 1979-80

The 4 hispanic males hired comprised 2.1% of the total 190 persons hired in 1979-80


The appointment of 82 minorities comprised 43.1% of the total 190 persons hired 1979-80

The appointment of 58 females comprised 30.5% of the total 190 persons hired in 1979-80

CLE001074

IV.  PROPOSED ACTIVITIES

CLE001075

The Cleveland Police Department has conducted numerous studies and projections concerning the hiring of civilian posistions to replace sworn officers, thereby freeing them for street duties. It has been demonstrated that from an economic standpoint, it would be a cost-effective measure to identify those posistions that do not require the full authority and training of a sworn police officer, and replace those posistions with civilian personnel.

At the present time, there are approximately 182 civilian posistions within the Cleveland Police Department, 43 of which are Traffic Controller personnel. Other than Traffic Controller personnel, civilain job descriptions include clerks, typists, general office personnel, lab technicians, corrections officers, data handlers and police safety aids.

The Department has identified a need for 110 additional civilian personnel within two specific job classifications. These include additional Traffic Controller personnel as well as Police Cadet personnel. The Department has been advised that CETA funding may be available for these programs, and is in the process of applying for funding to support these programs. It is anticipated that the Department will hire an additional fifty (50) Traffic Controllers and a total of sixty (60) Police Cadets.

The Traffic Controllers would be assigned to the Bureau of Traffic and would be utilized on a city-wide basis, in the same manner as the present personnel. Traffic Controllers earn approximately $9,500 per year, and their duties include traffic and other non-hazardous assignments. Police Cadets would be employed on a part time basis, and reimbursed at the rate of $4 per hour, not to exceed 20 hours per week. These personnel are enrolled in a college level study program, and will be assigned to various duty assignments within the Department. Cadets will be rotated to various duty assignments in order to provide them with a balanced background in the law enforcement field. Examples of their assignments will include the record room, police radio, computer center, police academy and major offense bureau assignments.

It is anticipated that through the implementation of these programs, various duty assignments now completed by sworn officers can be transferred to civilian personnel. In addition, requests for service that previously could not be handled due to the lack of manpower, can be addressed by these personnel.

The following report presents the current status of civilianization efforts within the Department.

CLE001076

1. Civilianization

Central Headquarters Building - Justice Center

Most all police units that were housed at old Central Headquarters, 2001 Payne Avenue, and at the Headquarters Annex, 1609 East 21 Street, and at the Amstan Building, 1825 Lakeside Avenue, moved into the new Central Headquarters, part of the Justice Center Complex, approximately three and one-half (3½) years ago.

From exhibit #3, a total of 256 Patrol Officers work in the Central Headquarters doing office type or specialty type duties. The balance, 465 officers, work on the street in field units or as supervisors of field units.

The 256 inside jobs consist of: Office only, i.e., typing, filing, etc. - 35 positions; Specialty, research and investigative - 10 positions; Inside Investigative, using computer, NEOPIN, LEADS, NCIC, arrest files, criminal records, booking - 97 positions; Detective Specialties, i.e., Lab, Photo, Statistics - 39 positions; Police Academy Class and Academy Instructors - 56 positions; Miscellaneous, Property Room, Mail Room, Gun Registration, Radio, Bank Alarms, and Community Relations Posts - 10 positions.

Most all typing and filing positions could be filled by Civilians, approximately 35 positions. Of the specialty research and investigative jobs, perhaps half or five (5) positions could be civilianized, particularly in inspections. The inside investigative, using computer terminal, arrest files, criminal records, booking and jailing jobs might be filled by 67 civilians, leaving 30 police officers for continuity and supervision.

The miscellaneous grouping of Community Relations, Property Room, Mail Room, Gun Registration, Radio and Telephone Exchange jobs provide a possible six (6) civilian positions and thirteen (13) police officer positions.

The Detective Bureau specialties of lab work, photography, and crime statistics work, call for police officer supervision by twenty (20) officers, leaving nineteen (19) possible civilian positions.

CLE001077

The Police Academy Class of 52 will graduate December 16, 1980.  The Academy Instructors perform a continuing educational function and the eight (8) officers so assigned provide recruit and in-service training, each instructor having met State Certification requirements.

To recap, the above 256 inside positions are:

| Typing and Filing | Civ. | P.O. |
|---|---|---|
| Headquarters Staff | 2 | 1 |
| Personnel Unit | 2 | 1 |
| Medical Unit | 3 | 0 |
| Community Response | 4 | 0 |
| Traffic Central | 4 | 0 |
| Traffic Enforcement | 1 | 0 |
| Hitskip Unit | 1 | 0 |
| Foot Patrol Unit | 3 | 0 |
| MOB, Command | 3 | 0 |
| Juvenile Records | 3 | 0 |
| Mob, Strike Force | 1 | 0 |
| Auto Theft | 1 | 0 |
| Building Maintenance | 1 | 0 |
| Complaint Unit | 2 | 1 |
| Building Security | 1 | 0 |
| Total: | 32 | 3 |

| Detective Bureau: Lab, Photo, Crime Analysis, Statement | Civ. | P.O. |
|---|---|---|
| Crime Analysis/ Statement Unit | 11 | 10 |
| Scientific Unit | 3 | 8 |
| Photo Lab | 5 | 2 |
| Total: | 19 | 20 |

| Miscellaneous | Civ. | P.O. |
|---|---|---|
| Community Relations | 0 | 6 |
| Property Unit | 0 | 6 |
| Mail Room | 3 | 0 |
| Gun Registration | 0 | 1 |
| Radio Dispatch | 2 | 0 |
| Telephone Exchange | 1 | 0 |
| Total: | 6 | 13 |

| Specialty Research/Investigative | Civ. | P.O. |
|---|---|---|
| Organized Crime Office | 1 | 3 |
| Narcotics Office | 0 | 1 |
| Homicide Office | 0 | 1 |
| Inspection Office | 0 | 1 |
| Total: | 1 | 6 |

| Inside Investigative: Computer Terminal, Arrest, Crime and Booking Files, and Corrections | Civ. | P.O. |
|---|---|---|
| Impound Unit | 12 | 3 |
| Tow Unit | 3 | 3 |
| Court Unit | 0 | 14 |
| Warrant Unit | 9 | 5 |
| Jail Unit | 22 | 0 |
| Data Processing | 9 | 0 |
| General Records | 12 | 5 |
| Total: | 67 | 30 |

| Police Academy | Civ. | P.O. |
|---|---|---|
| Academy Class | 0 | 48 |
| Academy Instructors | 0 | 8 |
| Total: | 0 | 56 |

Total Civilians:        129

Total Police Officers: 127

Total Personnel: 256

Civilian Job Descriptions would include:  Clerks, Typists, General Office, Lab Technicians, Photo Technicians, Corrections Officers, Data Handlers, and Police Safety Aids.

CLE001078

The latter pages of this report will cover the incapacitated police officers.  Reference is made at this point only to mention that many of the listed inside jobs are filled by officers with some incapacity.

Police Units at Other Locations

Exhibit #4 lists a total of ninety (90) inside jobs handled by Police Officers at other locations.  The ninety (90) jobs consist of General Office, Typing, Filing, Police Safety Aids, and others.

The General Office type duties at District Stations are usually coupled with answering inquiries from the public that are made by the personal appearance of the public at the District Station.  The booking, searching and jailing of prisoners is also a District Station inside duty.  The special police nature of most all inside duties at District Stations precludes the replacement by Civilians. However, since a great deal of typed report writing must be done by police officers at the District Station, and this requirement applies to both inside and outside duties, at least one typist on each platoon at each District, or a total of eighteen (18) civilian typists could be hired and thereby release 18 officers for street duty.  A Typist's average salary with fringes is $12,470.  A Patrol Officer's salary with fringes is $23,494.

The duties of the officers assigned to the Transport Unit, (two officers) are such that civilianization would not apply.

The Mounted Unit, Ports and Harbors and Airport Unit require a total of seven (7) officers to do general office-type work, typing and filing.  All seven positions could be filled by civilian general office types.

The eight (8) patrol officers assigned to the Ordnance Section perform specialty services such as; rangemaster, firearms instructor, armorer, amno reloader and these assigned duties preclude civilianization at this time.

CLE001079

The recap of the ninety    inside jobs at locations other than Central Headquarters appears as:

| Location | Civ. | P.O. | Location | Civ. | P.O. |
|----------|------|------|----------|------|------|
| District 1 | 3 | 9 | Transport Unit | 0 | 2 |
| District 2 | 3 | 11 | Mounted Unit | 3 | 0 |
| District 3 | 3 | 8 | Ports & Harbors | 1 | 0 |
| District 4 | 3 | 10 | Airport Unit | 3 | 0 |
| District 5 | 3 | 10 | Ordnance Unit | 0 | 8 |
| District 6 | 3 | 7 | | | |

Total Civilians:        25

Total Police Officers: 65

TOTAL Personnel:    90

Civilianization at the Airports

Presently, 69 officers are assigned to the Airports as follows:

Regular Hopkins screening forty-three (43) officers; Hopkins Security Detail fourteen (14) officers; and Burke Airport screening twelve (12) officers.  Present information seems to indicate that Federal Aviation Association rules indicate or infer that the screening must be maintained by sworn officers.  This follows from a demand by the public to maintain control over the incidence of airplane hyjacking. This requirement is being studied by the Law Department.

The fourteen officers in the Hopkins Security Detail are not covered by the FAA rules and could be replaced now by civilians.

If investigation by the Law Department shows that regular officers can be replaced by private police, the question remains, whose private police; private of city.

CLE001080

## VARIOUS CIVILIANIZATION COSTS

| CLASSIFICATION | PAY SCALE | FRINGES |
|---|---|---|
| Cadet Parapolice Officer | $ 6,341 - 11,751 | + 25% |
| Police Radio Dispatcher | 11,624 - 14,792 | + 25% |
| Data Conversion Operator | 6,340 - 11,751 | + 25% |
| Data Programmer | 8,854 - 15,319 | + 25% |
| Data Conversion Supervisor | 8,380 - 14,595 | + 25% |
| Junior Clerk | 6,286 - 10,928 | + 25% |
| Principal Clerk | 8,380 - 14,595 | + 25% |
| Senior Clerk | 7,210 - 12,732 | + 25% |
| Photographic Lab Technician | 7,960 - 13,937 | + 25% |
| Police Safety Aid | 6,286 - 10,928 | + 25% |
| Typist | 6,340 - 11,751 | + 25% |

CLE001081

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Headquarters Staff | 2 | 1 | 1 | 2 | 3 | 3 | | 9 |
| Proffessional Conduct | - | | 1 | 3 | | | | 4 |
| Personnel | | | 2 | 1 | 5 | 3 | | 8 |
| Planning & Research | 2 | | 1 | | | | | 3 |
| Medical Unit | | | | 1 | 3 | 3 | | 4 |
| Organized Crime | | | 1 | 5 | 23 | 4 | | 29 |
| Community Response | | 1 | 2 | 9 | 92 | 4 | | 104 |
| Traffic Control | Comm | | 1 | | 4 | 4 | | 6 |
| Traffic Enforcement | | | | 2 | 27 | 1 | | 29 |
| Accident Investigation | | | 1 | | 12 | | | 13 |
| Hitskip | | | | 1 | 7 | 1 | | 8 |
| Foot Patrol | | | 1 | 7 | 45 | 3 | | 53 |
| Impound Unit | | | | 3 | 21 | 15 | | 24 |
| Tow Unit | | | | 7 | 19 | 6 | | 26 |
| Mob Command Unit | | 1 | | | 14 | 3 | | 15 |
| Narcotics | | | 1 | 1 | 14 | 1 | | 16 |
| Homicide | | | 2 | 2 | 26 | 1 | | 30 |
| Crime Analysis-statements etc | | | | 4 | 25 | 21 | | 29 |
| Juvenile Records | | | 1 | 1 | 5 | 3 | | 7 |
| Arson & Sex | | | | 1 | 9 | | | 10 |
| M63 Strike Force | | | | 2 | 13 | 1 | | 15 |
| Auto Theft | | | 1 | 1 | 8 | 1 | | 10 |
| S I U | | | | 3 | 27 | 11 | | 30 |
| Photo Lab | | | | 1 | 8 | 7 | | 9 |
| MOB TOTAL | | 1 | 5 | 16 | 149 | 49 | | 171 |
| Inspections | 1 | 1 | 1 | | 4 | 4 | | 7 |
| Building Maintainance | | | | 1 | 1 | 1 | | 2 |
| Complaint Unit | | | 1 | 3 | 4 | 3 | | 8 |
| Community Relations | | | | 1 | 20 | 6 | | 21 |

CLE001082

| Unit | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| WARRANT UNIT | | | 1 | 1 | 14 | 14 | | 16 |
| Building Security | | | | 1 | 17 | 1 | | 18 |
| Court Unit | | | | 1 | 14 | 14 | | 15 |
| Jail Unit | | | | 3 | 22 | 22 | | 25 |
| Data Process | 1 | 1 | | 3 | 9 | 9 | | 14 |
| Property Unit | | | 1 | | 6 | 6 | | 7 |
| General Records | 1 | 1 | 1 | 3 | 17 | 17 | | 23 |
| Mail Center | | | | | 3 | 3 | | 3 |
| Gun Registration | | | | 1 | 1 | 1 | | 2 |
| Radio Dispatch | 2 | | | 3 | 2 | 2 | | 7 |
| Telephone Exchange | | | | 1 | 1 | 1 | | 2 |
| Academy | | 1 | 1 | 2 | 8 | 8 | | 12 |
| Training Class | | | | | 48 | 487 | | 48 |
| | 10 | 7 | 22 | 81 | 601 | 256 | | 721 |

These numbers were arrived at by review of Daily Duty Assignment sheets and inquiries at all units involved. They include members detailed into a unit and exclude members detailed out. Total numbers of indoor only reflect only patrol officers and exclude superior officers.

Respectfully _Wm. _____ Captain.

Examined,

John _____, D. d.

CLE001083

EXHIBIT # 4

| Personnel Assigned to the following Units Away from the Police Hdqtrs Building 3-1-80 | Deputy Inspector | Captain (M) | Captain (F) | Lieutenant (M) | Lieutenant (F) | Sergeant (M) | Sergeant (F) | Patrol Officer (M) | Patrol Officer (F) | Total | PI INDOOR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| District 1 | | 2 | | 6 | | 12 | | 136 | 11 | 157 | 12 |
| District 2 | | 3 | | 7 | | 14 | | 148 | 10 | 182 | 14 |
| District 3 | | 3 | 1 | 6 | | 13 | | 156 | 10 | 189 | 11 |
| District 4 | 1 | 2 | | 7 | | 15 | | 197 | 11 | 233 | 13 |
| District 5 | | 3 | | 7 | | 13 | | 123 | 11 | 157 | 13 |
| District 6 | | 2 | | 8 | | 11 | | 136 | 9 | 165 | 10 |
| Transport Unit | | | | | | 1 | | 2 | | 3 | 2 |
| Employee Assistance | | | | 1 | | | | 3 | | 4 | — |
| Mounted Unit | | | | 1 | | 2 | | 20 | 1 | 24 | 3 |
| Ports and Harbors | | | | | | | | 12 | | 12 | 1 |
| Airport Unit | | | | | | 6 | 1 | 35 | 2 | 44 | 3 |
| Ordnance Unit | | | | | | | | 8 | | 8 | 8 |
| Totals | 1 | 15 | 1 | 43 | | 87 | 1 | 976 | 64 | 1188 | 90 |

CLE001084

An area which has demonstrated the ability to provide a great deal of assistance to the Cleveland Police Department is the Auxiliary Police Unit. The Unit has been operational since the early 1970's, and has served as the eyes and ears of the Department. These volunteers donate their time and energy to assist the Department in routine patrol activities within their neighborhoods, they provide a great deal of crime prevention information to residents, and they assist at major events such as the Cleveland National Air Show, and other occasions.

The Unit has been neglected in the past, due to financial constraints imposed by Federal Grant guidelines and the uneven support from various administrations. The Unit has been reestablished as a priority effort, and during the past several months, a great deal of progress has been made in securing the funding necessary to restore the unit to its maximum effectiveness.

Through the efforts of the Council of Smaller Enterprises (COSE), a division of the Greater Cleveland Growth Association, a pledge of commitment has been received by the City. The program currently operates from twenty-four Auxiliary bases throughout the city, and has a membership of nearly 500 persons. It is the goal of the City and COSE to increase the Auxiliary membership to 1,000 persons.

A copy of the proposal submitted to COSE, along with their response is attached.

CLE001085

PROPOSAL FOR ASSISTANCE

COUNCIL OF SMALLER ENTERPRISES

The Cleveland Police Auxiliary Program has been in operation since early 1972, funded largely through grants awarded by the Law Enforcement Assistance Administration (LEAA). During the early years of the program, nearly 1,000 Auxiliaries were participants in the program, which operated from thirty community outreach centers located throughout the City of Cleveland.

Through the years, the amount of federal assistance was reduced in accordance with program guidelines, and the financial plight of the city prohibited any additional assistance to the program. As a result, the program began to deteriorate and become more limited in scope. Currently, the total membership of the program is listed as 498 participants, and a total of 24 bases are operational.

The Auxiliary program is a volunteer effort. The majority of the expenses associated with the program are paid by the participants. These expenses include the rent and utility costs associated with the base stations, telephone charges, communications equipment and miscellaneous supplies. In recent years, the city has only been able to provide the program with uniforms, mileage reimbursement and training. Future funding prospects from the Federal Government are extremely poor.

The goal of the program is to enhance the security of the City of Cleveland through the involvement of citizens in the areas of crime prevention and education. The program also serves to provide a visible patrol in the neighborhoods, in order to assist and complement the Cleveland Police Department. The Cleveland Police Department is currently understaffed by a total of 910 sworn officers, and the Auxiliary Program provides coverage that otherwise would not be available.

The Auxiliary Units operate in a manner similar to all law enforcement agencies. Each base has a Commander who is responsible for the operations of that unit. All patrol personnel are responsible to the Commander as well as other supervisory personnel

CLE001086

designated by the Commander. The Commanders are responsible to the Officer in Charge of the Community Relations Unit of the Cleveland Police Department, which has been designated to coordinate the activities of the Auxiliaries.

The Community Relations Unit is staffed by one Sergeant and four Patrol Officers. These personnel have the responsibility of supervising the activities and the administration of the Auxiliary program on a city-wide basis. This unit is also responsible for the monitoring and evaluation of the program.

The Voinovich Administration has returned the Auxiliary program to a priority status, and the Department of Police has pledged its support to make the program viable once again. Due to the financial limitations of the city, the revitalization of the program has been divided into two efforts. The first of these efforts has been in the planning stages for several months, and is currently being implemented. These efforts include the provision of training by the Cleveland Police Academy to all members of the Auxiliary Unit, the implementation of a city-wide recruitment campaign, increased supervision and monitoring of the program, and the planning of several events designed to enhance the public image of the program. The first of these events is the sponsorship of Auxiliary Police Week, to be held August 4 - 9, 1980.

The second effort concerns financial assistance which would enable the program to not only regain the status it once had, but in fact expand the capabilities of the unit to include additional activities in the area of security. It is felt that within this program lies the potential to coordinate many seperate crime prevention and private patrol efforts throughout the city, while providing adequate supervision and control. Experience has shown that a well trained and well equipped Auxiliary program will serve to attract new members, will lay the groundwork for new base units

CLE001087

-3-

to be formed, and will greatly enhance the professionalism and level of service derived from the participants.

The Cleveland Police Department is requesting assistance from the Council of Smaller Enterprises (COSE) to expand and better coordinate the services of the Auxiliary Police program. It is felt that through the joint efforts of the City of Cleveland and COSE, the Auxiliary program will be restructured to provide direct security services to the membership of COSE as well as all citizens of Cleveland.

Specifically, the Cleveland Police Department will continue the implementation of the training program for all Auxiliaries, continue the operations of the city-wide recruitment effort, and complete all aspects of the media campaign designed to enhance the image of the program. In addition, as the program increases its membership, the Department will expand the supervision and monitoring of the program to insure compliance with the goals and objectives of the program, as outlined in the attached project narrative summary.

The benefit to be acquired by the membership of COSE will include the increased security to be provided by the Auxiliary patrols, seminars to be conducted by the Department to employees and security personnel concerning crime prevention activities as well as security enhancement of their building, and the active participation of the Cleveland Police Department with COSE representatives in developing a strategy to enhance the safety of this community.

The following section represents budget items that were previously funded through Federal sources or General Fund expenditures. These items are considered essential for the expanded efforts of the Auxiliary program, and are presently not available through these sources.

CLE001088

MEMORANDUM

TO:         Fred S. Szabo
            Headquarters Staff
            Cleveland Police

FROM:       Chuck Ciuni

DATE:       August 7, 1980

RE:         Auxiliary Police Program - COSE Proposal


          Pursuant to our various discussions concerning COSE participation in
the Auxiliary Police Program, COSE is willing to make a commitment to provide
the following services, equipment and supervision of the Auxiliary Police Program:

          - Clerical and administrative services for preparation and
            review of monthly reports of each auxiliary unit;

          - Assistance in securing adequate space either at minimal charge
            or without charge for each auxiliary unit;

          - Assistance in securing the necessary office furniture and
            equipment, including the following: Communications equipment,
            base stations, portable transceivers and receivers; desks,
            file cabinets and necessary office furniture; office supplies;
            typewriters; telephones; uniforms, including batons, whistles,
            flashlights, badges and wreaths; and identification signs for
            base stations and vehicles operated by auxiliary personnel;

          - Provide personnel to handle telephone calls during business
            hours when auxiliary personnel are not available or present;

          - Assistance in meeting operating expenses of the program, such
            as utility expense; and

          - Solicitation of COSE membership for persons with supervisory
            skills to participate in the auxiliary program.

          In order to make this commitment, COSE needs a commitment from the
City, including specific commitments from both the Mayor and the Police Chief.
First we need a commitment that the present auxiliary program will be expanded
to at least 1,000 members with the following minimum police personnel for
supervision:

CLE001089

-2-

- One ranking officer for overall coordination of the program at the Justice Center.

- Five officers on the East side of Cleveland for normal super-vision and coordination of each of the auxiliary units within the districts encompassed therein with a minimum of two vehicles regularly at their disposal.  Five officers on the West side of Cleveland for normal supervision and coordination of each of the auxiliary units within the districts encompassed therein with a minimum of two vehicles regularly at their disposal.  Of those ten officers, one officer on each side of town should be provided for purposes of training auxiliary personnel.

- Minimal standards for admission into the auxiliary program should be established.  Prior to full acceptance into the program, applicants must complete a required amount of training.  A program should be developed to establish minimal training requirements for both new recruits and for ongoing training of existing auxiliary personnel.  Provision should be made to provide auxiliary personnel the use of the Police Academy for four hours per night at least two nights per week for training purposes.

- At the present time it is our understanding that auxiliary police may not patrol beyond midnight.  This restriction should be eliminated.  Furthermore, each auxiliary unit should set up regular schedules for patrol and other assignments and every effort should be made to have the patrols performed on a 24 hour basis.

A commitment should be made in writing from the Mayor to COSE setting forth his intention to increase the auxiliary police to a minimum of 1,000 persons with directions to the Police Chief to take the necessary steps to accomplish that goal and urging him to cooperate with COSE and its membership in the full development of the Auxiliary Police Program.  Likewise, after the Mayor has made such a commitment, a letter should be sent from the Police Chief to COSE setting forth his willingness to provide the personnel, training and program development necessary to realistically provide an effective Auxiliary Police Program.

CLE001090

The Cleveland Police Department currently has an aggressive grant program. At the present time, the Department is the recipient of $6.7 million which supports 24 seperate grant funded programs. A listing of these programs along with the program budgets is attached.

Due to the severe financial crisis that the city is currently in, it has become increasingly important to attract the maximum amount of Federal and other external assistance to enhance the daily operations of the Department. The attached list demonstrates that these funds are being utilized for a varity of uses, to include training of police personnel, arson investigation, traffic enforcement and other services.

Although an explination and evaluation of each grant program is too lengthy for this report, this information is available upon request of the Chief's Office, Cleveland Police Department.

CLE001091

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 66 of 78. PageID #: 6167

# POLICE DEPARTMENT
### CLEVELAND, OHIO
## DEPARTMENTAL INFORMATION

QUARTERS STAFF

ZONE                         August 12,   19 80

MINED BY_____RANK_____             _____19____

OM   Fred S. Szabo, Headquarters     TO   Chief William T. Hanton

JECT   Federal Grant Status

PIES TO   Vincent Amato, Steve Hurko, Ptl. Michael Allen, Mr. Booker Tall

following report summarizes all Federal Grant activities within the Cleveland Police partment as of August 10, 1980. There are currently 24 seperate grant funded programs, alling $6,780,517, that have been awarded to the Department, with an additional 8 pro- rs totalling $1,394,828 in the development stage. The following projects are included thin this monitoring system.

### OPERATIONAL PROGRAMS

| JECT TITLE | F.Y. | EXPIRES | FUND # | SOURCE | TOTAL BUDGET | FEDERAL SHARE |
|---|---|---|---|---|---|---|
| LD PERSONNEL EVALUATION | 1981 | 6-30-81 | 967.0 | CLE FDN | $ 104,400 | $ 104,400 |
| MOTIONAL PROCEDURES | 1981 | 6-30-81 | 967.0 | CLE FDN | $ 36,400 | $ 36,400 |
| SERVICE TRAINING | 1980 | 9-30-81 | 911.0 | LEAA | $ 40,000 | $ 36,000 |
| ECTIVE ENFORCEMENT | 1980 | 9-30-80 | 949.0 | ODHS | $ 156,657 | $ 118,500 |
| MPH PROGRAM | 1980 | 9-30-80 | 949.0 | ODHS | $ 57,809 | $ 40,092 |
| PLOYEES ASSISTANCE | 1980 | 12-31-80 | 941.0 | CLE FDN | $ 16,800 | $ 16,800 |
| SERVICE TRAINING | 1979 | 9-30-80 | 911.9 | LEAA | $ 40,000 | $ 36,000 |
| SON INVESTIGATION | 1979 | 9-30-80 | 774.0 | LEAA | $ 25,000 | $ 22,500 |
| MUNITY RESPONSE UNIT | 1979 | 8-30-80 | 071 | HUD | $1,300,000 | $1,300,000 |
| A POLICE PATROL | 1979 | 8-30-80 | 071 | HUD | $1,150,000 | $1,150,000 |
| ENILE OFFICER | 1979 | 12-31-80 | 071 | OYC | $ 7,000 | $ 7,000 |
| ENILE SUPPORT UNIT | 1978 | 8-31-80 | 924.8 | LEAA | $ 148,280 | $ 133,452 |
| XILIARY POLICE | 1978 | 9-30-80 | 926.8 | LEAA | $ 83,333 | $ 75,000 |
| INE PATROL | 1978 | 12-31-80 | 738.8 | ODNR | $ 10,000 | $ 10,000 |

### APPROVED PROGRAMS TO BE AWARDED

| JECT TITLE | F.Y. | EXPIRES | AWARD | SOURCE | TOTAL BUDGET | FEDERAL SHARE |
|---|---|---|---|---|---|---|
| ECTIVE ENFORCEMENT | 1981 | 9-30-81 | 10-80 | ODHS | $ 283,422 | $ 209,474 |
| MPH PROGRAM | 1981 | 9-30-81 | 10-80 | ODHS | $ 187,541 | $ 122,089 |
| OOL PROGRAM | 1981 | 9-30-81 | 10-80 | ODHS | $ 49,407 | $ 37,603 |
| MUNITY RESPONSE UNIT | 1981 | 8-30-81 | 8-80 | HUD | $1,500,000 | $1,500,000 |
| A POLICE PATROL | 1981 | 8-30-81 | 8-80 | HUD | $ 650,000 | $ 650,000 |
| CTRIC VEHICLE PROGRAM | 1981 | 1-01-82 | 11-80 | DOE | $ 380,318 | $ 179,930 |
| SON INVESTIGATION | 1980 | 9-30-81 | 9-80 | LEAA | $ 30,338 | $ 27,304 |
| ME ANALYSIS UNIT | 1979 | 9-30-81 | 9-80 | LEAA | $ 44,490 | $ 40,446 |
| ENILE SUPPORT UNIT | 1979 | 8-31-81 | 9-80 | LEAA | $ 148,280 | $ 133,452 |
| XILIARY POLICE | 1980 | 12-31-81 | 9-80 | COSE | $ 331,042 | $ 331,042 |

### PROGRAMS IN DEVELOPMENT

| JECT TITLE | F.Y. | DATE SUBMITTED | SOURCE | TOTAL BUDGET | FEDERAL SHARE |
|---|---|---|---|---|---|
| FFIC CONTROLLER | 1981 | 9-01-80 | CETA | $ 481,500 | $ 481,500 |
| ICE CADET | 1981 | 9-01-80 | CETA | $ 261,600 | $ 261,600 |
| VELAND ARSON CONTROL | 1981 | - | LEAA | $ 182,630 | $ 164,367 |
| ENILE SUPPORT UNIT | 1981 | 4-25-80 | LEAA | $ 150,000 | $ 135,000 |
| SERVICE TRAINING | 1981 | 4-25-80 | LEAA | $ 80,000 | $ 72,000 |
| PACITY BUILDING | 1981 | 4-25-80 | LEAA | $ 110,000 | $ 99,000 |
| XILIARY POLICE | 1981 | 4-25-80 | LEAA | $ 80,598 | $ 72,539 |
| RSON INVESTIGATION | 1981 | 4-25-80 | LEAA | $ 48,500 | $ 43,650 |

Respectfully,

*Fred S. Szabo*

Fred Szabo, Headquarters Staff

CLE001092

Case: 1:15-cv-00989-CAB Doc #: 114-47 Filed: 03/01/17 67 of 78. PageID #: 6168

C 302-234

# CITY OF CLEVELAND
### INTER-OFFICE CORRESPONDENCE

Mayor George V. Voinovich                          Date August 19, 1980

William T. Hanton                    Subject   Traffic Safety Program
Chief of Police

Dear Mayor Voinovich,

The first month of our Traffic Safety program has now been completed, and we are in the process of compiling a statistical report to be forwarded to the Ohio Department of Highway Safety.

The program has been an overwhelming success during its first month of operation. During the 31 days in July, the program was responsible for the writing of a total of 2,577 citations for violations that otherwise would not have been written. In conjunction with this program, several traffic arrests have been made, including one felony arrest for a stolen vehicle.

Traffic officers have been attending community meetings and discussing traffic related problems with the residents. This portion of the program will be expanded soon with the arrival of film and audio-visual equipment that has been ordered.

The following represents a breakdown of the citations written as a result of the program:

## 55 MPH (FREEWAY) Program

Total citations written- 1,248

| Target Area | Total Citations |
| --- | --- |
| I 71, Bellaire to Brookpark | 358 |
| I 90, W 25 to Warren, Dennison to Mc Kinley | 483 |
| I 90, East 140 to East 200 | 146 |
| I 71, Ridge to Ontario | 135 |
| I 77, Broadway to Fleet | 62 |
| I 90, Innerbelt to Liberty | 64 |

## SELECTIVE ENFORCEMENT (CITY) PROGRAM

Total Citations written- 1,329

| Target Area | Total Citations | Target Area | Total Citation |
| --- | --- | --- | --- |
| Bridge Ave, W25 to W 65 | 62 | Miles Ave, E131 to E178 | 107 |
| Euclid Ave, E55 to E105 | 91 | St Clair, E88 to Eddy Rd. | 222 |
| Liberty Blvd, I 90 to E105 | 135 | Superior, E79 to E105 | 153 |
| Lorain Ave, W25 to W117 | 332 | W25 and Pearl | 227 |

Very truly yours,

WILLIAM T. HANTON
CHIEF OF POLICE

WTH:fs

CLE001093

C 302-214

# CITY OF CLEVELAND
## INTER-OFFICE CORRESPONDENCE

lliam T. Hanton
ef of Police

*Date*   August 13, 1980

homas P. Baginski
ommissioner of Traffic

*Subject*   Traffic Enforcement

Regarding the memo that you received from Mayor George Voinovich on August 4th, 1980, ng for a breakdown on traffic enforcement, the following is submitted.

On any given shift, both first and second platoon there is one and sometimes two s assigned to the freeway systems within the city. The remainder of the enforcement are assigned to high accident areas throughout the city. The men are assigned lar beats which were selected for their high accident incidence and for it's um of traffic. The beat concept is something that I recently started in order for unit to have it's highest visibility and greatest impact on the citizens. Buckeye which is mentioned by the Mayor is one of those locations. We do have a man igned to the area and he is responsible for any and all complaints in the vicinity. re are a total of 15 beats that were selected and assigned to personnel. Comparing number of men assigned to the freeways and beats, the ratio is 15 to 2. Past erience has shown that we cannot afford to pull the men from the freeway without the ident rate rising rapidly. It seems that the word gets out that there are no cars on freeway via the CBers and the average speed goes up as well as the serious accidents.

As far as the programs from the State of Ohio are concerned, we furnish 5 additional s to high accident locations throughout the city and 5 cars for enforcement on the ways. This is on an off duty basis and usually results in additonal coverage for average of 4 hours per day.

Thus far the State program has been a sucess as far as the number of citations ued are concerned. An example is the 5924 citations for the month of July that were ued by the Enforcement unit. With this sort of effort being put forth by the men, we sure to have a great impact on the people who drive in our city. It should be noted there have been 28,442 citations issued for moving violations in this unit since ary 1, 1980. This does not include the Jaywalkers and Parking tickets issued. The 442 figure compares with 21,504 that was issued during the same time in 1979.

Respectfully,

*Tom Baginski*

CLE001094

# POLICE DEPARTMENT
### · CLEVELAND, OHIO
## DEPARTMENTAL INFORMATION

rcement Unit .
ZONE

NED BY: _____ RANK Comm

August 12, 19 80

2-12- 19 2

Kenneth Kuntz, Sergeant        TO        Thomas Baginski, Traffic Commissioner

CT   Info relative to Enforcement Unit

S TO   Chief's Office, Mayor's Office, Unit Files.

In answer to letter from the Mayor's Office dated Aug. 4, 1980.
We have assigned one officer to patrol Buckeye Rd. and vicinity on a
y basis.
Depending on days off, we have assigned to the Interstates one to two
per shift. These vehicles are the high speed 1976 Fords. They are un-
ed and are different colors.
We now are assigning personnel to 15 beat patrols thru-out the city.
these beats we are able to give the citizens of Cleveland better coverage
ars able to cover the high accident areas more readily. The officers ass-
d also handle the complaints from citizens living in there areas.
We also are now into the S.E.P. and Program 55 programs and assign per-
el the high accident areas when manpower permits. These vehicles are
0 Fords and are also unmarked with the exception of Police in block letters
the front fenders. Five cars are all white and five are all met. blue.
The total number of moving citations for the month of July was 5924
kets issued by the Enforcement Unit.

Respectfully:

_____ Sgt..

8-7-80

As of 7-31-80 there have been a total of 2,577 citations written. This is a combined total of both programs.

A number of traffic arrests have been made including one felony arrest for GTMV.

The officers participating have been to neighborhood meetings to familarize themselves with the complaints of residents. This has been warmly received and greatly appreciated by the residents for obvious reasons.

The following is a breakdown of target locations being worked in the 55 Program and SEP Program respectively. It should be noted that these areas may be re-vamped to insure the best possible coverage of both our interstates and main or major arteries and residential streets.

Of the 6 target locations in the 55 Program a total of 1,248 citations have been written the majority being speed violations.

| | | |
|---|---|---|
| Beat #1 | I 71 Bellaire to Brookpark | 358 |
| Beat #2 | I 90 W.25 to Warren-Harvard denison bridge to McKinley | 483 |
| Beat #3 | I 90 E.140 to E. 200 | 146 |
| Beat #4 | I 71 Ridge to Ontario | 135 |
| Beat #5 | I 77 Broadway to Fleet | 62 |
| Beat #6 | I 90 Interbelt to Liberty | 64 |

There are 8 target locations in the SEP Program, a total of 1,329 have been written. The violations occurring would include traffic control ddevices (traffic lights, stop signs, arrows painted in the street, vehicle equipment violations, improper turns), would cover the majority of violations but would not exclude speed violations in the SEP Program.

| | | |
|---|---|---|
| Beat #1 | Bridge W.25 to W.65 | 62 |
| Beat #2 | Euclid E.55 to E.105 | 91 |
| Beat #3 | Liberty Blvd. I90 to E. 109 | 135 |
| Beat #4 | Lorain W.25 to W.117 | 332 |
| Beat #5 | Miles E131 to City Limits | 107 |
| Beat #6 | St.Clair E.88 to Eddy Rd. | 222 |
| Beat #7 | Superior E.79 to E. 105 | 153 |
| Beat #8 | W.25 and Pearl Rd Area | 227 |

CLE001096

The area of communications improvement is an extremely high priority within the Cleveland Police Department. The problems associated with police radio communications, as well as the proposed changes have been addressed in earlier sections of this report.

One area of interest at the present time is the implementation of a 911 emergency system. This concept has been discussed in this area for quite some time, but has never approached the implementation stage. A 911 system would greatly enhance the ability of all emergency services to provide more rapid response to requests for assistance.

As pointed out in the attached report, strides have already been made in the implementation of a 911 system within the City of Cleveland. The planning group mentioned in the report has been created, and is currently reviewing the details of implementation.

CLE001097

Case: 1:15-cv-00989-CAB  Doc #: 114-47  Filed: 03/01/17  72 of 78.  PageID #: 6173

# POLICE DEPARTMENT
### CLEVELAND, OHIO

TRANSMISSION CONTROL        DEPARTMENTAL INFORMATION        January 23, 19 80

DIST.   ZONE

EXAMINED BY_____RANK_____        _____ 19_____

FROM    Frank Volk, Sergeant        TO    Harold Laubenthal, Captain

SUBJECT    911 Emergency Telephone System Considerations

COPIES TO    Chief's Office; Sergt. Dunn

Sir:

On Friday, January 18, 1980, met with Chief Hanton, Captain Laubenthal, Sergeant B. Dunn, and Ohio Bell Marketing Representative NiCastro, and together discussed various aspects of the 911 emergency telephone system, and its probable impact on the citizens of the city as related to calls for emergency services.

The 911 emergency telephone system is intended to be a nationwide three digit emergency telephone number, developed by the Bell System to provide the public with direct single-number access to emergency services such as police, fire, ambulance, and others. The City of Cleveland has been periodically urged to adopt the 911 system, by the Ohio Bell Telephone Company, the Area Councils Association of Greater Cleveland, and others who are convinced that the establishment of such a system will greatly benefit the citizens of the city.

Now, basic 911 is simply a central answering point to which all dialled 911 calls in a given central office area are routed. Certain other features are avilable, however, that really enhance the basic system: forced disconnect, tone application, called party hold, ring back, ANI, ALI, and selective routing. Here's a brief description of each feature

Forced Disconnect — Provides control of the disconnect at the 911 center, to preclude caller jamming of incoming lines.

Tone Application — Sends a tone on the line to indicate whether caller has hung up, or is on the line but either unable or unwilling to speak.

Called Party Hold — Permits the 911 center to hold the line open even if the caller hangs up; permits call tracing, and virtually eliminated phony and nuisance calls.

Ring Back — Associated with Called Party Hold, allows quick call back after a caller has hung up, to verify calls, obtain additional information, etc.

ANI — Acronym for Automatic Number Identification, displays the telephone number being called from on a CRT at the 911 center while the call is in progress. Obvious advantages here.

ALI — Acronym for Automatic Location Identification, display: the location of the telephone being called from while the call is in progress. Again, obvious advantages.

Selective routing — Provides the proper routing of a distress call to a designated area, regardless of central office boundaries.

The very first step, in initially looking at the possible development of a 911 system, is to establish a planning group to include such authorities as representatives from police, fire, EMS, Civil Defense,

CLE001098

POLICE DEPARTMENT
CLEVELAND, OHIO

TRANSMISSION CONTROL    DEPARTMENTAL INFORMATION    January 23, 19 80

DIST.    ZONE

EXAMINED BY_____RANK_____    _____19____

FROM    Frank Volk, Sergeant    TO  Harold Laubenthal, Captain

SUBJECT    911 Emergency Telephone System Considerations (CONTINUED)

COPIES TO    chief's Office; Sergt .Dunn

### CONTINUED FROM PAGE ONE

the.telephone company, and possibly citizen groups. This group should then study existing material available on 911 systems, decide the area to be served, project the type of emergency services processed through 911 (Police, Fire, ambulance, hospitals, poison and suicide control centers, drug abuse, civil defense) and select the agencies to be included. Then, the location of the answering center must be decided upon, and the configuration of the center decided upon.

The Telephone Company will begin to move in their initial study, following a letter of intent from the Mayor that the City of Cleveland is interested in implementation of 911. A really hard look at 911, an in depth study, is long overdue; even if the city decides to postpone the system until a future date, we'll still have some realistic answers and an objective picture of cost versus results...which we don't have now.

Respectfully,

_Frank Volk_____,Sergt.

V.   FISCAL OVERVIEW

CLE001100

radio dispatchers. All of these actions have been taken to improve police operational effectiveness. As you will recall, the projected budget presently reflects a deficit of $8.1 million. Assuming that the required cutbacks are shared equally by all Departments, approximately 140 personnel could be released within the Police Department (based on budget strength in 1980). This action in the case of the Police Department would mean that the level of employment would approximate the same as presently on board, but that the level of services provided by overtime would be eliminated.

It is because of the uncertainty over 1981 that we cannot call for a new Civil Service list. The attrition within the Department will have to take place in order to keep manpower within available resources. Normally, losses due to attrition have been matched (in the short run) by an increase in overtime to keep the level of service approximately constant. The actual level of service will have to decline as the attrition takes place in order to reduce actual expenditures

CLE001101

POLICE DEPARTMENT (001)

DEPARTMENT OF PUBLIC SAFETY

REPORT ON COST OF OPERATIONS

ACTUAL 1972, 1978, 1979 Budget 1980

(000's omitted)

| | Actual 1972 | Actual 1978 | Actual 1979 | Budget 1980 |
|---|---|---|---|---|
| Personnel Cost | $ 35,054 | $ 52,667 | $ 55,415 | $ 61,571 |
| Operation and Maintenance | 1,507 | 4,122 | 5,040 | 5,684 |
| Capital | 107 | 179 | -- | 188 |
| Total | $ 36,668 | $ 56,968 | $ 60,455 | $ 67,255 |
| | | | | |
| General Fund Total | $ 94,142 | $162,001 | $171,764 | $195,265 |
| Police as % of Total | 39% | 35% | 35% | 34% |

2

CLE001102

POLICE DEPARTMENT

DEPARTMENT OF PUBLIC SAFETY

OVERTIME HOURS
1978, 1979, 1980

|  | Jan.-June | Jan.-Dec. |
|---|---|---|
| 1978 | 185,044 | 432,616 |
| 1979 | 207,013 | 644,551 |
| 1980 | 382,004 | 580,004[1] PROJECTED BASED ON June, 1980 |

1980 Overtime by month

| | |
|---|---|
| January | 74,114 hours |
| February | 52,176 |
| March | 104,714 |
| April | 57,276 |
| May | 60,635 |
| June | 33.089 |
| Total Jan.-June | 382,004 hours |

note: (1)  The projected overtime does not include the overtime that will be required for the next phase of school desgregation or the effect of the Presidential election.

CLE001103

Cleveland Material

MEZZ

qHV 8148 .C6 C626x          **PubAd**
Cleveland (Ohio). Department
of Police. Department of
[The Cleveland Police Dept.,

Cleveland Material

MEZZ

qHV 8148 .C6 C626x
Cleveland (Ohio). Department
of Police. Department of
[The Cleveland Police Dept.,

Cleveland Material

CLEVELAND PUBLIC LIBRARY

325 SUPERIOR AVENUE

CLEVELAND, OHIO 44114

MEZZ

PubA    CLEVELAND PUBLIC LIBRARY

CLE001104