IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| RICKEY JACKSON, | ) | |
| | ) | |
| Plaintiff | ) | No. 1:15-CV-989 |
| | ) | |
| v. | ) | |
| | ) | Judge Christopher A. Boyko |
| CITY OF CLEVELAND, J. REID | ) | |
| YODER, as Administrator of the | ) | |
| Estates of former Cleveland Police | ) | |
| Detectives EUGENE TERPAY, | ) | |
| JAMES FARMER, and JOHN | ) | |
| STAIMPEL, and KAREN | ) | |
| LAMENDOLA, as Administrator of | ) | |
| the Estate of former Cleveland | ) | |
| Police Detective FRANK STOIKER, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## THIRD AMENDED COMPLAINT

Plaintiff, RICKEY JACKSON, by his attorneys, Loevy & Loevy, and complains of Defendants CITY OF CLEVELAND, J. REID YODER, as Administrator of the Estates of former Cleveland Police Detectives EUGENE TERPAY, JAMES FARMER, and JOHN STAIMPEL, KAREN LAMENDOLA, as Administrator of the Estate of former Cleveland Police Detective FRANK STOIKER, as follows:

### Introduction

1.     Plaintiff, Rickey Jackson, spent 39 years in prison for a murder that he did not commit. Arrested at the age of 18, he was wrongfully convicted and sentenced to death for the murder of Harold Franks.

2.     In 1978, Mr. Jackson's death sentence was commuted to life in prison.

3.      Mr. Jackson served over 39 years of his sentence before he was exonerated in November 2014. Mr. Jackson was one of the longest-serving wrongfully convicted persons to be exonerated in U.S. history.

4.      Mr. Jackson was exonerated after the one and only supposed eyewitness who testified against him at his criminal trial, Edward ("Eddie") Vernon, finally came forward to tell the truth: that as a 12-year-old boy, Eddie was threatened and coerced by Cleveland police detectives into falsely testifying against Mr. Jackson, and that his statement implicating Mr. Jackson was a complete fabrication created by the detectives.

5.      It was the misconduct by Cleveland police detectives and those working in concert with them that led to Mr. Jackson's wrongful conviction. This misconduct included but was not limited to witness manipulation; fabrication, destruction, and suppression of evidence; and perjury. Mr. Jackson therefore brings this action pursuant to 42 U.S.C. § 1983 and Ohio law seeking redress for the wrongs done to him, as well as to deter future misconduct.

## Jurisdiction and Venue

6.      This Court has jurisdiction over Mr. Jackson's federal claims pursuant to 28 U.S.C. § 1331, and over his state-law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper because, upon information and belief, nearly all of the individual defendants reside within this district, and all of the events giving rise to the claims asserted herein occurred within this district.

## Parties

8.      Plaintiff Rickey Jackson is a 59-year-old resident of Ohio. At the time of his arrest in May 1975, he was just 18-years-old and living with his family in Cleveland.

9.      Defendant City of Cleveland (the "City") is an Ohio municipal corporation that operates the Cleveland Police Department (the "Department"). The City is responsible for the policies and practices of the City and Department.

10.      Defendant J. Reid Yoder is the duly-appointed Administrator of the Estate of Eugene Terpay ("Defendant Terpay"). Yoder has been appointed by the Probate Court of Cuyahoga County to receive the claims against Defendant Terpay in this lawsuit and accept service of process of this lawsuit. Terpay, at all times relevant to this Complaint, was a Cleveland Police Detective.

11.      Defendant J. Reid Yoder is the duly-appointed Administrator of the Estate of James T. Farmer ("Defendant Farmer"). Yoder has been appointed by the Probate Court of Cuyahoga County to receive the claims against Defendant Farmer in this lawsuit and accept service of process of this lawsuit. Farmer, at all times relevant to this Complaint, was a Cleveland Police Detective.

12.      Defendant J. Reid Yoder is the duly-appointed Administrator of the Estate of John Staimpel ("Defendant Staimpel"). Yoder has been appointed by the Probate Court of Cuyahoga County to receive the claims against Defendant Staimpel in this lawsuit and accept service of process of this lawsuit. Staimpel, at all times relevant to this Complaint, was a Cleveland Police Detective.

3

13.     Defendant Karen Lamendola is the Administrator of the Estate of Frank Stoiker ("Defendant Stoiker"). Lamendola has been appointed by the Probate Court of Lorain County as the Administrator of Stoiker's estate and to receive the claims against Defendant Stoiker in this lawsuit and accept service of process of this lawsuit. Stoiker, at all times relevant to this Complaint, was a Cleveland Police Detective.

14.     Defendants Terpay, Farmer, Staimpel, and Stoiker are referred to as the "Defendant Officers." They are sued in their individual capacities. At all times relevant, the Defendant Officers acted under color of law and within the scope of their employment for the Defendant City and the Department.

## Background

15.     Rickey Jackson was born in Mississippi and grew up in Ohio. In 1972, Mr. Jackson and his family moved to a house on Arthur Avenue in Cleveland, Ohio.

16.     Mr. Jackson became friends with Ronnie ("Bitsey") and Wiley ("Buddy") Bridgeman, two brothers who lived a few houses down from Mr. Jackson. Mr. Jackson and the Bridgeman brothers were close together in age: in 1975, Ronnie Bridgeman was 17-years-old and Wiley Bridgeman was 20-years-old.

17.     In May 1975, Mr. Jackson had been recently honorably discharged from the Marines. The week that he was wrongfully arrested, he had been preparing to obtain employment.

## The Murder of Harold Franks

18.    On the afternoon of May 19, 1975, Harold Franks was shot and killed outside of Fairmount Cut-Rate, a drugstore on Fairhill Avenue near where Mr. Jackson, his family, and the Bridgeman brothers lived.

19.    Mr. Franks was a money order salesman. He was killed as he left the Fairmount Cut-Rate after conducting business there. The two assailants threw acid in Mr. Franks' face, beat him over the head, stole his briefcase containing cash and blank money orders, and shot him twice in the chest. The shooter also fired a third shot into the store, wounding the storeowner's wife, Anna Robinson.

## The Evidence

20.    Neither Mr. Jackson nor the Bridgeman brothers had anything to do with Mr. Franks' robbery and murder. They are completely innocent.

21.    Within a week of the crime, Mr. Jackson, along with Wiley and Ronnie Bridgeman,[1] were arrested for the robbery and murder of Harold Franks.

22.    There was never any physical evidence tying Mr. Jackson or the Bridgeman brothers to the crime. Although police recovered some physical evidence from the scene, not a single piece of it was linked to Mr. Jackson or the Bridgeman brothers.

23.    None of Mr. Jackson's or the Bridgeman brothers' fingerprints or DNA were ever found at the crime scene, nor was any incriminating evidence of any kind ever discovered in their possession.

---

[1] Ronnie Bridgeman has since changed his name to Kwame Ajamu. He will be referred to individually as "Kwame Ajamu," and referred to collectively with his brother Wiley Bridgeman as "the Bridgeman brothers."

24.     In fact, much of the evidence pointed to other persons. Almost immediately after the shooting, an informant told police that he had seen the assailants escape in a two-toned green car. The informant gave a license plate number of CC4902. The Defendant Officers learned that this plate matched a dark green car belonging to Ishmael Hixon, whose arrest record included a robbery and shooting the year before. The year after Mr. Jackson's conviction, Hixon pleaded guilty to over a dozen counts of aggravated robbery in an unrelated case.

25.     The Defendant Officers also received information that another man, Paul Gardenshire, might have been involved in the murder. Shortly after the shooting, Gardenshire's mother contacted the store owner and police to report that her son had a gun and that she believed he was involved in the shooting in some way.

26.     The Defendant Officers also received information from a second informant, Ed Garrett, which implicated Gardenshire in the shooting. Garrett told the Defendant Officers that Gardenshire had stolen his grandfather's .38 caliber handgun, which was the same caliber gun used in the crime. He also reported that Gardenshire was driving around in a green convertible, which matched the initial description of the two-toned green car the assailants used to flee the scene. Neither of these details was public knowledge at the time Garrett provided this information to Defendant Officers. Defendant Terpay found Gardenshire's green convertible where Garrett said it would be.

27.     Despite these leads and others, the Defendant Officers did not conduct any serious investigation into Hixon, Gardenshire, or any other suspects. The Defendant Officers' investigation into these suspects ended around the time that Mr. Jackson and the Bridgeman brothers were supposedly identified by a single 12-year-old alleged eyewitness named Eddie Vernon.

### Fabrication of Eddie Vernon's Testimony

28.     The only evidence ever linking Mr. Jackson and the Bridgeman brothers to the crime was the testimony of Eddie Vernon, who claimed that he saw Mr. Jackson and the Bridgeman brothers commit the crime.

29.     In actuality, Eddie did not see who committed the crime and had no information or knowledge suggesting that Mr. Jackson or the Bridgeman brothers were involved.

30.     At the time of the shooting, Eddie was a seventh grader on a school bus coming home from junior high school with other children. He heard shots while he was on the bus but did not see anything.

31.     He was familiar with Mr. Jackson and the Bridgeman brothers from the neighborhood, but he did not see them commit any crime.

32.     Eddie was one of a number of children who walked to the scene of the shooting from the bus stop after the shooting had already occurred. After the police began pushing back the crowd of people observing the scene, Eddie and a friend, Tommie Hall, left the scene.

33.     As Eddie and Tommie walked home, Tommie allegedly told Eddie that he knew who committed the crime, and that it was "Rickey," "Buddy," and "Bitsey." Tommie, who was only a year or two older than Eddie at the time, had not seen who committed the crime either; he and Eddie were on the school bus at the same time when the shooting occurred.

34.     After stopping by his home, Eddie went back to the scene of the crime. There, he purportedly told the police that he knew who may have committed the crime. Although he had not witnessed the crime, Eddie thought at the time that he was being helpful. However, things quickly spiraled out of control.

35.     On more than one occasion over the course of the next several days, Defendants Terpay and Farmer questioned Eddie without his mother or other guardian present. Eddie told them that he did not see any of the assailants' faces.

36.     Defendants Terpay and Farmer were partners. They investigated the homicide of Harold Franks together.

37.     Defendants Terpay and Farmer also showed Eddie photographs of potential suspects, but Eddie did not identify anyone out of those photographs.

38.     Defendants Terpay and Farmer engaged in unduly leading and coercive questioning and fed Eddie details about the crime, including where Mr. Franks was shot, that acid was thrown in his face and that he was hit over the head with a stick. None of this was information that Eddie knew because he did not witness the crime.

39.     Defendants Terpay and Farmer interrogated Eddie without a guardian present, and they did not seek consent from Eddie's parents to interrogate him outside of his parents' presence.

40.     Defendants Terpay and Farmer took Eddie for a ride around the neighborhood and told him to point out the houses of "Buddy" and "Rickey."

41.     On or about May 25, 1975, Mr. Jackson and Wiley Bridgeman were arrested.

42.     Kwame Ajamu was only arrested initially for allegedly interfering with police procedure during the course of Wiley Bridgeman's arrest.

43.     Defendants Terpay and Farmer interrogated Mr. Jackson and Wiley Bridgeman separately regarding the murder of Mr. Franks.

44.     During the interrogation, Defendants Terpay and Farmer asked Mr. Jackson if he wanted to sign a statement regarding the crime.

45.     Mr. Jackson had nothing to do with the crime and had no knowledge of it. He refused to sign any statement. Mr. Jackson stated that he wanted an attorney.

46.     After Mr. Jackson refused to sign a statement, Defendant Terpay choked him, called him a "stupid n-----," and tried to coerce him into falsely confessing to the crime. Defendant Terpay also repeatedly put a phone book on Mr. Jackson's face and other areas of his body and hit him through it so that it would not leave any marks. Defendant Farmer was present at the time. Farmer also slapped Mr. Jackson in the face.

47.     Despite this abuse, Mr. Jackson did not falsely confess to the crime.

48.     Mr. Jackson was subsequently subjected to a second interrogation by Defendants Farmer and Terpay where they physically abused him, falsely claimed that the Bridgeman brothers had incriminated him, told him to confess, and told him that he would get the electric chair if he did not confess. Farmer and Terpay gave Mr. Jackson something they had written out, told him to sign it, and he refused. As a result of his refusal, Terpay and Farmer placed a phone book over Mr. Jackson's face and the detectives punched him in the face and about the body. The detectives did this while Mr. Jackson's hands were handcuffed behind his back to a chair.

49.     Meanwhile, at Defendants Terpay and Farmer's direction, Defendants Stoiker and Staimpel picked up Eddie from his home and brought him alone to the police station to view a lineup with Wiley Bridgeman and Mr. Jackson in it. The lineup occurred on or about May 25, 1975.

50.     Defendants Stoiker and Staimpel were partners. They investigated the homicide of Harold Franks together.

51.     Eddie tried to come clean about not knowing who committed the crime. During the lineup, Eddie did not identify anyone he recognized as being involved in the crime because he did not witness the crime. When instructed to identify the persons who committed the crime, Eddie told Defendants Staimpel and Stoiker, "No. No. I don't know nobody in this lineup participating to this particular crime."

10

52.     After Eddie failed to identify Mr. Jackson and Wiley Bridgeman in the lineup, the Defendant Officers were furious at Eddie.

53.     Defendants Stoiker and Staimpel took Eddie alone into a separate room. With Stoiker present, Staimpel began yelling at Eddie, calling him names, throwing things around the room, and slamming and beating on the table. Staimpel told Eddie that he was lying and threatened to put his mother and father in jail if he backed out. Eddie was scared, did not understand what was happening, and began to cry. Eddie's mother was sick at that time, and the prospect of her going to jail was very scary to him as a 12-year-old boy. Eddie has explained, "I didn't want to testify but I was told that if I didn't that my mother and father would be arrested."

54.     With Eddie terrified and in tears, Defendant Staimpel told Eddie not to worry and said, "we'll fix it." Staimpel and Stoiker left the room. They returned with a typed statement falsely implicating Mr. Jackson and the Bridgeman brothers and falsely stating that the reason Eddie did not pick anyone out during the lineup was because he was scared. Staimpel told Eddie to sign the false statement and said he wanted Eddie to say that he did not identify Mr. Jackson and the Bridgeman brothers because he was scared during the lineup. Eddie was not, in fact, scared to pick anyone out of the lineup; the reason he did not pick anyone out of the lineup was because he had no actual knowledge that Mr. Jackson or the Bridgeman brothers had committed the crime.

55.     Eddie did not believe that he had any choice but to go along with the statement fabricated for him by Defendants Staimpel and Stoiker. Staimpel, Stoiker, and Vernon signed the false statement.

56.     After Defendants Staimpel and Stoiker threatened Eddie and told him that they would "fix it," they went to the Criminal Statement Unit, where they had Detective Jerold Englehart type up a false and fabricated statement for Eddie to sign.

57.     Defendants Staimpel and Stoiker prepared a written statement for Eddie falsely implicating Mr. Jackson and the Bridgeman brothers in the crime and falsely stating that Eddie was scared to pick anyone out of the lineup.

58.     Defendants Staimpel and Stoiker brought the false and fabricated written statement back to the room where they had left Eddie and told him to sign it.

59.     Having been threatened by the detectives and believing that he had no choice, Eddie signed the statement.

60.     All of the Defendant Officers knew that what they put in Eddie's statement was not true and that it contained information they fed to him.

61.     At one point, Defendants Staimpel and Stoiker engaged in unduly suggestive identification procedures by showing Eddie single photos of Mr. Jackson, Wiley Bridgeman, and Kwame Ajamu.

62.     A day after the lineup, Defendants Terpay and Farmer picked Eddie up and took him to the police station.

63.     Defendants Terpay and Farmer knew what had happened during the lineup and Eddie's fabricated statement.

64.     Defendant Terpay was very angry and told Eddie that he was mad at him for not picking anyone out of the lineup.

65.     When Eddie, Terpay and Farmer got to the police station, Eddie told Terpay and Farmer that he did not see the crime take place and that he knew Mr. Jackson and the Bridgeman brothers did not do it.

66.     Defendant Terpay was angry with Eddie, yelled at him, and told him that his mother and father would go to jail if he did not say that Mr. Jackson and the Bridgeman brothers had committed the crime.

67.     Because he was afraid and had been threatened by the Defendant Officers, Eddie agreed to say that Mr. Jackson and the Bridgeman brothers committed the crime, even though it was not true.

68.     In addition, the Defendant Officers ignored other evidence that exculpated Mr. Jackson and the Bridgeman brothers. For instance, a girl named Karen Smith viewed the same lineup because she walked past the assailants on her way into the store as Harold Franks was heading out of the store. Smith told the Defendant Officers that she was positive Mr. Jackson and Wiley Bridgeman were not the men she had seen outside the store, because she knew who they were.

69.     Moreover, both the Jackson and Bridgeman houses were thoroughly searched by the police and nothing connecting Mr. Jackson or the Bridgeman brothers to the crime was found.

13

70.     Defendants Terpay, Farmer, Staimpel, and Stoiker searched the Jackson and Bridgeman's homes even though they had applied for and been denied search warrants by the prosecutor's office.

71.     Eddie testified against Mr. Jackson and the Bridgeman brothers at their criminal trials. During this time, Defendant Terpay continued to meet with Eddie to rehearse the false testimony the Defendant Officers had made up for him. The more they discussed the crime, the more information Terpay fed Eddie.

72.     Defendants Terpay and Farmer also created notes or memoranda of their interviews with Eddie containing exculpatory information, which they destroyed.

73.     The destruction of such evidence was consistent with Defendant City and the Department's policies and practices at the time.

74.     Defendants Staimpel, Stoiker, Terpay, and Farmer fabricated police reports indicating that Eddie possessed independent knowledge of facts from the crime that only someone who witnessed the crime would know.

75.     The Defendant Officers never disclosed to the prosecutors, Mr. Jackson, or his counsel, the fact that they fabricated Eddie's inculpatory statement; that Eddie could not identify anyone in the lineup because he had not witnessed the crime; or that they had created false police reports.

76.     The Defendant Officers never disclosed to the prosecutors, Mr. Jackson, or his counsel any of their misconduct described herein.

14

77.     At the time of his trial, Mr. Jackson did not know that the police had threatened Eddie into testifying falsely against him or that they had fabricated Eddie's statement. The first time Mr. Jackson heard about such threats and fabrication was in 2014.

78.     If the prosecutors had known that the Defendant Officers fabricated evidence and committed the other misconduct described herein, they would not have pursued the prosecution of Mr. Jackson, and his unlawful detention would not have been continued.

79.     Given that the entirety of the State's case against Mr. Jackson rested on Eddie's testimony, the exculpatory evidence described in the preceding paragraphs were material, if not critical, to Mr. Jackson's defense of his criminal charges.

## Rickey Jackson's Wrongful Conviction

80.     Mr. Jackson was tried for Harold Franks' robbery and murder, and the attempted murder of Anna Robinson, in July and August 1975. On the basis of Eddie's testimony, Mr. Jackson was convicted of aggravated murder, aggravated robbery, and attempted aggravated murder. Subsequently, Mr. Jackson was sentenced to death by electric chair. Throughout the proceedings, and throughout his life, Mr. Jackson maintained his innocence.

81.     During the time that the capital murder charges were pending against Mr. Jackson and before he was convicted, one of Mr. Jackson's defense counsel informed him that the State would be willing to forgo seeking the death penalty if

15

he would plead guilty and testify against the Bridgeman brothers. Even though Mr. Jackson was facing the possibility of a death sentence, he refused to plead guilty because he was innocent and had committed no crime.

82.     Had the Defendant Officers disclosed their fabrication of Eddie Vernon's testimony at the time of the original trial to prosecutors, Mr. Jackson, or his counsel, the prosecution would not have been pursued and Mr. Jackson would not have been convicted.

83.     At all times relevant hereto, it was the policy of the attorneys in the Cuyahoga County Prosecutor's Office to disclose all exculpatory evidence of which they were aware.

84.     The exculpatory evidence described in the preceding paragraphs was not provided by the Defendant Officers or any member of the Cleveland Police Department to any member of the Prosecutor's Office.

85.     The Defendant Officers' misconduct continued even after Mr. Jackson's conviction and during the time that he was pursuing appellate and post-conviction relief. A few years after Mr. Jackson's conviction, a defense attorney or investigator contacted Eddie to ask him questions about what he saw. Defendant Terpay told Eddie that he was not allowed to talk about the incident, and that if anyone came asking questions, he should tell Terpay and Terpay would "take care of it." Because Eddie was scared of Terpay, he did not talk to the defense attorney or investigator.

86.     Similarly, when Eddie was around 19 or 21 years old, another defense attorney or investigator came to talk to him. Because Defendant Terpay had told him not to talk to anyone, he refused to talk and contacted Terpay instead.

87.     During this time, Eddie continued to be fearful of what Defendant Terpay and other officers would do if he came forward to tell the truth.

### Defendant City of Cleveland's Policies and Practices

88.     The misconduct described herein was undertaken pursuant to the express written policy of the Defendant City and the Department because in 1975, the City had an express policy, GPO 19-73, instructing officers not to disclose witness statements to defense counsel or to any court. GPO 19-73 expressly excluded witness statements made to police officers from the definition of "[e]vidence favorable to the defendant." GPO 19-73 did not explain officers' obligation to preserve or disclose exculpatory evidence or inform officers that they were required to turn everything over to the prosecutor.

a.      Furthermore, the City and Department had no other policies, procedures, rules or regulations relating to Cleveland police officers' obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory or impeachment evidence.

b.      The Department manual governing Cleveland police officers' conduct in May 1975 was titled "Rules of Conduct and Discipline" ("Cleveland Police Manual" or "Manual"), and it was originally promulgated in 1950. The Manual had not changed between 1950 and May 1975.

17

c.      The Manual contained no policies, rules, or guidance regarding preservation or disclosure of exculpatory or impeachment evidence, conduct of interrogations, juvenile interrogations, conduct of lineups or showups, arrests, or writing of police reports or notes of witness statements.

d.      The final policymakers for the City and Department were on notice, as early as 1972, that the outdated Cleveland Police Manual was wholly inadequate, likely to lead to constitutional violations by officers, and needed to be completely revised.

e.      For instance, in a 1972 memorandum from Mayor Ralph Perk to the Director of Safety and the Chief of Police, the Mayor remarked that Cleveland police officers had recently been indicted for various felonies, and he noted that the current police manual was out of date: "Immediate steps should also be undertaken for a complete revision of the 'Rules of Conduct and Discipline' written in 1950, for members of the Cleveland Police Department so that it is consistent with the requirements and conditions that exist today in 1972."

f.      No changes were made to the Cleveland Police Manual between 1950 and 1972.

g.      No changes were made to the Cleveland Police Manual between 1972 and May 19, 1975.

h.      A study titled "The Cleveland Police Department, 1970-1980," conducted by the Department itself, acknowledged these and other problems.

18

The City's policymakers for the Department had knowledge of this study and the problems referenced therein. This study began by stating that "[c]ertain factors that have caused the level of police service to deteriorate have not been effectively addressed for many years."

i.      The study also noted the obvious lack of policies and guidance to police officers: "Patrol officers need clear guidance from their department in the form of written rules which lay out the department's expectations for their behavior. Sometimes those rules are called policy; sometimes they are called general orders. In Cleveland … no one in the department has an up-to-date rule book."

89.     The City's unconstitutional express policy caused the misconduct described herein and caused Cleveland police officers to regularly withhold and/or suppress exculpatory evidence.

a.      For instance, it was a widespread, clear, and persistent pattern and practice of the officers in the Department not to turn over investigative notes, including statements of witnesses, taken during the course of an investigation. As a matter of policy and practice, such memos and notes were destroyed after the creation of typewritten official reports that were placed into an investigation file.

b.      This widespread practice was so well-settled as to constitute *de facto* policy in the Cleveland Police Department, and it was allowed to exist

because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

90.     The misconduct described herein was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the City and Department had a policy of inadequate training and supervision of Cleveland police officers with respect to the following, even though the need for such training and supervision was obvious: their obligation to disclose exculpatory and impeachment evidence; the handling, preserving and disclosure exculpatory or impeachment evidence; the conduct of interrogations; the conduct of juvenile interviews; and writing of police reports or notes of witness statements.

    a.     In fact, at all relevant times, the City and Department did not provide any training or supervision to Cleveland police officers with respect to their obligation to disclose exculpatory and impeachment evidence or any of the other above-referenced topics.

    b.     The systemic policy and training failures within the Cleveland Police Department in 1975 have been well documented. In September 1975, the Cleveland Foundation issued a written report regarding the Cleveland Police Department after extensive study and interviews with the Chief of Police and many officers in the Department. The report recognized the lack of supervision over the massive power delegated to subordinate officers, and it quoted one commentator as follows: "No other agency ... does so little

20

supervising of vital policy determinations which directly involve justice or injustice to individuals."

      c.      The report also noted a lack of training within the Department. There was no "ongoing inservice training" for all officers, with "inservice training" defined as "the periodic training received by a police officer throughout his career to maintain, update, and improve his police knowledge and skills." The report noted that there was "little formal training going on in the Department."

      d.      The importance of and need for training was known to final policymakers of the City and Department in and prior to May 1975. The lack of training in the Department at that time was so severe that Cleveland police officers emphasized that it was a major concern. The report stated, "The need for inservice training was one of the two problems most frequently mentioned by the officers interviewed."

91.     At all relevant times, policymakers for the City and the Department knew of these problems, allowed them to continue, and made decisions not to implement adequate policies, training or supervision.

92.     The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip Cleveland police officers with the specific tools—including policies, training and supervision—to handle the recurring situations of how to handle, preserve and disclose exculpatory or impeachment

evidence, how to conduct interrogations, how to conduct juvenile interviews, and how to write police reports or notes of witness statements.

93.     As a result of the Defendant City and Department's unconstitutional express policy and failure to train its officers in the requirements of *Brady*, officers were led to believe that they could violate citizens' constitutional rights with impunity.

a.     The City and the Department had no policies, procedures, or systems for ensuring that: all citizen complaints concerning police misconduct be taken down in written form or forwarded for investigation; complaints be investigated by a central investigation unit rather than the supervisor of the officer who is the subject of the complaint; an analysis be conducted of reasons for the complaint and corrective or disciplinary measures to ensure that such conduct is not repeated; or complaint investigations were properly reviewed.

b.     According to news reports, in 1966, Defendant Terpay made false statements at a criminal trial related to a 1966 burglary.

c.     In 1975, civil rights attorney Stanley Tolliver filed a complaint against Terpay, alleging that he and other officers beat a confession out of Tolliver's client.

d.     Despite its knowledge of these allegations, the City and the Department took no action to discipline or investigate Terpay.

22

e.　At all relevant times, policymakers for the City and the Department knew of these problems and allowed them to continue, even though the need for a legitimate mechanism for oversight or punishment of officers was obvious. The constitutional violations complained of by Plaintiff were a highly predictable consequence of the failure to have such a mechanism.

94.　The policies and practices of the Defendant City and the Department were the moving force behind the misconduct described herein and the violation of Plaintiff's rights. The widespread practices were so well-settled as to constitute *de facto* policy in the Cleveland Police Department, and they were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problems, thereby effectively ratifying them.

95.　Specifically, policymakers for the City on matters relating to the Department knew, among other things, that there was a need to train and supervise police officers and that the Cleveland Police Manual was outdated and needed to be updated to include policies on how to handle, preserve and disclose exculpatory or impeachment evidence, how to conduct interrogations, how to conduct juvenile interviews, how to write police reports or notes of witness statements, and how not to conduct unduly suggestive identifications or interrogations.

96.　In addition, the misconduct described in Complaint was undertaken pursuant to the policy and practice of the Defendant City and the Department in

23

that the violation of Plaintiff's rights was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

97.     The Defendant City is liable because the violation of Plaintiff's rights as described in this Complaint was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

98.     As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth herein.

**Rickey Jackson's Exoneration**

99.     In 2013, Eddie Vernon told his pastor that he had given false testimony in the trials of Mr. Jackson and the Bridgeman brothers decades before. Then in his early 50's, Eddie could no longer bear the weight of having contributed to the wrongful incarceration of three innocent men.

100.     After Mr. Jackson and his attorneys became aware of Eddie's new testimony, they presented that testimony to the criminal court via a motion for new trial and petition for post-conviction relief.

101.     An evidentiary hearing was held in November 2014. Eddie testified at the hearing that Mr. Jackson and the Bridgeman brothers were innocent, he never witnessed the Franks murder, and he was coerced and threatened by Cleveland

24

police into making false statements against Mr. Jackson and the Bridgeman brothers.

102.    At the conclusion of the evidentiary hearing, the State of Ohio withdrew its opposition to Mr. Jackson's motion for a new trial and moved to dismiss the criminal charges against Mr. Jackson.

103.    On November 21, 2014, the court granted the State's motion to dismiss, and all charges against Mr. Jackson were dismissed. Mr. Jackson was ordered released from prison after serving more than 39 years of a life sentence.

104.    Two courts subsequently entered orders in December 2014 and February 2015 declaring that Rickey Jackson did not commit the offenses of which he was charged, including all lesser-included offenses, and that he was a wrongfully imprisoned individual. These judgments were entered without objection by the State. The charges against the Bridgeman brothers were also dismissed. The county prosecutor's office filed separate notices regarding all three men stating that it "considers the defendants innocent" and that they "have been victims of a terrible injustice."

### Rickey Jackson's Injuries

105.    Mr. Jackson's 39 years of wrongful incarceration is one of the longest ever served prior to exoneration in the history of the United States.

106.    In serving almost four decades behind bars, Mr. Jackson was wrongfully deprived of his entire adult life to date. Imprisoned at age 18 and released at age 58, Mr. Jackson must now attempt to make a life for himself outside

of prison without the benefit of the decades of life experiences which ordinarily equip adults for that task.

107.   Additionally, the emotional pain and suffering caused by losing 39 years in the prime of life has been enormous. During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to fall in love and marry and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being. He lost his mother, father, stepfather, and other loved ones during his wrongful incarceration.

108.   Not only did Plaintiff spend nearly four decades in prison as an innocent man, but he was tried for capital murder, sentenced to death, and spent years on death row.

109.   Plaintiff was physically assaulted during his wrongful incarceration by guards and other inmates, and he was also sexually assaulted more than once.

110.   As a result of the foregoing, Plaintiff has suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

## Count I: 42 U.S.C. § 1983 – Fourteenth Amendment
### *Brady* Violations

111.   Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

112.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, destroyed, failed to disclose, and otherwise withheld and/or suppressed exculpatory information and material from the prosecution, Plaintiff, and Plaintiff's defense counsel.

113.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

114.    The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial guaranteed by the U.S. Constitution. By their actions, the Defendant Officers thereby misled and misdirected the criminal prosecution of Plaintiff. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and there is a reasonable probability that he would not have been convicted.

115.    Furthermore, in the manner described more fully above, the Defendant Officers continued to withhold and/or suppress exculpatory evidence from prosecutors, Plaintiff, and Plaintiff's defense counsel even after his criminal trial and during the time that Plaintiff's appellate and post-conviction efforts were pending.

116.    In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant City and the Department.

27

117.    In the manner described more fully above, the policies and practices of the Defendant City and the Department were the moving force behind the misconduct described in this Count and the violation of Plaintiff's rights. The widespread practices were so well-settled as to constitute *de facto* policy in the Cleveland Police Department, and they were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problems, thereby effectively ratifying them.

118.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

119.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

120.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count II: 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
### Fabrication of False Evidence

121.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

122.    In the manner described more fully above, the Defendant Officers, acting individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, fabricated statements and identifications attributed to witnesses. Defendants knowingly fabricated evidence and a reasonable likelihood exists that the false evidence affected the decision of the jury.

123.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

124.    The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial guaranteed by the U.S. Constitution. Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued. This misconduct caused Plaintiff to be wrongfully convicted of crimes of which he is innocent.

125.    In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City and the Department.

126.    In the manner described more fully above, the policies and practices of the Defendant City and the Department were the moving force behind the

misconduct described in this Count and the violation of Plaintiff's rights. The widespread practices were so well-settled as to constitute *de facto* policy in the Cleveland Police Department, and they were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problems, thereby effectively ratifying them.

127.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the violation of Plaintiff's rights described in this Count was committed by the relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

128.    The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

129.    As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count III: 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
### Due Process and Continued Detention Without Probable Cause[2]

130.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

---

[2] Occasionally referred to as "federal malicious prosecution."

131.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, instigated, influenced, or participated in the decision to prosecute Plaintiff, and there was no probable cause for the criminal prosecution. As a consequence of the criminal prosecution, Plaintiff suffered a deprivation of liberty apart from his initial seizure. Plaintiff's criminal prosecution was terminated in his favor in a manner indicative of innocence.

132.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

133.    Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. In so doing, the Defendants fabricated evidence and withheld exculpatory information.

134.    In the manner described more fully above, the Defendant Officers' misconduct denied Plaintiff his constitutional right to procedural due process under the Fourteenth Amendment and right under the Fourth Amendment to be free from continued detention without probable cause. Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued. This misconduct caused

Plaintiff to be wrongfully accused, arrested, prosecuted, and convicted of crimes of which he is innocent.

135.    Furthermore, in the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

136.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

137.    In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City and the Department.

138.    In the manner described more fully above, the policies and practices of the Defendant City and the Department were the moving force behind the misconduct described in this Count and the violation of Plaintiff's rights. The widespread practices were so well-settled as to constitute *de facto* policy in the Cleveland Police Department, and they were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problems, thereby effectively ratifying them.

139.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant City and the Department in that the violation of Plaintiff's rights described in this Count was committed by the

32

relevant final policymaker for the City, or the persons to whom final policymaking authority had been delegated.

140.   The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, customs, and/or actions of policymakers for these Defendants.

141.   As a direct and proximate result of the Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count IV: Ohio State Law – Indemnification

142.   Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

143.   Ohio law provides that the Defendant City is directed to pay any tort judgment for compensatory damages for which its employees are liable within the scope of their employment activities.

144.   The Defendant Officers were employees of the Defendant City and acted within the scope of their employment at all times relevant in committing the actions and omissions described herein.

WHEREFORE, Plaintiff RICKEY JACKSON respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF CLEVELAND, J. REID YODER, as Administrator of the Estates of former Cleveland Police

Detectives EUGENE TERPAY, JAMES FARMER, and JOHN STAIMPEL, and

KAREN LAMENDOLA, as Administrator of the Estate of former Cleveland Police

Detective FRANK STOIKER, awarding compensatory damages, costs, and

attorneys' fees against each Defendant, along with punitive damages against each

of the individual Defendants, as well as any other relief this Court deems

appropriate.

## JURY DEMAND

Plaintiff, Rickey Jackson, hereby demands a trial by jury pursuant to Federal

Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

RICKEY JACKSON

By: /s/ Elizabeth Wang
Attorney for Plaintiff

Jon Loevy
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: 312.243.5900
jon@loevy.com
*Counsel for Plaintiff Rickey Jackson*

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

## CERTIFICATE OF SERVICE

I, Elizabeth Wang, an attorney, hereby certify that on September 16, 2019, I filed the foregoing Third Amended Complaint, via CM/ECF, which served all counsel via electronic service.

s/ Elizabeth Wang
One of Plaintiff's Attorneys